**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| ROBERT POWERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case:  04-3024 |
| | ) | |
| GEORGE E. RICHARDS, RAYMOND W. | ) | Honorable Jeanne E. Scott |
| EWELL, JOHN M. DORGAN, BARBARA | ) | |
| J. PETERSON, DAN P. FABRIZO, ROD | ) | |
| BLAGOJEVICH, THOMAS LONDRIGAN | ) | |
| and ALONZO MONK, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF STATE**
**OFFICIALS' MOTION FOR SUMMARY JUDGMENT**

**Introduction**

This Court should enter summary judgment on Plaintiff Robert Powers' ("Plaintiff")

patronage claims (counts VI-VIII) because his former position was exempt from patronage

protection, and should enter summary judgment on his due process claims (counts I-V) because

he received all the process afforded him under the law.  Plaintiff was the former Executive

Secretary of the Illinois Civil Service Commission (the "Commission").  The gist of Plaintiff's

claims are that he is entitled to relief because, after the gubernatorial administration changed in

2003, Plaintiff was allegedly terminated for political reasons and without due process.

Plaintiff's patronage claims are fatally flawed because, as Your Honor knows from recent

experience[1], politically-motivated personnel action is permitted whenever political affiliation is

an "appropriate requirement" for the duties inherent in the position – including when the position

includes the formulation and/or implementation of policy.  Branti v. Finkel, 445 U.S. 507, 518

---

[1] Your Honor recently granted judgment on the pleadings in favor of the State Officials in Utley
v. Monk, No. 05-3017, 2005 WL 3478844 at *5, (C.D. Ill. Dec. 20, 2005) (attached as Ex. 1.)

(1980); Riley v. Blagojevich, 425 F.3d 357, 361 (7th Cir 2005).  In moving for summary judgment, the State Officials rely exclusively on the official Position Description maintained by the Illinois Department of Central Management Services ("CMS") for Plaintiff's former Executive Secretary position, which shows that the duties inherent in that position included the development and implementation of policy, including budgeting and spokesperson duties.

Plaintiff's due process claims are contradicted by his own Complaint, and the affidavit of the former Chairman of the Commission, George Richards.  While most Rutan-exempt positions are exempt from both the protections of Rutan and the Illinois Personnel Code, Plaintiff's former position was covered under Jurisdiction B of the Personnel Code and, therefore, he could only be terminated for cause.  However, Plaintiff received complete and sufficient process, including advanced notice of the charges and evidence against him, a pre-deprivation hearing in which he had an opportunity to refute the charges, consideration of the charges by the Commission, review of the Commission's decision by the Director of CMS, a full trial at his post-deprivation hearing, and an appeal of the decision.

In Part I of this Memorandum, we set forth the undisputed facts relating to Plaintiff's former Executive Secretary position, including the duties inherent in his former position, and the undisputed facts relating to his termination.  In Part II, we show that the State Officials are entitled to summary judgment on Plaintiff's patronage claims because the Position Description for Plaintiff's former position contains substantial policymaking and policy implementing duties. In Part III, we show that the State Officials are entitled to summary judgment on Plaintiff's due process claims because Plaintiff received proper due process at his pre-deprivation and post-deprivation hearings.  In Part IV, we show, in the alternative, that the State Officials are entitled

to qualified immunity from damages because it was not clearly established that the State

Officials' alleged conduct was improper when Plaintiff was terminated.

I.      **Statement of Undisputed Material Facts.**

      A.      **Pre-Termination Procedures Received by Plaintiff.**

      1.      From August 16, 2002 through October 1, 2002, Plaintiff was employed by CMS

as a Deputy Director.  (Richards Aff. ¶ 2, attached as Ex. 2).  In connection with his role as

Deputy Director, Plaintiff was charged with fraudulently executing CMS personnel transactions

when he improperly signed personnel documents as the Director of CMS. (Richards Aff. ¶¶  2-3;

11/7/03 Order, attached as Ex. 3).

      2.      From October 1, 2002 through May of 2003, Plaintiff was employed as the

Executive Secretary of the Commission.  (Compl. ¶ 1).

      3.      On April 14, 2003, Governor Blagojevich's office notified Commissioner

Richards that it was investigating alleged fraudulent actions by Plaintiff while he was serving as

the Deputy Director of CMS. (Richards Aff. ¶ 3).

      4.      On April 15, 2003, Governor Blagojevich's legal counsel, Thomas Londrigan,

sent a letter to the Commission outlining the allegations against Plaintiff. (Richards Aff. ¶ 4 &

Ex. A thereto).

      5.      On April 17, 2003, Plaintiff received a copy of Thomas Londrigan's April 15,

2003 letter outlining the allegations against him.  (Richards Aff. ¶ 5 & Ex. A thereto).

      6.      On April 17, 2003, the Commission met in executive session, and considered the

allegations against the Plaintiff and decided to place Plaintiff on Administrative Leave with pay

from his position as Executive Secretary of the Commission.  (Richards Aff. ¶ 6).

7.      On May 14, 2003, Ed Wynn, the General Counsel for CMS, provided the Commission with an investigative report that further detailed the allegedly fraudulent personnel transactions committed by Plaintiff. (Richards Aff. ¶ 7 & Ex. C thereto).

