## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ROBERT POWERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case:  04-3024 |
| | ) | |
| GEORGE E. RICHARDS, RAYMOND W. | ) | Honorable Jeanne E. Scott |
| EWELL, JOHN M. DORGAN, BARBARA | ) | |
| J. PETERSON, DAN P. FABRIZO, ROD | ) | |
| BLAGOJEVICH, THOMAS LONDRIGAN | ) | |
| and ALONZO MONK, | ) | |
| | ) | |
| Defendants. | ) | |

### EXHIBIT INDEX

The State Officials submit this Exhibit Index and the following exhibits as attachments to

their Memorandum of Law in Support of the State Officials' Motion for Summary Judgment in

the above-captioned case:

Exhibit 1:    Utley v. Monk, No. 05-3017, 2005 WL 3478844, (C.D. Ill. Dec. 20, 2005).

Exhibit 2:    Affidavit of George E. Richards.

Exhibit 3:    November 7, 2003 Order of Administrative Law Judge William F. Trapp.

Exhibit 4:    Official transcripts from the June 27, 2003 and September 10, 2003 hearings before Administrative Law Judge Trapp.

Exhibit 5:    Affidavit of Larry Plummer.

Exhibit 6:    <u>Steigmann v. Blagojevich</u>, No. 05 C 0336, 2005 WL 3482635, (N.D. Ill. Dec. 20, 2005).

Respectfully submitted:

GEORGE E. RICHARDS, RAYMOND W. EWELL, JOHN M. DORGAN, BARABARA J. PETERSON, DAN P. FABRIZO, ROD BLAGOJEVICH, THOMAS LONDRIGAN and ALONZO MONK

Dated:  February 6, 2006

By:    <u>s/ Jeffrey D. Colman</u>
       One of Their Attorneys

Jeffrey D. Colman
David Jiménez-Ekman
John R. Storino
Christopher V. Parente
Acting as Special Assistant Attorneys General
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 3478844 (C.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,C.D. Illinois.
James **UTLEY**, Plaintiff,
v.
Alonzo MONK, et al., Defendants.
No. 05-3017.

Dec. 20, 2005.

John Edward Kerley, Kerley & Associates PC,
Springfield, IL, for Plaintiff.
Jeffrey D. Colman, David Jimenez-Ekman, John R.
Storino, Matthew R. Devine, Jenner & Block LLC,
Chicago, IL, for Defendants.

OPINION

SCOTT, J.

**\*1** This matter comes before the Court on
Defendant State Officials' Rule 12(c) Motion for
Judgment on the Pleadings (d/e 16). Plaintiff James
Utley claims in Count I of the Complaint (d/e 1)
that he was fired from his state employment as the
Chief Record Officer (Position) for the Illinois
Department of Corrections (IDOC) for political
reasons in violation of his First Amendment rights.
He alleges in Count II that he was denied his
property interest in the Position without due process
of law. The Defendants are Illinois Governor Rod
Blagojevich, his Chief of Staff, Alonzo Monk, and
other officials in the Blagojevich administration.
The Defendants ask for judgment on the pleadings,
claiming that: (1) the Position was one for which
political affiliation was an appropriate employment
consideration, and (2) Utley had no property
interest in the Position because he was a
probationary employee at the time of his
termination. The Court finds that the Position was
one for which political affiliation was an
appropriate employment consideration. The Court,
therefore, grants judgment on the pleadings on

Count I. Issues of fact, however, exist regarding
whether Utley had a property interest in the
Position. The Motion for Judgment on the Pleadings
on Count II is denied.

For purposes of the Motion, the Court may consider
all pleadings, including the Complaint, Answer, and
attached exhibits. *Fed.R.Civ.P.* 12(c); *Northern
Indiana Gun & Outdoor Shows, Inc. v. City of
South Bend,* 163 F.3d 449, 452 (7th Cir.1998). The
Answer (d/e 15) includes as exhibits: (1) a letter
dated September 15, 2003, from Defendant Roger
Walker Jr., Director of the IDOC, to Utley
informing him that his employment would be
terminated as of September 19, 2003 (Exhibit A);
(2) a Central Management Services (CMS) Position
Description for Chief Record Officer, effective
January 1, 2001 (Exhibit B) (2001 Position
Description); and (3) a CMS Position Description
for Chief Record Officer, effective June 1, 2003
(Exhibit C) (2003 Position Description) (The 2001
Position Description and the 2003 Position
Description are collectively referred to as Position
Descriptions). The Position Descriptions may also
be considered in evaluating the Defendants' Motion
because they are matters of public record and are
central to Utley's claim that nothing in the Position
made political considerations a requisite for the
Position. *Riley v. Blagojevich,* 425 F.3d 357, 362 (7th
Cir.2005); *188 LLC v. Trinity Industries, Inc.,*
300 F.3d 730, 735 (7th Cir.2002).

Rule 12(c) motions for judgment on the pleadings
are reviewed under the same standard as Rule
12(b)(6) motions. *188 LLC,* 300 F.3d at 735. The
Court must accept as true all of Utley's well-pleaded
factual allegations and draw all inferences in the
light most favorable to him. *Hager v. City of West
Peoria,* 84 F.3d 865, 868-69 (7th Cir.1996);
*Covington Court, Ltd. v. Village of Oak Brook,* 77
F.3d 177, 178 (7th Cir.1996). The Court, however,
is not obligated to give any weight to unsupported
conclusions of law. *R.J.R. Services, Inc. v. Aetna
Cas. and Sur. Co.,* 895 F.2d 279, 281 (7th

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3478844 (C.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

Cir.1989). Judgment on the pleadings should not be entered unless it appears beyond doubt that Utley can prove no set of facts that would entitle him to relief. *Doherty v. City of Chicago,* 75 F.3d 318, 322 (7th Cir.1996).


