**E-FILED**
Monday, 06 February, 2006 04:30:07 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 4

BEFORE THE CIVIL SERVICE COMMISSION
STATE OF ILLINOIS

STATE OF ILLINOIS,
Petitioner,
-vs- No. DA-104-03
ROBERT B. POWERS,
Respondent.

Hearing held, pursuant to Notice, on the 27th day of June, 2003, at the hour of 10:00 a.m., at 425 1/2 South Fourth Street, Springfield, Illinois, before William F. Trapp, duly appointed Hearing Officer.

COPY



APPEARANCES:

OFFICE OF THE ATTORNEY GENERAL, by
MR. MATTHEW D. BILINSKY
Attorney at Law
500 South Second Street
Springfield, Illinois 62706
On behalf of Petitioner;

MR. JAMES P. BAKER
Attorney at Law
415 South Seventh Street
Springfield, Illinois 62701
On behalf of Respondent.

I N D E X


| WITNESSES | PAGE |
|---|---|
| ROBERT POWERS | |
| Examination by Mr. Bilinsky | 23 |
| GEORGE RICHARDS | |
| Examination by Mr. Bilinsky | 45, 99 |
| Examination by Mr. Baker | 61, 102 |

| EXHIBITS | PAGE | OFFERED |
|---|---|---|
| Joint Exhibit 1 | 108 | 108 |
| Group Exhibit 2 | 29 | 43 |
| Group Exhibit 3 | 40 | 43 |
| Group Exhibit 4 | 41 | 43 |
| Exhibit 8 | 51 | 104 |
| Group Exhibit 9 | 51 | 104 |
| Group Exhibit 10 | 49 | 104 |
| Respondent's Exhibit 1 | 67 | 106 |
| Respondent's Exhibit 2 | 86 | 106 |
| Respondent's Exhibit 3 | 86 | 106 |




PROCEEDINGS

MR. TRAPP: Let's go on the record. This is in the matter of the Illinois Civil Service Commission versus Robert B. Powers, Number DA-104.03.

Counsel, would you state your appearances for the record.

MR. BILINSKY: Matthew Bilinsky on behalf of the Civil Service Commission.

MR. BAKER: James Baker on behalf of Mr. Powers.

MR. TRAPP: Okay. We're here today because of the hearing requested by Mr. Powers, as I understand it, on or about June 1, 2003. Prior to getting into the hearing, are there any preliminary matters we should try to take care of?

MR. BAKER: I believe there are. First, and I think this is undisputed, a motion to exclude witnesses other than the parties or the representatives of the parties.

MR. TRAPP: Okay.

MR. BAKER: Which I assume is contemplated by Mr. Bilinsky as well.

MR. BILINSKY: Yes.

MR. TRAPP: So that motion will be granted.



You have no objection to that, Mr. Bilinsky?

MR. BILINSKY: That's correct.

MR. TRAPP: Okay. I might point out that this gentleman over here is Jason Barlow, who is a summer law clerk in our office, and -- so he's not a witness. Any other motions?

MR. BAKER: There have been two motions filed. Mr. Bilinsky filed one several days ago to amend the charge, and I have filed a motion in limine, which should be taken up in whatever order you deem appropriate.

MR. TRAPP: Okay. Mr. Bilinsky, would you wish to speak to your motion to amend?

MR. BILINSKY: Yes. Under the Civil Service Commission rules, the charge can be amended as long as it is consistent with the charge that was originally presented to the employee at the predisciplinary hearing. I have amended the charge, which in effect takes the original charges, withdraws what was originally charge two and charge three, and divides the first charge into two separate charges, and then withdraws the last sentence from what was originally charge one.

MR. TRAPP: Okay.

MR. BILINSKY: And more specifically, the first half of charge one deals with Mr. Powers allegedly signing some documents in a space designated for the director of CMS when he was not the director, and the second charge deals with him being -- directing others or participating in a system that was to fill positions that would not have been in compliance with Illinois Administrative Code, Section 302.820(a).

MR. TRAPP: So your amended charge, which you've filed with your motion --

MR. BILINSKY: And has been signed off on by CMS.

MR. TRAPP: Okay. You're telling us that it divides the original paragraph one into two, basically.

MR. BILINSKY: Correct.

MR. TRAPP: And then original paragraphs two and three are withdrawn.

MR. BILINSKY: Correct, as is the last sentence of paragraph one.

MR. TRAPP: Okay. And anything else in support of your motion?

MR. BILINSKY: Not at this time.



MR. TRAPP: Okay. Mr. Baker.

MR. BAKER: Mr. Hearing Officer, it might be helpful as I go through my comments if you had before you both the original charge and the amended charge prepared by Mr. Bilinsky, and I can identify for you what my objections are.

Originally, there were three separate charges, each of which was substantively different. The first charge dealt with making a false mark on a document contrary to Section 13 of the Personnel Code. It also dealt with altering the effective date of an appointment for a man by the name of Frank Cavallaro, and that charge, as I understand it, dealt with three individuals who were employed by the Department of Central Management Services.

The second charge dealt with the placement of a false mark on a document which resulted in four transactions being inappropriately executed at one time, and that charge dealt with four employees of the Department of Corrections.

The third charge is a little more complicated, and dealt with a situation where Mr. Powers apparently did something knowing that the individuals who were the subject of the transactions



did not perform the duties of exempt appointments.

In accordance with Commission rule, Mr. Powers propounded a set of written interrogatories upon the Commission, and received answers to those interrogatories on Monday of this week. In their answers, it's my understanding that the Commission has withdrawn from the charge the last sentence in charge number one, and that's spoken to in its response to interrogatory number 11; all of charge number two, which was spoken to in interrogatory number 13 and 14; and all of charge number three, as represented by the Commission's response to interrogatories numbers 15, 16, 17, and its response to item number four of the document production request.

