E-FILED
Monday, 06 February, 2006 04:30:49 PM
Clerk, U.S. District Court, ILCD

57

prediscipIinary hearing?
A Yes.
Q Did you ask him if -- or did you discuss with him the series of transactions that had been used to restart term appointments for certain employees?
A Indirectly, yes. At the hearing, I said it was his opportunity to rebut what the charges were, and I basically listened and made notes of those things, and he did give his version of how this came to be signed.
Q And what was his version of that?
A His version was, I guess, similar to his previous testimony that he had -- that Director Schwartz was not willing to sign the forms, and that he had discussion with Diane Ford, and they -- he was told or they agreed that he should sign under Director of Management Services and that Diane Ford's signature should be affixed by Sarajane Wright.
Q And Diane Ford in September of 2002, was she the head or the director of Central Management Services to your knowledge?
A Not to my knowledge.
Q The director was Michael Schwartz?

58

A Best to my -- yes.
Q So Group Exhibit 2, 3, and 4 have signatures for the Department of Central Management Services, and for the agency head that aren't from people who were in any of those positions?
A Correct.
Q Did you form any opinions as to whether Mr. Powers had engaged in improper conduct?
A This was, I think, the major concern of the commissioners was that someone who was an attorney and would understand these things, and also was in charge of enforcing the Personnel Code as executive secretary of the Civil Service Commission, that this was a serious violation.
Q The serious violation being signing as the director of CMS?
A Correct.
Q And what actions did you take after the predisciplinary hearing?
A It was my judgment that the -- that there was no evidence that would change the Commission's vote to continue with discharge.
Q And did you, in fact, discharge Mr. Powers?
A Yes.

59

Q At any time did the Commission discuss whether they believed it would interfere with Mr. Powers' ability to carry out the duties of the executive secretary if he had been signing forms in which his signature purports to be that of the director of CMS?
A Again, that was what was, I think, a major concern in our consideration of what discipline one might have. If one were to uphold the Personnel Code, that, again, this could be a serious violation.
Q And it's the -- strike that. Did you at any point relate your determination to the Commission?
A Yes, I did.
Q And did the Commission ever review your determination, the rest of the commissioners, and make any decision as to whether they agreed or disagreed with your decision?
A I'm trying to think if we -- if they formally agreed at our June meeting. I mean I contacted all of them, and indicated what the -- that we continue with the discharge, and they had previously given me authority to do so at the May 15th meeting. I don't recollect if we officially discussed that at our June meeting.

60

Q Okay.
MR. TRAPP: Could I ask a point?
MR. BILINSKY: Sure.
MR. TRAPP: At the hearing on May 29, pretermination hearing, were you the only commissioner present?
A Yes.
MR. TRAPP: Okay. The others were not present?
A Correct.
MR. BILINSKY: Q The Commission had conveyed the authority upon you as the chairman to act on their behalf?
A Yes, yes.
Q And you also did -- or convened a predisciplinary hearing for Sarajane Wright as well?
A We did.
Q Did you decide to terminate Sarajane Wright?
A No, we did not. We decided on a suspension.
Q But the Commission had, in its May 15th meeting, given you the authority to discipline up to discharge, same as you had been given for Mr. Powers?
A Yes.
MR. BILINSKY: I have no further questions.

CROSS-EXAMINATION

BY MR. BAKER:

Q I have a few questions to ask you, Dr. Richards. Concerning Sarajane Wright, can we agree that there was a negotiated settlement concerning her employment status with the Illinois Civil Service Commission?

A Yes.

Q And that negotiated settlement occurred contemporaneous with her predisciplinary hearing?

A Yes.

Q In fact, the reality is, the predisciplinary hearing really turned into a negotiation session to discuss resolving her personnel status with the Civil Service Commission?

A I don't think that is accurate. I would say after the predisciplinary hearing that I determined that I didn't think there were grounds for discharge.

Q Let me attempt, in my discussion with you this morning, to proceed in some attempt at being chronologic. When did you first meet Rob Powers?

A I think the first time I ever met him was early in Governor Ryan's thing as he called all the directors and chairs of the various boards and



commissions together for a meeting.

Q Okay. While Rob worked in the governor's office, did you see him and talk to him from time to time?

A Not -- not to my recollection.

Q Okay. There came a point in time where Rob became the executive secretary of the Commission?

A Correct.

Q Will you describe for us how that occurred?

A In -- there was going -- Bruce Finne, the director, was going to take advantage of the early retirement program. There was some discussion -- one of the considerations of the Commission was that of our four members, three of them were considering taking early retirement. We had no money to pay out the accumulated vacation and sick leave that they had. We knew we had to replace the executive director. We did have a search off an open list from attorneys and veterans, and during that search, Rob Powers had applied.

Previous to his applying, I think he and Mr. Finne had had conversations as to how -- if this would be a place that he might fit, and I think there were also some discussions that part of what could



happen is that maybe Mr. Finne could be placed at another department so that his retirement could be paid out of there, and that was certainly an attractive sounding thing for our financial thing.

However, I would say that of the applicants in the open search, that Mr. Powers was the person that we interviewed and deemed his qualifications to be the best for the position.

Q So he did compete with others for the position?

A He did.

Q Okay. And he testified that he started with the Commission on October 1st --

A Correct.

Q -- of last year. And actually worked for the Commission up until sometime in April of this year?

