111

```
 1         BEFORE THE CIVIL SERVICE COMMISSION
 2              STATE OF ILLINOIS
 3
 4   STATE OF ILLINOIS,
 5              Petitioner,
 6   -vs-                    No. DA-104-03
 7   ROBERT B. POWERS,
 8              Respondent.
 9
10
11
12
13
14
15
16        Continued hearing held, pursuant to Notice,
17   on the 10th day of September, 2003, at the hour of
18   9:30 a.m., at 425 1/2 South Fourth Street,
19   Springfield, Illinois, before William F. Trapp, duly
20   appointed Hearing Officer.
21
22
23
24
```

112

```
 1   APPEARANCES:
 2        OFFICE OF THE ATTORNEY GENERAL, by
          MR. MATTHEW D. BILINSKY
 3        Attorney at Law
          500 South Second Street
 4        Springfield, Illinois  62706
          On behalf of Petitioner;
 5
          MR. JAMES P. BAKER
 6        Attorney at Law
          415 South Seventh Street
 7        Springfield, Illinois  62701
          On behalf of Respondent.
 8
 9
10
11
12             I N D E X
13   WITNESSES              PAGE
     DEBBIE HENSEY
14      Examination by Mr. Baker     115, 166
        Examination by Mr. Bilinsky  150, 170
15
     ROBERT POWERS
16      Examination by Mr. Baker     172, 186
        Examination by Mr. Bilinsky  182, 187
17
18
19
20
21
22
23
24
```

COPY

113

```
 1                    PROCEEDINGS
 2        MR. TRAPP:  We are back on the record in the
 3   Illinois Civil Service Commission versus Robert B.
 4   Powers, No. DA-104-03.  It's our second day of
 5   hearing.  I was looking at my paperwork, and I wanted
 6   to make sure that I had everything that had been
 7   submitted to date, and, Mr. Baker, I saw that the
 8   state had propounded requests to admit to you at some
 9   point.
10        MR. BAKER:  Correct.
11        MR. TRAPP:  And for some reason, my file did
12   not reflect whether you had responded to that or not.
13        MR. BAKER:  If it's the requests that I'm
14   thinking about, we have not responded.  I think there
15   were four requests asking for the respondent to admit
16   that he had not been appointed or confirmed by the
17   Senate to serve as director of the Central
18   Management Services, and if those are the ones that --
19        MR. TRAPP:  I think that's the one I'm
20   thinking of.  There are about four requests, and
21   those are the only ones you've propounded; right?
22        MR. BILINSKY:  Those are the only ones I've
23   propounded.
24        MR. BAKER:  I think the failure to respond
```

114

```
 1   is deemed an admission.
 2        MR. TRAPP:  That's -- I just wanted to make
 3   sure that it hadn't slipped past me somehow.  All
 4   right.  Well, that's clear enough.
 5        As I recall, Mr. Bilinsky rested, and it's
 6   now Mr. Baker's time to call any witnesses that he
 7   would like to call.
 8        MR. BAKER:  Okay.  Before I do, I would like
 9   to attempt to read into the record a stipulation that
10   I think Mr. Bilinsky and I have agreed to --
11        MR. BILINSKY:  Is this the documents?
12        MR. BAKER:  Yes.  So I will attempt to do
13   it, and if I have misstated it, I'm sure he will be
14   good enough to call the misstatement to my attention.
15   But the stipulation is as follows:  In the late
16   summer of 2002, 40 state employees from various
17   agencies were involved in personnel transactions.
18   The nature of these transactions were that these
19   employees left their term appointments, took exempt
20   positions, and then in short order were reinstated to
21   new term positions.  These employees included the
22   three employees of the Department of Central
23   Management Services who are the subject of the case.
24   Except for those three CMS employees who are the
```

115

1  subjects of this case, the CMS-2 forms for all of the
2  other employees bear the signature of Michael
3  Schwartz in the box on that form marked for the
4  signature of the director of Central Management
5  Services.
6          MR. TRAPP:  Is that an accurate stipulation?
7          MR. BILINSKY:  That is an accurate
8  stipulation.  Just to clarify that Mr. Schwartz was
9  the director of CMS, and that he did not sign the
10 forms related to any employees who are directly under
11 his supervision.  The only forms he signed were forms
12 for employees that were not directly supervised by
13 him.
14         MR. TRAPP:  Okay.  With that on the
15 record --
16         MR. BAKER:  Call my first witness.
17         MR. TRAPP:  You want to swear the witness?
18             DEBBIE HENSEY,
19 having been duly sworn, was examined and testified as
20 follows:
21             DIRECT EXAMINATION
22             BY MR. BAKER:
23     Q   Good morning, Ms. Hensey.
24     A   Hello.

116

1      Q   Will you state your name and address for us,
2  please.
3      A   Debbie Hensey, and my home address or work
4  address?
5      Q   Home or business, either one.
6      A   Work address is Stratton Building 503.
7      Q   Can you spell your last name for us, please?
8      A   It's H-e-n-s-e-y.
9      Q   Where are you presently employed?
10     A   I work for Central Management Services.
11     Q   How long have you worked for CMS?
12     A   Since March of '01.
13     Q   And what is your position presently at
14 Central Management Services?
15     A   I currently am working on the consolidation
16 efforts related to all of the executive orders for
17 the governor.
18     Q   Going back to August and September of 2002,
19 what was your position at CMS?
20     A   I was the bureau manager of personnel.
21     Q   And how long had you held that position?
22     A   Two years.
23     Q   And during that two-year period, had your
24 duties always remained the same in that position?

117

1      A   Yes, they had.
2      Q   Can you describe for us what your duties
3  were as the bureau manager of personnel?
4      A   Sure.  Basically, I was over all of the
5  personnel rules, implementing the rules for all 52
6  agencies at the time, transactions, examining,
7  counseling, technical services, recruitment.
8      Q   Does that generally cover it?
9      A   Rutan training, Rutan implementation.
10 Pretty much everything about personnel except for
11 labor relations, which was handled separately.
12     Q   You say you were involved in implementing
13 rules for 50 agencies?
14     A   52 agencies, I believe, at the time.
15     Q   Okay.  Without describing each of these
16 agencies by name, are you referring to agencies that
17 work under the jurisdiction of the governor's office?
18     A   Correct, correct.
19     Q   And those would be agencies whose employees
20 are subject to the Illinois Personnel Code?
21     A   Yes.
22     Q   And when you say you implemented rules, what
23 do you mean by that?
24     A   Well, whatever -- and interpreted rules.  So

118

1  if there were new rules to come into effect, such as
2  FMLA or something like that, would implement those
3  rules, interpret the rules for the agencies, come up
4  with interpretive policies, et cetera.
5      Q   Are you familiar with rules of the
6  Department of Central Management Services?
7      A   Yes, I am.
8      Q   Are those rules commonly called the
9  personnel rules?
10     A   Yes, they are.
11     Q   In your job did you have responsibility for
12 advising agencies in state government concerning
13 those rules?
14     A   Yes, I did.
15     Q   And what was your role in that respect?
16     A   Pretty much whenever they would have
17 questions about how the rules should be interpreted,
18 what the rules actually meant, how to apply them into
19 certain situations, et cetera.
20     Q   In your position as bureau chief, did you
21 have any involvement with the law known as the
22 Illinois Personnel Code?
23     A   Yes, I did.
24     Q   And can you describe for us what your

**119**

1  involvement was with that particular law in terms of
2  your day-to-day duties as a bureau chief.
3      A    It was my responsibility to know the
4  Personnel Code, to make any recommendations for
5  change that needed to be done to -- it's the
6  foundation for the personnel rules.
7      Q    Would it be an accurate statement that your
8  job involved interpreting and dealing with both the
9  Personnel Code and the CMS personnel rules?
10     A    Yes.
11     Q    And would you do that on a daily basis?
12     A    As needed.
13     Q    Are you familiar with a man named Michael
14 Schwartz?
15     A    Yes, I am.
16     Q    At any time did you work either under or
17 with Mr. Schwartz?
18     A    Yes, he was the director of the agency.
19     Q    And for how long while you were at CMS did
20 you work either with or under Mr. Schwartz?
21     A    From March of '01, I believe he left in
22 September of '02, the end of September '02.
23     Q    Okay.  Going back to the late summer of the
24 year 2002, August and September, on days when you

**120**

1  were in the office in Springfield and on days when
2  Director Schwartz was in the office in Springfield,
3  how frequently would you have contact with him?
4      A    Several times a day.
5      Q    And what would generally be the nature of
6  your contact with Director Schwartz?
7      A    It varied.  Internal CMS was also under my
8  supervision.  So it could have anything to do with
9  the employment within CMS.  Very rarely did it have
10 anything to do with other agencies, it was primarily
11 CMS employees.
12     Q    Okay.  Are you familiar with a document that
13 is commonly known as a CMS-2 form?
14     A    Yes.  Yes, I am.
15     Q    Okay.  Are these the exhibits from the last
16 time?
17     A    Those are CMS-2s.
18          MR. BILINSKY:  I think this is the
19 corrections people.  Off the record for a second.
20          (Discussion off the record.)
21          MR. BAKER:  I want to hand you for a
22 moment what has previously been admitted into this
23 hearing as Group Exhibit No. 2.
24     A    Uh-huh.

