**E-FILED**
Thursday, 09 March, 2006  03:28:07 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ROBERT POWERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-3024 |
| | ) | |
| GEORGE E. RICHARDS, RAYMOND W. | ) | |
| EWELL, JOHN M. DORGAN, BARBARA J. | ) | |
| PETERSON, DAN P. FABRIZO, ROD | ) | |
| BLAGOJEVICH, THOMAS LONDRIGAN and | ) | |
| ALONZO MONK, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF THE PLAINTIFF, ROBERT POWERS, IN OPPOSITION
TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Robert Powers ["Plaintiff"] initiated this proceeding because of his termination from

employment as Executive Secretary of the Illinois Civil Service Commission ["Commission"] in May of

2003.  He joins as Defendants the Governor of the state of Illinois and two members of his staff

["Governor's Officials"] as well as five members of the Commission ["Commission Officials"].

Relying upon 42 U.S.C. § 1983, the PLAINTIFF advances two claims.

First, he asserts that the Commission Officials terminated his employment without providing him

with a meaningful pre-deprivation hearing in violation of his rights under the Due Process Clause of the

Fourteenth Amendment to the Constitution.

Second, he claims that with the encouragement, support and assistance of the Governor's

Officials the Commission Officials terminated him from his position as Executive Secretary of the

Commission because of his former affiliation with the Republican Party and, in so doing, violated his right to political association as protected by the First Amendment of the Constitution.

The Defendants now seek summary judgment pursuant to Rule 56 of the "Federal Rules of Civil Procedure." They advance two arguments.

With respect to the Plaintiff's due process claim, they allege he received all the process to which he was entitled under the Fourteenth Amendment. They claim that the Plaintiff: a) could constitutionally be removed from his position prior to a pre-deprivation hearing; b) received a constitutionally adequate pre-deprivation hearing; and c) had a constitutionally adequate post-deprivation hearing.[1]

Second, they claim that the Plaintiff as the Executive Secretary of the Commission had policymaking responsibilities and thus had no First Amendment protection against losing his employment because of his political affiliation.

Each of the Defendants' arguments is fatally flawed.

First, a reasonable trier of fact could conclude that the Commission Officials made the decision to terminate the Plaintiff's employment <u>prior</u> to any pre-deprivation hearing. If so, he was not afforded a meaningful pre-deprivation hearing consistent with the Due Process Clause as required by *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 84 L.Ed.2d 494 (1985).

---

[1] It is unclear why the Defendants advance any argument with respect to the post-deprivation hearing since this Court has earlier ruled that the Commission Officials' conduct in affording him a post-deprivation hearing involves quasi-adjudicatory functions for which they were immune from § 1983 liability. Although it is no longer an issue in this case, the post-deprivation hearing was fundamentally flawed since the individuals deciding the merits of the post-deprivation proceeding (the Commission Officials) were the same individuals who terminated the Plaintiff's employment.

Second, while it is true that in certain instances policymakers are excepted from the First Amendment's protections against terminating an employee based upon his partisan political affiliation, that exception could never apply in the instant situation given the nature of the Plaintiff's position.

The Defendants concede that the Plaintiff was protected in his position by the merit principles of the "Personnel Code" [20 ILCS 415/1 et.al.]. They nonetheless advance a position that is tantamount to being frivolous when they make the claim that:

> "The new administration was constitutionally permitted to make employment decisions regarding Plaintiff's position, if it chose, based upon the Plaintiff's political affiliation" (see ¶3 of the Defendants' motion for summary judgment).

The Defendants' argument: a) is logically inconsistent; b) cannot be reconciled with settled law regarding the scope of the policymaker exception given the nature of the Plaintiff's position; and c) would emasculate the protections afforded many state employees under the "Personnel Code."

As the "Personnel Code" makes clear, the Plaintiff's position is one in which partisan political affiliation is never an appropriate requirement for the job. While it may be understandable why officials in the Governor's Office, viewing the Plaintiff's position as a political plum, would consider it advantageous to advance this mistaken proposition, it is downright alarming that the Commission Officials would make this argument. As will be seen, members sitting on the Commission must by statute be bipartisan and are required to be adherents of the merit's employment principle which are the foundation of the "Personnel Code." Their argument would essentially make the merit principles of the "Personnel Code" a nullity.

The Defendants' arguments cannot stand and their motion for summary judgment must be denied.

## II.  STATEMENT OF FACTS

**A.  <u>The Defendants' Undisputed Material Facts.</u>**

With respect to the material facts claimed to be undisputed by the Defendants, the Plaintiff agrees that the following facts are undisputed and material except as otherwise shown:  1(only to the extent that an allegation was made that the Plaintiff fraudulently or improperly executed certain personnel transactions), 2,6,7 (only to the extent Winn submitted a written report regarding the Plaintiff to the Commission Officials), 8 (only to the extent that is part, but not all, of the action taken by them against the Plaintiff), 10 (only to the extent the Plaintiff was provided some, but not all, of those documents), 11 (only to the extent the Plaintiff was provided some, but not all, of the documents), 13 (actually he approved the decision of the Commission to terminate the Plaintiff), 14,15,18,19,20,21,22,23,24,25,26,27,28,29, and 30.[2]

**B.  <u>Material Facts Claimed To Be Disputed.</u>**

With respect to the Defendants' claim of material facts which are undisputed, the Plaintiff disputes:  9 (the Commission members voted to terminate the Plaintiff; see ¶27 of the Plaintiff's statement), and 12 (see ¶37,38,39,45 of the Plaintiff's statement of additional undisputed facts).

**C.  <u>Facts Which The Plaintiff Claims Are Immaterial.</u>**

The Plaintiff asserts that:  3-5 (the actions of the Governor's Officials are not material to either

---

[2]  The Plaintiff admits the foregoing facts only for purposes of this Court's consideration of the Defendants' motion for summary judgment.

issue raised by the Defendants in the summary judgment proceeding), 14-17 (the post-deprivation

process provided the Plaintiff has been removed as an issue in this case by virtue of this Court's order

dismissing the Plaintiff's claims regarding the adequacy of the post-deprivation process he received

holding that the Commission Defendants' conduct in providing post-deprivation process involved quasi-

adjudicatory activities from which they were immune from liability under 42 U.S.C. § 1983.  To the

extent the Court feels these allegations are material, the Plaintiff calls to its attention the facts contained

in the discharge appeal portion of the Plaintiff's statement of additional undisputed facts).

**D.  The Plaintiff's Additional Undisputed Facts.**

**The Plaintiff's Career In State Government.**

1.  The Plaintiff began working for the Office of the Secretary of State on September 1, 1988.

On  January 16, 1999 he transferred from the Secretary of State's Office to the Governor's Office.

This occurred at the time George Ryan was elected Governor of the State of Illinois.  In the Governor's

Office, he served as Deputy Counsel of Personnel, Boards and Commissions [Tr.24-25].

2.  Between August 16, 2002 and October 1, 2003, the Plaintiff worked for CMS as a Senior

Public Service Administrator.  He served it as an Associate Director and was assigned to work in the

Governor's Office [Tr.26-27].

3.  The Plaintiff applied for the vacant position as Executive Secretary of the Commission as a

part of an open competitive search undertaken by the Commission to fill that position.  Of all the

applicants who applied, the members of the Commission determined that the Plaintiff was

best qualified for the position [Tr.62-63].[3]

4.  The Plaintiff applied for the position of Executive Secretary of the Commission.  At that time the Commission was engaging in an open search for a new Executive Secretary.  The Plaintiff competed with others for that position.  Of all the persons interviewed by the Commission, he was deemed the most qualified to hold the position [Tr.62-63].

5.  The Plaintiff worked for the Commission for approximately six months from October 1, 2002 through some time in April of 2003 [Tr.63].

6.  Between October 1, 2002 and April 2003, the Chairman of the Commission assessed the Plaintiff's performance as Executive Secretary of the Commission as fully satisfactory [Tr.73-75]. During the time period he worked for the Commission between October 1, 2002 and April of 2003, the Plaintiff was not the recipient of any type of discipline [Tr.75].

7.  In May of 2003 George Richards was aware that the Plaintiff's position as Executive Secretary of the Commission was covered under the terms of the "Personnel Code" [Tr.76].

**The Commission.**

8.  The purpose of the "Personnel Code" is to establish a personnel system for employees under the Governor of the State of Illinois based on merit principles and scientific methods [§ 2 of the "Personnel Code" (20 ILCS 415/2)].