8.      On May 15, 2003, the Commission members met in executive session, considered the charges against Plaintiff and agreed to suspend Plaintiff with pay based on the evidence that Plaintiff violated the Personnel Code and engaged in fraudulent personnel transactions while a State employee.  (Ans. ¶ 36; Richards Aff. ¶ 8).

9.      At the May 15, 2003 meeting, the Commission members also voted unanimously to allow then-Chairman Richards, to hold a pre-deprivation hearing with Plaintiff and gave Commissioner Richards the authority to impose discipline, up to and including discharge, unless Plaintiff presented new evidence in his defense.  (Richards Aff. ¶ 8).

10.      On May 21, 2003, prior to his pre-deprivation hearing, Commissioner Richards sent Plaintiff a letter notifying him of the charges, listing potential witnesses, and attaching documents pertinent to the charges against him. (Richards Aff. ¶ 9 & Ex. D thereto).

11.      On May 29, 2003, a pre-deprivation hearing was conducted by Commissioner Richards regarding Plaintiff's alleged wrongdoings.  (Ans. ¶ 39).  At the hearing, Plaintiff was again notified of the charges and presented with evidence against him.  Plaintiff was given the opportunity to refute the charges and present evidence refuting the charges.  (Richards Aff. ¶ 10).

12.      At the pre-deprivation hearing, Plaintiff admitted that he signed his name as the "Director of Central Management Services" on three separate personnel transactions knowing that the Director of CMS refused to sign the transactions.  Because Plaintiff did not present any new evidence refuting the charges, Commissioner Richards had the authority of the Commission to recommend to the Director of CMS that Plaintiff be terminated.  (Richards Aff. ¶¶ 10-11 ).

4

13. On May 30, 2003, the Director of CMS approved the recommendation of the Commission and terminated Plaintiff as Executive Secretary. (Richards Aff. ¶ 12).

**B. Post-Termination Procedures Received by Plaintiff.**

14. On June 27, 2003 and September 10, 2003, a full post-deprivation trial was held before William F. Trapp, an Administrative Law Judge, to determine the validity of Plaintiff's dismissal. (11/7/03 Order at 1; Richards Aff. ¶ 13). At the post-deprivation hearing, Plaintiff was entitled to conduct discovery, present evidence, challenge the evidence against him, cross-examine witnesses, and call witnesses on his own behalf. Plaintiff called two witnesses at his hearing. (9/10/03 Tr. at 115:16 & 172:14, attached as Ex. 4; 11/7/03 Order at 1).

15. On November 7, 2003, Judge Trapp held that "the written charges for discharge approved by the Director of Central Management Services, State of Illinois, have been proved and that said proven charges warrant the discharge of the Respondent, Robert B. Powers, from his position of Executive Secretary of the Illinois Civil Service Commission." (11/7/03 Order at 9).

16. On December 1, 2003, Plaintiff filed a response with the Commission objecting to Judge Trapp's decision. (Richards Aff. ¶ 14).

17. On December 18, 2003, the Commission adopted Judge Trapp's decision and upheld the termination of Plaintiff. (Richards Aff. ¶ 15, & Ex. E thereto.)

**C. The Official CMS Position Description Is Authentic And Reliable.**

18. Position Descriptions for Illinois State Employees are maintained by CMS and reviewed by the Commission. Riley, 425 F.3d at 361.

19. Position Descriptions are "public records and shall be open to public inspection." Riley, 425 F.3d at 361.

20.     Any State Employee who believes that the official CMS Position Description for his or her position is inaccurate can challenge it and, if he or she succeeds with the challenge, can get the Position Description changed.  Riley, 425 F.3d at 362.

21.     The Position Description corresponding to the position of Executive Secretary of the Commission, is a true and correct copy of the official CMS Position Description contained in CMS files which was in effect for the time period of March 1, 1961 to November 1, 2004. (Plummer Aff. ¶ 3, attached as Ex. 5, & Ex. A thereto.)

22.     The Amendment to the Position Description corresponding to the position of Executive Secretary of the Commission, is a true and correct copy of the official CMS Amendment contained in CMS files which was in effect for the time period of August 31, 1967 to November 1, 2004.  (Plummer Aff. ¶ 4 & Ex. B thereto.)

23.     The Position Action Notice, effective on August 2, 1993, is a true and correct copy of the official CMS Position Action Notice contained in CMS files in which CMS changed the position number for the Executive Secretary position from 07700-30-00-000-00-01 to 40070-30-00-000-00-01. (Plummer Aff. ¶ 5 & Ex. C thereto.)

24.     The Position Action Notice, effective on April 30, 1997, is a true and correct copy of the official CMS Position Action Notice contained in CMS files corresponding to the position of Executive Secretary of the Commission (position number 40070-30-00-000-00-01) in which CMS determined that the Executive Secretary position would be a Rutan-exempt position based upon the duties inherent in the position. (Plummer Aff. ¶ 6 & Ex. D thereto.)

25.     The Position Description and the Amendment to the Position Description corresponding to the position of Executive Secretary of the Commission outline the duties

inherent in the position at the time of Plaintiff's May 30, 2003 termination.  (Plummer Aff. ¶¶ 3-4 & Exs. A & B thereto).