## STATEMENT OF FACTS

*2 Utley worked for the IDOC in the Position. The Position Descriptions for the Position were produced by CMS. Under Illinois law, CMS position descriptions are produced by CMS and reviewed by the Illinois Civil Service Commission. 20 ILCS 415/8a(1) & 415/10(4); 80 *Ill. Adm.Code* § 301.20; *Riley,* 425 F.3d at 361-62. The 2001 Position Description stated that the Chief Record Officer reported to the IDOC Deputy Chief of Administrative Services. The 2001 Position Description stated that the Chief Record Officer performed the following duties:
Subject to administrative approval of the Deputy Chief of Adm. Services, serves as Chief Record Officer for the Department of Corrections; manages, through subordinate regional managers, all institutional Record Office operations; develops and implements policies and procedures regarding inmate record maintenance.
1. Formulates policies and directs uniform implementation of statutory changes or legal opinions affecting sentence and or good time credits; develops and implements procedures in which uniform record keeping is maintained.
2. Supervises staff; assigns work; approves time off; provides guidance and training; gives oral reprimands and refers employee for more severe discipline; completes and signs performance evaluations; establishes annual goals and objectives; counsels staff on problems with productivity, quality of work and conduct; determines staffing needs to achieve program objectives.
3. Coordinates Adult and Juvenile Division Record Offices in the establishment and maintenance of uniform record keeping procedures for all Adult and Juvenile facilities.
4. Coordinates record keeping activities for institutional field services and Bureau of Identification offices and develops and implements procedures for this operation.

5. Serves as a liaison for the Department's Record Offices to various State's Attorney Offices, Attorney General's Office, Department of Corrections legal staff and the Prisoner Review Board.
6. Schedules and conducts regular meetings of adult and juvenile institutions Record Offices; visits, inspects and reviews the Department's Record Offices in their continuing professional development.
7. Coordinates with Legislative Liaison in the development of legislative proposals; meets and confers with administrative staff for purpose of integrative departmental concerns.
8. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above.

*Answer,* Exhibit B.

The 2003 Position Description moved the Position to the Bureau of Legal Services. The holder of the Position now reported to the Chief Legal Counsel. *Answer,* Exhibit C. The duties of the Position, however, were substantially unchanged. The 2003 Position Description of duties states:
Subject to administrative approval of the Chief Legal Counsel (Sr. Public Service Admin.), serves as Chief Record Officer for the Department of Corrections; manages, through subordinate regional managers, all institutional Record Office operations; develops implements policies and procedures regarding inmate record maintenance.
*3 1. Supervise staff; assigns and reviews work; approves time off; provides guidance and training; effectively recommends grievance resolutions; completes and signs performance evaluations; establish annual goals and objectives; counsels staff on problems with productivity and quality of work; determines staffing needs to achieve program goals and objectives; reviews activity reports.
2. Formulates policy and directs uniform implementation of statutory changes or legal opinions affecting sentence and or good time credits; develops and implements procedures in which uniform record keeping is maintained.
3. Coordinates Adult and Juvenile Division Record Offices in the establishment and maintenance of uniform record keeping procedures for all Adult and Juvenile facilities; coordinates record keeping

Not Reported in F.Supp.2d                                    Page 3

Not Reported in F.Supp.2d, 2005 WL 3478844 (C.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

activities for institutional field services and Bureau of Identification offices and develops and implements procedures for this operation.

4. Serves as a liaison for the Department's Record Offices to various State's Attorney Offices, Attorney General's Office, Department of Corrections legal staff and the Prisoner Review Board.

5. Schedules and conducts regular meetings of adult and juvenile institutions, Record Offices; visits, inspects and reviews the Department's Record Offices in their continuing professional development.

6. Coordinates with Legislative Liaison in the development of legislative proposals; meets and confers with administrative staff for the purpose of integrative departmental concern.

7. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above.

*Answer,* Exhibit C.

By letter dated January 27, 2003, Utley was advised that his employment was being terminated on February 10, 2003. *Complaint,* ¶ 11. He evidently was terminated and then reinstated. *Id.,* ¶ 15. On September 15, 2003, Defendant Roger Walker, Jr., the IDOC Director, sent Utley a letter which stated: This letter serves as an official notice that you will not be certified from your probationary period to a Term Appointment as a Senior Public Service Administrator in Inmate Issues. Therefore, you will be terminated, non-certified, effective September 19, 2003 close of business.

*Answer,* Exhibit A. Utley claims he was fired both times, in February and September 2003, because of political considerations. He also claims that he had a property interest in his continued employment in the Position, and that the Defendants denied him that property without due process when they fired him both times. The Defendants ask for judgment on the pleadings.

## ANALYSIS

*Count I: First Amendment, Political Firing*

The First Amendment generally protects individuals from being fired due to their political affiliations. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Government officials, however, may make employment decisions based on political affiliation when such affiliation is an appropriate requirement for the effective performance of a particular position or public office. *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod,* 427 U.S. at 367.

*4 Political affiliation may be an appropriate employment consideration when the position has policy-making or confidential duties. Positions involve "policy-making" if the holders of the positions are authorized to have meaningful input, either directly or indirectly, into "government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981). Employees in " confidential" positions, "are in close contact with policymakers and the highly confidential communications or records affecting decisions." *Meeks v. Grimes,* 779 F.2d 417, 420 (7th Cir.1985). The question of whether a position is either " policy-making" or "confidential," for which political affiliation is an appropriate employment consideration, is determined by the duties and responsibilities inherent in the position itself, rather than the specific duties the particular employee performed in that position. *Riley,* 425 F.3d at 362; *Americanos v. Carter,* 74 F.3d 138, 141 (7th Cir.1996); *Tomczak v. City of Chicago,* 765 F.2d 633, 640-41 (7th Cir.1985).