That being the case, as of Monday of this week, the only charge against Mr. Powers was conduct on his part with respect to personnel transactions involving three employees of the Department of Central Management Services, and the nature of the charge is that he made a false mark on a transactional document, a CMS-2, in violation of Section 13 of the Personnel Code. More specifically, that he made a mark with respect to an appointment



when he knew three separate things, and the charge is drafted in the conjunctive, not the disjunctive. Number one, he knew that he was not authorized to sign the document on behalf of the director; number two, he knew the director had not approved the transaction as required by the Personnel Rules; and number three, he knew that the positions had not been filled in compliance with a fairly specific rule of the Department of Personnel.

Now, that is the claim in the initial charge. It is the claim for which discovery has been taken in this case, and it is the charge which was subject to the predisciplinary undertakings made in accordance with the Department of Central Management Services' Personnel Rule.

The amended charge alters the theory of the Commission's case, and expands it in several respects. First, the charge is not limited to employees of the Department of Central Management Services, but now includes as well four employees of the Department of Corrections. Second, the charge is not that Mr. Powers violated Section 13 of the Personnel Code, but instead that he violated, quote, Personnel Code -- without reference to a specific

section -- rules -- without reference to a specific rule -- and/or public policy of the State of Illinois. So we find ourselves not limited to whether Mr. Powers did something in contravention of Section 13 of the Personnel Code, or even Section 302.820 of the Personnel Rules, but instead that he has violated unspecified rules extending well beyond those.

The problem, of course, is that in our discovery efforts, we tried to focus on what rules were violated, what provision of the code was referred to, and it's much more expansive now than it was in the original charge. Moreover, we have no idea what the public policy is that is -- that has been violated by Mr. Powers, which was an area that was right for discovery, and it seemed to be a fairly significant component in this case.

In my view, paragraph one of the original charge with the last sentence removed, consistent with the position taken by the Commission, fully and adequately sets forth what the claim is that is the subject of this proceeding, and I am concerned that amending that charge will serve no good in that it's not going to provide any further clarity concerning



the nature of the claim, and runs the risk of opening this proceeding up to areas for which no discovery has been taken, and is well beyond the scope of what was done initially.

MR. TRAPP: Okay. Mr. Bilinsky.

MR. BILINSKY: Yeah. The amended charge in charge one states that the actions constitute an unlawful practice under the Personnel Code in violation of 20 ILCS 415/13. It's not amorphous, it's not generic, it's specifically spelled out. It says the conduct occurred during a period of time. It describes that he affixed his signature on the personnel forms, and it describes the statute that we're alleging that violates.

The original amended charge describes the same period of time, says that he placed his box in the signature as director of CMS, and that that was a violation of 20 ILCS, Section 13. The only difference is that I put that it's 20 ILCS 415/13 which is denominated as Section 13 because that's the more correct cite without making any comments on CMS.

The second portion of charge one states that his conduct is an attempt to fill term positions that had not been filled in compliance with Section



302.820(a), and my second charge puts the dates in for the conduct, which was not in charge one, so it's more specific information. It identifies the employees, and it says that that conduct was an attempt to circumvent or avoid the public policy of Illinois Admin. Code, Title 80, Section 302.820. So once again, I've clearly identified the rule at issue, and it's clearly a rule that was previously brought -- or allegations were brought. I have made mine more specific, including dates and times -- or excuse me -- dates and personnel, as opposed to the more general charge that had originally been placed before Mr. Powers.

And then, you know, have the general prayer for relief that says that the conduct from the above charges and those violations renders you -- or demonstrates that you're unable to carry out the functions of your job.

That said, if Mr. Baker is saying that he would like to conduct more discovery specific to the amended charge before convening the hearing, I would have no objection to that. I mean that was, you know, never discussed, but I don't have a problem if they want to go back and do more discovery before



convening the hearing based on the amended charges, which I believe would be more appropriate if you were to find that the amended charges differ sufficiently from the original to warrant the need for additional discovery.

MR. TRAPP: Mr. Bilinsky, I have a question. It appears to me that certain names that are mentioned in the original paragraph two of your original charge now appear in the amended two; correct?

MR. BILINSKY: That is correct.

MR. TRAPP: So is that consistent with your earlier statement that you had only divided original one into two?

MR. BILINSKY: Yeah. The second -- or I should say the second charge in the original charge dealt with allegations relating to affixing a false mark or statement, and were not related to actions alleging that he had violated -- Mr. Powers had violated Section 302.820 of the Illinois Administrative Code. My second charge is just putting in the specifics in regards to the allegations in charge one that he had not -- or he engaged in a series of activities that was not in

compliance with Section 302.820 by providing more detailed information in regards to the people and the transactions.

MR. TRAPP: But we may get into evidence concerning employees Mark Kinnaman, Diane Hurrelbrink, and Lynnette Jones; correct?

MR. BILINSKY: That would be correct.

MR. TRAPP: And they were mentioned in original paragraph two of your first charge.

MR. BILINSKY: That's also correct.

MR. TRAPP: Okay. It's my understanding that we may -- whatever occurs today, if we have witnesses, that the hearing will in all likelihood not been concluded today; is that correct?

MR. BAKER: Yes.

MR. TRAPP: Okay. And that would mean that we'd pick a date to reconvene with further witnesses. Is there any objection to any discovery taking place between those two dates?

MR. BILINSKY: As long as it's focused on or limited to the changes between the two charges, I would have no objection to that.

MR. TRAPP: Mr. Baker.