A Correct.

Q So he had actually done day-to-day work for the Commission for a period of about six months when he was terminated?

A Yes.

Q Now, want to talk with you a little bit about his job for a moment. One of his tasks was to



serve as an administrative law judge and hear cases such as the one we're at today; am I correct?

A Correct.

Q And my understanding is that as the administrative law judge, he receives evidence, makes rulings on the admissibility of evidence, and after all the evidence is received, will prepare written recommendations which are submitted to the Commission; am I correct?

A Correct.

Q And can we agree that during the time period Mr. Powers served as the executive secretary, he presided over at least two formal hearings?

A I'm not exactly sure of the number, but it was two or three. Not many, but yes.

Q Okay. And you had the opportunity, did you not, to review his written recommendations?

A Yes.

Q You also had the opportunity to review the record of the proceeding that was transcribed by a court reporter; am I correct?

A Correct.

Q With respect to each of the recommendations Mr. Powers made while he was the executive secretary

as a result of a formal hearing, can we agree that they were unanimously adopted by the Commission?

A I'm not challenging that, but I can't recall which were his and which were not -- which cases were Mr. Powers' and which were Mr. Sacks'. So if you could refresh me or indicate if we voted that, I would agree, but I don't recall.

MR. BILINSKY: If we can go off the record for a second.

(Discussion off the record.)

MR. BAKER: Q Let me ask the question this way: Do you recall any formal recommendation submitted to the Commission by Rob that was not unanimously adopted by the commissioners?

A I don't recollect that there was.

Q Now, Rob, as the executive secretary, also either prepared or supervised the preparation of various things that were required for Commission approval relating to personnel matters of the various agencies under the jurisdiction of the governor's office; am I correct?

A Would you reask that again, please?

Q All right. Well, do you know what the term "informal action" refers to?



A Not in veterinary medicine, no.

Q Well, let me ask you this: Do you know what the term "technical review" means?

A Okay. Yes.

Q Okay. For those of us that don't deal day to day with the Commission's activities, can you tell us what a technical review is?

A Well, I think a technical review is a review of the personnel practices of the various agencies.

Q And the Commission is called upon to make some sort of determination concerning those practices?

A Correct.

Q For example, there might be a technical review concerning whether an agency was violating a rule?

A Yes. My experience has been that -- and I'm not sure if we had any of those technical reviews after Mr. Lauderback took early retirement last year. I don't know if there were any under Mr. Powers' administration. So I'm not sure if we did any then.

Q All right. Do you recall from time to time at meetings that Mr. Powers would make, in written form, recommendations to the Commission for actions



concerning personnel matters relating to the various state agencies?

A I'm not recalling any specific instances.

Q At a meeting of the Commission, would Mr. Powers submit to the Commission for its approval various matters other than his recommendations concerning formal hearings?

A Well, yes, he could. I mean -- yes.

Q Let me give you an example.

A Okay.

Q I hand you what has been marked as Respondent Exhibit No. 1. Can you identify Exhibit No. 1 for us, Mr. Richards?

A Yeah, it is -- appears to be a copy of the minutes of -- executive session minutes and minutes of our Illinois -- April 17, 2003, Illinois Civil Service Commission meeting.

Q Okay. If you turn to the second page, are those the April 17th minutes of the Commission when it was in open session?

A Yes.

Q And is that the time where the Commission transacts the normal monthly business?

A Yes.



Q If you go to page two of those minutes, there's a section dealing Appeals Terminated Without Decision?

A Yes.

Q And then it looks like there are four separate appeals alluded to there, and then at the bottom, it looks like there was a motion which was unanimously adopted to concur with the staff decisions. What exactly was the process here?

A Okay. Yeah. I think I maybe understand your previous question now.

Q It wasn't a good question.

A Well, it wasn't a good answer either. These were all -- the process -- these are various individuals who had requested hearings, and the recommendation of staff, which would include Mr. Powers, was that for various reasons that did not meet the requirements of the Commission they were denied, or in some cases withdrawn, and there was final action recommended by the staff, and then the Commission would -- voted to accept that.

Q Okay. And that was something that would typically be done at every meeting?

A Yes.

Q And so at -- with respect to this particular subject matter at each meeting, the staff would submit something in writing for your review?

A They would -- they would actually submit -- in some cases there would be more explanation than here. Sometimes it would be just as indicated here.

Q Okay. And that would be either prepared by Mr. Powers or done under his supervision?

A Yes.

Q Okay. Would you agree with me that at least with respect to Appeals Terminated Without Decision, at monthly meetings of the Commission, while Mr. Powers was the executive secretary, it was the practice to adopt the staff recommendations?

A Yes.

Q You go to page three, there is a section discussing Complaints Filed Under Rule 7 of the Commission. Do you know what Rule 7 is?

A Well, I always have to refresh myself of the --

Q Let me help you, maybe.

A Yeah.

Q Does that deal with complaints or allegations that there's a Personnel Code violation?



A Yes, yes.

Q And typically, that would be something that the Commission would consider at its regular monthly meeting?

A Yes.

Q Am I correct?

A Yes.

Q And in considering those things, you would have submitted to you the recommendations of the staff?

A Correct.

Q And those recommendations, while Mr. Powers was the executive director, were either prepared by him or prepared under his supervision?

A Yes.