**121**

1      Q    And I want to refer you to the first page of
2  that document.  Is that first page a CMS-2 form?
3      A    Yes, it is.
4      Q    And is that an example of the way a form
5  looked back in the summer of 2002?
6      A    Yes, it is.
7      Q    What is a CMS-2 form?
8      A    A CMS-2 form can serve several purposes.  It
9  can be as simple as changing a person's address and
10 approp. code.  It can change a person's position.  It
11 changes whatever any one of these boxes would happen
12 to change, position numbers, titles, salary.
13     Q    Is it a document that is used to evidence a
14 personnel transaction?
15     A    Yes, it is.
16     Q    And would that include a wide range of
17 transactions?
18     A    Yes.
19     Q    Would it include, for example, someone being
20 discharged from employment?
21     A    Yes.  There are about 150, maybe --
22     Q    Different --
23     A    -- transactions, uh-huh.
24     Q    Okay.  What is the purpose of a CMS-2 form?

**122**

1      A    The purpose of the CMS-2 form is to alert
2  the proper entities that something has changed.
3  Payroll department.  It goes to the payroll
4  department after CMS internal personnel.
5      Q    Now, is the CMS-2 form normally initiated
6  within CMS, or is it initiated within the agency
7  where the employee who is affected by the transaction
8  works?
9      A    Within the agency.
10     Q    Okay.  And then can you describe for me how
11 it gets to the Department of Central Management
12 Services?
13     A    Sure.  After it is completed from the
14 agency, it is submitted to the transaction staff
15 within the bureau of personnel, and at that point it
16 is processed.
17     Q    Now, you say it is processed.  Let me speak
18 about that for a moment.  If you look at the box --
19 or the form for Exhibit 2 --
20     A.   Uh-huh.
21     Q    -- down at the bottom there appear to be two
22 signatures.
23     A    Yes.
24     Q    And the signature on the right hand calls

123

1  for agency head approval?

2    A    Yes.

3    Q    I'm assuming that would be the director or

4  administrator of the agency where the employee

5  affected by the transaction works?

6    A    Yes.

7    Q    When the document is received by CMS, is

8  that box normally filled?

9    A    Yes.

10    Q    Now, when it is received by CMS, and again,

11  comes from another agency, is the signature for the

12  director of Central Management Services blank --

13    A    Yes, it is.

14    Q    -- that box?  Okay.  Once it is received by

15  CMS from another agency, what becomes of this

16  document?

17    A    The transaction staff will review it to make

18  sure all the appropriate boxes are filled in for

19  whatever transaction that they're going to effect,

20  and then the director's signature is affixed and it

21  is put on the computer system and sent back to the

22  agency.

23    Q    Now, who affixes the director's signature?

24    A    Transaction staff.  There are approximately

124

1  ten transaction staff.

2    Q    Now, before the director's signature is

3  affixed, is his approval sought to sign it?

4    A    No.

5    Q    In most instances, is the director even

6  aware of these transaction forms?

7    A    In most instances, no.

8    Q    Now, you referred, I think, to the

9  transaction staff?

10    A    Yes.

11    Q    Okay.  Transaction staff suggests that

12  there's a transaction department or unit?

13    A    Yes.

14    Q    Okay.  How many -- back in the fall of 2002

15  or late summer of 2002, how many employees worked in

16  that unit, if you know?

17    A    Eight to ten.

18    Q    And did each of those individuals have

19  signature authority for the director?

20    A    Yes, they did.

21    Q    So at least back at that point in time, they

22  would have known who the director of Central

23  Management Services was?

24    A    Yes, they would have.

125

1    Q    Okay.  Now, once they receive a form -- and

2  I'm again referring to the transaction department --

3  what would they do?

4    A    They would make sure that all of the

5  appropriate boxes were filled in, all of the

6  procedures had been processed, you know, such as an

7  eligible list that had been requisitioned, if it needed to

8  be, that it was worked properly, that the proper

9  forms were attached, et cetera.

10    Q    So they make sure that all the necessary

11  documents are affixed to the form and that the

12  policies have been applied?

13    A    Yes.

14    Q    And if they determine that that's not been

15  done, what are they supposed to do?

16    A    Either they would take it to their

17  supervisor to see if it was actually necessary --

18  they have a strict set of rules, and whenever it

19  deviates from that, they would take it to their

20  supervisor to see if that box was actually critical,

21  or they would send it back to the agency to get the

22  appropriate documents.

23    Q    Okay.  Now, if this particular unit was

24  processing a CMS-2 form that related to a CMS

126

1  employee --

2    A    Yes.

3    Q    -- and they noticed any irregularities, who

4  would they contact about it?

5    A    That would have been Tricia Pineda.  Now,

6  the Central Management Services forms stay within

7  internal personnel, not the transaction staff.

8    Q    Okay.  Now, does a transaction -- can you

9  describe for me what internal personnel is?

10    A    Internal personnel is the unit that governs

11  all of -- or that oversees all of the personnel

12  transactions within Central Management Services.  We

13  work as two separate entities:  One for the outside

14  agencies, the other 51, and one for internal.

15    Q    Okay.  The internal personnel unit --

16    A    Yes.

17    Q    -- how many people work in that unit?

18    A    Ten.  Ten to twelve.

19    Q    And do any of those employees have the

20  director's signature authority?

21    A    Yes, they do.

22    Q    How many of them?

23    A    There would be a few.  That would be a

24  question for Tricia.

127

1    Q    Okay. Now, in that particular unit, with
2 respect to CMS-2 forms for CMS employees, do they
3 perform the same function that the transactions unit
4 does for non-CMS employees?
5    A    Yes, they do.
6    Q    And if they notice that a form is incomplete
7 or not consistent with policy, what does that unit
8 do?
9    A    They would then take it to their supervisor.
10 Take it to me, if necessary.
11    Q    Okay. Now, with respect to a CMS-2 form,
12 there is a box marked Agency Head Approval and a
13 place for a signature, and then a box marked Director
14 of Central Management Services --
15    A    Yes.
16    Q    -- you see that? What is the significance
17 of the box marked Director of Central Management
18 Services?
19    A    It is acceptance of the form rather than
20 approval.
21    Q    What do you mean by that?
22    A    It verifies that we have accepted that the
23 form is completed in its entirety, and that we are
24 processing the paperwork. Not necessarily that we're

128

1 approving the actual transaction.
2    Q    Okay. Is a CMS-2 form anything more than a
3 record of a personnel transaction?
4    A    No, it is not, except for in the case of
5 discharge.
6    Q    Okay. Can you explain to me how discharge
7 differs?
8    A    Discharge must have the approval of the
9 director of CMS, rather than just the acceptance of
10 the form.
11    Q    Okay. And is that a requirement of either
12 the Personnel Code or the rules of Central Management
13 Services?
14    A    It's a requirement of the transaction
15 manual, and that goes back to the Personnel Code.
16    Q    Okay.
17    A    Actually, the personnel rules, I believe.
18    Q    Okay. Do the personnel rules require the
19 signature of the director of CMS on CMS-2 forms that
20 would relate to matters other than discharge?
21    A    CMS-2 forms are not specifically mentioned
22 in the personnel rules.
23    Q    Are they mentioned in the Personnel Code?
24    A    No, they are not.

129

1    Q    What I would like to do is to hand you
2 Exhibits 2, 3, and 4, and we've talked about those
3 earlier in this hearing, and those relate to some
4 personnel transactions occurring, I believe, in
5 September of 2002, involving three employees of the
6 Department of Central Management Services, a
7 Ms. Gowen, a Ms. Skinner, and a Mr. Cavallaro. Am I
8 correct in that respect?
9    A    Yes, you are.
10    Q    Are you familiar with those documents?
11    A    Yes, I am.
12    Q    Did you have any involvement with the
13 transactions that are the subject of those documents?
14    A    I directed internal personnel to prepare
15 those documents.
16    Q    Okay. What I would like to do is to talk a
17 little bit about the underlying transactions that are
18 referred to in those documents, if I could.
19    A    Okay.
20    Q    And what I'm going to do is talk with you
21 about Exhibit 3, at least by way of illustration, and
22 I believe Exhibit 3 is the form for Ms. Gowen, is it
23 not?
24    A    It's Frank Cavallaro.

130

1    Q    Sorry. Mr. Cavallaro. The first page of
2 Exhibit 3 --
3    A    Yes.
4    Q    -- is that a CMS-2 form that evidences a
5 particular transaction?
6    A    Yes, it is.
7    Q    And what is the nature of the transaction
8 that is covered in that particular document?
9    A    It's a separation to accept another state
10 position.
11    Q    Okay. And what position did Mr. Cavallaro
12 hold prior to that separation?
13    A    He was the bureau manager of computer
14 services.
15    Q    Okay. Now, does this CMS-2 form authorize
16 that separation, or is it just evidence that the
17 separation has occurred?
18    A    It actually is evidence.
19    Q    Another document would authorize it?
20    A    Well, the director's signature in this one
21 particular box would mean that he has approved -- the
22 director has approved it, but no --
23       MR. BILINSKY: For the record, could you
24 identify what box you just pointed to?

131

1    A    Sure.  It is the box with the agency head

2 approval.

3        MR. BAKER:  Q  Okay.  And that's the box

4 that bears the signature of Diane Ford?

5    A    Right.

6    Q    Okay.  The second page --

7    A    Yes.

8    Q    -- is another CMS-2 form.  Does it evidence

9 another transaction?

10   A    Yes, it does.  It's an exempt appointment.

11   Q    Okay.  What does the term exempt appointment

12 mean?

13   A    Exempt appointment is to a position that is

14 considered 4(d)3 exempt or 4(d)1 exempt.  That is a

15 position that serves at the pleasure.