9.  Three separate areas of jurisdiction are created under the "Personnel Code."  Jurisdiction A covers position classifications and compensation of positions in state service.  Jurisdiction B refers to

---

[3] The term "Tr." refers to the transcript of the Plaintiff's discharge appeal to the Commission which is located in the appendix to the Defendants' motion for summary judgment as Ex.4.

positions in state service in which a person must hold the appointment on the basis of merit and fitness. Jurisdiction C covers conditions of employment in state services [§ 4a of the "Personnel Code" (20 ILCS 415/4a)].

10.   The Commission is empowered to exempt from jurisdiction B of the "Personnel Code" certain positions which in the judgment of the Commission involve either principle administrative responsibility for the determination of policy or principle administrative responsibility for the way in which policies are carried out [§ 4d(3) of the "Personnel Code" (20 ILCS 415/4d(3)].  The characteristics of a § 4d(3) position is that no provision of the "Personnel Code" applies to it.  A person can secure a position without securing a promotional grade, undergoing a test or being placed on an eligibility list.  The positions serve at the will of both the Governor and the agency employing the position [Tr.31-32].

11.   Members of the Commission must "be persons in sympathy with the application of merit principles to public employment".  No more than three members of the Commission may be adherence of the same political party [§ 7b of the "Personnel Code" (20 ILCS 415/7b)].

12.   The Executive Director is a full time employee of the Commission appointed by the members of the Commission.  His position is subject to jurisdictions A, B and C of the "Personnel Code" [§ 10(10) of the "Personnel Code" (20 ILCS 415/10(10)].

13.   Following the enactment of the "Personnel Code" in 1957, the Commission became responsible:  a) for approving (or disapproving) certain policies of the Director of CMS; b) hearing employee appeals; and c) directing compliance with the "Personnel Code" and rules in the event of a violation [see the history of the Commission contained on its website at www.icsc.il.gov/history.htm and

Ex.4].[4]

14.  In describing its role, the Commission notes:

"In essence, the Commission became a 'watchdog' for state government and, to this day, this responsibility has not changed.  Tested for over 50 years since the passage of the Illinois Personnel Code, the independent, bipartisan civil service commission, supported by a dedicated staff, has remained steadfast in its role:  to ensure that the employees and citizens of the state of Illinois are afforded their rights and protections set forth in the Personnel Code and the Personnel Rules" [see www.icsc.il.gov/history.htm and Ex.4].

15.  No employee protected by jurisdiction B of the "Personnel Code" may be removed from his position except for cause [§ 11 of the "Personnel Code" (20 ILCS 415/11)].

16.  The Commission has determined that both wardens and assistant wardens of the Illinois Department of Corrections are exempt from the "Personnel Code" under Section 4d(3) of that law. Those individuals served at the will of both the Governor and that Department [¶5 of the Plaintiff's affidavit].

17.  A person holding the position of deputy general counsel of the Illinois Department of Professional Regulation is by virtue of Section 4d(5) of the "Personnel Code" partially exempt from the coverage of that law.  A person holding such a position does not have to go through the open competitive examination and selection process to secure his position [¶6 of the Plaintiff's affidavit].

18.  In early April of 2003 there were approximately four hundred (400) positions in state government which were exempt from the coverage of the "Personnel Code" by virtue of Section 4d(3)

---

[4]  The Plaintiff submits as a part of this instrument an appendix consisting of:  a) the affidavit of the Plaintiff; b) answers to interrogatories of the Defendants; c) minutes of two Commission meetings; and d) history of the Commission.

of that law [¶7 of the Plaintiff's affidavit].

**The Commission Defendants' Termination Of The Plaintiff.**

19.    In April of 2003, Chairman Richards received a call from Alonzo Monk of the Governor's Office.  He was advised that Governor Blagojevich was going to hold a press conference at which time he was going to ask the Commission to discharge both the Plaintiff and Sarajane Wright [Tr.47-48].

20.    The following day, Chairman Richards received a memorandum from Tom Londrigan of the Governor's Office which made certain allegations against the Plaintiff [Tr.49].

21.    Thomas Londrigan, in his memorandum of April 7, 2003 to the Commission Officials, noted that the Plaintiff's position is protected by the "Personnel Code" and he can only be discharged for cause.  According to him, the applicable legal standard for terminating his employment with the Commission is "some substantial shortcoming which renders continued employment by the State in some way detrimental to the discipline or the efficiency of the service and which the law and public opinion recognizes as good cause for the employee no longer being held in that position" [see Ex.A to the appendix to the Defendants' motion for summary judgment].

22.    Tom Londrigan of the Governor's Office encouraged Chairman Richards to terminate the employment of the Plaintiff [Tr.79-80].

23.    Several days later, Chairman Richards met with the members of the Commission to discuss those allegations.  They decided to place both the Plaintiff and Sarajane Wright on administrative leave [Tr.50].  Chairman Richards then requested that CMS conduct an investigation.  Thereafter, he received a memorandum from Ed Wynn, the general counsel of CMS, reporting the results of an investigation [Tr.51-52].

24.  H. Edward Winn, the general counsel of CMS, informed the Commission Officials in his memo of May 14, 2003 that the Plaintiff as the Executive Secretary of the Commission was a "certified code employee" and as such could only be discharged if cause exists [see Ex.A to the appendix to the Defendants' motion for summary judgment].

25.  At the April 2003 monthly meeting of the Commission, Sarajane Wright, an employee of the Commission, and the Plaintiff were placed on administrative leave. George Richards had informed the Plaintiff that representatives of the Governor's Office wished to have his employment with the Commission terminated. The Plaintiff was told by Chairman Richards that the Illinois State Police were going to conduct an investigation into allegations that he had engaged in misconduct while employed by CMS. At no time has the Plaintiff ever been contacted by a representative of the Illinois State Police in connection with such an investigation [¶8 of the Plaintiff's affidavit].

26.  On May 15, 2003, the members of the Commission voted to allow Chairman Richards to hold a pre-disciplinary hearing and impose discipline "unless there was some other exculpatory reasons" [Tr.53].

27.  At the same May 15, 2003 meeting of the Commission adopted a resolution suspending the Plaintiff pending discharge [Res. Ex.2; Tr.87-88].

28.  At some time in mid-May 2003, the Plaintiff received notice of a pre-disciplinary hearing scheduled for him on May 29, 2003. Included with that notice were proposed charges of misconduct alleged against him [¶9 of the Plaintiff's affidavit].

29.  At no time prior to his pre-deprivation hearing did the Plaintiff receive a copy of any investigation conducted by Edward Winn of CMS or any other official of CMS relating to his conduct.

He did not have access to that document at the time of his pre-deprivation hearing [¶10 of the Plaintiff's affidavit].

30.   The Plaintiff was not provided a copy of the investigation conducted by CMS either at or before his pre-disciplinary hearing [Tr.93].  It was, however, available to the members of the Commission when they met on May 15, 2003 and the CMS investigator met with the members in their executive session at that meeting [Tr.51-52; 92-93].

31.   At the May, 2003, meeting of the Commission, the Commission decided to discharge the Plaintiff and gave Chairman Richards the authority to implement that decision [Tr.59].

32.   At the May 15, 2003 meeting, the Commission Officials voted to suspend the Plaintiff from employment pending his termination [see Ex.3].

33.   At the May 15, 2003 meeting of the Commission, its members had approved the discharge of the Plaintiff pending only any change in the pre-termination hearing that Chairman Richards would alter that decision [Tr.91-92].

34.   The decisions made by the Commission are to be decided by a majority vote of the members [Tr.99].

35.   The charges provided to the Plaintiff prior to the pre-deprivation hearing accused him of making a false statement.  He was alleged to have: a) without authorization signed documents on behalf of the Director of CMS; b) known the Director had not approved the transactions as required by the Personnel Rules; and c) known that, in the case of re-employment to the term position, the position had not been filled in compliance with the provisions of the Personnel Rules [¶12 of the Plaintiff's affidavit].

36.  At the pre-deprivation hearing of the Plaintiff, Chairman Richards was the only member of the Commission present.  The other commissioners had conveyed their authority to him to act on their behalf [Tr.60].