26.      The Position Description corresponding to the Executive Secretary of the Commission (position number 40070-30-00-000-00-01), is a true and correct copy of the official CMS Position Description contained in CMS files which was in effect for the time period of November 1, 2004 to the present.  (Plummer Aff. ¶ 7 & Ex. E thereto.)

27.      As reflected in Exhibits A and B of Mr. Plummer's affidavit, the duties inherent in the Executive Secretary position have remained substantially the same since August 31, 1967 through Plaintiff's termination.  (Plummer Aff. ¶¶  3-4 & Exs. A & B thereto.)

28.      As reflected in Exhibit D of Mr. Plummer's affidavit, based upon the duties inherent in the Executive Secretary position, the determination was made by CMS in 1997 that this position would be classified as <u>Rutan</u>-exempt.  (Plummer Aff. ¶ 6.)

29.      CMS considers all such Position Descriptions to be public documents under Illinois law which may be obtained by a request under the Illinois Freedom of Information Act. (Plummer Aff. ¶ 8).

**D.      Duties Inherent In Plaintiff's Former Executive Secretary Position.**

30.      The duties inherent in Plaintiff's former Executive Secretary position, detailed in the official CMS Position Description and Amendment to the Position Description, that were in effect at the time of Plaintiff's termination were as follows:

The Executive Secretary is the chief administrative officer of the Civil Service Commission. Subject to the provisions of Jurisdiction B, the Commission appoints the Executive Secretary, *establishes or approves broad basic policies for Commission operations,* makes the final determination in appeals, in approval of Personnel Rules, in the exemption of principal policy positions, and in other areas in which Commission approval is required.  *The Executive Secretary is fully responsible for and carries out the administrative duties of the Commission.*

10%  *Formulates and recommends to the Commission for approval, major policies, rules, and regulations; advises the Commission on hearings, technical personnel questions, and other matters before it for consideration and makes recommendations for their proper disposition, enforces decisions of the Commission.*

5%  Determines items to be included in the agenda for Commission meetings; *reviews and approves special or unusual items before agenda is published*; writes or reviews and approves minute items before their submittal to the Commission before approval.

40%  *Supervises the technical and clerical staff of the Commission; makes final decisions on administrative matters including securing of office space, organization and staffing of the Commission office, approval of personnel actions or requests, development and submission of the budget request, approval of expenditure of appropriated funds, and the broader questions of operating policy not requiring Commission approval in respect to review, hearing, and housekeeping activities*; insures proper maintenance and disposition of all Commission records including the official minutes of the Commission; is accountable officer for State property, requisitions needed equipment and supplies, and insures proper inventorying, use, maintenance, and replacement of all property and supplies.  Sets hearings and assigns cases; *reviews and recommends to the Civil Service Commission appropriate action on recommendations of Hearings Officers.*

15%  *Coordinates the program of the Commission with that of other agencies; meets with the Director of Personnel, the Personnel Advisory Board, operating agency heads and other state or non-state persons or organizational representatives to discuss and resolve questions relating to the operation of the Personnel Code and Rules or compliance therewith improvement of personnel operations, or other matters of concern to the Commission or agencies involved*

2%  *Advises Civil Service Commission on affect of proposed amendments in the Personnel Code or other proposed statutory changes which may affect the Commission and its statutory responsibilities; upon request, may advise the Personnel Advisory Board, legislators or other interested persons on the estimated effect of such proposals; attends hearings on budget requests and other bills directly affecting the Commission and testifies as required.*

10%  *Interprets for State officials, employees, and members of the public, either in person or through correspondence, the intent of the Personnel Code, personnel rules and regulations, and civil service rules, regulations and programs; furnishes related information requested . . .*

3%  *Occasionally investigates alleged violation of the Personnel Code or rules.*

5%  *Represents the Commission at meetings, conferences, and other events.*

10%  *Prepares special reports for the Civil Service Commission including the Annual Report of the Commission*, or assigns such reports in whole or part to the staff.

**SUPERVISORY DUTIES:**  *Makes general assignments to Division Supervisors, approves their recommendations and program plans, and evaluates their work and effectiveness through*

*program results. Exercises general supervision over secretary and close supervision when necessary on more complex non-routine assignments. Appoints, dismisses, and extends salary increases to employees.*
**PERSONAL CONTACTS:** *Very frequent contact with legislative and administrative officials, employees, and other persons to interpret Code and Rules, hear complaints and grievances, investigates alleged violations, and direct compliance.*

**Argument**

**II.    Seventh Circuit Law Requires Summary Judgment On Plaintiff's Patronage Claims Because His Former Executive Secretary Position Included Substantial Policymaking And Policy Implementing Responsibilities.**

**A.    Under <u>Branti</u>, Plaintiff Is Not Entitled To Relief If Political Affiliation Is An "Appropriate Requirement" For The Executive Secretary Position.**

As Your Honor knows, in a series of decisions beginning in 1976, the United States Supreme Court has held that government officials may not consider political affiliation when firing, hiring, recalling, transferring or promoting low-level, non-confidential, non-policymaking government employees. <u>See</u> <u>Elrod v. Burns</u>, 427 U.S. 347 (1976) (firing decisions); <u>Rutan v. Republican Party of Illinois</u>, 497 U.S. 62 (1990) (hiring, promotion, transfer and recall decisions). However, government officials may make employment decisions based on political affiliation whenever "party affiliation is an appropriate requirement for the effective performance of the public office involved," including when the position at issue has policymaking and policy implementing duties. <u>Branti</u>, 445 U.S. at 518;