The Court can determine as a matter of law that a position is one for which political affiliation is an appropriate employment consideration if the duties and responsibilities of the position are outlined by law. *Pleva v. Norquist,* 195 F.3d 905, 911-12 (7th Cir.1999). The Court can also determine the issue if the undisputed job description sets forth duties inherent in the position. *Riley,* 425 F.3d at 362; *Thompson v. Illinois Dept. of Professional Regulation,* 300 F.3d 750, 754-55 (7th Cir.2002). The official CMS job description in Illinois can be used to determine whether the duties of a position

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3478844 (C.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

are such that political affiliation is a proper consideration, unless the circumstances surrounding the creation of the job description indicate that the description has somehow been manipulated for political purposes. *Riley,* 425 F.3d at 361-62. The 2001 Position Description was produced before Defendant Blagojevich became Governor. Thus, the Defendants could not have manipulated that description to misstate the duties inherent in the Position. The June 2003 Position Description, quoted above, leaves the duties of the Position largely unchanged. The Court sees nothing in the pleadings that would call into question the accuracy of these job descriptions. Utley does not plead any facts that call into question the accuracy of the two Position Descriptions. He only pleads a legal conclusion that "There was nothing in the job duties of Plaintiff's positions that made political considerations a requisite for the position." *Complaint,* ¶ 13. Such legal conclusions are not entitled to any weight. *R.J.R. Services,* 895 F.2d at 281. *See Thompson,* 300 F.3d at 754 (plaintiff did not plead facts that would contradict the job description). The Court therefore finds that the Position Descriptions accurately set forth the duties inherent in the Position.

*5 The Position Descriptions establish that the Position is a "policy-making" position for which political affiliation is an appropriate employment consideration. The holder of the Position also formulates policies related to record keeping throughout the IDOC. In particular, the holder of the Position formulates policies to implement statutory changes and legal opinions affecting criminal sentences and good-time credits. The procedures and policies for calculating prison sentences and good-time credits are extremely important; the length of time that prisoners actually serve in prison affects prisoners, victims, their families, and society at large. The Defendants would want policies implementing the relevant statutes and case law to further the Blagojevich administration's goals. The Defendants therefore would want the person formulating those policies to be loyal to the Blagojevich administration. A person with the discretionary authority to formulate and implement such important policies is in a policy-making position. *See e.g., Thompson,* 300

F.3d at 757-58; *Tomczak,* 765 F.2d at 642.

The holder of the Position also participates in the development of legislative proposals for IDOC. The current administration would clearly have an interest in the political loyalty of individuals who provide input in the formulation of such proposals. *See e.g., Americanos,* 74 F.3d at 142. The inherent duties of the Position, therefore, make the Position one for which political affiliation is a proper consideration. The Defendants did not violate Utley's First Amendment rights when they terminated him based on political considerations.

### *Count II: Due Process*

To state a due process claim in Count II, Utley must allege that he had a property interest in the Position, and that the Defendants denied him that property interest without due process. *Strasburger v. Board of Educ., Hardin County Community Unit School Dist. No. 1,* 143 F.3d 351, 358 (7th Cir.1998). A property interest in employment does not arise from the Constitution, but must arise from an independent source, such as state law or a contract. The source of the right must give the employee a legitimate claim of entitlement to continued employment, not just a hopeful expectation. *Crim v. Board of Educ. of Cairo School Dist. No. 1,* 147 F.3d 535, 545 (7th Cir.1998).

Issues of fact exist concerning whether Utley had a property interest in the Position. Utley alleges that he had a property interest in the Position based on state law, specifically the Illinois Personnel Code and Personnel Rules. *Complaint,* ¶ 19. He further alleges that the Defendants fired him, and so, took his property without due process. The Defendants deny this allegation. The Defendants assert that Utley did not have a property interest in the Position because he was a probationary employee. To support their claim, the Defendants cite the September 15, 2003, termination letter, quoted above. Defendant Walker states in the letter that Utley was a probationary employee at the time of his termination.

*6 Walker's letter, at best, creates an issue of fact

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 5

Not Reported in F.Supp.2d, 2005 WL 3478844 (C.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

concerning whether he was a probationary employee on September 19, 2003. Unlike the official CMS job description, a letter written by one of the Defendants was not promulgated by CMS, and reviewed by the Civil Service Commission, pursuant to Illinois law. As such, the letter does not carry the authority to establish, as a fact, that Utley was a probationary employee. *See Riley,* 425 F.3d at 361-62 (discussing the process for the production of CMS position descriptions). Utley therefore may proceed with his due process claim.

The Defendants also cite Title 80, § 302.610(a) of the Illinois Administrative Code, which they claim establishes that Utley was a probationary employee on September 19, 2003. *State Officials' Response to Plaintiff's Clarification of His Memorandum of Law (d/e 27)* at 1-2; 80 *Ill. Adm.Code* § 302.610(a). This section of the Administrative Code states that an employee who is reinstated after January 1, 1999, is placed on four months' probation if the employee is a former certified employee who resigned, or was terminated in good standing, or whose position was reallocated downward, or who was laterally transferred, or whose name was placed on a reemployment list. The Defendants argue that Utley was terminated before this four month probationary period expired.