MR. BAKER: I find myself in a Catch-22



here, and let me explain my concern. With all due respect to Mr. Bilinsky, he's doing more than he says he's doing because charge number two now alleges an attempt to circumvent and avoid public policy. That wasn't in the face of the original charge, and he's going to call witnesses, presumably, in support of that particular proposition today. I'm going to be expected to cross-examine those witnesses. We've not had the opportunity to engage in any discovery on that point to prepare me to do that for today. While it is true, I suspect, that I could make a request for a continuance, under Commission rule and practice, if I do, then the time of the extended period is our nickel, so to speak, when it comes to back pay relief, and number two, that creates a fairly messy way to proceed with this case.

It seems to me the central charge is fairly well stated in paragraph number one. It's clear, we understand what the theory is that is being pursued, we know what the claims are, and I can see no reason why it's necessary to expand beyond that.

MR. TRAPP: Anything else, Mr. Bilinsky?

MR. BILINSKY: Yes. Just a moment, please. Under Rule 24, extensions of time, if -- Mr. Baker is



correct. If he himself requests the continuance, it would constitute a waiver for compensation -- you know, for any -- depending upon the outcome of the hearing, but for any period that -- or accrual that occurs after that. However, if the continuance is not -- if the ALJ -- or excuse me -- if the Administrative Law Judge for other reasons enters the continuance, it does not appear to have an effect on the employee's substantive rights in regards to his back pay. That would be my only comment in regards to his statement about that.

I believe that it's consistent, and that we have told him that he acted not in compliance with the section. I have defined the word compliance by saying you are attempting to circumvent the public policy, but, you know, it's sufficient to put you on notice. It's a notice pleading standard, not a fact pleading standard.

MR. BAKER: And that's why we take discovery in these cases, and I don't -- I don't mean to, you know, make a big deal out of nothing, but I think it's fairly important for everyone in this room, both the Commission and Rob Powers, to get this case decided on a timely basis so that we can all move on,



and that's why it was that we didn't request a continuance. We got our discovery in, tried to do it timely, and I think the attorney general's office did a commendable job in responding within the time prescribed by the rules so that we could all be prepared today.

If charge number one were vague, ambiguous, or unclear about what the theory of the misconduct was, I would feel differently, but it's not. We know what's being charged. We know that if that statute and that rule were violated, then in thu judgment of the Commission, that constitutes a sufficiently substantial shortcoming to justify his discipline. We know that's the theory of the case. So I think Mr. Bilinsky is fairly free to try his case, and put evidence on in accordance with that theory, and nothing is to be gained through his amended charge.

If we felt the charge was in some respect unclear, we could have moved for a bill of particulars under Commission rule. We didn't do that. It identifies in a fairly succinct fashion what the conduct was he engaged in. It provides all of us with a road map as to what the scope of the evidence is going to be in this case. It certainly

apprises us what the legal theories are of the case. So I really see no need. I don't see how it benefits in a strategic sort of way for the Commission to modify the theory.

MR. TRAPP: Okay.

MR. BILINSKY: Although I believe that's the Commission's choice. As Mr. Baker's familiar from his own practice, the defendants do not get to advise the plaintiffs on what theories they should pursue in their complaints or not pursue.

MR. BAKER: Try as they may.

MR. BILINSKY: Try as they may.

MR. TRAPP: All right. Well, I'm going to allow the motion to amend, and I will say, however, that if Mr. Baker chooses to propound additional discovery, I will certainly look at that very closely so that he is able to obtain that information which the discovery rules allow, but I think we should allow the motion to amend.

MR. BAKER: I am assuming, then, that if matters come up beyond the scope of the original charge number one through witness testimony as to those new matters, I could not only take discovery, but defer my cross-examination of the witnesses on



those particular points?

MR. TRAPP: What's your view on that, Mr. Bilinsky?

MR. BILINSKY: I would have no objection. I think that's a reasonable request.

MR. TRAPP: Okay. That sounds reasonable to me. I think we'll have to take that issue up on a -- perhaps on a question-by-question basis because of the sort of intermixture between the original charge and the amended charge. Anything else?

MR. BILINSKY: There are Mr. Baker's motions that he had filed.

MR. BAKER: Actually, I only think one motion --

MR. BILINSKY: Needs to be addressed today?

MR. BAKER: -- is addressed to the Hearing Officer. The other one is for someone in a different pay grade, I believe. And this motion may be resolved. Yesterday I filed a motion in limine attempting to limit evidence that was being presented to what the scope was of the predisciplinary proceeding, and it is my understanding from a conversation I had with Mr. Bilinsky yesterday that it's his intent to call Mr. Powers, Mr. Walter,



Commissioner Richards, and Ms. Hensey as witnesses, and if my recollection is correct, the only individual that was not included on the list of witnesses other than Mr. Powers, of course, was Ms. Hensey, and I think we would agree to go forward without barring her testimony.

So if that is truly the attorney general's intention in terms of the testimony it's going to present in this case, I believe my motion in limine as to testimonial proof is moot.

MR. BILINSKY: I can't speak for Lisa Madigan, but my intention is that those will be my only witnesses, except that depending upon the testimony of Mr. Powers, I may have to call Shelly Martin, who is the auditor general, and has the list of those who have signature authority for Director Schwartz.

MR. BAKER: Okay. If it's just for the limit -- that limited purpose, we would have no objection to that either.

MR. TRAPP: So, Mr. Bilinsky, you're going to call today or your intention is to call today the following: Powers, Walter. Is that A-l-t-e-r?

MR. BILINSKY: W-a-l-t-e-r, yes.



MR. TRAPP: Richards, and Hensey; right?

MR. BILINSKY: Correct.

MR. TRAPP: All right. And, Mr. Baker, you're saying that as to those witnesses, you have -- you were withdrawing the testimonial portion.