Q Can we agree that as a matter of course the recommendations concerning Rule 7 that were either prepared by Mr. Powers or prepared under his direction were typically approved?

A Correct.

Q The next section deals with Section 4(d)3 of the Personnel Code. I think Mr. Powers testified to that section earlier, did he not?

A He did.



Q Is it your understanding that that is a section of the Personnel Code which removes an employee from jurisdictions A, B, and C of the Personnel Code?

A Yes.

Q So the employee who becomes exempt is truly an at-will employee?

A That's correct.

Q Can be terminated without cause, and can be hired regardless of qualification --

A That's my understanding.

Q -- is that correct?

A Yes.

Q Okay. From time to time would the Commission, under Mr. Powers' tenure, consider 4(d)3 exemptions, or was that something that was new in April?

A No, that was a usual consideration of the Commission.

Q Okay. And here again, did -- when those things were considered, did the Commission consider the analysis of the staff?

A Yes.

Q And was that the analysis of Mr. Powers and people that reported to him?



A Yes.

Q Without going through all of this, there are various types of personnel matters, some of which we have discussed, that are presented to the Commission for its approval at monthly meetings; am I correct?

A Correct.

Q And we've talked about some of them this morning. And before the Commission approves or, for that matter, disapproves a particular personnel transaction, the staff normally gives the Commission some type of analysis?

A Correct. There originally is an analysis by CMS which is presented to the Civil Service staff for their further analysis.

Q Okay. While Mr. Powers served as the executive secretary, did you find his analysis thoughtful of these personnel matters?

A Yes.

Q Did you feel his analysis was objective and unbiased?

A It seemed to be, yes.

Q Okay. You never felt, in your review of any recommendations Mr. Powers made either as the result

of an administrative hearing or through some of these less formal things that we've talked about, that he had any partisan bias, did you?

A There may have been a couple of questions by commissioners, and I can't recall the exact ones of some 4(d)3 exemptions that a commissioner would say would like to withhold, you know, for further review, and I didn't always know the reasoning about that, if there was consideration as to whether it was -- you know.

Q As to your state of mind, though, you never felt that Mr. Powers' assessment was partisanly based, did you?

A It didn't appear to be.

Q How frequently would you interact with Mr. Powers either by way of telephone conversation or personal meeting between October of 2002 when he started and April of 2003 when he left the Commission?

A We would probably have at least weekly or close to weekly phone call updates. Maybe not quite that often. It was a tradition that the evening before the meetings in Chicago, at least, that we would go out to dinner usually with Mr. Sacks.



Q How did you assess Rob's performance of his duties as the executive secretary during the time period he worked at the Commission between October 1, 2002 and April of 2003?

A I thought things were okay. I mean it was -- we had not had a formal evaluation, which is on an annual basis. Usually, we do that in December. That was two months into his -- or three months into his employment, so we really didn't have one.

Q If you had done an evaluation, say, at the end of March of this year, would it be an accurate statement that he would have at least been considered fully satisfactory in performing his duties?

A I guess I can't speak for all the commissioners, but I would assume that it would have been at least satisfactory, yes. Yeah.

Q You make a good point. As to your state of mind --

A Okay.

Q -- can we agree that he was fully satisfactory?

A I guess I don't know what the scale is, but I would say he certainly wasn't -- was not unsatisfactory.



Q Okay.

A I'm not sure where we were placing him, but --

Q All right. Well, he seemed to perform in an acceptable fashion the duties he was assigned by the Commission, at least in your judgment?

A Seemed to. Seemed to.

Q And you're not aware of any misconduct he committed during the period of time he worked on the staff of the Commission, are you?

A No. Not directly, no.

Q I mean if we were to take a look just at the time period between October 1, 2002 and April 7 or April 15th, whenever it was he left the Commission, you're not aware during that time period of Rob engaging in any act or, for that matter, any omission which would justify disciplinary action being taken against him?

A Nothing formally presented, correct.

Q Okay. And there was no counseling sessions or written reprimands or any type of progressive disciplinary action taken during that time period?

A There were not.

Q I am assuming, by virtue of your tenure with



the Commission, that you're aware of progressive discipline as it takes place in state government?

A Yes.

Q And you're aware that Rob as well as the other staff of the Commission had positions that were covered under the Personnel Code?

A Yes.

Q There were, in fact, some cases which came before the Commission earlier this year, involving term appointments that were instituted by the governor's office, were there not?

A Yes.

Q And can we agree that with respect to those cases Rob, by virtue of his prior employment with the governor's office, recused himself from those positions?

A I think he did on some of those. There was no staff analysis. I don't know if it was --

Q Okay. You're not aware of him having any involvement with any of those cases, are you?

A I'm not aware.

Q Going back to the April meeting, if you look at the minutes, there were, what appears to me to be, a number of requests made for Section 4(d)3

exemptions?

A Yes.

Q Would you agree with me that that is significantly more requests than would normally be made at a meeting?

A That was more than we had usually had, yes.

Q Significantly more --

A Yes.

Q -- am I correct?

A Yes.

Q And these were requests made by the governor's office?

A Well, they were made by different departments that report to the governor.

Q Do you recall any individual who appeared before the Commission or discussed with the Commission the need for these exemptions?