16   Q    Okay.  You're referring with those numbers

17 to sections of the Personnel Code?

18   A    Yes, I am.

19   Q    Okay.  And a person that would accept that

20 type of position would not be hired pursuant to the

21 Personnel Code, and would not be protected under the

22 Personnel Code?

23   A    Correct.

24   Q    Okay.

132

1    A    Under jurisdiction B.  They would be under A

2 and C which are your rights to things such as

3 vacation and sick time.

4    Q    I see.  Now, is this particular document

5 just evidence that the transaction occurred, or is it

6 approval of the transaction?

7    A    Evidence that it occurred.

8    Q    Okay.  Now, the next document, I think, is

9 referred to in state government as a PAR, is it not?

10   A    Yes.

11   Q    It's a personnel action request form?

12   A    Yes, it is.

13   Q    Can you tell us what that form is?

14   A    That form is used anytime that you are

15 filling a position that is deemed to be exempt from

16 Rutan.  You must seek governor's office approval to

17 put someone into that position.

18   Q    Rutan refers to a decision of the United

19 States Supreme Court, does it not?

20   A    Yes, in 1990.

21   Q    And that decision basically related to

22 hiring of employees independent of political

23 patronage?

24   A    Yes.

133

1    Q    Now, is this form -- the personnel action

2 request form dealing with Rutan, is that independent

3 of a requirement under the Personnel Code?

4    A    Yes, it is.

5    Q    Okay.  What is the purpose of that

6 particular form?

7    A    The Rutan decision said that certain

8 positions could be filled for reasons of political

9 affiliation.  In order to fill one of those

10 positions, previous administrations have required

11 that this particular form or some variation be filled

12 out.

13   Q    Okay.  And was this a form that was

14 routinely used in filling out -- or in filling Rutan

15 exempt positions?

16   A    Yes.

17   Q    Okay.  Maybe we've already covered this, but

18 just so the record is complete, a Rutan exempt

19 position would be a position that would not be

20 covered by the Rutan holding?

21   A    Exactly.

22   Q    Let's go to the next document, and I think

23 we're at the fourth page.  Can you identify for me

24 what that document is?

134

1    A    That is a separation from the 4(d)3 exempt

2 position to accept another state position.

3    Q    Okay.  And that bears an effective date of

4 9-12-02?

5    A    Yes, it does.

6    Q    And that's, again, a CMS-2 form?

7    A    Yes, it is.

8    Q    What does that CMS-2 form evidence with

9 respect to Mr. Cavallaro?

10   A    That separates him from the 4(d)3 exempt

11 position.

12   Q    If someone separates from his position in

13 state government, regardless of the reason, is a

14 CMS-2 form normally prepared?

15   A    Yes, it is.

16   Q    And is this document evidence of a

17 transaction?

18   A    Yes, it is.

19   Q    Doesn't authorize the transaction?

20   A    No.

21   Q    The next document is another CMS-2 form for

22 Mr. Cavallaro, is it not?

23   A    Yes.

24   Q    And what is the transaction evidenced by

135

1  that document?

2  A    It is a reinstatement to term appointment.

3  Q    Okay.  And what does that reflect with

4  respect to Mr. Cavallaro?

5  A    That is reinstating Mr. Cavallaro back into

6  his bureau manager position at computer services.

7  Q    Okay.  Within the Illinois personnel system,

8  at least within the Personnel Code and the rules of

9  Central Management Services, what is a reinstatement?

10  A    A reinstatement is a person who has held

11  certified status before.  They are allowed to be

12  reinstated versus coming off an open competitive list

13  and going through the competitive process again.

14  Q    Okay.  Is reinstatement something that

15  commonly occurs in the state government?

16  A    Yes, it is.

17  Q    And has it occurred prior to September of

18  2002 with respect to individuals who were at one time

19  term appointees returning to term appointments?

20  A    Yes.

21  Q    Okay.  Is it fairly commonly used?

22  A    Yes.

23  Q    Under the Personnel Code or CMS rules, does

24  the director of Central Management Services have to

136

1  approve or authorize a reinstatement?

2  A    Yes.  Through the process of signing the CMS

3  form, he accepts the fact that --

4  Q    Okay.

5  A    -- it's coming in.

6  Q    Okay.  Well, does he have to approve the

7  underlying transaction?

8  A    He would approve it -- it would be an

9  acceptance.

10  Q    Okay.

11  A    More of an acceptance, yes.

12  Q    Okay.  An acceptance rather than an

13  approval?

14  A    Yes.

15  Q    Okay.  Let's go to the last page, if we

16  could, and that, again, is a PAR document, is it not?

17  A    Yes, it is.

18  Q    And what is the purpose of the PAR document

19  with respect to Mr. Cavallaro's situation?

20  A    Mr. Cavallaro was returning to his term

21  appointment at communication and computer services.

22  That was a Rutan exempt position.  Therefore, it

23  needed a Rutan exempt form.

24  Q    Now, I don't want to -- let me ask you this:

137

1  If you would, just very quickly review the pages of

2  Exhibits 2 and 4 as compared to Exhibit 3, and then

3  I'm going to ask you some questions quickly about

4  each of those documents.

5  A    Okay.

6  Q    Are those documents -- again, I'm referring

7  to Exhibits 2 and 4 -- CMS-2 forms and PAR forms

8  evidencing transactions and personnel transactions in

9  September of 2002 for Lori Skinner, and Susan Gowen?

10  A    Yes, they are.

11  Q    And if I were to take you through each page

12  of each of those forms concerning what each page

13  signified, would your testimony for them be the same

14  as it was for Mr. Cavallaro?

15  A    Yes, it would.

16  Q    And are the transactions for Ms. Skinner and

17  Ms. Gowen essentially the same as the transactions

18  involving Mr. Cavallaro?

19  A    Yes.

20  Q    Okay.  Now, I understand that each of the

21  positions, whether it's a term position or exempt

22  position, held by Mr. Cavallaro and Ms. Skinner and

23  Ms. Gowen were Rutan exempt; am I correct?

24  A    Yes.

138

1  Q    And was that a determination, at least with

2  respect to these positions, that was made sometime

3  before the summer of 2002?

4  A    Yes, it was.

5  Q    Okay.  So at least with respect to these

6  transactions, there was no determination or inquiry

7  made as to whether they should or should not be Rutan

8  exempt?

9  A    Correct.

10  Q    Now, as to the three employees that we have

11  talked about, Mr. Cavallaro, Ms. Skinner, and

12  Ms. Gowen, did you have some involvement in the

13  transactions that are memorialized on these

14  documents?

15  A    Yes, I did.

16  Q    Okay.  What I would like to do is attempt to

17  deal chronologically with your involvement.  Number

18  one -- and let me clear this up.  Were there

19  employees of other agencies who went through

20  transactions similar to these?

21  A    Yes, there were.

22  Q    And do you recall approximately how many of

23  those employees there were?

24  A    40 to 44.

**139**

1    Q    Okay. Now, with respect to the transactions
2  generally as to not only these three employees but
3  the 40 to 44 employees, did you ever have a
4  discussion concerning those types of transactions
5  with Rob Powers?

6    A    Yes, I did.

7    Q    Okay. Can you identify for me when the
8  first time was that you had that type of discussion?

9    A    It would have been in late spring of '02.

10   Q    Of 2002?

11   A    Yes.

12   Q    Okay. And did you approach him, or did he
13 approach you?

14   A    He approached me.

15   Q    Was that by telephone or personal meeting?

16   A    Don't recall.

17   Q    Okay. And what did he ask of you at that
18 time?

19   A    To check into the possibility of whether
20 or not a person could take a four-day break in
21 service -- or take a break in service, it wasn't
22 necessarily a four-day break, and restart their term.

23   Q    Did he ask -- did he make any specific
24 request of you?

**140**

1    A    No. Other than to check it out and get back
2  to him, no.

3    Q    Okay. After that telephone conversation,
4  what, if anything, did you do?

5    A    I went over to our transactions head and
6  talked to Carol Mouser, who was the transaction staff
7  supervisor at the time, about whether or not this was
8  actually a doable transaction.

9    Q    Okay. Did you report that conversation to
10 Rob Powers?

11   A    Yes, I did.

12   Q    And when was it you reported that to him?

13   A    Within a day or so of -- may have even been
14 that day.

15   Q    Okay. And what did you tell Rob?

16   A    That it was something that could be done per
17 Carol Mouser. It had been done in the past.

18   Q    At that time did Rob say anything to you or
19 give -- make any requests of you?

20   A    Not that I recall.

21   Q    Okay. At any time did you ever discuss with
22 Rob Powers the process that should be done to fulfill
23 what he asked you to look into?

24   A    Yes.

**141**

1    Q    And was that at the time you spoke with him
2  after your conversation with Carol Mouser, or was it
3  some later time?