37.  At the time of the Plaintiff's pre-discipline hearing, Chairman Richards, Barbara Hayes, a Commission employee, the Plaintiff and his wife were present.  The proceeding was informal. Chairman Richards explained to the Plaintiff that this was his opportunity to respond to proposed charges that had been asserted upon him.  The Plaintiff explained to Chairman Richards that he had been informed by Debbie Hensey that the Director of CMS had approved of the personnel transactions for CMS employees which were at issue.  He further explained to Chairman Richards how his signature appeared on the CMS-2 transactional forms.  He did not tell Chairman Richards that he was signing those forms in the capacity of Director of CMS.  Instead, he explained that Director Schwartz sent those forms to the Plaintiff's office to have someone else sign them [Tr.179-181].

38.  During his pre-disciplinary hearing, the Plaintiff informed Commissioner Richards that: a) prior to proceeding with the transactions which were noted in the disciplinary charges he had consulted with Deborah Hensey, Bureau Chief of the Department of Personnel at CMS, concerning whether the transactions could be undertaken, and if so, the procedure which should be followed; b) Deborah Hensey explained to him that similar transactions had been done in the past during the Edgar Administration and informed him of the process which should be followed; c) he passed the information he received from Ms. Hensey along to his superiors in the Governor's office; d) he received a telephone call from Deborah Hensey informing him that Director Michael Schwartz of CMS had approved the transactions but did not want to sign the transactional forms covering CMS employees

and he authorized someone in the Governor's office to sign them in his place; e) he informed his supervisor, Diane Ford, of what he had been told and she instructed him to sign his name on the forms; and f) the documents were brought to his office by Tricia Pineda, a CMS personnel officer, who told him to sign the documents "on this line" [¶13 of the Plaintiff's affidavit].

39.  The Plaintiff never told Commissioner Richards during his pre-deprivation hearing that he signed those forms in the capacity of Director of CMS.  Instead, he explained that Director Schwartz had sent those forms to his office to have someone from the Governor's office sign them [¶14 of the Plaintiff's affidavit].

40.  Following the pre-disciplinary hearing, Chairman Richards discharged the Plaintiff [Tr.57-58].  At the May 29, 2003 pre-disciplinary hearing, Chairman Richards was the only member of the Commission present [Tr.60].  Chairman Richards has no recollection of securing the approval of the other Commissioners to that action after his May 29, 2003 pre-disciplinary hearing with the Plaintiff [Tr.59].

41.  At no time between the pre-disciplinary hearing conducted for the Plaintiff on May 29, 2003 and the approval of the discharge by the Director of CMS did other members of the Commission ratify that decision [Tr.91-92].

42.  The Commission's charge to discharge the Plaintiff was effected on May 29, 2003 and approved by the Director of CMS on the next day, May 30, 2003 [Charge; Tr.90-92].

43.  After the pre-disciplinary hearing conducted of the Plaintiff, George Richards concluded that there was no evidence which would change the Commission's earlier vote to discharge the Plaintiff [Tr.58].

44.  In an answer to written interrogatories in the Plaintiff's discharge appeal to the Commission, counsel for the Commission admitted that each of the Commission Officials made or recommended that the Plaintiff be terminated from his employment with it [see interrogatory number 8 on Ex.2].

45.  At no time during his pre-disciplinary meeting with Chairman Richards did the Plaintiff indicate to him that he executed the CMS-2 forms in the capacity as Director of CMS [Tr.181].

**The Discharge Appeal.**

46.  Following his discharge from employment with the Commission, the Plaintiff appealed his discharge to the Commission as was his right as a merit employee protected by the "Personnel Code" [¶15 of the Plaintiff's affidavit].

47.  William Trapp, a Springfield, Illinois lawyer, was appointed to serve as the Administrative Law Judge in the Plaintiff's discharge appeal.  Mr. Trapp had never worked for the Commission or previously served it as an administrative law judge.  The Plaintiff was not consulted and played no role in the selection of Mr. Trapp as the administrative law judge [¶16 of the Plaintiff's affidavit].

48.  Because the members of the Commission were prepared to testify as witnesses against the Plaintiff in his discharge appeal and were the individuals who made the decision to discharge him from employment with the Commission, the Plaintiff was concerned about the fairness of any hearing in which the persons who ultimately decided the case were the same individuals who made the discharge decision and were potential witnesses against him.  Accordingly, he filed a motion with the Commission requesting that those individuals refrain from deciding the merits of his appeal and instead that a neutral decisionmaker be jointly selected by the members of the Commission and the Plaintiff to decide the

merits of that appeal.  The members of the Commission denied the motion the Plaintiff filed [¶17, 18 of

the Plaintiff's affidavit].

49.  Following the Plaintiff's termination, Dan Stralka became the Executive Secretary of the

Commission.  At the March, 2003, and April, 2003, monthly meetings of the Commission, Mr. Stralka

appeared on behalf of Governor Blagojevich [¶19 of the Plaintiff's affidavit].

### III.  SUMMARY JUDGMENT STANDARDS

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment

shall be granted only if the pleadings, depositions, answers to interrogatories and admissions on file

together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving

party is entitled to judgment as a matter of law [*Celotex v. Catrett*, 477 U.S. 317, 91 L.Ed.2d 265

(1986)].

Summary judgment is only appropriate when the record reveals that no reasonable jury could

find for the non-moving party [See *Karazanos v. Navistar International Transportation Corp.*, 948

F.2d 332 (7th Cir.  1991); *Konowitz v. Schnadig Corporation*, 965 F.2d 230 (7th Cir.  1992);

*Anderson v. Stauffer Chemical Company*, 965 F.2d 397 (7th Cir.  1992); and *McCoy v. WGN*

*Continental Broadcasting Company*, 957 F.2d 368 (7th Cir.  1992)].

In a summary judgment proceeding the facts and inferences drawn from underlying facts must

be viewed in a light most favorable to the party opposing the motion [See *United States v. Diebold,*

*Inc.*, 369 U.S. 654, 8 L.Ed.2d 176, 82 S.Ct.  993 (1962); and *Matsushita Electric Industrial*

*Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 89 L.Ed.2d 538, 106 S.Ct. 1348

(1986)].

At the summary judgment stage of a case it is not the court's function to weigh the evidence and determine the truth of the matter, but instead to determine whether there is a genuine issue for trial. The role of the court is not to determine whether it thinks the evidence unmistakably favors one side or the other, but to instead determine whether a fair minded jury could return a verdict for the party opposing the motion on the basis of the evidence presented [See *Anderson v. Liberty Lobby, Inc.* (op.cit. 1985); and *Shager v. Upjohn Company*, 913 F.2d. 398 (7th Cir. 1990)]. If evidence is subject to conflicting interpretations or if reasonable people might differ as to its significance summary judgment must be denied [See *Egger v. Phillips*, 669 F.2d 497 (7th Cir. 1982); and *O'Connor v. Chicago Transit Authority*, 985 F.2d 1362 (7th Cir. 1992)].

## IV. ARGUMENT

### A) The Defendants mistakenly assert that a policymaker can never claim First Amendment protection against discharge from public employment because of partisan political affiliation.

In seeking the dismissal of the Plaintiff's First Amendment claims, the Defendants advance one argument.[5] They claim that because the Plaintiff was a policymaker as the Executive Secretary of the

---

[5] On page 12 of its brief, the Defendants in passing mention that the Plaintiff was not terminated because of his political affiliation, but instead for fraudulently executing CMS Personnel transactions during the course of his state employment. They allude to this contention in both their statement of facts and in the affidavit of the Defendant, George Richards (¶8). The Defendants do not develop this contention or use it as a basis for requesting summary judgment. They fail to raise it in their motion seeking summary judgment. Instead, they claim that regardless of the circumstances surrounding the Plaintiff's discharge, he is not entitled to First Amendment protections because of the nature of his job. Since the Defendants, for purposes of summary judgment, are focused only upon the status of his employment, the Plaintiff will not in this submission discuss the plentiful evidence surrounding his discharge which suggests that it was based upon partisan political considerations. However, if this Court feels such a discussion would be helpful to considering the Defendants' motion, the Plaintiff would be happy to file a supplemental brief addressing that subject.