In the Seventh Circuit, the touchstone question is "whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." <u>Nekolny v. Painter</u>, 653 F.2d 1164, 1170 (7th Cir. 1981). Political affiliation may also be an appropriate requirement for employees who "are in close contact with policymakers and the highly confidential communications or records affecting decisions." <u>Meeks v. Grimes</u>, 779 F.2d 417, 420 (7th Cir. 1985). In addition to ultimate policymakers,

9

political affiliation may be appropriately considered in appointing those who exercise discretion in implementing policies.  Wilbur v. Mahan, 3 F.3d 214, 217 (7th Cir. 1993).  The Seventh Circuit has held that the Court should begin its Branti analysis by "looking for policymaking powers or confidential relationships because those terms 'accurately describe the vast majority of offices that fall within the realm of legitimate patronage.'"  Thompson v. Illinois Dep't of Prof'l Regulation, 300 F.3d 750, 756 (7th Cir. 2002) (citation omitted).  "In determining whether an employee is in a policymaking position we consider, among other things, 'whether the employee acts as an adviser or formulates plans for the implementation of broad goals.'"  Id. (quoting Elrod, 427 U.S. at 367-68).  In determining whether political affiliation is an appropriate requirement for the duties of a position, the Court focuses on the responsibilities inherent in the position itself, *not* on the duties a particular employee may have performed in that position. Tomczak v. City of Chicago, 765 F.2d 633, 640-41 (7th Cir. 1996).  Allegations that Plaintiff did not perform all of the duties of a position are insufficient to avoid summary judgment.  Id. at 641-42; accord Americanos v. Carter, 74 F.3d 138, 141-42 (7th Cir. 1996).

The Seventh Circuit recently affirmed the use of precisely the same type of document relied on here – an official CMS Positions Description – to make the Branti determination in Riley, 425 F.3d 357.  In Riley, the Seventh Circuit held that absent evidence that the official CMS Position Description has in some way been improperly manipulated, the Position Description alone is used to ascertain the duties inherent in a position.  Riley, 425 F.3d at 361-62.  In Utley, Your Honor recently followed the Riley holding noting "[t]he official CMS job description in Illinois can be used to determine whether the duties of a position are such that political affiliation is a proper consideration, unless the circumstances surrounding the creation of the job description indicate that the description has somehow been manipulated for political

purposes." 2005 WL 3478844 at*4.[2]   Because there was no indication that the Position

Descriptions at issue in Utley (or Riley) had been altered – indeed, Your Honor noted that the

Position Description "was produced before Defendant Blagojevich became Governor," and "the

Defendants could not have manipulated that description to misstate the duties inherent in the

Position." – the court relied solely on the Position Description.  Id.

  Here, the official, written Position Description for Plaintiff's former Executive Secretary

position cannot reasonably be questioned or deemed "systematically unreliable" because it is the

same type of Position Description the Seventh Circuit relied on in Riley and Your Honor relied

on in Utley.  Moreover, as in Riley and Utley, the State Officials have submitted an

authenticating affidavit regarding the validity of the Position Description in effect at the time of

Plaintiff's termination as well as the earlier version of the Position Description.  (Plummer Aff.

¶¶ 3-4 & Exs. A & B thereto).  Just as in Riley and Utley, Plaintiff's Position Description has not

been materially changed since 1967, which is obviously "long before Governor Blagojevich

became Governor."  Riley, 425 F.3d at 361.  "The significance of the official job description in a

case like this is thus as a provisional safe harbor for elected officials."  Id. at 365.  Because

nothing Plaintiff could discover can create a material dispute of fact that the essential duties in

the Position Description have been in place since 1967, the inherent duties in Plaintiff's former

position, upon which the Branti inquiry proceeds, are undisputed as a matter of law.

---

[2] The validity of this approach was reaffirmed by the Seventh Circuit in Mark Pierson v.
Blagojevich, Case No. 05-3019 (7th Cir. 2005) and by another district court in Steigmann v.
Blagojevich, No. 05 C 0336, 2005 WL 3482635, (N.D. Ill. Dec. 20, 2005) (attached as Ex. 6),
because both courts applied the holding of Riley and dismissed the plaintiffs' political patronage
claims based solely on their official Position Descriptions.

**B.    Political Affiliation Is An "Appropriate Requirement" For Plaintiff's Former Executive Secretary Position.**

While the State Officials argue that Plaintiff could be terminated for political reasons because his former Executive Secretary position was <u>Branti</u>-exempt, they dispute that political affiliation was the reason for Plaintiff's termination.  To the contrary, Plaintiff was terminated for fraudulently executing CMS personnel transactions while a State employee.[3]

If, as here, the employment duties of a plaintiff's position "are easily ascertainable" and the duties demonstrate that the Plaintiff is within the <u>Branti-Rutan</u> exception, the Court should enter judgment as a matter of law on pre-discovery motions.[4]  This Court should grant the State Officials' Motion for Summary Judgment because (even assuming Plaintiff's allegations are true for argument sake only), based on the "easily ascertainable" duties inherent in Plaintiff's former Executive Secretary position – as reflected in the official CMS Position Description – they require him: (1) to make policy; (2) to implement policy; (3) to provide "meaningful input" to other policymakers; and (4) to serve as a spokesperson and liaison with elected officials.