The pleadings do not allege that Utley resigned, or was terminated in good standing, or that his position was reallocated downward, or that he was laterally transferred, or that his name was place on a reemployment list. Thus, the Court cannot determine from the pleadings whether § 302.610(a) applies. Furthermore, the pleadings do not allege the date on which Utley was reinstated after his first termination on February 10, 2003. [FN1] Thus, even if § 302 .610(a) applies, the Court cannot determine from the pleadings whether he was terminated within four months of his reinstatement. Finally, even if Utley was a probationary employee on September 19, 2003, he still may have a claim based on the February 2003, termination. Given these factual questions, judgment on the pleadings is not appropriate on the Due Process claim.

FN1. The parties rely on matters outside of

the pleadings to attempt to establish the date that Utley was reinstated. Plaintiff's *Clarification of His Memorandum of Law Opposing Defendants' 12(c) Motion for Judgment on the Pleadings (d/e 25),* Exhibit A. The Court will not consider matters outside the pleadings in evaluating the Motion for Judgment on the Pleadings. *Fed.R.Civ.P.* 12(c); *Northern Indiana Gun & Outdoor Shows, Inc.,* 163 F.3d at 452.

THEREFORE, the State Officials' Rule 12(c) Motion for Judgment on the Pleadings (d/e 16) is ALLOWED, in part, and DENIED, in part. The Court grants judgment on the pleadings in favor of the Defendants and against the Plaintiff on Count I of the Complaint, but denies the Motion for Judgment on Count II of the Complaint.

IT IS THEREFORE SO ORDERED.

C.D.Ill.,2005.
Utley v. Monk
Not Reported in F.Supp.2d, 2005 WL 3478844 (C.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2603217 (Trial Motion, Memorandum and Affidavit) State Officials' Reply Brief in Support of their Rule 12(c) Motion for Judgment on the Pleadings (Aug. 16, 2005)
• 2005 WL 450571 (Trial Pleading) Complaint (Jan. 28, 2005)
• 3:05cv03017 (Docket) (Jan. 27, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| ROBERT POWERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case: 04-3024 |
| | ) | |
| GEORGE E. RICHARDS, RAYMOND W. | ) | Honorable Jeanne E. Scott |
| EWELL, JOHN M. DORGAN, BARBARA | ) | |
| J. PETERSON, DAN P. FABRIZO, ROD | ) | |
| BLAGOJEVICH, THOMAS LONDRIGAN | ) | |
| and ALONZO MONK, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF GEORGE E. RICHARDS

I, George Richards, being first duly sworn and deposed, state as follows:

1.      I am a member of the Illinois Civil Service Commission ("Commission") in the position of Commissioner.  I have been a member of the Commission for 10 years.

2.      I was Chairman of the Commission from November 1995 until February 2004. During this time, the Commission hired Robert Powers ("Powers") to be the Executive Secretary of the Commission.  As the Executive Secretary of the Commission, Powers ran the operations of the Commission on a day-to-day basis.  Prior to being hired as the Executive Secretary of the Commission, Powers was employed as a Deputy Director for the Illinois Department of Central Management Services ("CMS") from August 16, 2002 until October 1, 2002.

3.      On April 14, 2003, Governor Blagojevich's office notified me that it was investigating alleged fraudulent actions by Powers while he was serving as the Deputy Director of CMS.

4.      On  April 15, 2003, Governor Blagojevich's legal counsel, Thomas Londrigan, sent a five-page letter to the Commission outlining the allegations against Powers.  (Attached as Ex. A).

5.      On April 17, 2003 I gave Powers a copy of Thomas Londrgian's April 15, 2003 letter outlining the allegations against him.

6.      On April 17, 2003, the Commissions met in executive session and considered the allegations against Powers.  Since Powers, as the Executive Secretary of the Commission, usually would investigate allegations such as these, the Commission decided to contact CMS for assistance with the investigation.  Because of the sensitivity of Powers' position, the Commission placed Powers on Administrative Leave with pay from his position as the Executive Secretary of the Commission. (Attached as Exhibit B).

7.      On May 14, 2003, Ed Wynn, the General Counsel for CMS, provided the Commission with an investigative report that further detailed the fraudulent personnel transactions committed by Powers.  (Attached as Ex. C).

8.      On May 15, 2003, the Commission met in executive session and discussed the charges against Powers and unanimously decided to suspend Powers pending discharge based on evidence demonstrating that Powers violated the Illinois Personnel Code and engaged in fraudulent personnel transactions while employed as Deputy Director of CMS.  At this meeting, the members of the Commission unanimously voted to give me the authority to hold a pre-termination hearing with Powers, and unless Powers presented new evidence in his own defense, to impose discipline up to and including discharge.

9.      On May 21, 2003, prior to the pre-termination hearing, I sent Powers a letter notifying him of the charges against him, listing the potential witnesses, and attaching documents pertinent to the charges against him. (Attached as Ex. D).

10.     On May 29, 2003, I conducted a pre-deprivation hearing with Powers.  At this hearing, I again notified Powers of the charges and presented him with the evidence against him. Powers was given the opportunity to refute the charges against him and to present evidence refuting the charges.  Powers admitted that he knowingly signed his name in the box labeled "Director of Central Management Services" on CMS forms for three State employees.  Powers informed me that he knew the Director of CMS at that time, Michael Schwartz, would not sign the forms.

11.     Because Powers did not present any new evidence refuting the charges, I recommended to the Director of CMS that Powers be terminated from his position as Executive Secretary of the Commission.

12.     On May 30, 2003, the Director of CMS approved the request of the Commission that plaintiff be discharged from his position as Executive Secretary of the Commission.

13.     On June 27, 2003 and September 10, 2003, Powers received a full post-deprivation hearing in front of Administrative Law Judge William F. Trapp.  I testified at the June 27, 2003 proceeding.

14.     On December 1, 2003, Powers filed exceptions with the Commission to the Administrative Law Judge's recommended decision that discharge was warranted.