MR. BAKER: That is correct. The only one that I think was not contemplated was Ms. Hensey, and I think I -- she's being used for a fairly limited purpose. We have no objection to those witnesses.

MR. TRAPP: Okay.

MR. BAKER: I further understand -- and make sure I have my notes correct on this point -- that there are three separate documents or sets of documents that Mr. Bilinsky intends to offer as documentary evidence. The first are CMS transactional forms which I believe were provided at Mr. Powers' predisciplinary hearing. So our motion would certainly not address those documents. And the other two documents are two letters, one written by Tom Londrigan -- or maybe memos, I don't recall -- and the other by Ed Wynn, who are lawyers for the Blagojevich administration, and those are not being offered as substantive evidence, but apparently to set the trail for what Mr. Richards did in his

activities leading up to the discharge decision. And if that's the case, we have no objection to those being presented for that purpose, and if that's all the documentary evidence that's going to be presented, then I think there's nothing for my motion in limine to address.

MR. TRAPP: Okay.

MR. BILINSKY: The only documents that I have in addition to what Mr. Baker described, I have a letter that goes along with the Ed Wynn memo. It's the letter requesting that they prepare the memo. It's just a foundational part of the memo. I don't -- depending upon Mr. Powers' testimony, I have the actual physical list that Shelly Martin would testify to as to those people who have Director Schwartz' signature authority if that becomes an issue. At this time I am not anticipating that I'm going to need to admit that, but I have that prepared as a potential exhibit.

MR. BAKER: And that would be used for Shelly Martin?

MR. BILINSKY: Right, for Shelly Martin.

MR. BAKER: Okay.

MR. BILINSKY: And then the only other



documents that I had were some documents related to just dates for Mr. Powers, when he had various appointments in 2002. Just -- I wasn't sure how much he was able to remember with specificity relating to his transfer into CMS and then the dates -- or actually, this is the dates he was transferred to the Civil Service Commission from CMS.

MR. BAKER: This came out of the personnel file?

MR. BILINSKY: Correct, that was in the personnel file.

MR. BAKER: That's okay. These are my copies?

MR. BILINSKY: Yeah, you can have them. And, in fact, we can, maybe to speed things along, go through the exhibits that I'm going to use, see if we can just agree to move them into evidence at this time, if there's any objections.

MR. BAKER: Well, why don't we just wait until after the evidence is in and see what the testimony looks like.

MR. BILINSKY: Sure.

MR. TRAPP: All right. So if I'm understanding, Mr. Baker, then given the



representations just made, that the document portion of your motion is pretty much moot as well then.

MR. BAKER: I think that's right.

MR. TRAPP: Okay. All right. So that should resolve that motion then. Anything else before we start?

MR. BILINSKY: Nothing for the petitioner.

MR. BAKER: Nothing for respondent.

MR. TRAPP: Okay. Ready to call witnesses?

MR. BILINSKY: Yeah. I'll waive opening statement, and then for my first witness, I'll call Mr. Powers.

ROBERT POWERS,

having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BILINSKY:

Q Sir, would you state your name for the record, please.
A Robert Powers. It's P-o-w-e-r-s.
Q And, Mr. Powers, are you currently employed?
A No.
Q And what was your most recent job?
A Executive secretary of the Illinois Civil



Service Commission.
Q And how long were you in that position?
A From October 1st of 2002 through May 30th of 2003.
Q And executive secretary with the Civil Service Commission, generally speaking, that's a position with the State of Illinois?
A That's correct.
Q Had you worked with the State of Illinois prior to being appointed to the executive secretary position?
A I started working with the secretary of state's office on September 1, 1988, and worked there until January 16th of 1999 when I transferred from secretary of state's office to the governor's office.
Q Did you work at the secretary of state's office when the secretary of state was Jim Ryan? Or excuse me. George Ryan?
A Yes, I did.
Q And then you transferred to the governor's office when George Ryan was elected governor?
A That's correct.
Q What was your position in the governor's office under George Ryan?

A Deputy counsel of personnel and boards and commissions.

Q Are you a licensed attorney in Illinois?

A Yes, I am.

Q And how long have you been licensed?

A Since May of 1980. May 1, 1980.

Q And do you maintain your license present day?

A That's correct.

Q Prior to transferring to the executive secretary position at the Civil Service Commission, what was your position in Governor Ryan's office?

A Deputy counsel over personnel, boards, and commissions.

Q At any time were you appointed to or were you working for Central Management Services?

A I'm sorry. August 16th of 2002 I transferred to the Department of Central Management Service, and was there until October 1st of 2003.

Q October 1st of 2002?

A I'm sorry. 2002. Correct.

Q So you started with George Ryan's office as a deputy counsel for personnel, boards, and commissions January 19th of '89, and worked in that



position until August 16th of 2002?

A January 16, 1999 is when I started at the governor's office.

Q Excuse me.

A And August 16 of 2002 is when I transferred to CMS.

Q Okay. And then in October 1st of 2002 is when you transferred to the executive secretary position?

A That's correct.

Q What was your position at CMS beginning in August 16 of 2002?

A I was in payroll title of SPSA, that's senior public service administrator. My job description indicated that I was -- served as an associate director of the Department of Central Management Services in benefits and support services division.

Q What did you do for benefits and support services as the associate director?

A I was assigned to work in the governor's office to handle personnel matters and boards and commissions.

Q So you did the same job, but it was under



the -- as an associate director out of CMS?

A Essentially the same functions, yes.

Q Now, sometime in 2002 were there any discussions in the governor's office about attempting to protect some of the term appointment employees whose terms were going to expire in 2003?

A I could take issue with your word "protect." I'm not sure what you mean with that word.