A Well, I think in the minutes, if I may refresh back, there were -- Dan Stralka was from the governor's office. There were -- Gary Crompton and Bob Hewson were from Department of Professional Regulation. There was Mike Grady from Commerce and Economic Opportunity.. So there were various things, and also representing Central Management Services was



Marianne Armento.

Q And if I understand correctly, Mr. Stralka was representing the governor's office with respect to those requests?

A Yes, although I think he's a -- officially is an employee of CMS.

Q Okay. Fine. And essentially, the nature of the request would be to allow positions which formerly would have to be filled through a competitive process to be filled through whatever means the agency needing employees chose to fill those positions?

A That's what 4(d)3 status gives, yes.

Q And can we agree that at some point following the April meeting of the Commission, Mr. Stralka was selected to serve as the acting executive secretary of the Commission?

A Temporary.

Q Okay. And he is serving in that capacity presently?

A Correct, yes.

Q We've talked about some memos you received from two individuals. One was Mr. Londrigan in the governor's office, and the other one was Mr. Wynn in



CMS?

A Correct.

Q And Mr. Wynn came to CMS with the new administration, did he not?

A That's my understanding, yes.

Q Other than receiving those memos, did you talk personally with Mr. Londrigan?

A Yes.

Q And did you talk personally with Mr. Wynn?

A I did.

Q And did you talk personally with Mr. Stralka concerning issues involving Rob Powers?

A Yes.

Q Would it be a truthful statement, Dr. Richards, that they were encouraging the Commission to terminate Mr. Powers?

MR. BILINSKY: Object to the form of the question, they.

MR. BAKER: Q Mr. Stralka, Mr. Londrigan, and Mr. Wynn.

A I would say that not all of them. Mr. Londrigan was one who was encouraging discharge, and my conversations with Mr. Wynn, they were after we requested him to do the investigation, and we had



many conversations with Mr. Stralka, but the initial ones were not to do the -- to do discharge.

Q So he recommended against discharge?

A I don't think I asked him nor did he state that we should discharge.

Q Ultimately, there were charges prepared, were there not?

A Correct.

Q Were those charges prepared by either a member of the Commission or a member of the Commission staff?

A They were prepared by me with help from CMS.

Q Who at CMS helped you?

A I initially talked with Ed Wynn, asking him to help, and he and Nancy Pittman from CMS were the ones who helped get the charges. I can't speak to who else may have been involved.

Q Do you recall when it was that they helped you prepare the charges?

A It was, I believe, after our -- shortly after our May meeting, so that would have been May 16th or thereabouts.

Q Okay. And are those the same charges that we talked about at the opening of this meeting -- of

81

this hearing?

A Yes. I think referred to as the original charges, yes.

Q Your termination decision or your decision to terminate Mr. Powers, as I understand it, was based upon three separate allegations of misconduct; am I correct?

A Those --

MR. BILINSKY: Objection as to relevancy. Those have been withdrawn.

MR. BAKER: That's why I'm going there.

MR. TRAPP: Let's go ahead, and you can answer that question.

A Yeah, I think -- we considered all the charges.

MR. BAKER: Q Okay. And in fact, two of those charges have been dismissed; am I correct?

A Yes.

Q Either -- for whatever reason --

A Yes.

Q -- the Commission has decided not to pursue them. So we're down to one charge. You never considered whether that one charge standing by itself would be sufficient for the purpose of assessing

82

discipline in the form of termination, did you?

A Actually, I think the Commission did consider that as the major reason for discipline.

Q Now, in reaching that decision, did you -- and I'm assuming you, as the chairperson of the Commission, were basically delegated the responsibility to speak with external persons, at least external persons from the Commission, concerning the investigation with respect to Rob --

A Yes.

Q -- am I correct? Can we agree that you did not speak with Director Schwartz?

A Correct.

Q And can we agree that you did not speak with Debbie Hensey?

A Correct.

Q And can we agree that other than lawyers on the staff of the Commission -- or on the staff of CMS, you didn't talk with anyone else at CMS?

A I'm not sure if Nancy Pittman is an attorney or not.

Q Okay. You did speak with Nancy Pittman?

A Correct.

Q All right. And Mr. Stralka and Mr. Wynn.

83

Those are the three people that you spoke with from CMS?

A Well, actually, I spoke with two other briefly. It was in -- it was a Rob Craddock and a Greg Newton, but I mean they were, I would say, short and not significant conversations, but I did talk with them.

Q You never spoke with Tricia Pineda?

A Actually, we did. The Commission, during its executive session on May 15th, requested her to come and give her personal testimony as to what she had said in the -- both Londrigan allegations and the things that Mr. Wynn had done.

Q Okay. And she has been chosen not to be a witness in this hearing.

MR. BILINSKY: I'm going to object. We're not going to ask him questions on trial strategy of the attorney.

MR. TRAPP: Sustain that objection.

MR. BAKER: Q Dr. Richards, do you know what a CMS-2 form is?

A I learned about those as I saw these.

Q Tell me what your understanding is.

A Well, it is -- my understanding it's a

84

personnel action form that is used to -- is in one's personnel file which is used to give their current status, change status, whatever their job position is.

Q Can we agree that that's a transmittal document that's used to convey information concerning a personnel transaction or personnel status?

A It would convey action that's taken, that's my understanding, yes.

Q Are you aware of any rule of the Department of Central Management Services that requires a CMS-2 form to be utilized?