4    A    It would have been as soon as I spoke with
5  Carol Mouser, yes.

6    Q    And what did you explain to him the
7  process --

8    A    The different transaction codes that would
9  need to be effected in order to do these
10 transactions.

11   Q    Okay. Now, with respect to transaction
12 forms -- well, let me back up. With respect to
13 Exhibits 2, 3, and 4, and talking about those as
14 opposed to the other 40 for a moment --

15   A    Uh-huh.

16   Q    -- did you have any involvement in the
17 preparation of those documents?

18   A    I directed trans -- our internal personnel
19 to prepare these documents.

20   Q    Okay. Do you recall when it was you gave
21 that direction?

22   A    August of 2002.

23   Q    Prior to giving them that direction, had you
24 spoken with Director Schwartz?

**142**

1    A    Yes, I had.

2    Q    And what did he tell you?

3    A    He told me basically that we could prepare
4  these forms, that he was not going to sign these
5  forms.

6    Q    Okay. Did he tell you not to prepare them?

7    A    No, he did not.

8    Q    Okay. Did you have any further discussion
9  with him as to whether you were or not going to
10 prepare them?

11   A    He was aware of the fact that I was going to
12 prepare them, yes.

13   Q    How do you know that?

14   A    I talked to him about that late August. Mid
15 August, late August.

16   Q    Okay. If he had told you not to prepare
17 them, would you?

18   A    No, I would not have.

19   Q    Okay. Tell me who you directed to prepare
20 these documents.

21   A    Tricia Pineda.

22   Q    Now, at any time after these forms were
23 prepared, did you ever have a conversation with Rob
24 Powers concerning the forms?

143

1    A    I believe I did.  I talked to Sarajane more
2  frequently than I did Rob, but the conversation back-
3  was that the director was not going to sign these
4  forms.
5    Q    Okay.  Did you have any discussion about
6  whether the director had approved the forms?
7    A    The director had said that it was okay to go
8  ahead and prepare the forms and submit them, and if
9  the governor's office wanted to sign them, that was
10  fine with him.
11    Q    Okay.  And is that what you communicated to
12  either Sarajane or Rob?
13    A    Yes.
14    Q    Did you direct that these forms be delivered
15  to Rob Powers' office?
16    A    Yes, I did.
17    Q    And if you know, who did you give that
18  direction to?
19    A    Tricia Pineda.
20    Q    Okay.  At any time did you ever inform
21  either Sarajane Wright or Rob Powers that Director
22  Schwartz disapproved the forms?
23    A    He never disapproved the forms.
24    Q    Okay.  So you never told anyone --

144

1    A    No.
2    Q    -- he did.  Okay.  If you're aware, was
3  Director Schwartz aware that these transactions were
4  taking place with respect to the three CMS employees?
5    A    Yes, he was.
6    Q    And how do you know that?
7    A    Conversations that I had with him late
8  August, September.
9    Q    Okay.  In his capacity as director of
10  Central Management Services, could he have directed
11  that the CMS-2 forms not be processed?
12    A    Yes, he could have.
13    Q    Did he at any time do that?
14    A    No.
15    Q    Are you personally acquainted with Frank
16  Cavallaro?
17    A    Yes, I am.
18    Q    Do you know if Frank Cavallaro personally
19  signed any of these forms?
20    A    Yes, he did.  He signed all four of them.
21    Q    How do you know that?
22    A    I was in the room when he signed them.
23    Q    What room was that?
24    A    It was the outer office to the director's

145

1  office.  The chief of staff, Nancy White's office.
2    Q    Okay.  What floor of the Stratton Building
3  is the director located on?
4    A    Seventh floor.
5    Q    Okay.  And Nancy White is his chief of
6  staff?
7    A    Was his chief of staff, yes.  She's retired.
8    Q    At that time?
9    A    Yes.
10    Q    Okay.  And her office is adjacent to the
11  director's office?
12    A    Yes, it is.  Was.
13    Q    And were you in the room when he signed --
14  when Mr. Cavallaro signed these forms?
15    A    Yes, I was.
16    Q    Who else was present in that room?
17    A    Nancy White was in the room as well.
18    Q    Okay.  Was Director Schwartz present?
19    A    He was in and out of the office throughout
20  the conversation.  We talked for approximately an
21  hour.
22    Q    Okay.  When he was not in the office, where
23  was he?
24    A    He was in his office.

146

1    Q    Okay.  Was he aware of what Mr. Cavallaro
2  was doing?
3    A    I believe so, yes.
4    Q    At any time during that hour when he was in
5  and out, did he verbalize any comments that he
6  disapproved of these transactions?
7    A    No, he did not.
8    Q    At some point in time, were these forms
9  returned to you after all the signatures at the
10  bottom of them had been filled in?
11    A    Yes, they were.
12    Q    And at that point in time, what did you do
13  with them?
14    A    I gave them back to Tricia Pineda's office
15  for processing.
16    Q    Okay.  Did you instruct her to do anything
17  differently with these forms than you did with other
18  personnel transaction forms for CMS employees whose
19  CMS-2s were being processed?
20    A    No, I didn't.
21    Q    And if you know, were these forms being
22  processed?
23    A    Yes, they were.
24    Q    At any time did the -- I think it was the

147

1  internal personnel unit?

2    A    Yes.

3    Q    The unit within CMS that processes CMS-2s

4  for CMS employees.

5    A    Yes, internal personnel.

6    Q    At any time did they ever raise any question

7  or concern about these forms?

8    A    No, they did not.

9    Q    Did they reject them?

10    A    No, they did not.

11    Q    Did anyone call you, asking you why a

12  signature other than Director Schwartz appeared at

13  the bottom?

14    A    No, they did not.

15    Q    The people that work in this internal --

16    A    Yes.

17    Q    -- personnel unit --

18    A    Yes.

19    Q    -- how frequently would they see a document

20  in completed form that has a space for the director's

21  signature of CMS?

22    A    Quite frequently.

23    Q    More than two or three times a day?

24    A    We had approximately 1300 employees.

148

1  Anytime there was a transaction that affected any one

2  of these various fields, there would be a CMS-2 that

3  was cut.  So frequently.

4    Q    Okay.  Based upon your experience with the

5  rules of CMS and the Illinois Personnel Code, back in

6  the late summer of 2002, did you have any discomfort

7  that these transactions violated any provision of the

8  Personnel Code or rule of the Department of Central

9  Management Services?

10    MR. BILINSKY:  Objection.  She's not going

11  to be allowed to give ultimate legal opinion for the

12  Commission on an issue of -- reach conclusions for

13  the Commission on issues that are before the

14  Commission.  Also, I don't believe she's qualified as

15  an expert as to the entire Code.  She testified that

16  she had worked with it for a two-year period.  She

17  didn't testify as to any of the opinions she was

18  asked to render, any analysis she was asked to

19  perform, any legal research or review she did on this

20  topic, and I don't think it's appropriate to treat

21  her as an expert.

22    MR. TRAPP:  Well, I'm going to -- I think

23  I'll overrule.  I'm going to go ahead and hear her

24  answer, and give it whatever weight is deemed to be

149

1  appropriate.

2    MR. BAKER:  Q  Remember the question?

3    A    Would you ask -- please.

4    MR. BAKER:  I'm going to ask the court

5  reporter, see if she was awake during your testimony.

6    (The requested portion was

7    read back by the reporter.)

8    A    No.  In my professional capacity, I didn't

9  believe they did.

10    MR. BAKER:  Q  Following the meeting where

11  Frank Cavallaro was in Nancy White's office --

12    A    Yes.

13    Q    -- that you testified to, at any time

14  thereafter did Director Schwartz ever indicate to you

15  that he disapproved of these transactions?

16    A    No, he did not.

17    Q    If you know, was Director Schwartz aware of

18  similar transactions with respect to employees in

19  other agencies?

20    A    Yes, he was.

21    Q    And in his capacity as director of Central

22  Management Services, did he authorize his signature

23  to be affixed to the CMS-2s for those transactions?

24    A    In the box of director of Central Management

150

1  Services, yes.

2    Q    Would there have been any difference in his

3  capa -- in the significance of his signature in the

4  capacity of director of CMS in signing the boxes for

5  these three employees as opposed to employees for

6  other agencies?

7    A    Slightly, in that the agency head approval

8  would have been the director's approval to sign, and

9  he would not do so.

10    Q    Okay.  But with respect to the box marked

11  for signature by the director of CMS, was there any

12  difference?

13    A    No.

14    MR. BAKER:  I have no further questions.

15  Thank you very much.

16    A    All right.

17    CROSS-EXAMINATION

18    BY MR. BILINSKY:

19    Q    I have a few for you, Ms. Hensey.

20    A    Okay.

21    Q    I want to start first with comments you made

22  earlier.  You said the director, you believe, retired

23  or left the agency in September of '02?

24    A    Yes.

151

    Q    Now, looking at Groups Exhibit 2, 3, and 4,
did all these transactions take place in September of
2002?

    A    Yes, they did.

    Q    So the director refused to have his
signature appear on the documents, and left the
agency during the same month that all these
transactions were occurring?

    A    He left at the end of the month, I believe,
yes.

    Q    Okay.  Now, you talked about folks who had
signature authority for internal CMS personnel, and
then governor office personnel transactions.  Do you
recall those discussions --

    A    Yes.

    Q    -- with counsel?  Now, when someone has
signature authority for the director, do they sign
their own name personally?

    A    No, they sign the director's name with their
initials after it.

    Q    Okay.  So no one who has director's
signature authority in the operation of CMS signs
their own name?

    A    To be the director, no.

152

    Q    Okay.  Now, I was confused by something
here.  We have these forms, Groups Exhibit 2, 3, and
4.  These are actual CMS employees; is that correct?

    A    Yes, they are.

    Q    Now, in the box at the bottom of the CMS-2
on the left, is there a title for the box?

    A    Director of Central Management Services.

    Q    The title says Director of Central
Management Services?

    A    Yes.

    Q    Is there a line through that title?

    A    No, there is not.