Commission the Defendants as a matter of law were free to terminate his employment based upon his

partisan political affiliations.[6]

In developing their argument, the Defendants first note that under existing law employment

decisions based upon an individual's political affiliation are lawful when that affiliation is an appropriate

requirement for the effective performance of one's duties "including when the position at issue has

policymaking and policy implementing duties" (see p.9 of the Defendants' brief). They then cite

precedent from our Circuit discussing when and under what circumstances an individual either engages

in policymaking functions or has close contact or a confidential relationship with policymakers. The

Defendants, following an analysis of the Plaintiff's job description which according to them has not been

materially changed since 1967 and includes various policymaking functions, then argue that the Plaintiff

is not entitled to First Amendment protections because according to his job description as the Executive

Secretary of the Commission he is required to:  a) make policy; b) implement policy; c) provide

"meaningful input" to other policymakers; and d) serve as a spokesperson and liaison with elected

officials.        The predicate to the Defendants' argument is that an individual who either serves as a

policymaker or enjoys a close or confidential relationship with a policymaking official is never entitled to

First Amendment protection against job actions based upon his political affiliation regardless of the

nature of his job.

The Defendants' argument is meritless for several reasons.

---

[6]  According to them in a constitutional sense, the Executive Secretary of the Commission could
be terminated by the Governor based on his political affiliation (see ¶3 of the Defendants' motion for
summary judgment).

First, they ignore the limited nature of the policymaking exception mentioned first in *Elrod v. Burns*, 427 U.S. 347, 49 L.Ed.2d 547 (1976) and later discussed in *Branti v. Finkel*, 445 U.S. 507, 63 L.Ed.2d 574 (1980) by arguing that if one is a policymaker or enjoys a confidential relationship to a policymaker then in that circumstance he can be terminated from his employment based upon partisan political affiliation. As will be shown, *Elrod, Branti* and their progeny apply a more restricted test from the one advanced by the Defendants for determining when political affiliation may be a basis for terminating public employment. Contrary to the Defendants' argument, being a policymaker is not dispositive.

Second, the Defendants have looked at the Plaintiff's position description and from that concluded that he was a policymaker. They ignore, however, other factors relating to the Plaintiff's position including those articulated by the Illinois General Assembly with its enactment of the "Personnel Code" [20 ILCS 415/1 et.al.]. These factors lead to the inevitable conclusion that political affiliation is not an appropriate consideration in either hiring or discharging the Executive Secretary of the Commission. The Defendants' argument not only ignores the "Personnel Code", but with respect to the Plaintiff's position, makes it meaningless.

Third, they rely upon cases applying the policymaker exception, where unlike this case, partisan political affiliation was an appropriate consideration for holding the position in question.

The impact of the Defendants' argument cannot be ignored. If this Court adopts it and holds that the Executive Secretary of the Commission for constitutional purposes serves at the whim of the Governor, it would carve out a principle which flies in the face of the actions of the Illinois General Assembly when it insulated the Executive Secretary of the Commission from partisan politics. If the

Page 18 of 45

Plaintiff's position, given the terms of the "Personnel Code", can be removed or filled based upon

political considerations, any person holding a merit position covered by the "Personnel Code" having

policymaking functions could in a constitutional sense be terminated.  Neither *Elrod* nor *Branti*, in

carving out the policymaker exception, intended that result.

 1) **The contours of the policymaker exception.**

  In *Elrod*, the Supreme Court held that a public employee who alleged that he was discharged

because of his partisan political affiliation (or non-affiliation) states a claim for the deprivation of a

constitutional right secured by the First and Fourteenth Amendments (p.349).  In that case, the public

officials argued that extending constitutional protections to public employees against patronage

dismissals could compromise the effective operation of the government since elected officials require the

political loyalty of their subordinates.  The *Elrod* Court was, in at least a limited sense, sensitive to that

concern and recognized that limiting patronage dismissals to policymaking positions would be sufficient

to achieve that governmental end.  It noted, however, that it was the government's burden "to

demonstrate the need to dismiss <u>certain</u> policymakers" (pp.367-68) [emphasis added].

  In *Branti*, the Court expanded upon its holding in *Elrod* recognizing that political party

affiliation may be an acceptable requirement for certain types of government employment.  The *Branti*

Court noted that it is not always easy to determine those positions where political affiliation is an

appropriate criteria for continued employment.  It reasoned that under some circumstances a position

may be appropriately considered "political" even though it is neither confidential nor policymaking in

character.  It went on to reason that party affiliation is not necessarily relevant to every policymaking or

confidential position.  It rejected a test which was limited only to whether a position had policymaking

or confidential functions stating:

> "In sum, the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits
> a particular position; rather, the question is whether the hiring authority can demonstrate
> that party affiliation is an appropriate requirement for the effective performance of the
> public office involved" (p.518).

In *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 111 L.Ed.2d 52 (1990), the Court,

referring to its holdings in *Elrod* and *Branti*, once again noted that policymaking and confidential

employees probably could be dismissed on the basis of their political views, but only when it can be

shown that party affiliation is an appropriate requirement for the effective performance of the public

office involved (see Rutan at footnote 5).

Our Circuit, in *Thompson v. Illinois Department of Professional Regulation*, 300 F.3d 750

(7th Cir. 2002), noted that under the holding in *Branti* the term policymaker is somewhat misleading in

determining whether or not an individual may be discharged from employment based upon partisan

political affiliation.  According to the *Thompson* Court, the ultimate inquiry is not whether the label

"policymaker" or "confidential" fits a particular position.  Instead, the question is whether party

affiliation is an appropriate requirement for the effective performance of the public office involved noting

that it is the defendant who bears the burden of establishing that the position is "a confidential or

policymaking position <u>which would justify politically motivated employment actions</u>" (p.756 emphasis

added).

Our Circuit has stated that a patronage dismissal will not survive a First Amendment challenge

unless the desired political affiliation is "essential to the discharge of the employee's governmental

responsibilities" [see for example, *Milazzo v. O'Connell*, 108 F.3d 129, 132 (7th Cir. 1997);

*Tomczak v. City of Chicago*, 765 F.2d 633, 640 (7th Cir. 1985); and *Americanos v. Carter*, 74

F.3d 138, 140-41 (7th Cir. 1996)].

From the foregoing caselaw, two fundamental principles emerge crucial to any consideration of

the Defendants' argument.

First, it is the Defendants who bear the burden of demonstrating that the Plaintiff is not entitled

to the protections of the First Amendment against discharge for political considerations.  They must

show that party affiliation is an appropriate requirement for serving as the Commission's Executive

Secretary [see *Thompson* at p.756 and *Milazzo*, 108 F.3d at 132].

Second, the crucial inquiry in determining whether or not the Plaintiff as Executive Secretary of

the Commission was entitled to the protections of the First Amendment does not begin and end with his

substantive duties as enumerated in his position description, but rather, turns upon whether, considering

the nature of his job, his party affiliation is an appropriate requirement for his effective performance in

that position.

Whether or not the Plaintiff is entitled to the First Amendment protections cannot be resolved

merely by determining from his job description whether he held a policymaking responsibility.  Instead,

it must be determined whether party affiliation is a legitimate criteria for holding his position in state

government.

In their request for summary judgment, the Defendants do not and cannot answer why the

effective performance of one's duties as the Executive Secretary of the Commission is dependent upon

his political affiliation.

**2) The Defendants have not demonstrated that the Plaintiff's position is one in which partisan political affiliation is an appropriate criteria.**

Contrary to the Defendants' contention, they are not insulated from the Plaintiff's First Amendment claims merely by demonstrating that as Executive Secretary of the Commission the Plaintiff: a) had policymaking responsibilities; or b) enjoyed a confidential relationship with policymakers. Instead, they must demonstrate that, given the nature of the Plaintiff's job, partisan political considerations were an appropriate requirement for holding the position. For multiple reasons, they cannot satisfy that burden given the nature of that position.

First, the Illinois General Assembly has declared that political affiliation is never an appropriate consideration in either the selection or removal of the Executive Secretary. Section 10 of the "Personnel Code" [20 ILCS 415/10] directs the Commission, a bi-partisan body, to appoint a full time Executive Secretary who shall be subject to the provisions of jurisdictions A, B, and C of that Act. Thus, in the selection of an Executive Secretary, the Commission is guided by merit (rather than partisan political considerations). In the Plaintiff's situation, he was selected through a competitive process and was determined by the five members of the bi-partisan Commission as a result of that competitive process to be the most qualified candidate for the position [see ¶3,4 of the Plaintiff's Statement]. Because his position is subject to the protections of the "Personnel Code", the Executive Secretary may be only removed for cause in accordance with the provisions of Section 11 of that Act. In providing that the Executive Secretary is subject to the provisions of all three jurisdictions of the "Personnel Code", it is evident that the General Assembly never intended that partisan political considerations could be utilized in either the selection or removal of the individual holding that position.