<u>First</u>, Plaintiff's Executive Secretary position makes policy.  According to the official Position Description, the job duties of the Executive Secretary include: Formulating and recommending to the Commission for approval major policies, rules, and regulations; approving personnel actions or requests; developing budget requests and approving expenditures of appropriated funds; formulating operating policy with respect to review and hearing procedures;

---

[3] At his pre-deprivation and post-deprivation hearings, Plaintiff admitted to signing official CMS personnel forms as the "Director of Central Management Services" even though he was not the Director of CMS and knew that the Director of CMS had refused to sign these forms.  (11/7/03 Order at 3-4; 6/27/03 Tr. at 34:13-22 & 37:23-41:11; Richards Aff. ¶ 10).

[4] <u>See</u>, <u>e.g.</u>, <u>Berry v. Illinois Dept. of Trans.</u>, 333 F. Supp 2d. 751 (C.D. Ill. 2004) (motion for judgment on the pleadings) (Judge Scott); <u>Pleva v. Norquist</u>, 195 F.3d 905, 912-13 (7th Cir. 1999) (motion to dismiss); <u>Americanos</u>, 74 F.3d at 141-43 (motion to dismiss); <u>Warzon v. Drew</u>, 60 F.3d 1234, 1240 (7th Cir. 1995) (motion for judgment on the pleadings);  <u>Shakman v. Democratic Org. of Cook County</u>, 722 F.2d 1307, 1309-10 (7th Cir. 1983) (motion to dismiss);

12

and coordinating the Commission's program with other agencies.  (Plummer Aff. ¶¶ 3-4 & Exs. A & B thereto).

In <u>Utley</u>, Your Honor relied solely on an official CMS Position Description – similar to the Position Description here – in finding that the Chief Records Officer for IDOC was a policymaker and exempt under <u>Branti</u>.  2005 WL 3478844 at*4-5.  Your Honor held that the responsibilities described in the Chief Record Officer's official Position Description, included "formulates policies related to record keeping throughout IDOC," and "participates in the development of legislative proposals for IDOC."  <u>Id</u>. at *5.  In <u>Thompson</u>, the Seventh Circuit also relied solely on an official CMS Position Description in finding that the Chief Administrative Law Judge ("Chief ALJ") of the Illinois Department of Professional Regulation was a policymaker.  <u>Thompson</u>, 300 F.3d at 757-58.  Plaintiff's job duties, like the Chief Record Officer in <u>Utley</u> and the Chief ALJ in <u>Thompson</u>, were clearly defined in the Position Description, and by the Position Description alone, it is clear that the Plaintiff "spends a considerable amount of time formulating policy and implementing broad goals."  <u>Id</u>. at 757.

<u>Second</u>, Plaintiff's Executive Secretary position implements policy.  The Seventh Circuit has consistently found that when an employee implements the policy of his or her superiors, the position is exempt from the protections of <u>Rutan</u> under <u>Branti</u>.  In <u>Tomczak</u>, the Seventh Circuit held that the First Deputy Water Commissioner was <u>Branti</u> exempt, even though he lacked final decision-making authority, because he had discretion to implement policy while providing services and had supervisory authority.  <u>Id</u>.  In <u>Selch v. Letts</u>, 5 F.3d 1040, 1046 (7th Cir. 1993), the Seventh Circuit stated that although the subdistrict highway superintendent was provided with the guidelines for the execution of road maintenance work, the performance of the services in diverse geographic areas constituted the implementation of policy.  Similarly, Plaintiff's

former Executive Secretary position "makes the final determination in appeals," "makes final decisions on administrative matters," sets the Commission's agenda, and "enforces decisions of the Commission." (Plummer Aff. ¶¶ 3-4 & Exs. A & B thereto) accord Upton v. Thompson, 930 F.2d 1209 (7th Cir. 1991) (finding the deputy sheriff exempt because he implemented policy).

Third, Plaintiff's Executive Secretary position requires "meaningful input" into other policymakers' decisions. In Americanos v. Carter, 74 F.3d 138, 142 (7th Cir. 1996), the Seventh Circuit held that deputy attorney generals were not entitled to patronage protection because, even though they did *not* have ultimate decision-making authority, they provided "meaningful input" into policy decisions because they conducted research and advised supervisors about the "correct course of legal action." Similarly, the Executive Secretary makes recommendations to the Commission on "major policies, rules, and regulations" and the disposition of cases, advises the Commission on the Personnel Code, and interprets the Personnel Code for State officials and members of the public. (Plummer Aff. ¶¶ 3-4 & Exs. A & B thereto).