15.    On December 18, 2003, the Commission after deliberation, adopted the decision

of the Administrative Law Judge and upheld the termination of Powers. (Attached as Ex. E.)

I declare under penalty of perjury that the foregoing is true and correct.

George Richards

Subscribed and sworn to before me
This _6_ day of _February_, 2006

Notary Public

Official Seal
Thomasina Johnson
Notary Public State of Illinois
My Commission Expires 08/10/08

4

# EXHIBIT A

# MEMO

**TO:**   Civil Service Commissioners

**FROM:**   Tom Londrigan

**DATE:**   April 7, 2003

**RE:**   Employees Who Improperly Sought to Extend Their Term Appointments

## BACKGROUND

In response to your request for information in the above reference matter, I have prepared this memo. The Governor's Office recently became aware of a series of improper employment transactions in the fall of 2002, which attempted to extend the term appointments of forty state employees for an additional four years. Most of the employees' terms were set to expire in the spring of 2003. A review of the forty personnel transactions revealed that all the employees participated in a series of four transactions. First, they purported to resign from their original term appointment. Second, the following day, the employees allegedly were "appointed" to another vacant job within the agency. Third, four days later, they resigned from this second job. And finally, they were appointed to the original job and given a new four-year term. Thirteen agencies participated in the transactions, which occurred within a two-week time frame in August and September of 2002.

As a general matter, term appointments expire at the end of a four-year term. During the term, the appointee can be terminated only "for cause." Under the Personnel Rules, an appointee may not transfer to another agency and thereby extend the term. Nor may an appointee take a leave of absence and then return to the original job and extend the term. The clock on the term keeps ticking, regardless of such transfers. At the end of the four-year term, the appointee may file for a term renewal. The term can be renewed for another four years. If no action is taken, the appointee is thereby terminated on the last day of his/her four-year term. If the appointee's term is renewed then the appointee serves a 120-day probationary period during which time the Administration may elect not to renew, the appointee's term. After the probationary period ends, the appointee can be terminated only "for cause." The employees who engaged in the foregoing series of employment "actions" did so to cause their new probationary periods to expire just days prior to the Governor's Inauguration.

## INQUIRY

I met with representatives of the thirteen agencies to learn more about this scheme. The essential chain of events was the same in each instance. First, Governor Ryan's office telephoned the agency personnel director with a request to "take care" of specifically named individuals by granting them new four-year terms as well as authorizing the agency to offer the new terms to anyone else that the Director wished; second, the personnel director met with the agency director; third, the director either objected to the process and his job was thereafter threatened by the Governor's Office, agreed to the process for only the individuals named, or

agreed to the process for the individuals named and offered the new four-year terms to other employees at his selection; fourth, since none of the personnel directors knew how to execute the transactions, the personnel directors received detailed instructions on how to complete the four personnel transactions from the Governor's Office.

After the interviews, we reviewed all personnel files. It was clear that the sole purpose for the transactions was improperly to extend the terms of the forty employees to 2006. In all cases, the employees never reported to the second job, all continued to perform the duties of their original job despite their representation that they had resigned from such job and in many instances the four days on the second job covered weekends and holidays. As a result, the Governor's office decided to initiate disciplinary proceedings against the forty employees and to continue investigating the other individuals involved in the transactions, namely, the former Governor's office, the personnel directors, CMS personnel, and the agency directors.

## DISCIPLINE

On March 7, 2003, forty employees were sent letters from their agency directors (pursuant to the Governor's office's direction) which placed them on paid administrative leave, outlined the facts surrounding the particular transactions, and informed them that they were being considered for disciplinary action. They were given five days to respond to the letter. All of them responded, however, seven employees resigned. The agency directors accepted these resignations. The General Counsel's Office personally met with each of the employees on March 15, 2003 and proposed a Resolution Agreement to each of the remaining 33 employees. The agreement required a two-week unpaid suspension. The agreement required the appointee to recognize that the term extension to 2006 was invalid and returned the appointee to their original term. The employees also waived all appeal rights. Nineteen of the employees signed the agreement and went back to work to finish their terms. Fourteen employees refused to sign the agreement and they were terminated on Friday March 28, 2003. They have fifteen days to file an appeal with the Civil Service Commission. Attached is a list of the employees who participated in the improper term extensions.

## CONTINUED INVESTIGATION

On March 26, 2003, I met with the Illinois State Police and informed them, since our administrative review was nearly complete, that I would like to turn over all of this information for their own review and investigation. On April 1, 2003, I received a call from the Illinois State Police asking to pick up the files in order to pursue their investigation. Upon completion of this recommendation, I will turn the files over to ISP.

## FURTHER ADMINISTRATIVE ACTION

Based upon the results of our investigation to date, Rob Powers, Diane Ford and Sarajane Wright, all formerly in the Governor's office, appear to have played key roles in concocting and implementing this scheme.

Robert Powers currently serves as the Director of the Civil Service Commission. Since the Commission has the authority to appoint the Director, it appears to be the only entity with the authority to terminate the Director. 20 ILCS 415/10. Sarajane Wright is also an employee of the Commission. On October 1, 2003, the Commission Chairman (George Richards) signed a

document, which transferred Mr. Powers to Civil Service Commission from CMS. The Civil Service Commission should initiate proceedings to discharge for cause. The Director position is protected by the Personnel Code and can only be discharged for cause. The legal standard to discharge for cause is "some substantial shortcoming which renders continued employment by the State in some way detrimental to the discipline or the efficiency of the service and which the law and public opinion recognizes as good cause for the employee no longer being held in that position." *Norris v. Commission on Human Relations*, 325 N.E. 2d 818. Section 302.700 of the Personnel Rules codifies this standard.