Q Was there some discussions about people whose jobs -- term appointments were going to expire in 2003, and there was discussion about how to possibly arrange their positions such that they had new positions that would expire at a date beyond 2003?

A Yes.

Q And you had some conversations with the folks over at Central Management Services, asking them about procedural codes for certain transitions related to restarting people's term appointments?

A That's correct.

Q One of the people you spoke to was Deb Hensey?

A Yes.

Q Now, are you familiar with Section 302.820



dealing with term appointments?

A Yes.

Q And that section provides that term appointments are for four -- shall be for four years, and then at the end of the four-year period, that term appointment can be renewed?

A That's generally correct, yes.

Q Now, the series of transactions to restart people's term appointments was an attempt to give them a new term appointment before their original four-year term appointment had expired; is that correct?

A Well, the effect of the transactions the people went through resulted in new four-year term appointments.

Q Now, would that have been a renewal of a term appointment, or would it be a new term appointment?

A A new term appointment.

Q Okay. And then three of the employees -- strike that. Did you contact CMS and ask them to set up a series of transactions to effect these new term appointments for Susan Gowen, Frank Cavallaro, and Lori Skinner?

A Quite honestly, don't know whether I contacted CMS about those three employees or not.
Q Okay.
A It could have been somebody on my staff.
Q Sarajane Wright on your staff?
A She was on my staff.
Q If she had contacted CMS, would she have been doing it on your behalf?
A She would have been doing it per my instructions, yes.
Q Okay. At some point -- well, let me show you. I'm going to hand you what's been marked as Group Exhibit 2, and ask if you can identify the documents that comprise Group Exhibit 2.
A Assuming these are the same copies of the originals that were provided to me in my pre-D hearing, I've seen these. Without having the originals, I can't necessarily identify them, but they look like the same copies that were provided to me in discovery and at my pre-D.
Q And what is that top form? Is that a CMS-2?
A It's called a CMS-2.
Q And that's the form that's used by Central Management Services whenever someone changes



position, gets a raise, has something that affects their personnel status with the state?
A Every transaction occurring with an employee, an agency would generate the CMS-2 to document what that transaction was, and forward that to CMS for entry into the computer database on personnel.
Q So CMS-2 forms are to document personnel transactions?
A It's the form used by an agency to notify Central Management Services of a personnel transaction.
Q Now, the top form on Exhibit Group 2, that's as to Susan Gowen; is that correct?
A That's correct.
Q And what is the transaction that's depicted in that document?
A Separation to accept another state position.
Q So that indicates that she's leaving whatever position she was in at that time; is that correct?
A To take another state position, right.
Q To take another state position?
A Uh-huh.



Q And then the -- what's the second page transaction document? What transaction is indicated there?
A That is the document that indicates that she had been put into an exempt appointment.
Q Now, in terms of the state Personnel Code, there's Rutan positions and Rutan-exempt positions; is that correct?
A That's one way of categorizing positions.
Q When it says exempt position on the second page of Group Exhibit 2, is that referring to a Rutan exempt, or is that term used in conjunction with some other description?
A It's used in some other description, although they would also be Rutan exempt. Exempt appointment refers to somebody being placed into a position that has been identified as exempt from the Personnel Code pursuant to Section, in this case, 4(d)3 of the Personnel Code.
MR. TRAPP: What section is that, Mr. Powers?
A 4(d)3. It's commonly referred to as a policy-making, confidential assistant exemption to the Personnel Code.



MR. BILINSKY: Q And those are positions, generally speaking, that directors or the governor can place people in without having to post lists, show qualifications, do interviews. It's someone that they can choose who they want to be in that position?
A The characteristics of the 4(d)3 is that no provision of the Personnel Code applies, so there is no grade, there is no test, there is no eligibility list, there is no requirements for holding the positions. They are totally at will at the discretion of the governor's office and the agency, generally speaking.
Q And then the next document in Group Exhibit 1 (sic) is just the form that's filled out to demonstrate that the exempt position that we just discussed is Rutan exempt; is that correct?
A Well, this document is a document that was prepared in the previous administration, and it was a document to satisfy CMS' requirements that Rutan-exempt positions had to have the approval of the governor's office. Regardless of what kind of transaction it was, if it was Rutan exempt, the governor's office had to approve that transaction,

and this document was simply an internal form created under the Edgar administration, which was retained by the Ryan administration, to let CMS know that the governor's office was okay with whatever was happening.

Q As part of the transaction process of appointing someone to the exempt position?

A I don't know that this document is required. It's not legally required. I don't even know whether it's mentioned anywhere specifically. The same effect could happen if I sent somebody an e-mail, and said, "Governor's office is okay with that transaction." It just so happened that this was the procedure that was in place, it seemed to work, and we didn't change it.

Q Okay. The next page in Group Exhibit 2, what transaction is purported in that document?

A That is a CMS-2 that indicates that Ms. Gowen separated from the exempt position to take a position in another -- or another state position.

Q And what's the date of that separation according to the face of the document?

A September 12th of '02.

Q And then the prior -- or excuse me -- the



next page?

A Next page is a CMS-2 that indicates that she had been reinstated into a term appointment on 9-13 of '02.

Q Now, on the CMS-2 forms in Group Exhibit 2, there's a series of signatures that appear at the bottom of the page; is that correct?

A Yes.

Q And Group Exhibit 2 contains two forms which are the Rutan-exempt Edgar administration forms, but I'm not addressing my questions to those forms.

A Yes.

Q On the CMS-2 forms, there are six signature blocks on the bottom; is that correct?

A That's correct.

Q And did you sign the bottom signature block on the left-hand side of the CMS-2 forms?

A Yes, I did.

Q And is that box -- does that have the title Director of Central Management Services?

A Within that box there is typed Director of Central Management Services.

Q Now, did you date your signature when you signed it?