A I'm not familiar with all CMS rules, so, no.

Q Okay. Are you aware of any statute or any section of the Illinois Personnel Code which requires a CMS form -- CMS-2 form to be utilized with respect to a personnel transaction?

A No.

Q Do you know what the purpose is of having a place marked for the signature of the director of the Department of Central Management Services on the CMS-2 form?

A I believe that's to approve the transaction that's indicated above.

Q How do you know that?

A I said I assumed that that's the purpose.

Q Fair enough. At the time of your discussions with representatives of CMS, I understand you reviewed CMS-2 forms that involved Mr. Powers?

A Correct.

Q Is it your understanding that at some time in the late summer or fall of last year, the transactions we've been talking about with the three CMS employees were undertaken as well for employees in other agencies?

A That's what Mr. Powers has related.

Q As a result of your discussions with either Mr. Wynn or Mr. Londrigan, were you aware of that?

A In Mr. Londrigan's memo there were those, yes.

Q Do you know one way or another with respect to the employees other than the CMS employees, whether Director Schwartz either signed or had his authorized signature utilized on the CMS-2 transactional forms?

A My recollection is that on some of the other forms they were signed, or his signature was affixed.

Q Okay. And those were transactions which



were very similar to the transactions that we've talked about this morning, they just dealt with other agencies?

A Agencies other than his own, I believe, yes.

Q I'm assuming that Director Schwartz never communicated to you a belief that these transactions were improper, did he?

A I did not talk with Director Schwartz.

Q Fair enough. I want to refer you for a moment to Exhibit No. 1. I believe those are the April minutes, and if you go to -- excuse me. Got the wrong exhibit. I'm going to hand you Exhibit 2, and ask -- Exhibit No. 2, if I understand it, are the minutes of the May 15th meeting of the Commission?

A It is. I'm not sure if this is the -- you know, we approve the minutes at our June meetings, and I'm not sure if these are the approved minutes or not.

Q Okay. Let me do this way.

MR. BILINSKY: Is that the fax that I --

MR. BAKER: Yeah.

Q I'm going to hand you Exhibit No. 3, and if you would, can you identify Exhibit No. 3?

A It appears to be a copy of the executive



session minutes of the May 15, 2003 meeting.

Q If you go to the last page of Exhibit 2.

A Okay. Is that page 13?

Q Yes. How does Exhibit 3 compare with the last page of Exhibit 2, or what's the relationship between those two documents?

A I guess there's -- these are the -- these are the minutes, and the other are -- Exhibit 3 is the minutes of the executive session; whereas, page 13 is the last page of the minutes of the meeting.

Q Okay. I'm confused. The last page of Exhibit 2, if we're on the same page, is headed Motion to go into Executive Session?

A Correct.

Q And then there are --

A Then we reconvene the meeting out of executive session, and then the next items were continuation of the open meeting.

Q Okay. On page 13, there's a motion which was made by Commissioner Dorgan and seconded by Commissioner Fabrizio -- am I pronouncing his name correctly?

A Yes.

Q -- and unanimously adopted to suspend,



pending discharge, Robert Powers and Sarajane Wright. Does that seem to be correct?

A Yes, that's what that says. But I don't believe these are the corrected adopted minutes that we did in June, and I think the wording of that particular motion wasn't exactly what happened, and so we adopted these minutes as amended, and you may or may not have gotten a copy of those. I don't know.

Q Apparently not.

A We --

MR. BAKER: Can we go off the record for a second?

MR. TRAPP: Uh-huh.

(Discussion off the record.)

MR. BAKER: Q When you meet in executive session, is there anyone present other than the members of the Commission themselves?

A There may be. There may be the executive secretary and -- well, there usually is executive secretary and the other administrative law judge.

Q And when the -- is there someone who is assigned the responsibility of taking minutes at the meeting?

A Usually, the executive secretary is taking minutes, but in truth, we haven't assigned a particular person to do that.

Q At the May meeting, do you recall who took the minutes when you were in executive session?

A Actually, I think I was the one who did the rough translation of that. Bobbie Peterson was not there by phone. There was no -- it was Commissioners only at the executive session.

Q Well, if you turn to the last page of Exhibit 2, that is a typed document, and I'm assuming you didn't type it, and I'm also assuming it was typed by someone on the secretarial staff of the Commission here in Springfield?

A Yes, yes.

Q Okay. The individual who typed it, however, would have had to have information communicated to her to prepare the minutes; right?

A Correct.

Q Were you the individual that communicated that information to the typist?

A I think so, but I don't recollect exactly what I did, and I think that was the purpose of clarifying those words in our June meeting.



Q Did someone tell you at some time after May 15, 2003 what the significance was of the term "suspension pending discharge"?

A No. This did not repre -- this motion did not represent the action that the Commission took, and that's why at our June meeting I brought that up. So it wasn't anyone suggesting that I should change or we should change.

Q My understanding is that the charges pertaining to Mr. Powers were submitted to the Department of Central Management Services the same day as his predisciplinary hearing. Is that consistent with your recollection?

A I'm sorry. On the chronology there, I'm -- we were trying to make sure that -- the problem that the commissioners had is that we essentially had no staff at that time, and we were waiting for CMS to assist us in doing the charges.

Q Can we agree that Rob's predisciplinary hearing was on May 29th?

A Correct.