    Q    Is there any mark that appears on Group
Exhibit 2, 3, or 4 that would indicate that the
person signing the box labeled Director of Central
Management Services wasn't the director?

    A    No.

    Q    By law are you required to maintain the
CMS-2s and make them available to the public if they
so request?

    A    Yes, I believe so.

    Q    In fact, Section 20 ILCS 415/14 says, "The
records of the Department of Central Management
Services shall be maintained as a matter of public

153

policy and made open to public inspection"; is that
correct?

    A    Yes.

    Q    So these documents are ones that ostensibly
would be reviewed by people who don't work internally
with the agency, if they're just members of the
public and not government employees?

    A    Could be, yes.

    Q    And if I was to pick up Group Exhibit 2, 3,
or 4 and look at the box labeled Director of Central
Management Services, would there be anything on the
face of this document that would tell me that the
signature that appears there was not placed down as
the director?

    A    No.

    Q    And, in fact, it appears that the person who
has signed all of these documents is signing as the
director of the agency; is that correct?

    A    It appears, yes.

    Q    When documents come in for transaction, does
the transaction team review the signatures to make
sure that they are from the person -- or from the
employee who is purporting to sign them, or make sure
that the person who has placed a signature there had

154

authority to sign it?

    A    Yes.

    Q    Okay.  So, for instance, when Frank
Cavallaro's documents came in, they would have pulled
some document they have on file with his signature to
make sure that that was his signature?

    A    If there was any question.

    Q    So they don't -- they don't check unless
there's a question?

    A    Well, for the actual employees, no, they
would not.

    Q    Okay.  Now, looking at Group Exhibit 2, 3,
and 4, you mentioned that documents -- and counsel
kind of asked you this in a vague fashion, so I want
to clear this up.

        MR. BAKER:  I appreciate that.

        MR. BILINSKY:  No problem.

    Q    Counsel asked you about transactions being
signed as accepted as opposed to signed as approved.
Group Exhibit 2, 3, and 4 are CMS employees; is that
correct?

    A    Yes, they are.

    Q    Do documents -- CMS-2 documents processed by
CMS have to have approval from someone?

155

1    A    They would have to have the agency head
2  approval, and then acceptance from Central Management
3  Services.
4    Q    Okay.  So if somebody wants a raise, they
5  can't just put in the paperwork to get a raise,
6  somebody has to approve that?
7    A    Correct.
8    Q    So when you talk about acceptance versus
9  approval, the documents do have to be approved?
10    A    Correct, in this one particular box, Agency
11  Head Approval.
12    Q    Okay.  Now, agency head approval, whose name
13  appears under the agency head approval in Exhibits 2,
14  3, and 4?
15    A    Diane Ford.
16    MR. BAKER:  Objection.  Relevance.
17    MR. TRAPP:  I'll overrule it.
18    MR. BILINSKY:  Q  Whose initials appear next
19  to Diane Ford's name?
20    A    Sarajane Wright.
21    Q    Who was Sarajane Wright in relation to Rob
22  Powers in September of 2002?
23    MR. BAKER:  Objection.  That's not an issue
24  in this case.  It's not relevant.

156

1    MR. TRAPP:  I'll overrule.  Go ahead and
2  answer.
3    A    His assistant.
4    MR. BILINSKY:  Q  So Rob Powers' assistant
5  signed in the box labeled Agency Head Approval,
6  putting down the name of Diane Ford; is that correct?
7    A    Yes.
8    Q    And then he himself affixed his signature in
9  the box labeled Director of Central Management
10  Services?
11    A    Yes.
12    Q    Now, you said that Director Schwartz said
13  that he wouldn't sign these documents; is that
14  correct?
15    A    Correct.
16    Q    You also testified that there are these
17  number of employees who have signature authority for
18  the director, and you made it sound like they sign
19  off his name all the time without ever asking for
20  permission or authority to do so.  Did Director
21  Schwartz give any instructions in regards to the use
22  of his signature authority in these transactions that
23  are in Group 2, 3, and 4?
24    A    Do not do so.

157

1    Q    So he specifically instructed all of the
2  people with his signature authority that they were
3  not to exercise it as to these transactions?
4    A    In this particular case it would have been
5  internal personnel only.  It would have been one or
6  two people, yes.
7    Q    So the internal people who could have signed
8  his name were specifically instructed not to?
9    A    Exactly.
10    Q    Now, you said it was common for
11  reinstatement to term appointments.  Do you recall
12  that testimony?
13    A    Yes.
14    Q    When you say it's common to reinstate an
15  employee to a term appointment, are you talking about
16  it's common after the term expires for an employee to
17  be replaced in that term, or are you saying it's
18  common for people before their term ever expires to
19  leave that position for four days, work another
20  position, and then be reappointed back?
21    A    The latter is not common, but it can also
22  occur for other reasons, such as a person left state
23  government for a short time, returned, they would
24  then be reinstated.

158

1    Q    Are the transactions that exist in Group
2  Exhibit 2, 3, and 4 which occurred in September of
3  2002 transactions that were common in CMS when you
4  were the bureau manager?
5    A    No.
6    Q    Prior to September of 2002, had you ever
7  processed or engaged in a series of transactions for
8  CMS employees where they left a position for a period
9  of time of four days solely for the purposes of
10  getting a new term appointment?
11    A    CMS employees, no.
12    Q    Now, the appointment provisions under
13  Section 302.820 for these term appointments says that
14  an appointee to a position subject to a term
15  appointment shall be selected by the director or
16  chairman of the department, board, or commission in
17  which the position is located from the appropriate
18  competitive list, and that that term shall be made
19  for a four-year term commencing on the date of
20  appointment.  Are you familiar with this section?
21    A    Yes, I am.
22    Q    Okay.  Had the people in Group Exhibits 2,
23  3, and 4 completed a four-year term of service?
24    A    No, they had not.

159

1  Q    Did Director Schwartz tell you to appoint
2  Susan Gowen, Frank Cavallaro, or Lori Skinner to the
3  positions that are set forth in Group Exhibits 2, 3,
4  and 4?
5  A    No, he did not.
6  Q    So under the rule, the director is the only
7  person -- the director or chairman of the department
8  or the board or commission is the only person who can
9  make appointments; is that correct?
10  A    Yes.
11  Q    And the director did not, in fact, make
12  these appointments; is that correct?
13  A    He was aware of them.
14  Q    But he did not make them; is that correct?
15  A    Correct.
16  Q    The rule says the director is the only one
17  who can make those appointments, and he did not make
18  these appointments; is that correct?
19  A    Correct.
20  Q    And he said his name was not to appear on
21  these, and nobody was to exercise his signature
22  authority on these; is that correct?
23  A    Correct.
24  Q    Now, you said that the transactions in your

160

1  opinion didn't violate any provision of the Code, but
2  if the Code requires the director to make the
3  appointments, then they do, in fact, violate that
4  provision of the Code, don't they?
5  A    Yes, you could say that. Yes.
6  Q    If the Code says the appointments have to be
7  made by the director of the agency, and as to Group
8  Exhibits 2, 3, and 4, Schwartz never made those
9  appointments, that would violate the Code section,
10  wouldn't it?
11  A    Yes. I was referring to the actual
12  transactions.
13  Q    You mean the sequence of transactions?
14  A    Yes, yes.
15  Q    Okay. Now, is there any section of the
16  Administrative Code or the Personnel Code or the
17  personnel transaction manual dealing with term
18  appointments which sets up a formula for allowing
19  people to back out of a term appointment so that they
20  can restart a new four-year term without having
21  completed the last term?
22  A    No, there's not one particular rule.
23  Q    And, in fact, the rule dealing with
24  appointments says, very simply and very

161

1  straightforward, such appointment shall be made for a
2  four-year term commencing on the date of the
3  appointment; is that correct?
4  A    Yes.
5  Q    And the section dealing with term
6  appointments has no other paragraph in there for
7  giving someone a new four-year term appointment prior
8  to the expiration of their old term appointment, is
9  there?
10  A    Correct.
11  Q    Frank Cavallaro. What was the initial
12  position he was in before he separated for the first
13  time?
14  A    The bureau manager of communications and
15  computer services.
16  Q    And then what position did he move into when
17  he left his term appointment early?
18  A    Deputy director of Human Resources.
19  Q    Would that have made him your boss?
20  A    No, it's a separate entity.
21  Q    Okay. What orders and paperwork or
22  activities did you see Mr. Cavallaro engage in as the
23  deputy director of Human Services?
24  A    None.

162

1  Q    Did you ever see him or notice him to
2  actually carry out the job functions of that new
3  position?
4  A    No.
5  Q    Did he at any time to your knowledge ever
6  stop working in his position of technology bureau?
7  A    Not to my knowledge, no.
8  Q    Okay. So the transactions that are
9  delineated for Frank Cavallaro ostensibly are him
10  leaving one position and going to another position
11  for a period of time, and then going back to the
12  position he was originally in; is that correct?
13  A    Correct.
14  Q    But in practice, to your knowledge, Frank
15  Cavallaro never stopped actually carrying out the job
16  duties and functions of his original job?
17  A    To my knowledge, yes.
18  Q    How about as to Lori Skinner? To your
19  knowledge did she ever stop ceasing doing the job
20  functions of her initial position when she did her
21  separation?
22  A    No.
23  Q    How about Susan Gowen?
24  A    No.