Second, as the Commission itself makes clear it is an independent, bipartisan body which together with its staff serves as a "watchdog" to ensure that Illinois citizens and employees are afforded the protections of the "Personnel Code" [¶14 of the Plaintiff's statement]. Given that mandate, the politics of the Executive Secretary or his allegiance to the Governor would never be a relevant requirement for the job.

Third, as the position description makes clear, the Executive Secretary assists the Commission in carrying out its powers and duties under the "Personnel Code" [see Section 10(10) of the Personnel Code]. Thus, any examination of the duties of the Executive Secretary as embodied in his written job description must be considered within the context of the Commission's functions under the "Personnel Code."

The purpose of the "Personnel Code" is to establish a personnel system based on both merit principles and scientific methods [20 ILCS 415/2]. The purpose of that law was, among other things, to assure employees of tenure and provide that they cannot legally be discharged for political or capricious reasons [see *Hacker v. Myers*, 33 Ill.App.2d 322, 179 N.E.2d 404 (1st Dis. 1961)]. The members of the Commission who are assisted by its Executive Secretary shall: a) be five in number; b) be in sympathy with the application of merit principles to public employees; and c) have not more than three of its five members as adherence of the same political party [20 ILCS 415/7a and 7b].

The Executive Secretary assists the Commission in various tasks entrusted to it by law in which decisions are to be made free of partisan political considerations. In this respect, the Executive Secretary assists the Commission in its tasks of: 1) deciding what positions in state government should be exempt from jurisdiction B of that Act; 2) approving (or disapproving) proposed rules promulgated

by the Director of CMS implementing the provisions of the "Personnel Code"; 3) approving (or

disapproving) any position classification plan for state employees submitted by the Director of CMS; 4)

hearing appeals of employees who protest the allocation of their positions under a classification plan; 5)

hearing and making recommendations in cases involving discharge, demotion, or significant suspensions

of a state employee; and 6) hearing appeals of state employees protesting a geographic transfer [see §

10 of the "Personnel Code"].  These are tasks which are to be performed free from partisan political

consideration given the purpose of the "Personnel Code".  In performing these functions, the Executive

Secretary is guided by the underlying purpose of the "Personnel Code" to administer a personnel

system based upon merit principles and scientific methods.  Because the policymaking functions of the

Executive Secretary of the Commission involve the administration of the "Personnel Code", a law

designed to promote merit and eliminate politics in state employment, he reports to a bi-partisan

commission.  The politics of the Executive Secretary should never be considered as a legitimate criteria

for holding that position.

      Fourth, to the extent the Executive Secretary of the Commission maintains a confidential

relationship with state officials, that relationship is with the members of the Commission who by law are

required to be bi-partisan with not the Governor.

      Given the features of the Executive Secretary's position, the Defendants have not and cannot

demonstrate how partisan political affiliation can be an appropriate consideration in either filling or

removing the position.

      Should this Court conclude that partisan political affiliation is an appropriate consideration in

either filling or removing the position of the Executive Secretary of the Commission, it will not only be

ignoring the mandates of the "Personnel Code", but will effectively make a decision that will have a

ripple effect in many positions in state government.  There are many policymaking positions in state

government which are covered by the "Personnel Code" and in which partisan political affiliation is not

an appropriate consideration.  To adopt the test urged by the Defendants in this case and be guided

only upon the policymaking features of the position would ignore the limited nature of the *Elrod/Branti*

policymaking exception and risk removing all policymakers in state government from the First

Amendment protections against politically based employment decisions.

Common sense makes clear that the argument of the Defendants must fail.  The history of the

Commission coupled with the intent of the General Assembly indicates that the Commission is designed

to be a body independent of the Governor.  The Executive Secretary makes recommendations on

various personnel matters effecting state employees protected by merit principles.  The idea, of course,

is to make sure that political considerations are not used in making decisions effecting those employees.

If the Executive Secretary is required to answer to the Governor, these merit protections become

worthless because the Governor's will would be pressed upon the Executive Secretary.  Practically

speaking, allowing political considerations to dictate the employment of the Executive Secretary would

allow political considerations to infiltrate into the day to day administration of the "Personnel Code".

**3)  The cases relied upon by the Defendants have little use in this proceeding.**

The Defendants over read our Circuit's holding in *Riley v. Blagojevich*, 425 F.3d 357 (7th Cir.

2005).  According to the Defendants, *Riley* stands for the proposition that the Defendants could

properly rely upon the position description for the Executive Secretary position and, if that description

reflected the position had policymaking duties, make decisions with respect to the incumbent based

upon his political affiliation.  The Defendants' application of *Riley* to this case is unwarranted.

The *Riley* Court, in citing cases from this Circuit in which political affiliation was held to be both a permissible and an impermissible qualification for public employment, noted a dilemma posed for elected officials such as the Governor of the state of Illinois upon taking office in not knowing whom he can fire and replace with loyalists and whom he cannot fire [see *Riley* at pp.359-360].  In that case, the plaintiff, an assistant warden at an Illinois correctional facility, claimed that given the real nature of her job duties she was not a policymaker.  The *Riley* Court held that unless official job descriptions are deemed "systematically unreliable" then in situations of the type presented in that case an elected official may rely upon them in determining whether or not the *Elrod/Branti* policymaking exception is applicable.  The Riley Court noted that a written job description would be a relatively easy form of guidance available to an incoming administration.  It was quick to note, however, that its decision did not stand for the proposition that every *Elrod/Branti* case can be resolved just by reading the job description (p.365).  According to the *Riley* Court, the "significance of the official job description in a case like this is that it is a provisional safe harbor for elected officials" (p.364) [emphasis added].

Unlike the present case, the *Riley* plaintiff held a position which was exempt from the protections of the "Personnel Code" by virtue of § 4d(3) of that law.  The new administration had nothing other than the official job description to guide it in determining whether partisan political affiliation could be a legitimate criteria for the position.  In the case at bar, the position of the Plaintiff was protected from patronage dismissal by § 10 of the "Personnel Code."  In fact, it is covered by all three jurisdictions of that law.  Thus, the Governor and his staff were not presented with the dilemma of the type posed in *Riley* in determining whether or not he could fire the incumbent and replace him with a

loyalist.  The General Assembly had answered that question for them when it declared that the

Executive Secretary of the Commission can neither be hired nor fired based upon reasons unrelated to

merit.

The *Riley* holding was announced to solve a dilemma posed because of uncertainty as to when

and under what circumstances a position was considered a policymaker and to provide a limited safe

harbor to elected officials.

The Defendants by their own actions were aware that the dilemma posed in the *Riley* situation

did not exist in this case.

Thomas Londrigan, a lawyer for the new administration informed the Commission Officials that

the Plaintiff as the Executive Secretary of the Commission was protected by the "Personnel Code" and

could only be terminated for cause.  He knew and advised the Commission Officials that the Plaintiff's

politics could not be a basis for terminating his employment.  Edward Winn, the legal counsel for CMS,

provided similar advice in his report to the Commission Officials [¶24 of the Plaintiff's statement].

Unlike the *Riley* situation, there was no uncertainty regarding the Plaintiff's job status.  The

administration knew he could be dismissed only for cause.

This Court's holding in *Utley v. Monk*, 2005 WL 3478844 (C.D.Ill.) is similarly unhelpful to

the Defendants.  Following our Circuit's holding in *Riley*, this Court in *Utley* relied exclusively upon the

plaintiff's written job description in determining whether political affiliation was an appropriate

employment consideration.  Based upon the nature of the policymaker functions in that position, this

Court concluded that the Defendants "would want the person formulating those policies to be loyal to

the Blagojevich administration" (see note 5).  In this respect, it reasoned that the holder of that position

participated in the development of legislative proposals for the Illinois Department of Corrections and noted that "the current administration would clearly have an interest in the political loyalty of individuals who provide input in the formulation of such proposals."  Unlike *Utley*, in this case the "Personnel Code" instructs this Court (and the Defendants when they terminated the Plaintiff) that the Plaintiff's political affiliation would never be an appropriate consideration in either filling the position or removing an incumbent from it.