Fourth, Plaintiff's Executive Secretary position serves as a spokesperson and as liaison with elected officials because it "[r]epresents the Commission at meetings, conferences, and other events." (Plummer Aff. ¶¶ 3-4 & Exs. A & B thereto). Moreover, the Executive Secretary testifies at budget hearings, and has "very frequent contact with legislative and administrative officials, employees, and other persons to interpret Code and Rules, hear complaints and grievances, investigates alleged violations and directs compliance." Id. These spokesperson duties, by themselves, makes the Executive Secretary position exempt under the Branti exception. In Branti, the Court stated that "it is equally clear that the Governor of a State may appropriately believe that the official duties of various assistants who help him . . . communicate with the legislature cannot be performed effectively unless those persons share his political

14

beliefs." <u>Branti</u>, 445 U.S. at 518.  In <u>Berry v. Illinois Dept. of Trans</u>., 333 F. Supp. 2d 751, 758

(C.D. Ill. 2004), Your Honor held that political officials "must be able to rely on the political

loyalty of the person authorized to advocate policies to elected officials and the public, and to

maintain relationships with elected officials."  <u>See</u>, <u>Selch v. Letts</u>, 5 F.3d 1040 (7th Cir. 1993).

**III.     The State Officials Are Entitled To Summary Judgment On Plaintiff's**
**Due Process Claims Because Plaintiff Received Sufficient Due Process.**

To make out a due process claim, Plaintiff must present evidence to prove three elements:

(1) a constitutionally protected property interest; (2) a deprivation of that interest; and (3) an

insufficient process in connection with the deprivation.  <u>Polenz v. Parrott</u>, 883 F.2d 551, 555 (7th

Cir. 1989).  While Plaintiff had a right only to be dismissed from his position for cause, Plaintiff

received sufficient process in connection with his termination based on his pre-deprivation

hearing, the findings of the Commission, the review of the findings by the Director of CMS, the

full post-deprivation hearing, and his appeal of the Administrative Law Judge's decision.

Plaintiff's claim that he was denied proper due process is refuted by his own Complaint,

Commissioner Richards' affidavit, and the findings of Judge Trapp.

**A.     Because Of The Sensitive Nature Of Plaintiff's Executive Secretary Position,**
**And The Seriousness Of The Allegations Against Him, Plaintiff Could**
**Be Terminated *Before* His Pre-Deprivation Hearing.**

The United States Supreme Court has held "that where a State must act quickly, or where

it would be impractical to provide predeprivation process, postdeprivation process satisfies the

requirements of the Due Process Clause." <u>Gilbert v. Homar</u>, 520 U.S. 924, 930 (1997)  <u>E.g.</u>,

<u>United States v. James Daniel Good Real Property</u>, 510 U.S. 43, 53 (1993).  "[W]here an

important governmental interest requires summary action, immediate and full post-action

hearings have been held to be within the parameters of due process."  <u>Feinberg v. FDIC</u>, 420 F.

Supp. 109, 118 (D. D.C. 1976).  "[W]hile at one point it appeared that due process required a

15

hearing *prior* to any deprivation of a constitutionally-protected interest, with the exception of certain 'extraordinary circumstances,' it now appears that the process due in a particular case is to be determined by the circumstances . . . ." Id. (citations omitted).  To determine what process is constitutionally required, the courts consider three distinct factors:

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute requirement would entail.

Matthews v. Eldridge, 424 U.S. 319, 324 (1976).  "An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation."  Federal Deposit Ins. Corp. v. Mallen, 486 U.S. 230, 240 (1988).

Here, Plaintiff was in a sensitive position because he was responsible for the daily operations of the Commission and needed to be removed as quickly as possible to mitigate any possible damage he might cause.  Even assuming Plaintiff's pre-deprivation hearing was not adequate, his prompt post-deprivation trial afforded him sufficient due process under the test outlined in Matthews.  First, Plaintiff's private interest was not affected because he was suspended with full pay pending the results of his pre-deprivation hearing and the approval of dismissal by the Director of CMS. (Richards Aff. ¶ 5).  Additionally, Plaintiff received a prompt post-deprivation hearing scheduled within 30 days of the Commission's decision to terminate him.  Second, the risk of erroneous deprivation was negated because Plaintiff admitted, at the pre-deprivation hearing, that he signed his name as the "Director of Central Management Services" on three separate personnel transactions even though he was not the Director of CMS and knew that the Director of CMS had refused to sign the transactions.  (11/7/03 Order at 3-4;

16

6/27/03 Tr. at 34:13-22 & 37:23-41:11; Richards Aff. ¶ 10).    Third, and most importantly, the State had a significant interest in not having Plaintiff – who admitted to fraudulently signing CMS personnel transfer documents while working for another State agency – responsible for running the daily operations of the Commission.  The seriousness of Plaintiff's actions were magnified because he was charged with fraudulently signing personnel documents in violation of the Personnel Code and the Commission was charged with upholding the Personnel Code. Moreover, Plaintiff's Executive Secretary position was responsible for reviewing disciplinary decisions by the Commission, and if Plaintiff had not been removed quickly, he would have been presiding over the propriety of his own dismissal and the dismissal of State employees that he fraudulently placed into their positions.