Powers' and Wright's actions satisfy this standard, particularly since they have been placed in positions to review the propriety of the employment transactions in question. The following people all stated that the multiple employment transactions were all executed and signed at the same time, despite different dates on the documents. Further, and perhaps most importantly, none of the employees performed the duties of the second job. They also detailed the following evidence in support of filing disciplinary charges, including discharge, against Powers and Wright:

## TESTIMONY

1. Nancy Bounds: *(Director of Personnel, Dept. of Corrections)* Andrew Walter, then Chief of Staff for the Department of Corrections, brought Bounds into his office and stated that Powers called and stated that he "needed to take care of a few people and wanted to get them out of a term an into a new term." Bounds claims to have advised that the process was illegal. Walter explained the process and that Powers was going to appoint the three people to exempt positions for four days before granting them new terms. Bounds claims that she refused to sign the paperwork because of her belief that the process was illegal. Bounds received the request to execute the paperwork on September 15, 2002 yet the transactions (according to the documents) all occurred before September 15, 2002. All the Corrections documents have been backdated by hand to ensure that the probationary periods ended before Gov. Blagojevich's inauguration.

2. Andrew Walter: *(Chief of Staff, Dept. of Corrections)* Walter received a phone call from Powers, asking for the term extensions for three employees. He forwarded the request to Director Snyder who, in turn, refused to have anything to do with the term extensions. Powers called two days later and Walter explained Snyder's position. Powers stated that Diane Ford would get involved if Snyder did not cooperate. Snyder again refused. Walter passed the information along to Powers and Powers said that Snyder should expect a phone call. Snyder received a call and his job was threatened. Snyder then cooperated.

3. Sergio Molina: *(Spokesperson, Dept. of Corrections)* Stated that Corrections Director Snyder received a call from the Governor's office to perform the term extensions but that Snyder was reluctant. Stated that the Governor's office called back and threatened to fire him and replace him with someone who would execute the term extensions. He is not sure if the phone calls came from Newtson, Ford or Powers.

4. Don Snyder: *(Director, Dept. of Corrections)* Confirms that the original requests came from Powers but that the threats came from Ford.

5. <u>Bob Thompson</u>: *(Director of Personnel, Banks and Real Estate)* He received a phone call from Sarajane Wright, Powers' assistant, with a request to stop and restart the term of one of the Department of Banks and Real Estate employees. Thompson did not think he had authorization to perform such transactions and passed the request on to Commission Darr. Darr asked to offer the deal to other employees. Wright told him that the Commission could offer the deal to anyone he saw fit. Darr asked for a list of employees whose terms ended in the spring of 2003. Darr eventually offered the deal to four other employees. All refused but one. Thompson refused to sign the transaction documents. After the new year when the Governor's office terminated sixty employees under the personnel rule change, Thompson received a call from Wright urging Thompson to inform those employees that they had appeal rights. Wright worked for the Civil Service Commission at the time.

6. <u>Marcy Trowbridge</u>: *(Personnel Dept., Banks and Real Estate)* She confirms the testimony of Thompson but adds that Wright "spelled out the details of the process" for her since nobody was familiar with how to execute the transactions.

7. <u>Lynette Jones</u>: *(Director of Personnel, Dept. of Agriculture)* Claims that Director Hampton received a call from the Governor's office to extend the terms of two employees. Hampton then requested a list of employees on terms and the dates when the terms end. He then called each of the employees into his office and offered them the extension. Two of the employees refused the offer because they thought it was illegal.

8. <u>Tammy Payne</u>: *(Personnel, Dept. of Agriculture)* She confirmed the testimony of Jones. However, she was detailed to Powers' office specifically to help execute these transactions. She was there without an interagency transfer or agreement and states that Powers directed her to perform these duties.

9. <u>April Cook</u>: *(Director of Personnel, Dept. of Natural Resources)* She received a call from either Wright or Powers stating that they "wanted to do this process for a couple of people." The Governor's office stated that any additional appointments were at the call of the Director of DNR. Cook didn't question the process because Powers and Ford stated that it was "ok" and they were attorneys. Director Manning told Cook that he "wanted to help as many people as he could and those people who were the most vulnerable." She has had communications with Wright, Powers, and Ford since these employees were terminated.

10. <u>Steve Gumble</u>: *(Director of Personnel, IEPA)* Powers called Gumble to "get this done for ███████████." ████ is ████████ sister-in-law. Powers said that Wright would call and walk him through the process. Director Cipriano told Gumble that "we have to do what Powers says to do." Powers offered the Director the authority to extend the terms of other employees.

11. <u>Tricea Pineda</u>: *(Director of Personnel, CMS)* Three employees were offered the term extensions. Director Schwartz did not want to be involved in the process and refused to sign the documents. Powers and Wright signed the documents themselves on behalf of the Director of CMS, but they had no legal authority to do so.

12. Dee Showalter: *(Director of Personnel, DHS)* Wright called her asking to extend the terms of two employees. Showalter felt the transactions were improper and reported her concerns to the Secretary Baker and the Governor's office. Secretary Baker stated to her that they were merely following the orders of the orders of the Governor's office.

13. Barbara Hoecker: *(Director of Personnel, DCEO)* Wright called Hoecker to extend the terms of certain employees. Director McDonough received a similar call from Ford and decided to extend the offer to two other employees.

14. Michelle Gentry: *(former Chief of Staff, DPH)* Wright called Gentry with a request to extend the terms of two employees. Gentry responded that she didn't think that DPH had two vacant positions to use in the process. Wright then identified two vacant positions DPH could utilize. Director Lumpkin authorized the term extensions because "the Governor's office told us to do it" therefore DPH did not have a choice in the matter. Gentry prepared the transactions and physically delivered them to Wright.