A Doesn't indicate that I did here.

Q Now, next to your signature is another box that has at the top of the box Agency Head Approval?

A Yes.

Q And the name Diane Ford appears in that box; is that correct?

A That's correct.

Q And then next to Diane Ford's name is what appears to be a set of initials?

A That's correct.

Q Were you present when Diane Ford's name was affixed to these documents to the best of your recollection?

A I took the documents in to Sarajane and indicated that they were to be signed or Diane's name was to be signed on them. I don't know whether I was there when she signed them or not.

Q Okay. Is it your understanding that Sarajane Wright signed Diane Ford's name for Diane Ford on these documents?

A It's my understanding.

Q And did she assign that name after you had signed, or before you had affixed your signature?

A I think it was after, but I don't know that



I really recall for sure.

Q Okay. Now, Group Exhibit 2 regards to -- is in regards to an employee named Susan Gowen. Did you know Susan Gowen?

A Yes, I did.

Q And how did you know Susan Gowen?

A I worked with her when she was at Illinois Department of Employment Security. She was the -- I'm not for sure what her working title was, but essentially she was in charge of personnel there. That's when I first met her. I can't really recall the date, but somewhere -- at some point in time there became a need to have an experienced personnel person in the Chicago CMS office, and I orchestrated the transfer of the person that was there to another position, and orchestrated Sue Gowen going to the CMS department in Chicago.

Q At the time of the separation that's on the first page of Group Exhibit 2 with Susan Gowen, was she working for CMS --

A Yes.

Q -- or was she a CMS employee?

A I believe so.

Q Now, do you know how you came to be in

possession of the CMS-2s for Susan Gowen such that you would be signing them?

A Sure.

Q And could you explain to me how that came to be in your possession?

A I can't tell you the date, but I received a call from Debbie Hensey indicating that Director Schwartz had approved the new term arrangements for these three people, but that he indicated he did not want to sign the CMS-2s and did not want his name on the CMS-2s, and stated something to the effect that if the governor's office wants these three processed, they'll have to sign them themselves or get somebody else to sign them or something to that effect.

Q And then within a period of time -- a short period of time after that phone call, Group Exhibit 2 and the documents in Group Exhibit 3 for Frank Cavallaro and the documents in Group Exhibit 4 for Lori Skinner appeared in your office?

A Well, there were some steps in between that initial call and them actually being brought down to my office, but they ultimately came to my office.

Q Okay. And that was after Deb Hensey had informed you that Director Schwartz wasn't going to sign them and didn't want his name to appear on the documents?



A The conversation was, she called and said director's approved processing these, he does not want his name on the document or he doesn't want to sign the document, and essentially, if you want them done, sign them yourself, or something to that effect.

Q Okay. At any time did you have any discussions with anybody in the governor's office relative to who was going to sign these documents?

A After that initial call from Debbie Hensey, I called Diane Ford, who was the general counsel for the governor and had his authority to deal with personnel matters. She had been my immediate supervisor when I was assigned to the governor's office and after I was on CMS' payroll and working for the governor's office. Indicated to her that -- what the conversation with Debbie Hensey, and she asked me, "What documents are you talking about?" I said, "I really don't know. I'll call and find out." Called Debbie Hensey back. She said the CMS-2 is the only thing that needs to be signed. I called Ms. Ford back, told her that. I think she said, "What's a CMS-2?" And I explained to her essentially what it does, and she said, "Tell them to bring them down and just sign them."



MR. TRAPP: I'm sorry. Mr. Bilinsky, did we have dates on these conversations with Deb Hensey?

MR. BILINSKY: We do not.

A Honestly don't know. I mean I don't recall.

MR. BILINSKY: Q Would those conversations have been in September of 2002?

A Yes, and they most likely occurred -- or they did occur, I believe, before 9-6 of '02.

Q Which was the date in Group Exhibit 1, 2, and 3 when the employees would have first separated from their original term appointments?

A That's correct.

Q So sometime in September prior to September 6th of '02 is your best recollection?

A Yes.

Q Did you communicate your conversation with Ms. Ford to anyone in CMS?

A I think I called Debbie Hensey back and said, "Diane said send them down here for me to sign them."

Q And then did the forms appear in your office?



A Yes.

Q Now, at the time that you signed the form, did you do any independent research on your own, look in the code, look at the statutes, to see if there was anything that suggested whether it would be appropriate or inappropriate for you to sign those forms?

A No.

Q Had you ever prior to September of '02 signed any other documents in a signature block that was titled Director of Central Management Services?

A Not to my recollection.

Q And I show you Group Exhibit 3. Is that the same series of documents -- transaction documents that we just discussed with Susan Gowen, representing a separation from appointment, a placement in an exempt position, and then separation from the exempt position, and then reinstatement into a term position?

A I believe so.

Q And were all of those CMS-2 forms in Group Exhibit 3 signed by you?

A Yes.

Q And then Group Exhibit 4, those are the same series of transaction documents for a CMS employee by the name of Lori Skinner?

A Yes.

Q And once again, did you sign all of the CMS-2 forms for Lori Skinner?

A Yes.

Q And your signature is in the box that has at the top of that signature box Director of Central Management Services?

A That's correct.

Q Did you date any of your signatures in Group Exhibit 2, 3, or 4?

A I don't believe there was a date there.

Q At this time do you know why you did not date your signature?

A There was no specific reason why I didn't date that signature.

Q Did you at some point in 2002, approximately August of 2002, have a telephone conversation with Andy Walter, the chief of personnel for Department of Corrections?

A I had many conversations with Mr. Walter.