Q And that was the same day as Sarajane Wright's predisciplinary hearing?

A Yes.



Q And that was conducted here in Springfield?

A Yes.

Q And you were the only member of the Commission present?

A Yes.

Q Can we also agree that the charges -- that the discharge of Mr. Powers was approved by the director of the Department of Central Management Services on May 30, 2003?

A Yes.

Q So I'm assuming what happened was that after your meeting with Mr. Powers, you, in some way, informed the Department of Central Management Services that he was being discharged from employment with the Civil Service Commission?

A Yes.

Q Okay. And between Mr. Powers' pretermination hearing and when you communicated that information to the Department of Central Management Services, there was no meeting of the commissioners convened to ratify that decision?

A It wasn't necessary as the meeting of the 15th they had given -- they had approved discharge pending any change in the pretermination hearing that



I would think different.

Q So getting back to the May 15th meeting then, it was approved that -- a decision had been made that Mr. Powers would be discharged unless he said something compelling at the time of his predisciplinary hearing?

A It was approved that he could be discharged unless there was some evidence that -- you know, if I thought there was evidence that would mitigate that, yes.

Q Between May 15th and May 29th, did you have any conversations with Mr. Londrigan concerning the discharge of Mr. Powers?

A Let's see. I talked with him -- I need to -- I can't recall the time I talked to him. I'm not -- I don't believe that I did talk with Mr. Londrigan after the April conversations with him.

Q Did you talk with Mr. Wynn between the May 15th meeting and May 29th concerning Mr. Powers' discharge?

A Yes.

Q And what was the purpose of that conversation?

A Initial, you know, conversations started

with Mr. Wynn to -- as we previously talked about, to do the independent investigation, and actually, on the 15th, during our executive session, we did talk with Mr. Wynn, and I asked for help in sample forms that one might use for preparing charges. And in the period of that -- between then and the meeting of the 29th, I did talk with both Mr. Wynn and Mrs. Pittman about the charges and getting the papers correct. They were sort of -- I asked for their help.

Q They were in the process of preparing the charges for you, and you talked --

A They were helping, yes.

Q Now, we've seen in this hearing a memorandum prepared by Ed Wynn which I believe was dated May 14, 2003?

A Yes.

Q Little over two weeks prior to the predisciplinary hearing. Can we agree that that memo was never provided to Mr. Powers either at or prior to his predisciplinary hearing?

A I think that's true. I'm --

Q And we've seen a memorandum prepared on April 7, 2003 by Tom Londrigan that's addressed to the Civil Service Commission, and can we also agree



that that memorandum was not provided to Mr. Powers prior to his predisciplinary hearing?

A I believe he -- I believe he did have that.

Q He did have that?

A He did.

Q Was that something he received in connection with his predisciplinary hearing, or did he receive it before that?

A I believe he received it at the April meeting.

Q By the way, Mr. Londrigan's memorandum is prepared on April 7, is it not?

A That's what it's dated, yes.

Q And that's roughly seven days before you received your call from Lon Monk?

A Yes.

Q Did you have any communication with Mr. Londrigan during the time period between April 7th and April 14th?

A No, I did not.

Q One other question, Dr. Richards. If you know, in the spring session of the general assembly, was there a bill pending that would have altered in any respect the appointments of commissioners to the



Civil Service Commission?

A There was.

Q And was that a bill that was encouraged by the Blagojevich administration?

A Yes.

Q And how would that bill have affected the term of commissioners if it had passed into law?

A If it had passed, the commissioners' terms would have ended June 30th, the number of commissioners would have been reduced from five to three, and there would have been no salary attendant to those new positions.

Q Is there a salary now?

A There is.

Q Now, that bill -- what became of that bill, I guess, is my question.

A That was -- the original bill was House Bill 3511, which no action was taken on it.

Q And at least by May 29, 2003, what was the status of that bill?

A It was probably -- the legislature was still in session, so I thought probably every bill was still alive.

Q Alive and well. So at least on May 29,



2003, you felt that there was some prospect that bill could be adopted into law?

A Actually, by then I think there was a Senate Bill 2003 which was -- had, actually, some different provisions in it. I'm not aware of what they all were.

MR. BAKER: Can we maybe take a five-minute break? I think I'm close to being wrapped up here.

MR. TRAPP: Yes.

(Short break.)

MR. TRAPP: Back on the record.

MR. BAKER: Just a couple of more questions.

Q Dr. Richards, you had the opportunity to look at the CMS-2 forms for some Department of Corrections employees --

A Yes.

Q -- as well, did you not?

A Yes.

Q Okay. And you're aware that with respect to those employees who -- their transactions, in terms of going from one term appointment to another term appointment, were structured in a way that was identical to the CMS employees?

A Correct.

Q And you're aware that with respect to those employees, Director Schwartz had signed his signature to a number of the CMS-2 forms?
A It appeared that, yes.
Q All right. And you're aware that the signature that Rob Powers signed at the block marked Director of CMS was in the capacity of the director of CMS as the director of CMS rather as the director of the agency that's employing the affected employees; am I correct?
MR. TRAPP: Can you read that one back?
MR. BAKER: It's a bad question.
Q Look at -- if you can, look at --
A Yes.
Q -- Group Exhibit 2 and Group Exhibit --
A I got you. I'm with you, yeah.
Q There are two blocks marked. One is for Agency Head Approval --
A Correct.
Q -- am I correct?
A Yes.
Q And that's the block that was signed by Diane Ford?
A Uh-huh.