163

1  Q    So as to these employees, the series of
2  documents that are here attempts to create a work-
3  around to the four-year limitation on term
4  appointments by creating a faux break in service; is
5  that correct?
6     A    Correct.
7     Q    And, in fact, none of these employees
8  actually engaged in the break of service?
9     A    Correct, it's not a true break in service,
10  they continued their service with the state.
11     Q    Right.  The idea was to try to give them
12  four-year terms prior to the expiration of the terms
13  they were already serving such that their employment
14  would not be reviewable by the next administration;
15  is that correct?
16     A    I would assume, correct.
17     Q    Have you ever made a public policy review of
18  the transactions that were involved or the Code
19  sections that apply to this case?
20     A    I'm sorry?
21     Q    Have you ever looked at the series of
22  transactions here --
23     A    Yes.
24     Q    -- and asked the question whether it was in

164

1  the best interest of the people of the State of
2  Illinois if employees who, under statute, were
3  supposed to work four-year terms, were not supposed
4  to be given four-year terms until their four-year
5  terms had expired in conjunction with four-year
6  election cycles, whether it was in their interest to
7  have this series of transactions be used to
8  circumvent what was the clear intent of the law?
9     A    No.
10     Q    So when you discussed giving your opinion
11  about the provisions of the Code, you weren't looking
12  at this from the perspective of the intent of the
13  legislature in passing the various laws that they had
14  passed that created term appointments; is that
15  correct?
16     A    Correct.
17     Q    And you didn't look at it from a public
18  policy perspective; is that correct?
19     A    Correct.
20     Q    Do you know if Frank Cavallaro, Susan Gowen,
21  or Lori Skinner ever received any type or form of
22  discipline for engaging in this series of
23  transactions?
24        MR. BAKER:  Objection.  Relevance.

165

1        MR. TRAPP:  I'll overrule.  Go ahead and
2  answer.
3     A    Prior to the administration change, or after
4  the administration change?
5        MR. BILINSKY:  Q    At any time.
6     A    Frank retired, I believe, in February.
7  Susan Gowen and Lori Skinner were terminated in
8  March, I believe.  Their cases are still pending, I
9  believe, on Susan.
10     Q    Now, looking at Group Exhibit 2, 3, and 4,
11  counsel asked you if the transaction department ever
12  stopped or didn't process these forms.  Do you recall
13  that?
14     A    Yes.
15     Q    Now, agency head approval.  Diane Ford or
16  Sarajane Wright, were either of them the head of
17  Central Management Services?
18     A    No, they were not.
19     Q    So when the transaction department passed
20  these through -- these forms through, they weren't
21  certifying that Diane Ford or Sarajane Wright was the
22  agency head of CMS; is that correct?
23     A    No.
24     Q    And once again, if some member of the public

166

1  was to look at these documents which are required to
2  be stored and maintained for the public, they would
3  have no way to tell from looking at the form that
4  Diane Ford wasn't the agency head?
5     A    Correct.
6     Q    But the agency head, in fact, had told you
7  that his name was not to appear on any of these
8  documents whether it was executed by him or one of
9  the people with his signature authority?
10     A    For these three documents, correct.
11     Q    For these three exhibits, 2, 3, and 4?
12     A    Correct.
13     Q    Are you aware of a law in the State of
14  Illinois which makes it an unlawful act to make a
15  false mark upon a document of the government?
16     A    I am, yes.
17        MR. BILINSKY:  I have no further questions.
18        REDIRECT EXAMINATION
19        BY MR. BAKER:
20     Q    Just a couple.  If you turn, for example, to
21  Exhibit 3, the last page -- second to the last page.
22     A    Yes.
23     Q    I think that's a document for Mr. Cavallaro,
24  is it not?

167

1   A   Yes, it is.

2   Q   Going down to block seven?

3   A   Yes.

4   Q   That describes the transaction as a
5   reinstatement, does it not?

6   A   Correct.

7   Q   It does not describe it as an appointment?

8   A   Correct.

9   Q   Is there a difference between a
10  reinstatement and an appointment?

11  A   A reinstatement is someone who has held
12  certified status before.  They would be subject to a
13  four-month probationary period.  An appointment -- a
14  probationary appointment is a brand new hire subject
15  to veterans preference, an open competative list, and
16  six-month probationary period.

17  Q   Okay.  Is reinstatement covered under the
18  CMS rules?

19  A   Yes, it is.

20  Q   Now, going back to Rule 820 -- do you have a
21  copy of it there in front of you?

22  A   302.820?

23  Q   Yes, ma'am.

24  A   Yes.  Okay.

168

1   Q   Does that rule apply to appointments or
2   reinstatements?

3   A   It does not specifically mention
4   reinstatements, although reinstatements are an
5   applicable transaction type.

6   Q   Okay.  When you say an applicable
7   transaction type, you mean what?

8   A   That a person can be reinstated to a term
9   appointment.  It's just not referenced in the
10  personnel rules.  There are several transactions.

11  Q   Okay.  It --

12  A   Can occur.

13  Q   Okay.  Reinstatement is a different
14  transaction from an appointment?

15  A   Well, it's called a reinstatement term
16  appointment, so it would depend on how you define it,
17  but yes, it's a different BA code.

18  MR. BAKER:  Could we take maybe a
19  five-minute break?

20  MR. TRAPP:  Before we're done with this
21  witness?

22  MR. BAKER:  Yes.

23  MR. TRAPP:  Sure.

24  MR. BAKER:  Thank you.

169

1   (Short break.)

2   MR. BAKER:  Q   Just a couple of other
3   questions.  CMS-2 forms like those that are affixed
4   to Exhibits 2, 3, and 4, after they're processed by
5   CMS, where do they go?

6   A   A copy would be retained within CMS, and a
7   copy would go back to the agency.

8   Q   And where in CMS are they retained?

9   A   It depends on whether they're internal or
10  external.  Internal are in the internal personnel
11  files.  External would go down to microfilm.

12  Q   Okay.  So with respect to 2, 3, and 4, which
13  are internal?

14  A   Yes.

15  Q   Those would go into the employees' personnel
16  files?

17  A   Yes.

18  Q   If I, as a member of the general public,
19  wanted to see the personal files of a CMS employee,
20  could I?

21  A   No.

22  Q   Why is that?

23  A   Covered under Freedom of Information Act.
24  We would send you up to the attorneys to talk to the

170

1   attorneys.

2   MR. BAKER:  Okay.  Very good.  I have
3   nothing further.  Thank you.

4   RECROSS EXAMINATION

5   BY MR. BILINSKY.

6   Q   Under the Freedom of Information Act, if I
7   asked you for all of the September separation of
8   service forms, though, you would provide those; is
9   that correct?

10  A   I would not until the attorney said I could.

11  Q   Okay.  But you're not aware of a law that
12  would prevent you from providing the personnel
13  transactions that CMS engaged in, in a FOIA request;
14  is that correct?

15  A   I am not aware, but nor am I the expert in
16  FOIAs.

17  Q   Got you.  Now, counsel had -- once again, he
18  kind of talked around something, so I just want to
19  kind of come out and ask you.  You had said that the
20  reinstatements to term appointments had a different
21  BA code?

22  A   Yes.

23  Q   Looking at the form, there's a column that
24  says 38 transaction code, and then it has a number

171

1  under it that says BA and has a number?

2      A    Yes.

3      Q    So the difference between an appointment and

4  a reinstatement to a term appointment is that the

5  transaction code is different; is that correct?

6      A    Correct.

7      Q    Is there a different section of the

8  Administrative Code which covers reappointments -- or

9  reinstatement to term appointments versus

10 appointments?

11     A    There is a reinstatement section, but I

12 don't believe there's a reinstatement to term

13 appointment.

14     Q    Okay.  So all term appointments, to the best

15 of your knowledge, are covered by Section 302.820?

16     A    Correct.

17     Q    Whether that's a reappointment to a term

18 appointment or a new term appointment?

19     A    Correct.

20     Q    Are you aware of any Code provision, any

21 statute, any personnel transaction rule, any internal

22 policy of the department which says that the

23 requirement in Section 302.820 that the director name

24 the person who is to have the appointment or the

172

1  reinstatement to term appointment has an exception?

2      A    No.

3      Q    Okay.  So to the best of your knowledge,

4  whether you're a reinstatement to a term appointment

5  or placed into a term appointment, even though the BA

6  codes are different, both of those transactions still

7  require that the person be selected by the director?

8      A    Correct.

9      MR. BILINSKY:  I have no further questions.

10     MR. BAKER:  I have nothing further.

11     MR. TRAPP:  Okay.  Thank you.

12     MS. MCNAUGHT:  Is this witness free to go?

13     MR. TRAPP:  Yes.

14     MR. BAKER:  She is.  Like to call

15 Mr. Powers.

16              ROBERT POWERS,

17 having been duly sworn, was examined and testified as

18 follows:

19              DIRECT EXAMINATION

20              BY MR. BAKER:

21     Q    Good morning, Mr. Powers.

22     A    Good morning.

23     Q    Just for the record, could you state your

24 name again, please.

173

1      A    It's Robert Powers, P-o-w-e-r-s.

2      Q    And you testified at the first session of

3  this hearing, did you not?

4      A    That's correct.

5      Q    What is your profession?

6      A    I've been a licensed attorney in the State

7  of Illinois since May 1st of 1980.  I've worked both

8  in private practice and for the State of Illinois

9  those 23 years.

10     Q    Okay.  I believe in your earlier testimony

11 you indicated that you worked for the Illinois

12 Secretary of State for some period of time?

13     A    That's correct.

14     Q    How many years did you work for the

15 Secretary of State?

16     A    I started in September of 1988 under the

17 Edgar administration, and I left January -- effective

18 January 16, 1999.  So approximately ten years, 12 --

19 11 years.