   *Steigmann v. Democratic Party of Illinois*, 2005 WL 3482635 (N.D. Ill.) has little value for the Defendants.  The *Steigmann* Court concluded that the Plaintiff's job description was a measuring stick for determining whether or not he was a policymaker subject to the *Elrod/Branti* exception. After analyzing that description, it concluded that the features of his job were such that the policymaking exception applied.  The holding in that case was fact dependent.  The *Steigmann* plaintiff had no civil service protections and, in fact, claimed political discrimination when his contract of employment was not renewed contrary to a longstanding practice of his employer to automatically renew contracts. Because of the facts presented in that case, the *Steigmann* Court determined that the plaintiff's current job description was central to his claim and crucial for determining whether or not the policymaker exception applied.  It was quick to note, however, that even under *Riley* a job description is not dispositive in all cases, stating:

> "Yet the Riley Court emphasized that the job description, though pivotal, may not be dispositive in all cases.  Neither [Riley nor any other case] stand[s] for the proposition that every Elrod/Branti case can be resolved just by reading the job description" [see note 8].

   Unlike the case at bar in which this Court has the benefit of how the "Personnel Code" treats

the position of Executive Secretary of the Commission, the *Steigmann* Court had little other than the

written job discrimination to guide it in determining the applicability of the policymaker exception.

The plaintiff in *Thompson v. Illinois Department of Professional Regulation*, 300 F.3d 750

(7th Cir. 2002), was appointed to the position of deputy chief counsel of the Department of Professional

Regulation and although transferred to the position of administrative law judge still held the formal

appointment as deputy chief counsel.  Unlike the Plaintiff who was protected by the merit provisions of

the "Personnel Code", the *Thompson* plaintiff, as deputy chief counsel of a state agency, was partially

exempt from the provisions of the "Personnel Code" by virtue of § 4d(5) of that law.

Each of the cases cited by the Defendants in which the policymaking exception has been

applied based upon the terms of the Plaintiff's job description is dissimilar to this case in the sense that

there was little to guide the employer or the new administration other than the written job description.

In this case, the Plaintiff's position is the creation of a statute which is instructive in considering whether

partisan political affiliation is a requirement for the position.  The lawyer for the new administration (and

a Defendant in this case) knew and advised the Commission Officials before the Plaintiff was terminated

that he could be terminated only for cause and not because of his politics.

**B)  The Defendants' erroneously argue that the Plaintiff received all the process he was due.**

In order to sustain a claim under the Due Process Clause, the Plaintiff must demonstrate that: a) he possessed a cognizable property interest in his employment; b) he was deprived of that property interest by the government; and c) the deprivation was accomplished without providing him constitutionally adequate process [see *Schroeder v. City of Chicago*, 927 F.2d 957, 959 (7th Cir. 1991); *Bigby v. City of Chicago*, 766 F.2d 1053, 1056 (7th Cir. 1985); and *Buttitta v. City of Chicago*, 9 F.3d 1198, 1201 (7th Cir. 1993)].

For purposes of the Defendants' motion for summary judgment, they seem to agree that the Plaintiff had a property interest in his employment.  The "Personnel Code" provides that the Plaintiff as Executive Secretary of the Commission could be terminated only for cause.  The Defendants concede that the Plaintiff was deprived of his property interest when he was terminated from his employment as Executive Secretary of the Commission.

Thus, for purposes of summary judgment, the only issue raised with respect to the Plaintiff's due process claim turns upon whether he received constitutionally adequate process.  In arguing the affirmative for that proposition, the Defendants advance three points.  First, because of the sensitive nature of the Plaintiff's position and the seriousness of the allegations made against him, he could be terminated prior to receiving a pre-deprivation hearing.  Second, the Plaintiff received adequate post-deprivation process.  Thus, whether or not he received a constitutionally adequate pre-termination hearing is a matter of no concern.  Finally, they argue that the Plaintiff did receive a constitutionally adequate pre-deprivation hearing.

**1)  The relevant legal landscape for considering the Plaintiff's due process claim.**

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 84 L.Ed.2d 494 (1985), the

Supreme Court recognized that the Due Process Clause requires the government, prior to terminating a

civil service employee who can only be terminated for cause and possessed post-termination

opportunities to have the termination decision reviewed, to provide the employee with a pre-deprivation

hearing.

The *Loudermill* Court noted that "the root requirement" of the Due Process Clause is that an

individual be given an opportunity for hearing before he is deprived of any significant property interest

(p.542).  Applying the tests articulated in *Matthews v. Eldredge*, 424 U.S. 319, 335, 47 L.Ed.2d 18

(1976), it recognized the need for some form of pre-termination hearing.  In this respect, the Court

noted three things.  First, the deprivation of one's livelihood represents a significant private interest in

need of protection.  Second, some opportunity for the employee to present his side of the case prior to

his termination has obvious value in avoiding a mistaken decision.  Finally, the governmental interest in

an immediate termination prior to a pre-deprivation hearing does not outweigh the foregoing

considerations.  Because the *Loudermill* plaintiff possessed, under state law, an entitlement to a full

post-termination hearing, the Court reasoned that the pre-termination hearing need not be elaborate and

due process is satisfied if the employee receives oral or written notice of the charges against him, an

explanation of the employer's evidence and an opportunity to present his side of the story (*Loudermill*

at p.546).

In the wake of *Loudermill*, our Circuit recognized that due process requires that, prior to a

termination decision being made, an employee need be given the chance to tell his side of the story and

the employing agency must be willing to listen to him.  Otherwise, the "opportunity to respond" required

by *Loudermill* is no opportunity at all [see *Levenstein v. Salafsky*, 164 F.3d 345, 452 (7th Cir.

1998); and *Ryan v. Illinois Department of Children and Family Services*, 185 F.3d 751, 762 (7th

Cir. 1999)].  In our Circuit a plaintiff who can introduce evidence that by the time the pre-termination

hearing is held the decision to terminate him had already been made is entitled to go forward with a

procedural due process claim [see *Cliff v. Board of School Commissioners of the City of*

*Indianapolis*, 42 F.3d 403, 414 (7th Cir. 1994); *Levenstein* at pp.351-52; and *Ryan* at p.762].

As will later be seen, a reasonable trier of fact can conclude that prior to the Plaintiff's pre-

deprivation hearing a quorum of the members of the Commission had already decided to terminate his

employment.

**2)  The Plaintiff's entitlement to a pre-deprivation hearing.**

Notwithstanding the holding in *Loudermill* the Defendants argue that the Plaintiff was not

entitled to a pre-deprivation hearing.  They reason that because of the sensitive nature of his position as

Executive Secretary he could be terminated without a pre-deprivation hearing.  Their argument is wrong

both on the facts and the law.

The facts in this case, analyzed in accordance with the *Matthews* factors, undermine rather than

support the Defendants' argument.

First, the contention of the Defendants that the Plaintiff needed to be removed as quickly as

possible "to mitigate any possible damage he might cause" [p.16 of the Defendants' Brief] is belied by

the facts.  Any misconduct committed by the Plaintiff occurred before, not while, he was the

Commission's Executive Secretary.  Chairman Richards acknowledged that while the Plaintiff worked

for the Commission he was a fully satisfactory employee.  At no time during his employment with the

Commission prior to this incident had he been disciplined.  The contention that there was some sort of

damage being caused on an ongoing basis by the Plaintiff which needed to be mitigated simply finds no

support in the evidentiary record [¶6 of the Plaintiff's statement].

Second, the Defendants' argument that the Plaintiff's private interest was not affected is

confusing at best and at worst misleading.  Immediately following his pre-deprivation hearing, the

Plaintiff was terminated and suffered all of the consequences of losing his job including, but not limited

to, the loss of a paycheck.  The fact that he had been on paid leave prior to his pre-deprivation hearing

is of no consequence to whether or not he should receive a pre-disciplinary hearing other than to show

that there would have been little burden to the Commission to provide him with a pre-deprivation

hearing before, not following, the decision was made to terminate his employment.

Finally, the notion that the Plaintiff admitted he signed his name as Director of CMS and thus a

hearing would have served no purpose is contrary to the facts.  As will be more fully explained, the

Plaintiff, at his pre-deprivation hearing, provided evidence which refuted the charges that he signed that

document without authorization from the Director of CMS.  The Plaintiff informed Chairman Richards

that:  a) Director Schwartz was aware of the transactions; b) approved of them; and c) authorized the

Governor's office to sign the documents in his stead.  He further informed him that the transactions

were undertaken based upon advice from CMS personnel professionals [¶37,38,39,45 of the Plaintiff's

statement].  None of this information was presented to the Commission Officials when they decided to

terminate the Plaintiff on May 15, 2003 and at no time thereafter did Chairman Richards pass along to

them the information shared with him by the Plaintiff at his pre-deprivation hearing [¶40,41 of the

Plaintiff's statement].