**B.      Plaintiff Received A Complete Pre-Deprivation Hearing.**

Even assuming (for argument sake only) that Plaintiff was entitled to a pre-deprivation hearing, Plaintiff concedes that he received such a hearing with Commissioner Richards.  The essence of due process is that "a deprivation of life, liberty or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"  Cleveland Board of Ed. v. Loudermill, 470 U.S. 532, 541 (1982) (citations omitted).  This principle requires that there be "some kind of . . . hearing prior to the termination of a legally cognizable property interest."  Id. at 569-70.  However, "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972).  The Supreme Court has held "the pre-termination hearing need not definitively resolve the propriety of the discharge.  It should be an initial check against mistaken decisions-essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Loudermill, 470 U.S. at 546; see also Smith v. Town of Eaton,

910 F.2d 1469, 1472 (7th Cir. 1990) ("this procedure need not be elaborate and can be satisfied

with less than a full evidentiary hearing"). "Due process requires only 'abbreviated pre-

termination processes where full post-deprivation processes are available.'" Chaney v. PACE,

52 F.3d 623, 630 (7th Cir. 1995). In Loudermill, 470 U.S. at 546-47, the Supreme Court held

"[t]he . . . employee is entitled to oral or written notice of the charges against him, an explanation

of the employer's evidence, and an opportunity to present his side of the story . . . To require

more than this prior to termination would intrude to an unwarranted extent on the government's

interest in quickly removing an unsatisfactory employee."

In his Complaint, Plaintiff admits that on "May 29, 2003, a pre-deprivation meeting was

conducted for the Plaintiff." (Compl ¶ 39). Plaintiff also acknowledged that "during the course

of the pre-deprivation hearing . . . the Plaintiff, Robert Powers, shared with the Defendant,

George E. Richards, information supporting his belief that he had not engaged in conduct

warranting his discharge from employment with the Commission." Id. at ¶ 40. Plaintiff's own

allegations conclusively demonstrate that he was given a pre-deprivation hearing prior to his

dismissal in which he was notified of the charges and evidence against him, and given an

opportunity to respond to those charges. Commissioner Richards' affidavit demonstrates that

Plaintiff received a copy of the written charges prior to his hearing, and he received a complete

opportunity to refute those charges at the pre-deprivation hearing. (Richards Aff. ¶¶ 5, 9-10 &

Ex. D thereto.)

In a futile attempt to plead a due process claim, Plaintiff mistakenly claims that the

Commission members voted to terminate him prior to his pre-deprivation hearing. (Compl. ¶

47). This contention is directly refuted by the affidavit of Commissioner Richards and by the

Plaintiff's own Complaint in which he admits receiving a pre-deprivation hearing with

Commissioner Richards *prior* to being terminated. (Compl. ¶ 39; Richards Aff. ¶¶ 10-12.) The Commissioners met on May 15, 2003, and voted to give Commissioner Richards the authority to conduct the pre-deprivation hearing and to allow him to impose the appropriate amount of discipline up to and including discharge depending on what happened at the pre-deprivation hearing. (11/7/03 Order at 4.) Plaintiff's claim that he was denied due process because his pre-deprivation hearing was not before the entire Commission is meritless.[5] (Compl. ¶ 39, 41.) Plaintiff fails to cite any provision of the Personnel Code that requires an employee be given a pre-deprivation hearing in front of all the Commission members, and no such provision exists. "*Loudermill* does not mandate any hard and fast rules on the specifics of predisciplinary due process." Sonnleitner v. York, 304 F.3d 704, 711 (7th Cir. 2002). Moreover, all the Commissioners did consider the charges against Plaintiff because on April 17, 2003 and May 15, 2003, the Commissioners reviewed the allegations against Plaintiff and unanimously voted to suspend him with pay. (Richards Aff. ¶¶ 6 & 8). Because the Plaintiff presented no new evidence at the pre-termination hearing (to the contrary, he admitted signing the CMS personnel forms as the Director of CMS), Commissioner Richards exercised the power given to him by the other members of the Commission and recommended to the Director of CMS that Powers be terminated.

### C.     Plaintiff Received A Full Trial At His Timely Post-Deprivation Hearing.

Even assuming (for argument sake only) that Plaintiff was not afforded complete due process at his pre-deprivation hearing, this defect was cured by Plaintiff's complete post-

---

[5] Plaintiff also claims that his due process rights were violated because he was not "provided with information considered by the Commission in deciding to terminate his employment." (Compl. ¶ 48). Plaintiff is only entitled to "an *explanation* of the employer's evidence" Loudermill, 470 U.S. at 546, which the Plaintiff received when he was given the written charges on April 17, 2003 and again when Chairman Richards discussed the charges with Plaintiff at the pre-deprivation hearing. (Richards Aff. ¶ 9, & Ex. D thereto).

deprivation hearing, which was conducted promptly after his dismissal.[6]  Both the United States Supreme Court and the Seventh Circuit have held that "when there is an opportunity for a full post-termination hearing, due process does not require an employer to provide full "trial-type rights" such as the right to present or cross-examine witnesses at the pre-termination hearing." Baird v. Board of Educ. Warren Comm. School Dist., 389 F.3d 685, 690-91 (7th Cir, 2004).  In Head v. Chicago Sch. Reform Bd. of Tr., 225 F.3d 794, 803 (7th Cir. 2000), the Court held when full post-termination procedures are available, a public employer must provide a public employee with a protected property interest with pre-termination notice, explanation of evidence and a chance to tell his side of the story.  In Loudermill, the Supreme Court noted that "the existence of post-termination procedures is relevant to the necessary scope of pre-termination procedures." Id. at 546-47.