15. Jessica Trame: *(Chief of Staff, ISP)* Tammy Payne, who was working for Powers, called Trame and stated that the Governor's office wanted "to take care of" an employee whose term expires in March of 2003. Payne stated that the Governor's office would create a vacancy to help with the transaction. Director Nolen stated that he would authorize the transaction as long as Diane Ford "is telling us to do it." Trame confirmed that Ford directed the transaction.

16. ███████: *(former Director of Personnel, ███████)* ███ was an employee of the Department of ███████. In the spring of 2001, Powers asked him to transfer to ███████ to assume the job of Director of Personnel. ███ agreed but requested a new four-year term in exchange. Upon arrival at ███ CMS personnel informed him that his term couldn't be restarted. ███ called Powers to express his displeasure and Powers promised to fix the problem and get him a new four-year term. Two months later Powers came up with the term extension process for ███. This appears to be the first instance of the term extensions being utilized.

## DOCUMENTARY

1) Four separate CMS Personnel Documents signed without authority by Powers and Ford/Wright.
2) 62 Personnel Action Request Forms signed by Ford/Wright.

# EXHIBIT B

April 17, 2003

XIII. <u>MOTION TO GO INTO SECOND EXECUTIVE SESSION FOR THE DISCUSSION</u>
<u>OF PERSONNEL MATTERS</u>
IT WAS MOVED BY COMMISSIONER DORGAN, SECONDED BY
COMMISSIONER FABRIZIO, AND THE MOTION UNANIMOUSLY ADOPTED
TO HOLD AN EXECUTIVE SESSION TO CONSIDER PERSONNEL MATTERS
OF THE COMMISSION. AYES: RICHARDS, DORGAN, FABRIZIO, EWELL,
AND PETERSON. NAYES: NONE.

XIV. <u>RECONVENE MEETING</u>
<u>Present</u>: George E. Richards, Chairman, John M. Dorgan, Ray W. Ewell, Dan P.
Fabrizio, and Barbara J. Peterson, Commissioners; and Leonard F. Sacks of the
Commission staff.

BY ROLL CALL VOTE, IT WAS MOVED TO PLACE ROBERT B. POWERS
AND SARAJANE A. WRIGHT OF THE COMMISSION STAFF ON PAID
ADMINISTRATIVE LEAVE UNTIL FURTHER NOTICE. AYES: RICHARDS,
DORGAN, EWELL, FABRIZIO, AND PETERSON. NAYES: NONE.

# EXHIBIT C



ILLINOIS _____ Rod R. Blagojevich, Governor
DEPARTMENT OF CENTRAL MANAGEMENT SERVICES
Michael M. Rumman, Director

# MEMORANDUM

**TO:** George Richards, Chair
Illinois Civil Service Commission

**FROM:** H. Edward Wynn
General Counsel, Central Management Services

**DATE:** May 14, 2003

**SUBJECT:** Term Appointment Extensions of Certain Employees

---

**PRIVILEGED AND CONFIDENTIAL**
Attorney-Client Privileged

This memorandum is in response to your request and the request of Michael Rumman, Director, Central Management Services, to review an April 7, 2003, Memorandum from Tom Londrigan relating to two current Civil Service Commission employees, Robert Powers and Sarajane Wright ("the Memorandum").

The specific request was to review certain relevant factual statements in the Memorandum, obtain verification of those statements, and determine whether those statements would support discharge of Mr. Powers and Ms. Wright.

Relevant Facts

Although there are other factual assertions in the Memorandum that may support discharge of Mr. Powers and Ms. Wright, two of these assertions are particularly compelling and incontrovertible.

First, Tricea Pineda, CMS Personnel Officer, stated that Powers and Wright demanded, over the objection of the CMS Director, Michael Schwartz, that three CMS employees, Lori Skinner, Susan Gowen, and Frank Cavallaro, be offered term extensions. (As described in the memo, "term extensions" referred to certain transactions in which certain term employees: (1) resigned from their current term appointment, (2) were appointed to another position, (3) resigned from that position shortly after their appointment, and then (4) were re-appointed to the original term position.) Nonetheless, the transactions for each of these employees were effectuated.

Second, Nanci Bounds and Andrew Walter, both with the Department of Corrections, stated that Powers similarly demanded that the same set of transactions be effected for three Corrections employees, Diane Hurrelbrink, Lynette Jones, and Mark Kinnaman, and that those documents were dated in a manner to ensure that those employees' probationary periods ended before Governor Blagojevich's inauguration, without regard to the actual dates those documents were executed.

## Verification of Relevant Facts

### CMS Employees

I personally spoke with Tricea Pineda regarding the first set of allegations described above. Tricea confirmed the statements. In addition, I asked her to provide the relevant documents reflecting each of the four transactions for each of the three CMS individuals listed above, and I personally reviewed those documents. (Copies of these documents are attached as Exhibit 1.)

A separate Personnel/Position Action Form was required for each of the four transactions for each employee. As clearly shown on the face of each of those documents, Robert Powers signed each of these as Director of Central Management Services, and Sarajane Wright initialed her signature of Diane Ford's name allegedly designating Agency Head approval. As you know, the Personnel/Position Action form must be signed by both the Director of CMS (or his or her lawfully approved designee), and by the head of the agency of the affected employee. (Because the three employees were CMS employees, the Director of CMS (or his or her lawfully approved designee) would have signed both as Director of CMS and as the Agency Head.)

I verified that neither Robert Powers nor Diane Ford were the Director of CMS in September 2002, when they executed these documents, nor—for that matter—at any other time. I also verified that none of Robert Powers, Diane Ford or Sarajane Wright had any signature authority for the Director of CMS, Michael Schwartz. I verified this by asking CMS Internal Audit for a list of individuals with such signature authority, and then I personally reviewed the list to ensure that none of the names Robert Powers, Diane Ford or Sarajane Wright appeared on that list. (The Director Schwartz Signature Approval list is attached as Exhibit 2.)