Q Do you recall having a conversation with Mr. Walter in August of 2002, asking him to effectuate the same series of transactions that were performed for these three CMS employees for DOC employee Diane Hurrelbrink --

MR. BAKER: Excuse me. Can I interpose an objection? Just a continuing objection to any testimony concerning Mr. Powers' acts in signing documents for the Department of Corrections. I think it's beyond the scope of the charge.

MR. BILINSKY: Actually, I'm not going to -- Mr. Powers, to my knowledge, did not sign any documents for the Department of Corrections. I'm not going to be asking him any questions relative to that.

MR. TRAPP: Okay.

MR. BILINSKY: Q Did you -- I'll rephrase the question or start over. Did you call Mr. Walter in August of 2002, and ask him to prepare or have the same series of four transactions performed for Diane Hurrelbrink and Mark Kinnaman?

A I had a conversation with Mr. Walter, I believe, about those three people and doing this process. I don't know for sure whether it was August. It could have been before then. Could have been the first day of September, but I did, in fact, have a conversation with him about those three employees.

Q And you requested that he have them engage in the same series of transactions, resign from one position, work in an exempt appointment for a period of time, resign from that position, and then be replaced in their term appointments?

A I don't know that I told him that they had to go into exempt positions. It really didn't matter.

Q Okay. You just instructed him to have him -- to have them resign for a period of time from their current term appointments, and then be reappointed to those term appointments?

A Essentially, yes.

Q And then you left the rest of the details up to Mr. Walter?

A Yes.

MR. BILINSKY: If I could have just a moment. I have no further questions for this witness. I move to put Group Exhibits 2, 3, and 4 into evidence.

MR. BAKER: No objection.

MR. TRAPP: Okay. Group Exhibits 2, 3, and 4 will be admitted without objection.

MR. BAKER: I will be calling Mr. Powers as a witness at a later point in the case. I have no questions for him.

MR. TRAPP: Okay. All right.

MR. BILINSKY: Thank you, Mr. Powers.

MR. POWERS: You're welcome.

MR. BILINSKY: If I can take a brief break, I may be able to skip Deb Hensey as a witness. Do you have any objection?

MR. BAKER: Is she under -- she is under subpoena?

MR. BILINSKY: She is under subpoena. Do you want her to stay?

MR. BAKER: Well, as long as that subpoena could extend through the balance of the trial. I may or I may not call her as a witness later in the case, but --

MR. BILINSKY: You need her for anything today?

MR. BAKER: I'm not putting on a case today, so, no.

MR. TRAPP: Do you want to take a break just

for general purposes --

MR. BILINSKY: Yes.

MR. TRAPP: -- for five-minute break? Anybody -- is that all right?

MR. BAKER: Yeah, that's great. Good timing.

(Short break.)

MR. TRAPP: Okay. We're back on the record after a short break.

MR. BILINSKY: My next witness will be George Richards.

MR. TRAPP: Okay.

GEORGE RICHARDS,

having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BILINSKY:

Q Could you state your name for the record, please.

A George Richards.

Q And are you currently employed, Mr. Richards?

A Yes.

Q And what's your current position?



A I'm a veterinarian with the Vermilion Veterinarian Ventures in Danville, Illinois.

Q And do you hold any other positions besides your veterinarian position?

A Yes, I am a member of the Illinois Civil Service Commission where I serve as chair.

Q And how long have you served with the Illinois Civil Service Commission?

A Since November of 1995.

Q And how long have you been the chairman of the Civil Service Commission?

A For the same period of time.

Q How many members are there currently on the Civil Service Commission?

A Five, including myself.

Q And does the chairman have any additional job duties in addition to the regular duties of a commissioner?

A Yes, I -- to -- besides the other hearings, things the Commissioners do, sort of overseeing the personnel operation of the office.

Q And then generally, what is the job of the Civil Service Commission and the commissioners?

A Really to oversee and make sure that the



provisions of the Personnel Code are being followed by the agencies. We hear and have final decision on decisions that the administrative law judge have made in appeal hearings.

Q Now, how many executive secretary positions are there in the Civil Service Commission?

A There's one.

Q And what are the job functions of the executive secretary?

A They serve as the day-to-day director of the Commission, and in charge of the employees of the Commission. Also, traditionally, has been an attorney who serves as an administrative law judge.

Q In 2002, at the start of 2002, who was the executive secretary?

A Bruce Finne, F-i-n-n-e.

Q And did Mr. Finne leave that position sometime in 2002?

A Yes.

Q And was that vacancy filled?

A Yes.

Q And who was hired to replace Mr. Finne?

A Mr. Powers.

Q Sometime in April of 2003, did you receive a



phone call from Alonzo Monk at the governor's office?

A I did.

Q And what did Mr. Monk say to you?

A He --

MR. BAKER: Hearsay.

MR. BILINSKY: This is just state of mind.

MR. BAKER: Okay. It's not being offered for the truth or falsity of the matters stated?

MR. BILINSKY: Correct. The state of mind to show why he undertook such actions.

MR. BAKER: Objection withdrawn.

MR. TRAPP: Proceed.

MR. BILINSKY: Q What did Mr. Monk say to you?

A He advised me that at about that time Governor Blagojevich was holding a press conference, at which time he was going to be firing Diane Ford from the Industrial Commission, and he was going to be asking the Civil Service Commission to discharge Rob Powers and Sarajane Wright.

Q And did you make any requests from Mr. Monk?

A I was surprised, and I asked him for what the particulars might be. I also expressed concern about the operation of the Commission if those

individuals were gone.

Q And did Mr. Monk respond to your request for particulars?

A Yes.

Q And what was his response?

A He said he would have someone from the general counsel's office send us a list of the information that they had acquired.

Q I'm going to hand you what's been marked as Group Exhibit No. 10, and ask if you can identify that document, please.