Q Or --
A For her.
Q Or Sarajane Wright for Diane Ford?
A Yes.
Q And the other box, which is Director of CMS, was signed by Rob Powers?
A Yes.
Q Okay. And would you agree with me, if you know -- if you don't know, say that -- that most employees of the Department of Central Management Services would have known that Michael Schwartz was the director in September of last year?
A I would think they would.
Q Okay. Now, just one other area of questioning. It will be short, I assure you. Can we -- my sense is -- and if I have it wrong, tell me I'm wrong -- that the five members of the Commission are a pretty collegial group --
A Yes.
Q -- am I correct? You get along with one another, and unlike our supreme court, you don't have vigorous dissents concerning actions?
A Well, we have discussions, but I don't think there's political considerations in our actions.



Q There's no Justice Scalia in your group.
A No comment.
Q I should have that stricken from the record, I guess. And if I understand correctly, by statute, decisions of the Commission are to be decided by majority vote?
A Yes.
Q Okay. So if you, as a member of the Commission, feel one way and feel strongly that way, and three other members of the Commission feel otherwise, your one vote as commissioner could not carry the day?
A Correct.
MR. BAKER: I have nothing further. Thank you very much.

REDIRECT EXAMINATION

BY MR. BILINSKY:

Q Dr. Richards, when you started on the Commission, how many members did it have?
A Three.
Q At any point were you -- or did any members of the Commission communicate to you information which led you to believe that anyone thought that they had to fire Mr. Powers or they would lose two



commissioners and all lose their salary?
A No.
Q Now, counsel asked you a number of questions dealing with the board's adopting staff recommendations on various transactions. Do you recall that?
A Yes.
Q Now, before the board adopts a staff recommendation, does it do an independent investigation to determine if the staff member has accurately and reliably recorded and obtained information in the recommendation?
A Does not.
Q So the Commission relies on the accuracy and the truthfulness of the documents that are submitted by the staff in making its determinations; is that correct?
A Correct.
Q And at no point when Mr. Powers served as the executive secretary position did the Commission undertake an independent review to see if the information he was actually providing was truthful and accurate?
A We did not, no.

Q You'd just rely on him to operate independently and provide accurate and truthful information in his reports?

A Correct.

Q So the -- one of the concerns with him potentially holding himself out --

MR. BAKER: Objection. Leading question.

MR. TRAPP: Can you rephrase?

MR. BILINSKY: Actually, I believe it was argumentative, not leading.

MR. BAKER: I was just being nice.

MR. BILINSKY: Q Would it be fair to say that the Commission had concerns about Mr. Powers' ability to continue in the executive secretary one position based on --

MR. BAKER: Same objection.

MR. BILINSKY: Q -- based on the documents that you had reviewed from CMS?

MR. TRAPP: I'll deny the objection. Go ahead and answer.

A Again, I think in -- the Commission, as they looked over the allegation and the charges, this was the major concern was the ability to -- if one were going to uphold the Personnel Code and rules, that if



there were these kind of problems going on, that was a concern.

MR. BILINSKY: I have no further questions.

RECROSS EXAMINATION

BY MR. BAKER:

Q I'm assuming, therefore, that you thought and the other commissioners thought what Rob had done violated some provision of the Personnel Code?

A Correct.

Q And that he had violated some Personnel Rule of the Department of Central Management Services?

A I don't know Central Management Services, but it was the code, yes, the --

Q Personnel Code?

A Personnel Code, yeah.

Q Okay. Might I assume that there are no commissioners who have legal training?

MR. BILINSKY: That would be correct.

A Well actually, Ray Ewell is an attorney.

MR. BAKER: Q Okay. Stand corrected.

A Yeah.

Q My understanding in this situation, you sought out and received legal guidance from Mr. Londrigan and Mr. Wynn concerning the



implications of Mr. Powers' conduct?

A Actually, we sought out not Mr. Londrigan. I think we considered his presentation as allegations, and we sought out Mr. Wynn to investigate the allegations.

Q Now, I think at the time this tempest arose, you discovered it when you received a telephone call from the governor's chief of staff --

A Correct.

Q -- correct, Mr. Monk? And he informed you that conterminously with your conversation with him, the governor was making a press announcement asking the commissioners to terminate Mr. Powers?

A Correct.

Q At any time between your conversation with Mr. Monk and May 30, 2003, were you aware that the governor had ever changed his request to the Commission?

A I was not aware.

MR. BAKER: Okay. Thank you. I have nothing further.

MR. BILINSKY: I have nothing further.

MR. TRAPP: You're excused. Yes, sir, Mr. Bilinsky.



MR. BILINSKY: If I haven't asked as to all of my exhibits, I would move to put all of my exhibits into evidence. I suppose I should name them all. 2, 3 --

MR. TRAPP: 2, 3, and 4 are admitted already.

MR. BILINSKY: How about 9, 8, and 10? 9 is the Ed Wynn memo, 8 is the letter to Ed Wynn, and 10 is the Londrigan memo.

MR. TRAPP: Mr. Baker, do you have an objection?

MR. BAKER: I have no objection to No. 8. Might ask Mr. Bilinsky for what purpose he's offering No. 9.