20     Q    What was your job in the Secretary of

21 State's office?

22     A    I was an attorney in the general counsel's

23 office throughout that period of time.  I had

24 different assignments from year to year and

174

1  administration to administration, but assistant legal

2  advisor.

3      Q    In that capacity with the Secretary of

4  State, did you receive performance appraisals?

5      A    Yes.  They were not always consistent.

6  Under the Edgar administration, I think they were

7  done annually.  In the Ryan administration, there was

8  a period of time when they either would or would not

9  be done.  I had several in that period of time I was

10 there.

11     Q    Okay.  Can you tell us how you did with your

12 personnel evaluations in terms of your ratings?

13     MR. BILINSKY:  Objection.  Relevancy as to

14 what other employers thought of his work product

15 prior to him coming to the Commission has no bearing

16 on this case whatsoever.

17     MR. BAKER:  Actually, he was terminated for

18 events that predated his employment with the

19 Commission.  It certainly is relevant, in terms of

20 mitigation, his overall record as a state employee.

21     MR. TRAPP:  Let's go ahead and -- go ahead

22 and answer the question.

23     A    The evaluation forms, as I recall them, at

24 the Secretary of State's office either had three

175

1  levels or four levels or five levels at different
2  times, I believe they changed them, and I was, I
3  think without exception, always rated higher than the
4  acceptable level.  There might have been one or two
5  levels above acceptable that -- exceeds expectation,
6  I believe, is one of the categories, but --
7      Q   Okay.  During your years of service in the
8  Secretary of State's office, were you ever the
9  recipient of any discipline?
10     A   No.
11     Q   Did you ever get a written reprimand?
12     A   No.
13     Q   I believe your testimony is that you worked
14 roughly for four years in the governor's office, and
15 there was a short period of time where you worked for
16 the Department of Central Management Services?
17     A   That's correct.
18     Q   During that particular block of time in your
19 service in state government, did you receive
20 performance evaluations?
21     A   The governor's office did not use the
22 evaluation process, so no.
23     Q   At any time during that particular time
24 frame, were you subjected to any discipline?

176

1      A   No.
2      Q   Even discipline as minor as an oral
3  reprimand?
4      A   No.
5      Q   I believe your testimony is that you worked
6  for the Civil Service Commission, if my recollection
7  is correct, from October 2002 through the end of May
8  of this year?
9      A   Yes, October 1st through May 30th or 31st,
10 whatever.  30th.
11     Q   Okay.  During that time period, other than
12 the incident which brings us here today, did you
13 receive any discipline from your supervisors at the
14 Civil Service Commission?
15     A   No.
16     Q   Who were your supervisors, by the way?
17     A   Well, the entire Commission, I reported to
18 them.  The chairman, obviously, was the lead contact
19 that I had.
20     Q   Okay.  Did you ever receive anything as
21 minor as an oral reprimand?
22     A   No.
23     Q   During your service with the Civil Service
24 Commission, did you receive any type of performance

177

1  evaluation?
2      A   No.
3      Q   At any time during your service with the
4  Civil Service Commission, were you ever the recipient
5  of any written or verbal comments evidencing that any
6  of the commissioners were dissatisfied with the
7  manner in which you were performing your duties?
8      A   Certainly nothing that I received that I
9  took as being critical of my job performance.
10     Q   Now, prior to your termination -- prior to
11 the time you were informed you were being terminated,
12 I believe you had a prediscipline conference?
13     A   That's correct.
14     Q   And do you recall when that conference
15 occurred?
16     A   I think it was a Thursday.  I don't really
17 remember the actual date.
18     Q   Okay.  Let's do it this way:  When was it in
19 relation to when you were informed you were being
20 terminated?
21     A   Two weeks, three weeks prior to my actual
22 receipt of discharge, as I recall.  Sometime in May.
23     Q   Okay.  The discharge receipt was in May, or
24 the predisciplinary conference --

178

1      A   The pre-D was in May, also, I believe.
2      Q   Okay, fine.  Who was present at the time of
3  that particular conference?
4      A   Chairman Richards, Barbara Hayes, one of the
5  employees of the Civil Service Commission, myself, I
6  believe my wife was present.  That's it, as I recall.
7      Q   And can you tell me generally what occurred
8  during that particular meeting?
9          MR. BILINSKY:  I'm going to object as to
10 relevancy.  This proceeding is about whether --
11         MR. BAKER:  Actually, I'm just clearing up
12 something that Dr. Richards said during his testimony
13 and responding to that.  He testified concerning what
14 occurred at the prediscipline and responded to many
15 questions, and I want to clear that up.
16         MR. TRAPP:  Let's go ahead and answer.
17     A   The proceeding was rather informal.  I
18 believe Chairman Richards, you know, indicated that
19 this was my opportunity to respond to the -- I think
20 it was three page or -- proposed charges that had
21 been delivered to me, along with some documents that
22 were attached.  As I recall, I went through the
23 charges with, you know, my response to either what
24 they said or my explanation of what occurred in that

**179**

1  regards.  For example, the scenario with the CMS
2  employees, I mean I explained to him the -- you know,
3  the initial calls regarding can this be done, the
4  calls from CMS saying this is the process that has to
5  be followed.  I explained to him the call that I got
6  from Debbie Hensey indicating that the director had,
7  you know, finally said okay, let's go ahead and --
8      MR. BILINSKY:  I'm going to object to him
9  providing testimony from the director in the form of
10  hearsay.
11      MR. TRAPP:  I'll --
12      MR. BAKER:  Actually, it's not offered for
13  the truth of what's asserted, just what he told the
14  chairman.
15      MR. TRAPP:  Could we sort of -- you said you
16  wanted to clear up something that the director had
17  said.  Could you just ask him what it is that he's
18  disagreeing with?
19      MR. BAKER:  Q  Did you talk with the
20  director -- or with Commissioner Richards about your
21  signature appearing on the CMS-2 forms?
22      A   Yes, I did.
23      Q   Did you ever tell him you were signing that
24  in the capacity of director of CMS?

**180**

1      A   No.  I explained to him exactly what has
2  been testified here that I've testified to and I
3  think others have mentioned, that Director Schwartz
4  sent those to my office to have someone else sign
5  them.
6      MR. BILINSKY:  I'm going to object.  There's
7  no foundation as to Director Schwartz sending them to
8  the office.  We seem to be, once again, getting far
9  afield and trying to substitute for the lack of
10  Director Schwartz with impermissible or
11  unfoundationally supported testimony.
12      MR. BAKER:  Actually, there's already been a
13  foundation established.  Right now I'm just
14  interested in what he told the commissioner.
15      MR. BILINSKY:  In the first -- when he first
16  testified, he said that the documents appeared, and
17  he didn't know who sent them to him.  So now we're
18  in guise of discussing an irrelevant proceeding,
19  attempting to put before the Commission and the
20  administrative law judge evidence that contradicts
21  his own testimony.
22      MR. BAKER:  If it is an irrelevant
23  proceeding, than much of Commissioner Richards'
24  testimony is irrelevant, is that what you're telling

**181**

1  us?
2      MR. BILINSKY:  Counsel, if you failed to
3  object or adequately represent your client, you can
4  have that discussion with him, but I'm saying that it
5  is not relevant to this proceeding what happened at
6  the predisciplinary hearing.
7      MR. TRAPP:  Can we just concisely have
8  Mr. Powers testify to what it is that he wants to
9  clear up that's different from what Mr. Richards
10  testified to?
11      MR. BAKER:  Q  Did you ever tell
12  Commissioner Richards during that meeting that you
13  signed the CMS-2 forms in the capacity of director of
14  CMS?
15      A   No.
16      Q   Okay.  We've heard testimony from Debbie
17  Hensey concerning a conversation you had with her
18  sometime in the spring or early summer of 2002?
19      A   Uh-huh.  Yes.
20      Q   Do you recall that?
21      A   Yes, I do.
22      Q   Did you initiate that conversation?
23      A   I believe I called her and asked her to
24  check out or determine whether or not a process was

**182**

1  available to place term employees into new positions
2  with new terms.
3      Q   And why did you do that?
4      A   I was instructed to do that.
5      Q   And why did you ask her if there was a
6  process available?
7      A   Well, anytime there's an issue or question
8  about, you know, personnel transactions, Debbie
9  Hensey and her office was the place where you would
10  go to get those answered.
11      Q   Okay.  And at any time were you ever
12  informed after that conversation with Debbie Hensey,
13  either by her or by anyone else, that such a process
14  was not available?
15      A   No.
16      MR. BAKER:  I have no further questions.
17  Thank you.
18          CROSS-EXAMINATION
19          BY MR. BILINSKY:
20      Q   Mr. Powers what was your position with
21  Governor Ryan's office?
22      A   I was the assistant counsel in charge of
23  personnel, boards, and commissions.
24      Q   So you worked for Ryan as being in charge

**183**

1  of, in part, personnel as part of your duties?

2    A  Yes.

3    Q  During the Edgar administration -- or excuse

4  me.  During the time that you worked at the Secretary

5  of State's office, how many times did you sign a

6  CMS-2 document in the box labeled Director of Central

7  Management Services?

8    A  I don't believe a CMS-2 document would have

9  been used at the Secretary of State's office.

10    Q  Okay.  Would it be fair to say then that you

11  never at any time when you worked for the Secretary

12  of State's office signed a CMS-2 document in the box

13  labeled Director of Central Management Services?