The Defendants reliance upon the Supreme Court's decision in *Gilbert v. Homar,* 520 U.S. 924, 138 L.Ed.2d 120 (1997) is misplaced. *Gilbert* was a case in which the Supreme Court refused to extend the pre-deprivation hearing entitlements of *Loudermill* after it applied the *Matthews* factors in a fact specific inquiry.

The *Gilbert* plaintiff was a police officer at a state university. Upon being charged with a felony relating to the possession of marijuana, he was suspended without pay by his employer pending an investigation into his conduct. While the court concluded in that situation he was not entitled to a pre-deprivation hearing, it did so by applying the *Matthews* factors to the facts in that case without undermining the *Loudermill* principle.

First, the *Gilbert* court evaluated the private interests of the employee and determined that the suspension was only temporary. Unlike the situation in *Gilbert,* there was nothing "temporary" about the Plaintiff's termination.

Second, the *Gilbert* court recognized there was little risk of an erroneous deprivation and the likely value of pre-deprivation procedures was minimal. In that case the plaintiff was suspended because he was charged with a felony. The court noted that the value of a pre-suspension hearing would have been to assure that there are reasonable grounds to support the suspension. That had already been assured when criminal charges were filed against him [*Gilbert* at p.933-34]. In contrast, the Plaintiff was terminated on May 15, 2003 based upon a belief that he had signed personnel transactions which were neither authorized nor approved by the Director of CMS. The Plaintiff, when he had a pre-termination hearing, explained to Chairman Richards that the underlying transactions

represented by the documents he signed had been approved by Director Schwartz and that Director

Schwartz authorized representatives of the Governor's office to sign those documents. He further

informed Chairman Richards that prior to undertaking those transactions the advice of personnel

professionals at CMS had been secured. All of this was information which the Commission Officials

did not have on May 15, 2003 when they decided to terminate the Plaintiff. Contrary to *Gilbert,* this

information had value in determining whether the Plaintiff should have been terminated given the nature

of the charges advanced against the Plaintiff.

Finally, the *Gilbert* court felt that the state had a significant interest in immediately suspending

an employee who had been charged with a felony reasoning that the government should not have to

give an employee charged with a felony a paid leave at taxpayer's expense [*Gilbert* at p.932-933].

This was not the situation in the case at bar. The Plaintiff was not charged with any criminal

misconduct. As pointed out earlier, the Defendants have failed to identify any governmental interests

which would justify denying him a pre-deprivation hearing.

Simply put, the Defendants' contention that a *Loudermill* type hearing was not required in this

case is wrong.

**3) The adequacy of the pre-deprivation hearing provided the Plaintiff.**

A reasonable jury could conclude that by the time of the Plaintiff's pre-deprivation hearing on

May 29, 2003, the Commission Officials had already decided to terminate his employment.

The business of the Commission is transacted through its five members. Acting through those

members, it is empowered to employ an Executive Secretary. Three members of the Commission are

necessary to constitute a quorum for the transaction of its business [see § 7a, 7b, 7c, 7e and 10 of the

"Personnel Code" (20 ILCS 415/7a, 7b, 7c, 7e and 10)]. Because of the business of the Commission is transacted by a quorum of its members, the decision to terminate the Plaintiff could not be effected absent the majority vote of a quorum of its members. In this case, the Commission Officials admit that they made or recommended the decision to discharge the Plaintiff [see interrogatory 8, Ex.2]. Since four of the Commission Officials were not consulted after the Plaintiff's pre-deprivation hearing, this decision could only have been made prior to that hearing [¶40,41 of the Plaintiff's statement].

At the May 15, 2003 meeting of the Commission, the Commission Officials following an executive session unanimously adopted a resolution suspending the Plaintiff from employment with the Commission pending only his termination. It directed Chairman Richards to conduct a pre-deprivation hearing with the Plaintiff [¶31,32,33 of the Plaintiff's statement]. Essentially, the Commission decided to discharge the Plaintiff and gave Chairman Richards authority to implement that decision [¶33 of the Plaintiff's statement]. All of this occurred after the Commission Officials had received the CMS investigation and the Londrigan report, but prior to hearing from the Plaintiff.

Given the charges advanced against the Plaintiff and served upon him prior to his pre-deprivation hearing, the Commission Officials based upon the information received by Londrigan and Winn believed that the Plaintiff: a) had signed documents on behalf of the Director of CMS without his authorization; b) knew that the Director of CMS had not approved the transactions; and c) knew that the transactions had not been undertaken in compliance with the CMS Personnel Rules [¶35 of the Plaintiff's statement].

At the time the Commission Officials voted to both suspend the Plaintiff pending termination and give him a pre-deprivation hearing, they had not had the opportunity to hear the Plaintiff's side of the story.

Although the Defendants claim that the Plaintiff "did not present any new evidence refuting the charges", a reasonable trier of fact could disagree.

The Plaintiff at the time of the pre-deprivation hearing informed Chairman Richards that: a) he had sought guidance from personnel professionals at CMS concerning whether the transactions could be undertaken and, if so, the appropriate process; b) he was informed that such transactions could be undertaken and had, in fact, been done during the Edgar administration; c) he had been informed that CMS Director Schwartz approved of the transactions, but did not want his signature affixed to them and authorized the Governor's Office to sign them on his behalf; and d) his role in the transactions was limited to securing guidance from the CMS professionals, passing the information along to his superiors and signing the transactional forms knowing that Director Schwartz approved them and authorized the Governor's Office to sign them [¶37,38,39,45 of the Plaintiff's statement]. All of this is evidence which the Commission Officials did not have at their May 15, 2003 meeting when they effectively voted to terminate the Plaintiff.

Notwithstanding that information, Chairman Richards, following the Plaintiff's pre-disciplinary hearing, acted upon the earlier decision to terminate the Plaintiff's employment without consulting with the other Commissioners regarding the information the Plaintiff had shared with him [¶40,41,42 of the Plaintiff's statement].

At the very least a reasonable trier of fact could wonder why Chairman Richards did not following the pre-termination hearing consult with other members of the Commission. Instead, he proceeded with the will of the Commission Officials, as expressed at their May 15, 2003 meeting, resulting in the Director of CMS on the very next day endorsing the Plaintiff's termination.

A reasonable trier of fact could conclude that the Commission Officials had, fourteen days prior to the Plaintiff's pre-deprivation hearing, decided to terminate his employment without the benefit of hearing the Plaintiff's side of the story. If so, the Plaintiff's pre-deprivation hearing was in reality meaningless and under the law of our Circuit was contrary to his rights under the Due Process Clause.

There is another constitutional flaw in the manner in which the Plaintiff's pre-deprivation hearing was conducted. *Loudermill* instructs that a public employer in connection with the pre-deprivation hearing is to share with the employee the evidence supporting the proposed discipline. In this case, some, but not all, of the evidence was shared with the Plaintiff. Significantly, the CMS investigation which was received and reviewed by the Commission Officials when they made the discharge decision on May 15, 2003 was not provided him. This was significant evidence. A reasonable factfinder could conclude that it was relied upon by the Commission Officials when they decided to terminate the Plaintiff and was reasonably needed by the Plaintiff to have a constitutionally adequate pre-deprivation hearing.

**4)  The post-deprivation hearing afforded the Plaintiff.**

The Defendants argue that the Plaintiff had a full blown post-deprivation hearing and, accordingly, his failure to receive an adequate pre-deprivation hearing was not unlawful. They correctly reason that where an opportunity for a full post-termination hearing exists due process does not require

an employer to provide a full "trial type" pre-deprivation hearing. In this case, the Plaintiff is not

claiming such an entitlement. As pointed out earlier, he only asked for a meaningful hearing meeting the

dictates of *Loudermill*. He was denied that opportunity in two respects. First, he was not provided

with pertinent evidence utilized by the Commission in reaching its May 15, 2003 decision when they

failed to provide him with a copy of the CMS investigation report. This was significant since that is a

report which was provided to the Commission Officials when they decided to terminate his employment

on May 15, 2003. Second, he was denied a meaningful hearing in the sense that the decision to

terminate him had been made prior to his pre-deprivation hearing.

While the Plaintiff did have a post-deprivation hearing where he was: a) presented the evidence

against him; b) afforded the opportunity to cross-examine witnesses; c) allowed to engage in discovery;

and d) permitted to call witnesses on his own behalf, he was denied one fundamental right inherent in

any type of hearing which satisfied the Due Process Clause.