There is no dispute that, at the very least, Plaintiff received, at the pre-deprivation hearing with Commissioner Richards, notice of the charges, an explanation of the evidence and a chance to tell his side of the story.  (Richards Aff. ¶¶ 9-10, Compl. ¶¶ 39-40.)  Accordingly, under Seventh Circuit law, these procedures coupled with the complete post-deprivation hearing provided Plaintiff sufficient due process.  At his post-deprivation hearing, Plaintiff was again given a copy of the written charges, he was given the opportunity to conduct discovery, to cross examine witnesses, and to present all his defenses and arguments to Judge Trapp.  (6/27/03 Tr. at 7:2-6, 8:11-12 & 61:1-2).  Further, Plaintiff received a copy of the Londrigan letter and the Wynn report that he claimed he did not receive at his pre-deprivation hearing. (6/27/03 Tr. at 93: 22-24).  Accordingly, this full, complete and timely post-deprivation hearing satisfied Plaintiff's due process rights and remedied any alleged deficiencies at the pre-deprivation hearing.

---

[6] Plaintiff also exercised his right to appeal Judge Trapp's decision, but the Commission once again determined that his dismissal was warranted by the evidence.

IV.    **Alternatively, The Qualified Immunity Doctrine Bars Plaintiff's Damage Claims.**

A.    **The State Officials Are Entitled To Qualified Immunity From Damages Unless Plaintiff Can Show That The Rights At Issue Were Clearly Established At The Time Of The Alleged Violation.**

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The burden is on the Plaintiff to prove, not the State Officials to disprove, the existence of a clearly established right. Davis v. Scherer, 468 U.S. 183, 197 (1984). Plaintiff can meet this burden only by citing "'closely analogous cases decided prior to the defendants' challenged actions" which clearly and consistently recognize the right forming the basis of the cause of action. Upton, 930 F.2d at 1212. In determining whether a right is clearly established, the Supreme Court has admonished that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . [I]n the light of pre-existing law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Government officials "are entitled to immunity unless it has been authoritatively decided that certain conduct is forbidden." Pounds v. Griepenstroh, 970 F.2d 338, 342 (7th Cir. 1992) (citations omitted). Unless Plaintiff can point to Seventh Circuit cases involving closely analogous facts and finding constitutional violations, his claims for damages must be dismissed.

B.    **The Constitutional Rights At Issue In This Case Were Not Clearly Established At the Time Of The Alleged Violation.**

Plaintiff cannot meet his burden of finding closely analogous cases to overcome qualified immunity on either his patronage claim or due process claim. First, the State Officials are entitled to qualified immunity on Plaintiff's political patronage claim because there are no cases

21

rejecting a <u>Branti</u> argument for the position at issue here.  The Seventh Circuit has recognized that in a case where the <u>Branti</u> test is an issue, in order to defeat qualified immunity and obtain damages, the plaintiff has the burden of finding a "nearly identical" case, involving a nearly identical position, that rules against the government officials.  <u>Pounds</u>, 970 F.2d at 341.  The Court explained that "it is difficult to imagine how any Plaintiff, under <u>Anderson</u>, could have a clearly established right to be free from patronage dismissal unless a nearly identical case had already been decided . . ."  <u>Id.</u> at 341.  Even assuming, *arguendo*, the truth of the allegations in Plaintiff's complaint, the State Officials are entitled to qualified immunity from damages because there simply are no cases holding that a "nearly identical" position was subject to the <u>Elrod</u>.  To the contrary, as outlined above, the case law demonstrates that Plaintiff's position was exempt under <u>Branti</u>.

<u>Second</u>, the State Officials are entitled to qualified immunity on Plaintiff's due process claim because there are simply no cases finding a due process violation in closely analogous circumstances.  The Plaintiff cannot demonstrate that it was clearly established that when an employee receives a pre-termination hearing, a full post-deprivation hearing, and an appeal of the Administrative Law Judge's decision, there has been a violation of due process.  To the contrary, as demonstrated above, the fact that Plaintiff was in such a sensitive position and received such a complete post-deprivation hearing mitigates any procedural deficiencies of his pre-termination hearing.  Since Plaintiff cannot point to Seventh Circuit cases involving closely analogous circumstances and finding constitutional violations, his claims for damages must be dismissed.

**<u>Conclusion</u>**

For the foregoing reasons, this Court should grant summary judgment in favor of the

State Officials on Plaintiff's complaint, or, alternatively, bar all claims for damages against the

State Officials under the doctrine of qualified immunity.


Respectfully submitted:

GEORGE E. RICHARDS, RAYMOND W.
EWELL, JOHN M. DORGAN, BARABARA
J. PETERSON, DAN P. FABRIZO, ROD
BLAGOJEVICH, THOMAS LONDRIGAN
and ALONZO MONK


Dated:  February 6, 2006                    By:    <u>s/ Jeffrey D. Colman</u>
                                                   One of Their Attorneys

Jeffrey D. Colman
David Jiménez-Ekman
John R. Storino
Christopher V. Parente
Acting as Special Assistant Attorneys General
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

CHICAGO_1354590_7