I also noted that on the Frank Cavallaro Action Form for the Reinstatement Term Appointment transaction, that the effective date was originally typed in as 09-17-02, but the "17" was crossed out and "13" was handwritten in its place. I confirmed with Trica Pineda that she did not change this date, and that the 9/17/02 date was on the document at the time it was sent for signature. It is unclear who changed the date, but the date is written in a darker-colored ink more consistent with the ink color of Mr. Powers signature. See Exhibit 1.

Pineda verified that during the time in question none of the named CMS employees ceased performing the duties of their original term appointments, nor did they assume the duties of the exempt appointments.

### Department of Corrections Employees

I personally spoke with both Nanci Bounds and Andy Walter regarding the allegations in the Memorandum relating to the Department of Corrections. Both verified the statements attributed to them in the Memorandum. In addition, I asked Nanci to provide me with copies of the relevant personnel documents for each of the employees. (These documents are attached as Exhibit 3.) I reviewed those documents, and as they clearly indicate, the effective dates of each of the transactions have been manually altered and that in the case of Ms. Hurrelbrink the date of the employee's signature has been changed to a date that is the same (or in one case the day immediately before) the stated effective date of the transaction. In this regard, it is noteworthy that the signature date of Ms. Hurrelbrink appears to have been changed from a date after 9/12/02 but before 9/20/02, to 9/8/02.[1] I verified – by checking a 2002 calendar – that September 8, 2002 was a Sunday, a non-work week day.

In addition, each of the document sets contained a Personnel Action Request from the Office of the Governor (two in the case of Ms. Jones). On each of these documents, it appears that the signature date of Donald Snyder, the Director of the Department of Corrections was similarly modified to an earlier date. Moreover, these PARs are all signed by Sarajane Wright in Diane Ford's name. See Exhibit 3.

### Legal Standard

Ms. Wright and Mr. Powers are currently certified code employees of the Illinois Civil Service Commission. As such, the Commission may discharge them only if cause exists. As provided in Commission Rule 20(a):

> Cause for discharge consists of some substantial shortcoming which renders the employee's continuance in his position in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for the employee no longer holding the position.

See also 80 Ill. Adm. Code Sec. 302.700.

Section 13 of the Personnel Code provides:

Sec. 13 Unlawful acts prohibited.

---

[1] The rationale for this conclusion is that it appears that for the day portion of the date, it was originally a two-digit number beginning with a 1, but that the "1" is "squiggled" out, and that the second digit is written over to create the number 8, indicating that the number was a number other than 1. This conclusion is completely supported by a review of CMS's copy of the document.

(1) No person shall make any false statement, certificate, mark, rating, or report with regard to any test, certification, or appointment made under any provision of this law, or in any manner commit or attempt to commit any fraud preventing the impartial execution of this law and the rules.

Section 302.820(a) of the Personnel Rules provides:

An appointee to a position subject to Term Appointment shall be selected by the Director or Chairman of the Department, Board or Commission in which the position is located from the appropriate open competitive or competitive promotional eligible list.

Notwithstanding any other grounds for potential discharge of Ms. Wright and Ms. Powers, the attached exhibits strongly support their discharge on the following grounds:

1.   Mr. Powers and Ms. Wright violated Section 13 of the Personnel Code by signing the Personnel Action Forms for the CMS Employees as though they were the Director (in the case of Mr. Powers) or a designated signatory of the Agency Head of CMS (i.e. the Director) (in the case of Ms. Wright). Their actions were a false statement, certificate or mark and were with regard to an appointment made under the Personnel Code, since in fact they (1) were not authorized to sign the documents on behalf of the Director of CMS, (2) knew that the Director of CMS had not approved the transactions as required by the Personnel Rules, and (3) knew that, in the case of the re-appointment to the term position, that that position had not been filled in compliance with Section 302.820(a) of the Personnel Rules.

2.   Mr. Powers similarly violated Section 13 of the Personnel Code by directing that the Department of Corrections transactions be made effective at certain dates regardless of their actual date of signature or submission, which resulted in the altering of the signature date (a false mark or statement) on the Personnel/Position Action Forms (relating to an appointment under the Personnel Code) for those employees. Ms. Wright appears to have also violated Section 13 by signing the Personal Action Forms for the Governor's Office, when the underlying Personnel/Position Action Forms from the agency appear altered on their face, and none were signed by the Director of CMS, as was required.

3.   There is significant evidence that Mr. Powers and Ms. Wright knew or should have known that these employees did not perform the duties of the exempt appointments. First, because the DOC documents were not executed until all four parts of the transactions took place, Powers

and Wright knew or should have known the employees did not performed the duties of the exempt appointments and did not cease performing the duties of their original term appointments. Second, because of the identical pattern of the transactions for the CMS employees, Powers and Wright knew or should have know those employees did not perform the duties of the exempt appointments and did not cease performing the duties of their original term appointments. Viewed in their totality, these facts strongly appear to constitute false statements relating to an appointment in violation of Section 13 of the Personnel Code.

These actions, each of which were unlawful under the Personnel Code and Rules provide ample basis for discharge. This is particularly true given that Mr. Powers' and Ms. Wright's current positions involve them in reviewing certain employment transactions for their consistency with laws and regulations that they themselves violated on several occasions. Such conduct, which is unbecoming of a state employee at their levels, renders their continued employment in their current positions detrimental to the discipline and efficiency of the services provided by the Civil Service Commission.

cc: Michael Rumman