A Yes. This is a memo that I received from Tom Londrigan the following day, which was, I believe, April 15th of 2003.

Q And when you say the following day, that was the day after you spoke with Mr. Monk?

A Correct.

Q And did you review the memo when Mr. Londrigan sent it to you?

A I did.

Q And did the memo contain allegations against Mr. Powers?

A It did.

Q And what did you do in response to the memo?



A I called the other commissioners who had also received the same copy, and said -- we were having a meeting -- a regularly scheduled meeting was to be two days later, and at that time we should consider those allegations.

Q And did the Commission meet and have discussions about the allegations in Group Exhibit 10?

A They did.

Q And what was the outcome of those discussions?

A After discussion, at the end we voted to put Mr. Powers and Ms. Wright on paid administrative leave.

Q After placing Mr. Powers and Ms. Wright on paid administrative leave, what was the next steps the Commission took?

A We were concerned as to the operation, again, of the Commission. We had then one administrative law judge who was hearing a number of appeal cases. We were concerned about the other cases that were coming into the office, and how we would fill that. So we had two concerns, I think. One was how the Commission would continue to operate.



We also -- in specific regards to Mr. Powers and Ms. Wright, we needed, we thought, to have some manner of investigating these allegations. There was -- the allegations had been turned over to the Illinois State Police, but we wanted to have some quicker, if you would, or what we thought might be a quicker resolution to this.

Q I'm going to show you what's been marked as Exhibit 8. Jim, I handed you a copy earlier. Could you identify that document, please.

A Yes. This is a copy of a memo and then a hard copy letter that I sent to Director Michael Rumman from Central Management Services.

Q And were you requesting that CMS conduct a separate investigation?

A I was.

Q And to your knowledge did CMS comply with your request?

A They did.

Q Hand you what's been marked as Group Exhibit 9, and ask you if you can identify that document, please.

A Yes. This is a copy of a document that Ed Wynn, who is general counsel with Central Management



Services, sent to me.

Q And was that document in relation to an investigation that Mr. Wynn had performed as to the charges that had been leveled against Mr. Powers?

A Yes.

Q And when you received that memo, what did you do?

A We received this, I think, the day before our next regularly scheduled Commission meeting, and I reviewed the -- his investigating, and then we brought it to the Commission meeting the -- whatever day that was. May 15th or 16th, I believe.

MR. BILINSKY: I'm going to show him that just for purposes of refreshing his recollection as to the date of the next Civil Service Commission meeting.

MR. BAKER: Fine.

A May 15th. Thank you.

MR. BILINSKY: Q So you received the memo from Ed Wynn on May 14th, and then the next meeting was May 15th?

A Correct.

Q Was there a discussion held at the May 15th meeting of the Civil Service Commission about the Ed

Wynn memo?

A There was. In addition, on the morning of the 15th, I did pick up additional documents that I think that you may have introduced earlier in regards to the various CMS-2 forms on those individuals, and we brought the -- we had then in hand the initial memo from Mr. Londrigan, we had this investigation report from Mr. Wynn, and we also had the documents that have been previously introduced, and those were what we considered at our executive session meeting of May 15th.

Q And what was the result of the committee's discussion and consideration of the personnel documents and other documents and the memo?

A Yes. We -- the Commission then voted to -- voted to allow -- voted to allow me, the chairman, to hold a pretermination/predisciplinary hearing and impose discipline up through and including discharge unless there were some other exculpatory reasons.

Q And that would be a predisciplinary hearing?

A Correct.

Q And did you conduct such a predisciplinary hearing for Mr. Powers?

A Yes, I did.



Q And on what date did you conduct that hearing?

A I believe that was on May 29th.

Q Of '03?

A '03.

Q Did Mr. Powers attend that hearing?

A He did.

Q Did he attend alone, or did he have counsel or representative with him?

A He was alone.

Q And did you confront him with the allegations in the Ed Wynn memo?

A We -- I'm not sure about the Ed Wynn memo, but he did have a list of the charges.

Q And at that time did Mr. Powers make any statements in response to the charges?

A Yes, he did.

Q And what was Mr. Powers' explanation for his signature on the CMS forms?

A He indicated that he had -- and maybe similar to his previous testimony that he -- that I heard that he had been in contact with Diane Ford, and that the director of CMS, Mr. Schwartz, would not sign the forms, and that he then signed the forms.



He indicated that he was associate director of CMS, and believed he had the authority to sign that form.

Q Did he present to you any evidence at that time that an associate director can sign off as the head of CMS?

A No.

Q To your knowledge is the director of CMS a position that requires senate confirmation?

A Yes, it is.

Q And it's also a position that requires the person to sign an oath of office and file it with the secretary of state before they can exercise those powers?

A That's my understanding.

Q At that time did Mr. Powers present any evidence showing that he had been confirmed to execute the powers of the director of CMS by the senate?

A No.

Q When you look -- I'm going to hand you what's been previously marked Group Exhibit 2, 3, and 4, and ask if those are the CMS forms with Mr. Powers' signature that you discussed with him at the predisciplinary hearing.



A Yes, these are the forms.

Q At the bottom of the CMS-2 forms contained in Group Exhibits 2, 3, and 4, there's a signature block that's titled Director of Central Management Services; is that correct?

A Correct.

Q And did Mr. Powers admit that that was his signature in that block?

A Yes, he did.

Q Did he cross out the title Director of Central Management Services?

A No.

Q Did he present any evidence that at any time he had been the director of Central Management Services?

A He did not.

Q When you looked at that form on its face, did you arrive at any conclusions as to Mr. Powers' signature?

A It appeared to be his signature.

Q And did you determine if he appeared to be signing as the director of CMS?

A That's what it indicated in our opinion.

Q And that's what he confirmed to you in the