MR.BILINSKY: Truth of the matter contained -- I mean state of mind of George Richards for the actions that he took when he received the memo.

MR. BAKER: If this is being offered for no other purpose than to show the process of the Civil Service Commission in considering its actions with respect to Mr. Powers, and is not being offered for the truth or falsity of underlying information, then I have no objection.

MR. BILINSKY: I am not submitting it for the truth or the falsity of the contents.

MR. BAKER: Just for the process?

MR. BILINSKY: Just for the process of the fact that they had obtained an independent -- or I should say a separate investigator. I won't --

MR. BAKER: How about investigator, can we agree on that? How about person? With that caveat in mind, I have no objection.

MR. TRAPP: It will be admitted for that limited purpose.

MR. BILINSKY: And then Group 10 was the Londrigan memo.

MR. BAKER: Same --

MR. BILINSKY: Discussion?

MR. BAKER: Same -- same limitation. If we can agree with that limitation, then I have no objection.

MR. BILINSKY: I would agree to that limitation.

MR. TRAPP: Admitted, again, No. 10 for that limited purpose.

MR. BILINSKY: Just because I'm standing here, do you want to move Respondent's Exhibit 1, 2,



and 3?

MR. BAKER: I think so. Let me see what they are. Yeah, I --

MR. TRAPP: I don't have copies of those.

MR. BILINSKY: Oh, let me give you all my originals. Do you have all of mine?

MR. TRAPP: Let's see.

MR. BILINSKY: You can keep the ones with the pretty stickers and give me the copies.

MR. TRAPP: Okay. Yeah, I have all those, and here's all those back.

MR. BILINSKY: Okay. Thanks.

MR. BAKER: I move for the admission of Respondent's 1, 2, and 3.

MR. BILINSKY: No objection.

MR. TRAPP: Okay. Those will be admitted without objection.

Now, do you have any further evidence today, Mr. Bilinsky?

MR. BILINSKY: I don't think so. Just a moment.

MR. TRAPP: Mr. Baker, I don't think I've got copies of your exhibits.

MR. BILINSKY: Wait a minute. I may have --



I believe I have Mr. Baker's copy of your exhibits.

MR. TRAPP: Okay.

MR. BILINSKY: The petitioner would rest. Move for judgment in its favor.

MR. TRAPP: Mr. Baker?

MR. BAKER: Just to preserve the record, and I don't need to argue it because I'm not sure it's even permitted under Commission rule, but I would move for a directed finding that no grounds exist for discipline, but I don't intend to argue that motion.

MR. TRAPP: Okay.

MR. BAKER: I do, however, ask for the dismissal of that portion of the charges which deal with specific employees --

MR. BILINSKY: Of DOC?

MR. BAKER: -- of Department of Corrections. There was really no testimony concerning --

MR. BILINSKY: I'll stipulate that that should be stricken. We can strike it by interlineation from the amended charge, or dismiss it. However you prefer.

MR. TRAPP: So the parties are stipulating then that the portions of the amended charge that relate to DOC employees are stricken?



MR. BAKER: Yes.

MR. TRAPP: Okay. Okay. By DOC, of course, I mean Department of Corrections.

MR. BAKER: Sure.

MR. TRAPP: All right. That will be done. And the motion for directed finding will be taken under advisement. Do you have witnesses to present, Mr. Baker?

MR. BAKER: Yes, but not today.

MR. TRAPP: Not today.

MR. BAKER: Mr. Bilinsky was a little more efficient than I gave him credit for being.

MR. BILINSKY: I have an extra copy of the amended charge. You want to just line through what we're agreeing to, initial it, and make it an official document?

MR. BAKER: Yeah, that's fine.

MR. TRAPP: Okay. So let's mark this as Joint Exhibit No. 1. Can you do that, Madam Court Reporter?

(Joint Exhibit No. 1 was marked for identification.)

MR. TRAPP: So Joint Exhibit 1 then is the -- a copy of the amended charges with line

through by interlineation which shows that portion of the amended charges that have been dismissed by stipulation.

MR. BAKER: In so stipulating, I don't want to waive my earlier objections to the amended charge --

MR. TRAPP: Right.

MR. BAKER: -- and I'm not doing that.

MR. TRAPP: All right. So when do you want to reconvene? Let's go off.

(Discussion off the record.)

MR. TRAPP: So it's now one o'clock. We have concluded for today our session, and we will reconvene on August 5 at 9:00 a.m.

MR. BILINSKY: Sounds good.

MR. TRAPP: Okay.

(End of proceedings for June 27, 2003.)



STATE OF ILLINOIS )
) SS
COUNTY OF SANGAMON )

CERTIFICATE

I, Robin A. Adams, affiliated with Capitol Reporting Services, Inc., do hereby certify that I reported in shorthand the foregoing proceedings; that the witnesses were duly sworn by me; and that the foregoing is a true and correct transcript of my shorthand notes so taken as aforesaid.

I further certify that I am in no way associated with or related to any of the parties or attorneys involved herein, nor am I financially interested in the action.

Robin A. Adams
License No. 084-002046
Certified Shorthand Reporter,
Registered Professional Reporter,
and Notary Public.

Dated this 11th day of July, A.D., 2003, at Springfield, Illinois.

OFFICIAL SEAL
ROBIN A. ADAMS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5-21-2004