14    A  I'm certain that I did not.

15    Q  Okay.  So there would have been no

16  circumstance which would have arisen on your

17  personnel evaluations during the time that you worked

18  for the Secretary of State's office where they would

19  have been evaluating the use of your signature on a

20  CMS-2 form in a box labeled Director of Central

21  Management Services; is that correct?

22    A  I'm not so sure I even understand what

23  you're trying to say.

24    Q  Well, you were talking about how you had

**184**

1  never received anything but good reviews, but your

2  work at the Secretary of State's office, as part of

3  those reviews, did not include determining whether

4  you had been signing CMS-2 forms in the box labeled

5  Director of Central Management Services; is that

6  correct?

7    A  As I said, a CMS-2 would not have been

8  even -- it would not have existed at the Secretary of

9  State's office.

10    Q  So it wouldn't have been --

11    A  So your hypothetical question is impossible,

12  how's that?

13    Q  So those reviews had nothing to do with your

14  affixing signatures to CMS-2 forms?

15    A  I don't recall there being any mention of

16  CMS-2s in my evaluations.

17    Q  Now, prior to September of 2002 when you

18  signed Group Exhibits 2, 3, and 4, had you signed any

19  CMS-2 forms in the box labeled Director of Department

20  of Central Management Services?

21    A  I don't believe I signed any CMS-2 forms in

22  any capacity.

23    Q  Okay.  So September of 2002 was the first

24  time that you recall ever signing a CMS-2 form?

**185**

1    A  That's correct.

2    Q  So all of the references to your reviews in

3  your employment wouldn't have considered your use of

4  CMS-2 forms prior to September of 2002, is that fair

5  to say, because you never used them?

6    A  I was going to say, it was not a form used

7  by the governor's office.  I would have had no

8  opportunity to sign one until September of 2002.

9    Q  Now, in September of 2002 you were a

10  licensed attorney; is that correct?

11    A  Yes.

12    Q  Did you have any knowledge of or

13  understanding of principles of contract?

14    A  I've had some exposure to it, yes.

15    Q  Now, can you show me on Group Exhibits 2 or

16  3 or 4 where you've made any kind of mark crossing

17  out the director of Central Management Services or

18  otherwise indicating that your signature in the box

19  with that title is not being affixed as

20  representative of that office?

21    A  I don't believe there's any marks on those

22  documents that I put other than signing my name.

23    Q  Had you signed any other state documents in

24  signature blocks labeled Director of Central

**186**

1  Management Services affixing your name other than the

2  documents that appear in Group Exhibits 2, 3, and 4?

3    A  I'm not aware of any.

4    MR. BILINSKY:  I have no further questions.

5          REDIRECT EXAMINATION

6          BY MR. BAKER:

7    Q  Just a couple.  And just -- not to beat up

8  the obvious, but does the Secretary of State's office

9  have -- covered by the merit system that relates to

10  CMS?

11    A  No.

12    Q  Employees are covered by a different merit

13  system?

14    A  Secretary of State's office has its own

15  Merit Commission, has its own Personnel Code, has its

16  own administrative rules, has its own transaction

17  manuals, and uses its own forms.

18    Q  Okay.  So it would not be possible for you

19  to deal with CMS forms while you worked in the

20  Secretary of State's office?

21    A  I don't -- I don't believe they existed

22  there.

23    Q  Okay.  Now, Mr. Bilinsky was good enough to

24  ask you your familiarity of contracts, and you

**187**

1  indicated you had some.  At the time you signed the
2  documents that are affixed to Group Exhibits 2, 3,
3  and 4, the CMS-2 forms, did you have any
4  understanding that those documents were a contract
5  binding on CMS?
6      A    I -- no.
7      MR. BAKER:  Okay.  All right.  I have
8  nothing further.  Thank you.
9              RECROSS EXAMINATION
10             BY MR. BILINSKY:
11     Q    So is it your testimony then that the
12 documents here in Group Exhibits 2, 3, and 4 do not
13 create any property rights in the employees to those
14 positions such that even your own CMS-2 forms
15 appointing you to the Civil Service Commission are
16 not binding as giving you a position?
17     A    Do I think that this form is that legal
18 document or that -- no, I don't think so.
19     MR. BILINSKY:  Okay.  Thank you.
20     MR. TRAPP:  Anything else?
21     MR. BAKER:  Nothing further.
22     MR. TRAPP:  Okay.  This witness is
23 concluded.
24     MR. BAKER:  I don't think there have been

**188**

1  any exhibits offered today.  If there are, I've
2  forgotten about them, and assuming I'm correct on
3  that point, the respondent rests.
4      MR. TRAPP:  Mr. Bilinsky.
5      MR. BILINSKY:  Take a brief break, and then
6  I'll respond on the issue of rebuttal.
7      MR. TRAPP:  Okay.
8          (Short break.)
9      MR. BILINSKY:  We're not going to provide a
10 rebuttal case.
11     MR. TRAPP:  Okay.  We're on the record.
12 Both sides have rested, and so we're ready to get on
13 to the post hearing process.  What's your pleasure as
14 to how you would like to argue?  Would you -- I
15 assume you'd rather argue in --
16     MR. BILINSKY:  Briefs.
17     MR. TRAPP:  -- in briefs than orally.  Do
18 you need the transcript of today before you submit a
19 brief?
20     MR. BAKER:  I think it probably would work a
21 little better, yeah.
22     MR. TRAPP:  Okay.  Court reporter says she
23 thinks it will take her about two weeks to provide
24 this.  So let's say -- that would get us up to

**189**

1  September 24.  How long would you guys like to have
2  from the date of the transcript to submit?  And do
3  you want to submit all at once rather than a
4  step-by-step process?  Seems to me that both sides
5  could submit at the same time in this case.
6      MR. BILINSKY:  And given that the Commission
7  has 60 days after the last brief is in before they
8  have to -- or before the decision is due, I would say
9  it would be faster if we do joint submission, but if
10 you want to stagger it out through a three-phase
11 process, that's fine.
12     MR. BAKER:  I'm thinking.
13     MR. TRAPP:  Yes.
14     MR. BAKER:  And I have a question to ask.
15 Not that I would ever take issue with anything
16 Mr. Bilinsky says in written form, or that he would
17 ever do the same with me, but at least it is, in a
18 theoretic sense, possible that one of us might want
19 to file a reply brief, what is your thought about
20 that?
21     MR. TRAPP:  Well, what about both sides
22 submit at the same time, and then both sides have a
23 week after that submission to do a reply.
24     MR. BAKER:  That's fine.

**190**

1      MR. BILINSKY:  How about we even make
2  replies optional.
3      MR. TRAPP:  Okay.  So --
4      MR. BAKER:  Conceding that the position has
5  merit?
6      MR. BILINSKY:  Conceding that my first time
7  around I'm going to get it right, so I won't need
8  to --
9      MR. BAKER:  You always get it right,
10 Mr. Bilinsky, that's what my son tells me.
11     MR. TRAPP:  So let's assume that we have the
12 transcript on the 24th.  Can you get the briefs in,
13 in ten days, or do you want two weeks after that or
14 what?
15     MR. BILINSKY:  That's tight for me.  I don't
16 know about Jim.
17     MR. BAKER:  I am supposed to be out of state
18 the last week in September taking depositions in
19 another case.  So it would work a little better for
20 me if we could have two weeks.
21     MR. TRAPP:  Is that acceptable?  Okay.  So
22 let's just see if I can pin this down.  24th is a
23 Wednesday.  So let's say October 8th to submit
24 briefs, and then each side can submit a reply by

191

1  October 15.  And then I should be able to get

2  something out pretty quickly.

3          What would be helpful to me format wise is

4  if you guys could do proposed findings of fact and

5  conclusions of law, maybe, and then have a section of

6  your brief after that explaining your basis for those

7  findings and conclusions.  Does that sound

8  reasonable?

9          MR. BAKER:  Sure.

10         MR. BILINSKY:  Sounds good to me.  Did I

11  give you back the exhibits?

12         MR. TRAPP:  Yes, or actually, we took them

13  back while you were out of the room.

14         MR. BILINSKY:  Just wanted to make sure I

15  didn't walk off with them.

16         MR. TRAPP:  Okay.  Let's do that then.  The

17  briefing process will be done by the 15th of October.

18  We are adjourned then.

19         MR. BILINSKY:  Thank you.

20             (End of hearing.)

21

22

23

24

---

192

1  STATE OF ILLINOIS    )
                         )  SS
2  COUNTY OF SANGAMON   )

3

4              CERTIFICATE

5      I, Robin A. Adams, affiliated with Capitol

6  Reporting Services, Inc., do hereby certify that I

7  reported in shorthand the foregoing proceedings; that

8  the witnesses were duly sworn by me; and that the

9  foregoing is a true and correct transcript of my

10  shorthand notes so taken as aforesaid.

11     I further certify that I am in no way associated

12  with or related to any of the parties or attorneys

13  involved herein, nor am I financially interested in

14  the action.

15

16

17  License No. 084-002046
    Certified Shorthand Reporter,
18  Registered Professional Reporter,
    and Notary Public.
19

20

21  Dated this 22nd day of

22  September, A.D., 2003,

23  at Springfield, Illinois.

24

OFFICIAL SEAL
ROBIN A. ADAMS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 5-21-2004

---

CAPITOL REPORTING SERVICE, INC.
SPRINGFIELD, ILLINOIS    217-525-6267