It is an elemental principle of due process jurisprudence that any hearing in connection with a

property deprivation must have a decisionmaker who did not participate in the determination under

review [see *Goldberg v. Kelly*, 397 U.S. 254, 25 L.Ed.2d 287 (1970)]. In *Gibson v. Berry Hill*,

411 U.S. 564, 36 L.Ed.2d 488 (1973), a statutory scheme in which members of an administrative

body adjudicated claims in which they had a personal interest was held contrary to due process

because the body charged by law to adjudicate the matter was sufficiently biased. The Court reasoned

that a hearing in front of those members having an interest or stake in the outcome would not comport

with due process [see also *United Church of the Medical Center v. Medical Center Commission*,

689 F.2d 693 (7th Cir. 1982)].

The post hearing process provided to the Plaintiff was fundamentally flawed since the individuals who terminated the Plaintiff and were prepared to testify against him were the same individuals who would ultimately adjudicated the merits of his appeal.  In other words, the Commission Officials were sitting in judgment of themselves.  Moreover, the administrative law judge assigned to receive evidence and make recommendations was not a neutral, but instead someone appointed by the Commission.  Notwithstanding his efforts to address these due process concerns to the Commission during his discharge appeal, they were disregarded by the Commission Officials [see ¶47,48 of the Plaintiff's statement].

**C)  The Defendants are not entitled to qualified immunity.**

*Harlow v. Fitzgerald*, 457 U.S. 800, 73 L.Ed.2d 396 (1982) held that governmental officials performing discretionary functions are generally shielded from liability for civil damages to the extent that their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Our Circuit has recognized the problem posed by either characterizing a clearly established right so generally that any unlawful act of a public official might infringe upon a clearly established right or with such detail that each case becomes unique creating an insurmountable burden to a claimant in overcoming a qualified immunity defense.  It has struck a balance by requiring, in order to overcome qualified immunity, the existence of precedent in a closely analogous area [see *Connor v. Reinhard*, 847 F.2d 384 (7th Cir. 1988); *Pieczynski v. Duffy*, 875 F.2d 1331 (7th Cir. 1989); *Rakovich v. Wade*, 850 F.2d 1180 (7th Cir. 1988); *Auremia v. Rice*, 910 F.2d 1449 (7th Cir. 1990); *Gregorich v. Lund*, 54 F.3d 410 (7th Cir. 1995); and *Bakalis v. Golembeski*, 35 F.3d 318 (7th Cir. 1994)].

In *Rakovich v. Wade* (op.cit.1988) it articulated the "clearly established" standard stating:

"We caution that just as a right alleged violated should not be characterized or defined so generally that invariably guiding law is found to show that the right was clearly established, the right should not be defined to intricately that invariably guiding law never can be found" [p.112].

In *Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir. 1996) it rejected the narrow view that a claimant must present caselaw which is the precise parallel to the incident at issue in order to overcome qualified immunity stating:

"The defendants bemoan the fact that there is no prior case directly on point with facts identical to this case. Under the doctrine of qualified immunity, liability is not predicated upon the existence of a prior case that is directly on point. See *McDonald v. Haskins*, 966 F.2d 292, 293 (7th Cir. 1992). The question is whether a reasonable state actor would have known that his actions, viewed in the light of the law at the time, were unlawful. *Id.* at 294. We believe that reasonable persons standing in the defendants' shoes at the time would have reached just such a conclusion" [p.17].

As the doctrine has developed, a public official can still be on notice that his conduct violates established law even in novel factual circumstances. The facts of a case need not be "fundamentally similar" to those of a prior case in order for a claimant to overcome qualified immunity. The salient question is whether the state of the law at the time of the alleged misconduct gave a public official fair warning that his conduct was unconstitutional [*Hope v. Pelzer*, 536 U.S. 730, 740-41, 153 L.Ed.2d 666 (2002); and *McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004)].

A qualified immunity analysis requires a twofold inquiry. Initially, viewing the facts in the light most favorable to the party asserting the injury did the Defendants' conduct violate a constitutional right? If so, was the right in question "clearly established at the time of the violation" [*Saucier v. Katz*, 533 U.S. 194, 201, 150 L.Ed.2d 272 (2001)]?

In answering the second inquiry, the salient question is not whether there is a prior case on all fours with the current claim, but whether the state of the law at the relevant time gave the Defendants fair warning that their treatment of the Plaintiff was unconstitutional [see *McGreal* at p.683].

With respect to the Plaintiff's First Amendment claim, the issue this Court must decide for purposes of the Defendants' qualified immunity defense is whether in May of 2003 reasonable public officials would have known that the Plaintiff could not have been terminated from his position because of his political affiliation. Not only would a reasonable public official have known that in the spring of 2003, but in this case, the evidence is that the Defendants did know it.

In their argument, the Defendants seem to suggest that absent prior precedent involving the Executive Secretary of the Commission they could not have known that the policymaker exception was inapplicable to that position.

As discussed in detail earlier, the Defendants had a guidepost. The "Personnel Code" was explicit in telling the Defendants that the Executive Secretary of the Commission was covered by all three jurisdictions of the "Personnel Code" and that political considerations could not used in either filling or removing someone from that position. While there may not have been a case litigated concerning that position, we have something in this case which is better. An Act of the Illinois General Assembly informed them that the Executive Secretary could be terminated only for cause.

This is the unusual case in which the law should not only have been apparent to the Defendants, but was actually known to them. Both Thomas Londrigan and Edwin Winn informed the Commission Officials in April of 2003 well prior to the Plaintiff's termination that he was protected by the provisions

of the "Personnel Code" and could only be terminated for cause.  Thus, the Commission Officials and

at least one of the Governor's Officials had actual knowledge that partisan political considerations could

not be used to discharge the Plaintiff.

The Defendants' reliance upon *Pounds v. Griepenstroh*, 970 F.2d 338 (7th Cir. 1992) does

not support the argument advanced by the Defendants with respect to the Plaintiff's position at the

Commission.  The *Pounds* Court identified the qualified immunity issue as follows:

> "Could the defendants, in light of what they knew about the duties and powers of a
> county VSO and the law at the time, have reason to believe that they could refuse to
> appoint Pounds solely because of his political affiliation?"

Because of the confusion arising in the wake of the *Rutan* holding in determining when it would

be reasonably possible for a public official to know when a position is subject to the policymaker

exception unless a nearly identical case had previously been decided.  That is not a problem in this case

since:  a) the Illinois General Assembly through the "Personnel Code" has recognized that the Plaintiff's

position was not one which could be filled or terminated because of political affiliation; and b) the

Londrigan memorandum makes clear there was no confusion in the minds of the Defendants on this

point.

The Defendants' qualified immunity argument with respect to the Plaintiff's due process claim is

equally unavailing.  Contrary to their contention, there are cases demonstrating that an employee is

entitled to a pre-termination hearing even when he has a right to a full post-deprivation hearing.

*Loudermill* was explicit in recognizing that a plaintiff who had post-deprivation remedies was

nonetheless entitled to a pre-deprivation hearing in which he is:  a) informed of the charges against him;

b) provided the employer's evidence; and c) given a reasonable opportunity to respond.  In the wake

of *Loudermill*, our Circuit in *Ryan*, *Cliff*, and *Levenstein* indicated that to satisfy due process the hearing could not be a sham and needed to be undertaken before not after the termination decision is made.  In view of *Loudermill* and the cases cited above from our Circuit, the Defendants' claim that there are no cases closely analogous to the circumstances presented in this case has no merit.

## V.  CONCLUSION

For the reasons addressed above, the Defendants have not presented a reason why summary judgment should be granted with respect to either of the Plaintiff's constitutional claims.  This Court, therefore, must deny their motion for summary judgment.

ROBERT POWERS

By:    s/ James P. Baker
James P. Baker
Bar Number: 0097802
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone: (217) 522-3445
Facsimile: (217) 522-8234
E-mail: brendabakerlaw@sbcglobal.net
(Memorandum/powersroppositionmsj 030606)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 9, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Jeffrey D. Colman
David Jimenez-Ekman
Acting as Special Assistant Attorneys General
John Storino
Christopher V. Parente
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611

By:___s/ James P. Baker_____
      James P. Baker
      Bar Number: 0097802
      Baker, Baker & Krajewski, LLC
      415 South Seventh Street
      Springfield, Illinois 62701
      Telephone: (217) 522-3445
      Facsimile: (217) 522-8234
      E-mail: brendabakerlaw@sbcglobal.net