## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ROBERT POWERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case:  04-3024 |
| | ) | |
| GEORGE E. RICHARDS, RAYMOND W. | ) | Honorable Jeanne E. Scott |
| EWELL, JOHN M. DORGAN, BARBARA | ) | |
| J. PETERSON, DAN P. FABRIZO, ROD | ) | |
| BLAGOJEVICH, THOMAS LONDRIGAN | ) | |
| and ALONZO MONK, | ) | |
| | ) | |
| Defendants. | ) | |

## STATE OFFICIALS' REPLY BRIEF
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### Introduction

In our opening memorandum, we demonstrated that plaintiff cannot recover on his

patronage claim, as a matter of law, because even if – contrary to fact – plaintiff's factual

allegations were true, political affiliation is an "appropriate requirement" for his former position

as Executive Secretary of the Illinois Civil Service Commission.  In his response, plaintiff

concedes that the official Position Description outlines the duties of his former position.[1]  This

concession is fatal to plaintiff's claim because the Position Description requires plaintiff to

develop and implement policy, including spokesperson and budgeting responsibilities for the

Commission.  Plaintiff's due process claim also fails because he received more than sufficient

process in the form of a pre-deprivation hearing with then-Chairman Richards and a full two-day

post-deprivation hearing.  Again, plaintiff's concessions are fatal to his claim because he

concedes that he received: notice and a copy of the charges against him prior to his termination

---

[1] Plaintiff admits that his official Position Description listed the duties inherent in his former
Executive Secretary position "for purposes of this Court's consideration of the Defendants'
motion for summary judgment."  (Resp. at 4).

(Pl. Resp., Ex. 1 ¶¶ 9, 12); a pre-deprivation hearing with Commissioner Richards in which he was presented with the charges and evidence against him and he was given the opportunity to present his defense (Pl. Resp., Ex. 1 ¶¶ 11-13); and a timely complete "trial type" post-deprivation hearing before an administrative law judge in which plaintiff served discovery, cross-examined witnesses and presented his own witnesses and evidence. (Resp. at 39 & Ex. 1 ¶¶ 15-18.)  In his response, plaintiff attempts to argue the merits of the termination decision, which is improper in a due process claim.  Plaintiff's claim is limited to whether he received sufficient process regarding his termination and, in light of the undisputed fact that he received a complete pre-deprivation and post-deprivation hearing, any argument that he did not receive sufficient process is meritless.

In Part I of this reply brief, we address plaintiff's alleged additional material facts.  In Part II, we show that plaintiff's arguments on his patronage claims are meritless and judgment should be entered as a matter of law.  In Part III, we show that plaintiff's due process claims fail since he was accorded all the process he was due under the law.  In Part IV, we show that, alternatively, the State Officials are entitled to summary judgment on all plaintiff's damages claims under the doctrine of qualified immunity.

**I.      Reply to Plaintiff's Additional Material Facts.**

1.      The Plaintiff began working for the Office of the Secretary of State on September 1, 1988.  On January 16, 1999 he transferred from the Secretary of State's Office to the Governor's Office.  This occurred at the time George Ryan was elected Governor of the State of Illinois.  In the Governor's Office, he served as Deputy Counsel of Personnel, Boards and Commissions [Tr.24-25.]

**REPLY:**      The State Officials deny that this additional fact is material because plaintiff was not employed in the Secretary of State's Office or the Governor's Office at the time of his termination at issue in this case.

2.      Between August 16, 2002 and October 1, 2003, the Plaintiff worked for CMS as a Senior Public Service Administrator.  He served it as an Associate Director and was assigned to work in the Governor's Office [Tr.26-27.]

**REPLY:**      The State Officials admit that plaintiff started working for CMS on August 16, 2002, but state that plaintiff stopped working for CMS on October 1, 2002.  (6/27/03 Tr. 26:7-10.)

3.      The Plaintiff applied for the vacant position as Executive Secretary of the Commission as a part of an open competitive search undertaken by the Commission to fill that position.  Of all the applicants who applied, the members of the Commission determined that the Plaintiff was best qualified for the position [Tr.62-63.]

**REPLY:**      The State Officials deny that this additional fact is material because the Commission's decision to fill the Executive Secretary position as part of an open competitive search process under the Illinois Personnel Code is irrelevant to plaintiff's First Amendment patronage claim because the Branti issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in plaintiff's former position as outlined in the official CMS Position Description for plaintiff's former Executive Secretary position.  Riley v. Blagojevich, 425 F.3d 357, 360-61 (7th Cir. 2005); Flenner v. Glover, 107 F.3d 459, 464 (7th Cir. 1997.)  Furthermore, this additional fact is not material to plaintiff's due process claim because it does not address the process the plaintiff received regarding his termination.

4.      The Plaintiff applied for the position of Executive Secretary of the Commission. At that time the Commission was engaging in an open search for a new Executive Secretary. The Plaintiff competed with others for that position.  Of all the persons interviewed by the Commission, he was deemed the most qualified to hold the position [Tr.62-63.]

**REPLY:**      The State Officials deny that this additional fact is material because the Commission's decision to fill the Executive Secretary position as part of an open competitive search process under the Illinois Personnel Code is irrelevant to plaintiff's First Amendment patronage claim because the Branti issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in plaintiff's former position as outlined in the

official CMS Position Description for plaintiff's former Executive Secretary position. Riley v. Blagojevich, 425 F.3d 357, 360-61 (7th Cir. 2005); Flenner v. Glover, 107 F.3d 459, 464 (7th Cir. 1997.)  Furthermore, this additional fact is not material to plaintiff's due process claim because it does not address the process the plaintiff received regarding his termination.

     5.     The Plaintiff worked for the Commission for approximately six months from October 1, 2002 through some time in April of 2003 [Tr.63].

**REPLY:**     The State Officials admit that plaintiff started working for the Commission on October 1, 2002, but state that plaintiff continued working for the Commission through May 30, 2003. (Compl ¶ 1.)

     6.     Between October 1, 2002 and April of 2003, the Chairman of the Commission assessed the Plaintiff's performance as Executive Secretary of the Commission as fully satisfactory [Tr.73-75].  During the time period he worked for the Commission between October 1, 2002 and April of 2003, the Plaintiff was not the recipient of any type of discipline [Tr.75].

**REPLY:**     The State Officials deny that this additional fact is material because the decision to terminate the plaintiff was based on his fraudulently executing CMS personnel transactions by improperly signing personnel documents as the Director of CMS while he was employed at CMS.  (S.O. Mem. Ex. 2, Richards Aff. ¶¶ 8, 10.)

     7.     In May of 2003 George Richards was aware that the Plaintiff's position as Executive Secretary of the Commission was covered under the terms of the "Personnel Code" [Tr.76].

**REPLY:**     The State Officials deny that this additional fact is material because the application of certain provisions of the Illinois Personnel Code to the plaintiff's former position is irrelevant to plaintiff's First Amendment patronage claim because the Branti issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in plaintiff's former position as outlined in the official CMS Position Description for plaintiff's former Executive Secretary position. Tomczak v. City of Chicago, 765 F.2d 633, 640-42 (7th Cir. 1985); Riley, 425 F.3d at 360-61; Flenner, 107 F.3d at 464.  Furthermore, this additional fact

is not material to plaintiff's due process claim because it does not address the process the plaintiff received regarding his termination.

8.    The purpose of the "Personnel Code" is to establish a personnel system for employees under the Governor of the State of Illinois based on merit principles and scientific methods [§ 2 of the "Personnel Code" (20 ILCS 415/2)].

**REPLY:**    The State Officials deny that this additional fact is material because the application of certain provisions of the Illinois Personnel Code to the plaintiff's former position is irrelevant to plaintiff's First Amendment patronage claim because the <u>Branti</u> issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in plaintiff's former position as outlined in the official CMS Position Description for plaintiff's former Executive Secretary position. <u>Tomczak</u>, 765 F.2d at 640-42; <u>Riley</u>, 425 F.3d at 360-61; <u>Flenner</u>, 107 F.3d at 464. Furthermore, this additional fact is not material to plaintiff's due process claim because it does not address the process the plaintiff received regarding his termination.

9.    Three separate areas of jurisdiction are created under the "Personnel Code." Jurisdiction A covers position classifications and compensation of positions in state service. Jurisdiction B refers to positions in state service in which a person must hold the appointment on the basis of merit and fitness. Jurisdiction C covers conditions of employment in state services [§ 4a of the "Personnel Code" (20 ILCS 415/4a)].

**REPLY:**    The State Officials deny that this additional fact is material because the application of certain provisions of the Illinois Personnel Code to the plaintiff's former position is irrelevant to plaintiff's First Amendment patronage claim because the <u>Branti</u> issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in plaintiff's former position as outlined in the official CMS Position Description for plaintiff's former Executive Secretary position. <u>Tomczak</u>, 765 F.2d at 640-42; <u>Riley</u>, 425 F.3d at 360-61; <u>Flenner</u>, 107 F.3d at 464. Furthermore, this additional fact is not material to plaintiff's due

process claim because it does not address the process the plaintiff received regarding his termination.

10.    The Commission is empowered to exempt from jurisdiction B of the "Personnel Code" certain positions which in the judgment of the Commission involve either principle administrative responsibility for the determination of policy or principle administrative responsibility for the way in which policies are carried out [§ 4d(3) of the "Personnel Code" (20 ILCS 415/4d(3)]. The characteristics of a § 4d(3) position is that no provision of the "Personnel Code" applies to it. A person can secure a position without securing a promotional grade, undergoing a test or being placed on an eligibility list. The positions serve at the will of both the Governor and the agency employing the position [Tr.31-32].

**REPLY:**    The State Officials deny that this additional fact is material because the application of certain provisions of the Illinois Personnel Code to the plaintiff's former position is irrelevant to plaintiff's First Amendment patronage claim because the Branti issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in plaintiff's former position as outlined in the official CMS Position Description for plaintiff's former Executive Secretary position. Tomczak, 765 F.2d at 640-42; Riley, 425 F.3d at 360-61; Flenner, 107 F.3d at 464. Furthermore, this additional fact is not material to plaintiff's due process claim because it does not address the process the plaintiff received regarding his termination. Moreover, the State Officials deny that the "characteristics of a §4d(3) position is that no provision of the 'Personnel Code' applies to it" because Jurisdictions A and C apply to such positions.

11.    Members of the Commission must "be persons in sympathy with the application of merit principles to public employment". No more than three members of the Commission may be adherence of the same political party [§ 7b of the "Personnel Code" (20 ILCS 415/7b)].

**REPLY:**    The State Officials deny that this additional fact is material because the plaintiff was employed as the Executive Secretary of the Commission, and not as a member of the Commission.

12.   The Executive Director is a full time employee of the Commission appointed by the members of the Commission.  His position is subject to jurisdictions A, B and C of the "Personnel Code" [§10(10) of the "Personnel Code" (20 ILCS 415/10(10)].

**REPLY:**       The State Officials deny that this additional fact is material because the application of certain provisions of the Illinois Personnel Code to the plaintiff's former position is irrelevant to plaintiff's First Amendment patronage claim because the Branti issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in plaintiff's former position as outlined in the official CMS Position Description for plaintiff's former Executive Secretary position.  Tomczak, 765 F.2d at 640-42; Riley, 425 F.3d at 360-61; Flenner, 107 F.3d at 464.  Furthermore, this additional fact is not material to plaintiff's due process claim because it does not address the process the plaintiff received regarding his termination.

13.   Following the enactment of the "Personnel Code" in 1957, the Commission became responsible:  a) for approving (or disapproving) certain policies of the Director of CMS; b) hearing employee appeals; and c) directing compliance with the "Personnel Code" and rules in the event of a violation [see the history of the Commission contained on its website at www.icsc.il.gov/history.htm and Ex.4].

**REPLY:**       The State Officials admit that this additional fact describes some of the responsibilities of the Commission, but state that the Branti issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in the plaintiff's former position as outlined in the official CMS Position Description for plaintiff's former Executive Secretary position.  Tomczak, 765 F.2d at 640-42; Riley, 425 F.3d at 360-61.  Furthermore, this additional fact is not material to plaintiff's due process claim because it does not address the process the plaintiff received regarding his termination.

14.   In describing its role, the Commission notes:

"In essence, the Commission became a 'watchdog' for state government and, to this day, this responsibility has not changed.  Tested for over 50 years since the passage of the Illinois Personnel Code, the independent, bipartisan civil service commission, supported

by a dedicated staff, has remained steadfast in its role:  to ensure that the employees and citizens of the state of Illinois are afforded their rights and protections set forth in the Personnel Code and the Personnel Rules" [see www.icsc.il.gov/history.htm and Ex.4].

**REPLY:**    The State Officials admit that this additional fact describes some of the responsibilities of the Commission, but state that the Branti issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in the plaintiff's former position as outlined in the official CMS Position Description for plaintiff's former Executive Secretary position.  Tomczak, 765 F.2d at 640-42; Riley, 425 F.3d at 360-61.  Furthermore, this additional fact is not material to plaintiff's due process claim because it does not address the process the plaintiff received regarding his termination.

15.    No employee protected by jurisdiction B of the "Personnel Code" may be removed from his position except for cause [§ 11 of the "Personnel Code" (20 ILCS 415/11)].

**REPLY:**    The State Officials deny that this additional fact is material because the application of certain provisions of the Illinois Personnel Code to the plaintiff's former position is irrelevant to plaintiff's First Amendment patronage claim because the Branti issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in plaintiff's former position as outlined in the official CMS Position Description for plaintiff's former Executive Secretary position.  Tomczak, 765 F.2d at 640-42; Riley, 425 F.3d at 360-61; Flenner, 107 F.3d at 464.  Furthermore, this additional fact is not material to plaintiff's due process claim because it does not address the process the plaintiff received regarding his termination.

16.    The Commission has determined that both wardens and assistant wardens of the Illinois Department of Corrections are exempt from the "Personnel Code" under Section 4d(3) of that law.  Those individuals served at the will of both the Governor and that Department [¶5 of the Plaintiff's affidavit].

**REPLY:**    The State Officials deny that this additional fact is material because plaintiff was employed in the position of Executive Secretary when he was terminated, and not as a warden or

assistant warden of a correctional institution.  Moreover, the State Officials deny that wardens and assistant wardens are exempt from the entire Personnel Code and deny that the Governor has the authority to terminate such employees.

17.     A person holding the position of deputy general counsel of the Illinois Department of Professional Regulation is by virtue of Section 4d(5) of the "Personnel Code" partially exempt from the coverage of that law.  A person holding such a position does not have to go through the open competitive examination and selection process to secure his position [¶6 of the Plaintiff's affidavit].

**REPLY:**     The State Officials deny that this additional fact is material because plaintiff was employed in the position of Executive Secretary when he was terminated, and not as deputy general counsel of the Illinois Department of Professional Regulation.

18.     In early April of 2003 there were approximately four hundred (400) positions in state government which were exempt from the coverage of the "Personnel Code" by virtue of Section 4d(3) of that law [¶7 of the Plaintiff's affidavit].

**REPLY:**     The State Officials deny that this additional fact is material because the application of certain provisions of the Illinois Personnel Code to the unidentified positions of approximately four hundred State employees is irrelevant to plaintiff's First Amendment patronage claim because the Branti issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in plaintiff's former position as outlined in the official CMS Position Description for plaintiff's former Executive Secretary position.  Tomczak, 765 F.2d at 640-42; Riley, 425 F.3d at 360-61; Flenner, 107 F.3d at 464.  Furthermore, this additional fact is not material to plaintiff's due process claim because it does not address the process the plaintiff received regarding his termination.

19.     In April of 2003, Chairman Richards received a call from Alonzo Monk of the Governor's Office.  He was advised that Governor Blagojevich was going to hold a press conference at which time he was going to ask the Commission to discharge both the Plaintiff and Sarajane Wright [Tr.47-48].

**REPLY:**     The State Officials admit this additional fact.

20. The following day, Chairman Richards received a memorandum from Tom Londrigan of the Governor's Office which made certain allegations against the Plaintiff [Tr.49].

**REPLY:** The State Officials admit that Chairman Richards and the other members of the Commission received a memorandum from Tom Londrigan detailing the allegations that the plaintiff fraudulently executed CMS personnel transactions by improperly signing personnel documents as the Director of CMS while he was employed at CMS. (S.O. Mem. Ex. 2, Richards Aff. ¶¶ 4, 8, 10.)

21. Thomas Londrigan, in his memorandum of April 7, 2003 to the Commission Officials, noted that the Plaintiff's position is protected by the "Personnel Code" and he can only be discharged for cause. According to him, the applicable legal standard for terminating his employment with the Commission is "some substantial shortcoming which renders continued employment by the State in some way detrimental to the discipline or the efficiency of the service and which the law and public opinion recognizes as good cause for the employee no longer being held in that position" [see Ex. A to the appendix to the Defendants' motion for summary judgment].

**REPLY:** The State Officials deny that this additional fact is material because the application of certain provisions of the Illinois Personnel Code to the plaintiff's former position is irrelevant to plaintiff's First Amendment patronage claim because the Branti issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in plaintiff's former position as outlined in the official CMS Position Description for plaintiff's former Executive Secretary position. Tomczak, 765 F.2d at 640-42; Riley, 425 F.3d at 360-61; Flenner, 107 F.3d at 464. Furthermore, this additional fact is not material to plaintiff's due process claim because it does not address the process the plaintiff received regarding his termination.

22. Tom Londrigan of the Governor's Office encouraged Chairman Richards to terminate the employment of the Plaintiff [Tr.79-80].

**REPLY:** The State Officials admit that Tom Londrigan provided Chairman Richards and the other members of the Commission with a memorandum detailing the allegations that the

10

plaintiff fraudulently executed CMS personnel transactions by improperly signing personnel documents as the Director of CMS while he was employed at CMS.  (S.O. Mem. Ex. 2, Richards Aff. ¶¶ 4, 8, 10.)  The State Officials refer to that memorandum for its true meaning and context, and deny that plaintiff has accurately characterized that memorandum.

23.     Several days later, Chairman Richards met with the members of the Commission to discuss those allegations.  They decided to place both the Plaintiff and Sarajane Wright on administrative leave [Tr.50].  Chairman Richards then requested that CMS conduct an investigation.  Thereafter, he received a memorandum from Ed Wynn, the general counsel of CMS, reporting the results of an investigation [Tr.51-52].

**REPLY:**     The State Officials admit that Chairman Richards met with the entire Commission to discuss the allegations against the plaintiff, and the entire Commission voted to place the plaintiff and Ms. Sarajane Wright on paid administrative leave.  The State Officials also admit that the Commission requested CMS assistance in investigating the allegations against the plaintiff, and Mr. Ed Wynn provided the Commission with an investigative memorandum.  (S.O. Mem. Ex. 2, Richards Aff. ¶ 7.)

24.     H. Edward Winn, the general counsel of CMS, informed the Commission Officials in his memo of May 14, 2003 that the Plaintiff as the Executive Secretary of the Commission was a "certified code employee" and as such could only be discharged if cause exists [see Ex. A to the appendix to the Defendants' motion for summary judgment].

**REPLY:**     The State Officials deny that this additional fact is material because the application of certain provisions of the Illinois Personnel Code to the plaintiff's former position is irrelevant to the plaintiff's First Amendment patronage claim because the Branti issue presented in the State Officials' motion for summary judgment is controlled by the duties inherent in plaintiff's former position as outlined in the official CMS Position Description for plaintiff's former Executive Secretary position.  Tomczak, 765 F.2d at 640-42; Riley, 425 F.3d at 360-61; Flenner, 107 F.3d at 464.  Moreover, Mr. Wynn's report stated that the results of his

investigation into the matter showed that cause existed for the termination of the plaintiff under

the Illinois Personnel Code.  (S.O. Mem. Ex. 2, Richards Aff. ¶ 7.)

25.     At the April 2003 monthly meeting of the Commission, Sarajane Wright, an
employee of the Commission, and the Plaintiff were placed on administrative leave.  George
Richards had informed the Plaintiff that representatives of the Governor's Office wished to have
his employment with the Commission terminated.  The Plaintiff was told by Chairman Richards
that the Illinois State Police were going to conduct an investigation into allegations that he had
engaged in misconduct while employed by CMS.  At no time has the Plaintiff ever been
contacted by a representative of the Illinois State Police in connection with such an investigation
[¶8 of the Plaintiff's affidavit].

**REPLY:**     The State Officials admit that at its April 2003 meeting, the Commission voted to

place Ms. Wright and the plaintiff on paid administrative leave based on the charges that they

violated provisions of the Illinois Personnel Code and engaged in fraudulent personnel

transactions while employed at CMS. (6/27/03 Tr. 50:1-14; S.O. Mem. Ex. 2, Richards Aff. ¶ 6)

The State Officials deny that the remaining additional facts in this paragraph are material to the

plaintiff's First Amendment patronage claim because the Branti issue presented in the State

Officials' motion for summary judgment is controlled by the duties inherent in the plaintiff's

former position as outlined in the official CMS Position Description for plaintiff's former

Executive Secretary position Tomczak, 765 F.2d at 640-42; Riley, 425 F.3d at 360-61.

Furthermore, the  remaining additional facts in this paragraph are not material to plaintiff's due

process claim because they do not address the process the plaintiff received regarding his

termination.

26.     On May 15, 2003, the members of the Commission voted to allow Chairman
Richards to hold a pre-disciplinary hearing and impose discipline "unless there was some other
exculpatory reasons" [Tr.53].

**REPLY:**     The State Officials admit that on May 15, 2003, the members of the Commission

unanimously voted to give Commissioner Richards the authority to hold a pre-deprivation

hearing with the plaintiff and to impose discipline, up to and including discharge, unless plaintiff

presented new exculpatory evidence in his defense. (S.O. Mem. Ex. 2, Richards Aff. ¶ 8.)

Moreover, the State Officials state that because plaintiff did not present any new evidence

refuting the charges, Commissioner Richards recommended to the Director of CMS that plaintiff

be terminated from his position as Executive Secretary of the Commission. (S.O. Mem. Ex. 2,

Richards Aff. ¶ 11.)

27.    At the same May 15, 2003 meeting of the Commission adopted a resolution
suspending the Plaintiff pending discharge [Res. Ex2; Tr.87-88].

**<u>REPLY:</u>**    The State Officials admit that on May 15, 2003, the members of the Commission

unanimously voted to suspend plaintiff and Ms. Sarajane Wright with pay based on evidence that

they violated the Illinois Personnel Code and engaged in fraudulent personnel transactions while

employed at CMS. (6/27/03 Tr. 50:1-14; S.O. Mem. Ex. 2, Richards Aff. ¶ 8.)

28.    At some time in mid-May 2003, the Plaintiff received notice of a pre-disciplinary
hearing scheduled for him on May 29, 2003. Included with that notice were proposed charges of
misconduct alleged against him [¶9 of the Plaintiff's affidavit].

**<u>REPLY:</u>**    The State Officials admit that on May 21, 2003, Commissioner Richards sent

plaintiff a letter notifying him of his May 29, 2003 pre-deprivation hearing, and providing him

with the charges against him, a list of the known potential witnesses, and attaching the official

CMS documents that the plaintiff had fraudulently signed. (S.O. Mem, Ex. 2. Richards Aff. ¶ 9,

attached as ex. D.)

29.    At no time prior to his pre-deprivation hearing did the Plaintiff receive a copy of
any investigation conducted by Edward Winn of CMS or any other official of CMS relating to
his conduct. He did not have access to that document at the time of his pre-deprivation hearing
[¶10 of the Plaintiff's affidavit].

**<u>REPLY:</u>**    The State Officials deny that this additional fact is material because plaintiff was

not entitled to every document that the Commission reviewed in deciding to discipline him

because due process requires that plaintiff receive either "oral or written notice of the charges

against him, an explanation of the employer's evidence, and an opportunity to present his side of

the story" <u>Cleveland Board of Ed. v. Loudermil</u>, 470 U.S. 532, 546-47 (1982), and plaintiff has

conceded that he received such process.  (Pl. Resp., Ex. 1. Powers Aff.  ¶¶ 9, 12.)

30.     The Plaintiff was not provided a copy of the investigation conducted by CMS either at or before his pre-disciplinary hearing [Tr.93].  It was, however, available to the members of the Commission when they met on May 15, 2003 and the CMS investigator met with the members in their executive session at that meeting [Tr.51-52; 92-93].

**<u>REPLY:</u>**     The State Officials deny that this additional fact is material because plaintiff was

not entitled to every document that the Commission reviewed in deciding to discipline him

because due process requires that plaintiff receive either "oral or written notice of the charges

against him, an explanation of the employer's evidence, and an opportunity to present his side of

the story" <u>Cleveland Board of Ed. v. Loudermil</u>, 470 U.S. 532, 546-47 (1982), and plaintiff has

conceded that he received such process.  (Pl. Resp., Ex. 1. Powers Aff.  ¶¶ 9, 12.)

31.     At the May, 2003, meeting of the Commission, the Commission decided to discharge the Plaintiff and gave Chairman Richards the authority to implement that decision [Tr.59].

**<u>REPLY:</u>**     The State Officials dispute this additional fact because plaintiff was not

discharged at the May 15, 2003 meeting, but continued to be paid until May 30, 2003. (Richards

Aff. ¶ 12).  The State Officials state that at the May 15, 2003 meeting, the Commission members

unanimously voted to give Commissioner Richards the authority to hold a pre-deprivation

hearing with the plaintiff and to impose discipline, up to and including discharge, unless plaintiff

presented new exculpatory evidence in his defense.   (6/27/03 Tr. 53:15-19; S.O. Mem. Ex. 2,

Richards Aff. ¶ 8.)  Moreover, the State Officials state that because plaintiff did not present any

new evidence refuting the charges, Commissioner Richards recommended to the Director of

CMS that plaintiff be terminated from his position as Executive Secretary of the Commission.

(S.O. Mem. Ex. 2, Richards Aff. ¶ 11.)

32.     At the May 15, 2003 meeting, the Commission Officials voted to suspend the Plaintiff from employment pending his termination [see Ex. 3].

**REPLY:**     The State Officials admit that at the May 15, 2003 meeting, the Commission unanimously voted to suspend the plaintiff and Sarajane Wright with pay, based on evidence that they violated the Illinois Personnel Code and engaged in fraudulent personnel transactions while employed at CMS.  (6/27/03 Tr. 50:1-14; S.O. Mem. Ex. 2, Richards Aff. ¶ 8.)

33.     At the May 15, 2003 meeting of the Commission, its members had approved the discharge of the Plaintiff pending only any change in the pre-termination hearing that Chairman Richards would alter that decision [Tr. 91-92].

**REPLY:**     The State Officials dispute this additional fact because plaintiff was not discharged at the May 15, 2003 meeting, but continued to be paid until May 30, 2003. (Richards Aff. ¶ 12).  The State Officials state that at the May 15, 2003 meeting, the Commission members unanimously voted to give Commissioner Richards the authority to hold a pre-deprivation hearing with the plaintiff and to impose discipline, up to and including discharge, unless plaintiff presented new exculpatory evidence in his defense.  (S.O. Mem. Ex. 2, Richards Aff. ¶ 8.)  Moreover, the State Officials state that because plaintiff did not present any new evidence refuting the charges, Commissioner Richards recommended to the Director of CMS that plaintiff be terminated from his position as Executive Secretary of the Commission. (S.O. Mem. Ex. 2, Richards Aff. ¶ 11.)

34.     The decisions made by the Commission are to be decided by a majority vote of the members [Tr.99].

**REPLY:**     The State Officials admit this additional fact.

35.     The charges provided to the Plaintiff prior to the pre-deprivation hearing accused him of making a false statement.  He was alleged to have: a) without authorization signed documents on behalf of the Director of CMS; b) known the Director had not approved the transactions as required by the Personnel Rules; and c) known that, in the case of re-employment to the term position, the position had not been filled in compliance with the provisions of the Personnel Rules [¶12 of the Plaintiff's affidavit].

**REPLY:**      The State Officials admit that the plaintiff was provided with a copy of the charges against him prior to his pre-deprivation hearing.  The charges against the plaintiff were that he made a false statement or mark in violation of 20 ILCS 415/13 when he signed his name in a box labeled "Director of Central Management Services" on official CMS Personnel Action Forms to fraudulently execute multiple personnel transactions when he knew the Director of CMS had refused to sign the forms.  (S.O. Mem. Ex. 2, attached thereto as Ex. D; 6/27/03 Tr. 37:9-11 & 38:3-6.)  Plaintiff was informed that these acts violated the Personnel Code and Rules that, in his position as Executive Secretary, plaintiff was charged with upholding.

36.    At the pre-deprivation hearing of the Plaintiff, Chairman Richards was the only member of the Commission present.  The other commissioners had conveyed their authority to him to act on their behalf [Tr.60].

**REPLY:**      The State Officials admit that Commissioner Richards was the only Commissioner present at the plaintiff's pre-deprivation hearing because the other Commission members unanimously voted to give Commissioner Richards the authority to hold a pre-deprivation hearing with the plaintiff and to impose discipline, up to and including discharge, unless the plaintiff presented new exculpatory evidence in his defense.  (6/27/03 Tr. 53:15-19; S.O. Mem. Ex. 2, Richards Aff. ¶ 8.)

37.    At the time of the Plaintiff's pre-discipline hearing, Chairman Richards, Barbara Hayes, a Commission employee, the Plaintiff and his wife were present.  The proceeding was informal.  Chairman Richards explained to the Plaintiff that this was his opportunity to respond to proposed charges that had been asserted upon him.  The Plaintiff explained to Chairman Richards that he had been informed by Debbie Hensey that the Director of CMS had approved of the personnel transactions for CMS employees which were at issue.  He further explained to Chairman Richards how his signature appeared on the CMS-2 transactional forms.  He did not tell Chairman Richards that he was signing those forms in the capacity of Director of CMS. Instead, he explained that Director Schwartz sent those forms to the Plaintiff's office to have someone else sign them. [Tr. 179-181].

**REPLY:**      The State Officials admit that Commissioner Richards, Barbara Hayes, the plaintiff and his wife were all present at the plaintiff's pre-deprivation hearing.  The State

Officials further admit that Commissioner Richards explained the charges to the plaintiff and advised plaintiff that this was his opportunity to respond to the charges against him. The State Officials further admit that plaintiff explained to Commissioner Richards that plaintiff voluntarily signed his name to the CMS-2 transactional forms in the box designated for the Director of CMS. (Richards Aff. ¶ 10; 6/27/03 Tr. 34:16-18.) The State Officials deny that plaintiff explained to Commissioner Richards that Debbie Hensey informed plaintiff that the Director of CMS had approved the personnel transactions for the CMS employees that were at issue. Rather, plaintiff admitted that he knew the Director of CMS would not sign the forms. (Richards Aff. ¶ 10; Trapp Order at 4-5; 6/27/03 Tr. 37:9-11 & 38:3-6.) Moreover, the State Officials deny that the alleged additional facts are material to this dispute because plaintiff was dismissed for making a false statement or mark in violation of 20 ILCS 415/13 when he signed his name in a box labeled "Director of Central Management Services" on officials CMS Personnel Action Forms to fraudulently execute multiple personnel transactions when the plaintiff was not the Director of CMS, did not have the Director's signature authority (6/27/03 Tr. 55:1-19) and did not make any notation on the form indicating that he was not the Director (6/27/03 Tr. 56:7-23.) The proposed additional facts do not refute that charge.

38.     During his pre-disciplinary hearing, the Plaintiff informed Commissioner Richards that: a) prior to proceeding with the transactions which were noted in the disciplinary charges he had consulted with Deborah Hensey, Bureau Chief of the Department of Personnel at CMS, concerning whether the transactions could be undertaken, and if so, the procedure which should be followed; b) Deborah Hensey explained to him that similar transactions had been done in the past during the Edgar Administration and informed him of the process which should be followed; c) he passed the information he received from Ms. Hensey along to his superiors in the Governor's Office; d) he received a telephone call from Deborah Hensey informing him that Director Michael Schwartz of CMS had approved the transactions but did not want to sign the transactional forms covering CMS employees and he authorized someone in the Governor's office to sign them in his place; e) he informed his supervisor, Diane Ford, of what he had been told and she instructed him to sign his name on the forms; and f) the documents were brought to his office by Tricia Pineda, a CMS personnel officer, who told him to sign the documents "on this line" [¶13 of the Plaintiff's affidavit].

17

**REPLY:**    The State Officials dispute the additional facts.  Plaintiff informed Commissioner Richards that he knowingly signed his name in the box labeled "Director of Central Management Services" on official CMS Personnel Action Forms for three employees.  (Richards Aff. ¶ 10).  Furthermore, plaintiff  admitted that he knew Director Schwartz would not sign the forms.  (Id.)  Moreover, the State Officials deny that the alleged additional facts are material to this dispute because plaintiff was dismissed for making a false statement or mark in violation of 20 ILCS 415/13 when he signed his name in a box labeled "Director of Central Management Services" on officials CMS Personnel Action Forms to fraudulently execute multiple personnel transactions when the plaintiff was not the Director of CMS, did not have the Director's signature authority (6/27/03 Tr. 55:1-19) and did not make any notation on the form indicating that he was not the Director (6/27/03 Tr. 56:7-23.)  The proposed additional facts do not refute that charge.

      39.    The Plaintiff never told Commissioner Richards during his pre-deprivation hearing that he signed those forms in the capacity of Director of CMS.  Instead, he explained that Director Schwartz had sent those forms to his office to have someone from the Governor's office sign them [¶14 of the Plaintiff's affidavit].

**REPLY:**    The State Officials dispute the additional facts.  Plaintiff informed Commissioner Richards that he knowingly signed his name in the box labeled "Director of Central Management Services" on official CMS Personnel Action Forms for three employees.  (Richards aff. ¶ 10).  Furthermore, plaintiff  admitted that he knew Director Schwartz would not sign the forms.  Id.  Moreover, the State Officials deny that the alleged additional facts are material to this dispute because plaintiff was dismissed for making a false statement or mark in violation of 20 ILCS 415/13 when he signed his name in a box labeled "Director of Central Management Services" on officials CMS Personnel Action Forms to fraudulently execute multiple personnel transactions when the plaintiff was not the Director of CMS, did not have the Director's signature authority

(6/27/03 Tr. 55:1-19) and did not make any notation on the form indicating that he was not the

Director (6/27/03 Tr. 56:7-23.) The proposed additional facts do not refute that charge.

40.     Following the pre-disciplinary hearing, Chairman Richards discharged the
Plaintiff [Tr.57-58]. At the May 29, 2003 pre-disciplinary hearing, Chairman Richards was the
only member of the Commission present [Tr.60]. Chairman Richards has no recollection of
securing the approval of the other Commissioners to that action after his May 29, 2003 pre-
disciplinary hearing with the Plaintiff [Tr.59].

**REPLY:**     The State Officials dispute these additional facts. The State Officials admit that at

the May 29, 2003 pre-deprivation hearing, Chairman Richards was the only Commissioner

present, but the State Officials dispute that "Chairman Richards discharged the Plaintiff" because

the Commission unanimously voted to give Commissioner Richards the authority to hold a pre-

deprivation hearing with the plaintiff and to impose discipline, up to and including discharge,

unless plaintiff presented new exculpatory evidence in his defense. (6/27/03 Tr. 53:15-19; S.O.

Mem. Ex. 2, Richards Aff. ¶ 8.) Moreover, following the pre-deprivation hearing, Chairman

Richards recommended to the Director of CMS that Plaintiff be terminated from his position as

Executive Secretary of the Commission. (Richards Aff. ¶ 11.) The State Officials dispute that

"Chairman Richards has no recollection of securing the approval of the other Commissioners"

after the May 29, 2003 pre-deprivation hearing because Commissioner Richards contacted all the

members of the Commission, and informed them of his recommendation to discharge the

plaintiff. (6/27/03 Tr. 59:11-24.)

41.     At no time between the pre-disciplinary hearing conducted for the Plaintiff on
May 29, 2003 and the approval of the discharge by the Director of CMS did other members of
the Commission ratify that decision [Tr.91-92].

**REPLY:**     The State Officials dispute this additional fact because the Commission

unanimously voted to give Commissioner Richards the authority to hold a pre-deprivation

hearing with the plaintiff and to impose discipline, up to and including discharge, unless plaintiff

presented new exculpatory evidence in his defense. (S.O. Mem. Ex. 2, Richards Aff. ¶ 8.)

19

Moreover, following the pre-deprivation hearing, Chairman Richards recommended to the Director of CMS that Plaintiff be terminated from his position as Executive Secretary of the Commission. (Richards Aff. ¶ 11.) The State Officials dispute that "[a]t no time between the pre-deprivation hearing conducted for the Plaintiff on May 29, 2003 and the approval of the discharge by the Director of CMS did other members of the Commission ratify that decision" because Commissioner Richards contacted all the members of the Commission, and informed them of his recommendation to discharge the plaintiff. (6/27/03 Tr. 59:11-24.)

42.     The Commission's charge to discharge the Plaintiff was effected on May 29, 2003 and approved by the Director of CMS on the next day, May 30, 2003 [Charge; Tr.90-92].

**REPLY:**     The State Officials admit this additional fact.

43.     After the pre-disciplinary hearing conducted of the Plaintiff, George Richards concluded that there was no evidence which would change the Commission's earlier vote to discharge the Plaintiff [Tr. 58].

**REPLY:**     The State Officials dispute this additional fact because plaintiff was not discharged at the May 15, 2003 meeting, but continued to be paid until May 30, 2003. (Richards Aff. ¶ 12.) The State Officials state that at the May 15, 2003 meeting, the Commission members unanimously voted to give Commissioner Richards the authority to hold a pre-deprivation hearing with the plaintiff and to impose discipline, up to and including discharge, unless plaintiff presented new exculpatory evidence in his defense. (6/27/03 Tr. 53:15-19; S.O. Mem. Ex. 2, Richards Aff. ¶ 8.) The State Officials admit that at the pre-deprivation hearing the plaintiff admitted that he signed his name in a box labeled "Director of Central Management Services" on official CMS Personnel Action Forms when he was not the Director (6/27/03 Tr. 34:16-18 & 41:8-11); the Director of CMS refused to sign the forms (6/27/03 Tr. 37:9-11 & 38:3-6); he did not have the Director's signature authority (6/27/03 Tr. at 55:3-19); and he did not indicate in any way that he was not the Director of CMS (6/27/03 Tr. at 55:3-19 & 56:2-23). Based on

these admissions, Commissioner Richards concluded that plaintiff had not presented any new exculpatory evidence to the charge that he made a false statement or mark under 20 ILCS 415/13, and therefore Commissioner Richards exercised the Commissions' authority to impose discipline.

44.    In an answer to written interrogatories in the Plaintiff's discharge appeal to the Commission, counsel for the Commission admitted that each of the Commission Officials made or recommended that the Plaintiff be terminated from his employment with it [see interrogatory number 8 on Ex. 2].

**REPLY:**    The State Officials admit that all of the Commission members authorized Commissioner Richards to conduct a pre-deprivation hearing and to impose discipline, up to and including discharge, unless plaintiff presented new exculpatory evidence in his defense. (Richards Aff. ¶¶ 8-12; 11/7/03 Order at 4.)

45.    At no time during his pre-disciplinary meeting with Chairman Richards did the Plaintiff indicate to him that he executed the CMS-2 forms in the capacity as Director of CMS [Tr.181].

**REPLY:**    The State Officials dispute that this additional fact is material because plaintiff admitted that he signed his name in a box labeled "Director of Central Management Services" on official CMS Personnel Action Forms when he was not the Director (6/27/03 Tr. 34:16-18 & 41:8-11); the Director of CMS refused to sign the forms (6/27/03 Tr. 37:9-11 & 38:3-6); he did not have the Director's signature authority (6/27/03 Tr. at 55:3-19); and he did not indicate in any way that he was not the Director of CMS (6/27/03 Tr. at 55:3-19 & 56:2-23). Based on these admissions, Commissioner Richards concluded that plaintiff had not presented any new exculpatory evidence to the charge that he made a false statement or mark under 20 ILCS 415/13, and therefore Commissioner Richards exercised the Commissions' authority to impose discipline.

46.    Following his discharge from employment with the Commission, the Plaintiff appealed his discharge to the Commission as was his right as a merit employee protected by the "Personnel Code" [¶15 of the Plaintiff's affidavit].

**REPLY:**    The State Officials admit this additional fact.

47.    William Trapp, a Springfield, Illinois lawyer, was appointed to serve as the Administrative Law Judge in the Plaintiff's discharge appeal.  Mr. Trapp had never worked for the Commission or previously served it as an administrative law judge.  The Plaintiff was not consulted and played no role in the selection of Mr. Trapp as the administrative law judge [¶16 of the Plaintiff's affidavit].

**REPLY:**    The State Officials deny that these additional facts are material to plaintiff's claims because plaintiff has not presented any evidence to support the allegation that Mr. Trapp was biased during the proceeding or in his decision.

48.    Because the members of the Commission were prepared to testify as witnesses against the Plaintiff in his discharge appeal and were the individuals who made the decision to discharge him from employment with the Commission, the Plaintiff was concerned about the fairness of any hearing in which the persons who ultimately decided the case were the same individuals who made the discharge decision and were potential witnesses against him.  Accordingly, he filed a motion with the Commission requesting that those individuals refrain from deciding the merits of his appeal and instead that a neutral decision maker be jointly selected by the members of the Commission and the Plaintiff to decide the merits of that appeal.  The members of the Commission denied the motion the Plaintiff filed [¶17, 18 of the Plaintiff's affidavit].

**REPLY:**    The State Officials deny that these additional facts are material to plaintiff's claims because the Commission appointed a "neutral decision maker" – Mr. Trapp – to adjudicate the merits of plaintiff's termination.

49.    Following the Plaintiff's termination, Dan Stralka became the Executive Secretary of the Commission.  At the March, 2003, and April, 2003, monthly meetings of the Commission, Mr. Stralka appeared on behalf of Governor Blagojevich [¶19 of the Plaintiff's affidavit].

**REPLY:**    The State Officials deny that these additional facts are material to the plaintiff's claims because the identity of plaintiff's replacement is irrelevant to plaintiff's patronage claim which is controlled by the official Position Description, and it is irrelevant to his due process claim because it is unrelated to the process plaintiff received with respect to his termination.

**ARGUMENT**

**II.     The State Officials Are Entitled To Summary Judgment Because The Official CMS Position Description Demonstrates That The Duties Inherent In Plaintiff's Former Executive Secretary Position Makes Political Affiliation An "Appropriate Requirement" For That Position.**

In our opening brief, we demonstrated that plaintiff's patronage claim fails, as a matter of law, because the duties inherent in the Executive Secretary position, as outlined in the official Position Description, makes political affiliation an "appropriate requirement" for the position under Branti. (S.O. Mem. 12-15.)  In his response, plaintiff does not – indeed, cannot – challenge (a) the authenticity or validity of the official CMS Position Description, or (b) the policymaking, policy-implementing, spokesperson and budgeting duties in his former position. Indeed, plaintiff himself relies on the official Position Description.  (Resp. at 23.)  Rather, in his response, plaintiff primarily argues that the policymaking, policy-implementing, and spokesperson duties of his former position are not dispositive of his First Amendment claim because the Illinois Personnel Code provides the Executive Secretary position with certain civil service protections.

However, plaintiff's argument is a red herring because, under well-established Seventh Circuit law, the application of the Personnel Code is unrelated to the Court's determination of whether political affiliation was an "appropriate requirement" for the plaintiff's position. Obviously, the Illinois legislature can impose heightened employment requirements on State employees, but such measures do not provide an employee with an increased level of protection under the First Amendment to the United States Constitution.  In light of the official CMS Position Description and controlling Seventh Circuit law, plaintiff's response is meritless, and the State Officials are entitled to summary judgment as a matter of law for eight reasons.

First, plaintiff's attempts (at 16-20) to distort the State Officials' argument and the legal

standard in the Seventh Circuit for resolving a <u>Branti</u> inquiry lack support and should be rejected.
Contrary to plaintiff's assertions, the State Officials do not contend that "an individual who
either serves as a policymaker or enjoys a close or confidential relationship with a policymaking
official is never entitled to First Amendment protection against job actions based upon his
political affiliation *regardless of the nature of his job*." (Resp. at 17) (emphasis added). Plaintiff
also incorrectly argues (at 21) that the State Officials must demonstrate that the plaintiff's
"partisan political affiliation" was essential to the operations of the plaintiff's position and that
his performance "as Executive Secretary of the Commission is dependent upon his political
affiliation." Contrary to the plaintiff's argument, the State Officials do not need to show that
there was an actual conflict between the plaintiff's political beliefs and those of the State
Officials that impeded the performance of his public duties. As outlined in our opening brief (at
9), the <u>Branti</u> inquiry in the Seventh Circuit turns on "whether the position held by the individual
authorizes, either directly or indirectly, meaningful input into government decisionmaking on
issues where there is room for principled disagreement on goals or their implementation."
<u>Nekolny v. Painter</u>, 653 F.2d 1164, 1170 (7th Cir. 1981).[2]

Plaintiff's former Executive Secretary position falls squarely within this standard because
he was the chief administrative officer of the Commission and he "formulate[d] and
recommend[ed] to the Commission for approval, major policies, rules, and regulations; advise[d]
the Commission on hearings, technical personnel questions . . . and [met] with . . . operating
agency heads and other state or non-state persons . . . to discuss and resolve questions relating to

---

[2] This is the standard followed to hold that a position was exempt under <u>Branti</u> in at least eight Seventh
Circuit cases: <u>Pleva v. Norquist</u>, 195 F.3d 905 (7th Cir. 1999); <u>Ryan v. Illinois Dep't of Children and
Family Svcs.</u>, 185 F.3d 751, 759 (7th Cir. 1999); <u>Warzon v. Drew</u>, 60 F.3d 1234, 1239 (7th Cir. 1995);
<u>Selch v. Letts</u>, 5 F.3d 1040 (7th Cir. 1993); <u>Pounds v. Griepenstroh</u>, 970 F.2d 338, 340 (7th Cir.
1992); <u>Upton v. Thompson</u>, 930 F.2d 1209 (7th Cir. 1991); <u>Tomczak v. City of Chicago</u>, 765 F.2d
633 (7th Cir. 1985); and <u>Shakman v. Democratic Organization of Cook County</u>, 722 F.2d 1307, 1310
(7th Cir. 1983).

the operation of the Personnel Code and Rules;" assisted the Commission in "deciding what

positions in state government should be exempt from jurisdiction B"; and "approv[ed] (or

disapprov[ed]) proposed rules promulgated by the Director of CMS implementing the provisions

of the 'Personnel Code.'"  (S.O. Mem. Ex. 5.)  Clearly, assisting the Commission in formulating

major policies and regulations, and interpreting the State's Personnel Code includes "meaningful

input into government decisionmaking on issues where there is room for principled

disagreement," and it is reasonable that the State Officials "would want the person formulating

those policies to be loyal to the Blagojevich administration."  Utley v. Monk, No. 05-3017, 2005

WL 3478844 at *5 (C.D. Ill. Dec. 20, 2005).[3]

Second, plaintiff's assertion (at 21) that the Branti inquiry "does not begin and end with

his substantive duties as enumerated in his position description" is simply wrong.  In Riley v.

Blagojevich, 425 F.3d 357, 360-61 (7th Cir. 2005), the Seventh Circuit expressly held that "the

job description, if reliable, is the correct basis for the court's determining whether political

affiliation is a legitimate requirement of the job."  Riley, 425 F.3d at 364.  Your Honor recently

held in Utley that "[t]he official CMS job description in Illinois can be used to determine

whether the duties of a position are such that political affiliation is a proper consideration, unless

the circumstances surrounding the creation of the job description indicate that the description has

---

[3] Moreover, while plaintiff is correct (at 18) that "being a policymaker is not dispositive" of a
Branti inquiry, the Seventh Circuit has held that a Branti analysis should begin by "looking for
policymaking powers or confidential relationships because those terms 'accurately describe the
vast majority of offices that fall within the realm of legitimate patronage.'" Thompson v. Illinois
Dep't of Prof'l Regulation, 300 F.3d 750, 756 (7th Cir. 2002); see also, Riley v. Blagojevich,
425 F.3d 357, 359 (7th Cir. 2005).  As Your Honor recently stated in Utley, "[p]olitical
affiliation may be an appropriate employment consideration when the position has policy-
making or confidential duties."  Utley, 2005 WL 3478844 at * 4.  Accordingly, plaintiff's
concession that his position contained policymaking and confidential duties is fatal to his claim.
(Res. at 22, 25.)

somehow been manipulated for political purposes." <u>Utley</u>, 2005 WL 3478844 at * 4.[4]  Here,

plaintiff relies entirely on the legal conclusion (at 22) that the duties contained in the Position

Description do not make political affiliation an "appropriate requirement" for the Executive

Secretary position.  As Your Honor noted in <u>Utley</u>, when the plaintiff made a similar conclusory

argument, "[s]uch legal conclusions are not entitled to any weight."  <u>Id</u>.

    <u>Third</u>, plaintiff incorrectly attempts (at 21) to place the burden on the State Officials to

establish that there is a sufficient need to exempt his former position from patronage protection.

The Seventh Circuit in <u>Riley</u> held that "[i]f the official job description is objective . . . then the

elected officials can rely on it in deciding whom they can replace on political grounds."  <u>Riley</u>,

425 F.3d at 365.  The State Officials have satisfied their burden because they have established

(and the plaintiff has not disputed) the validity of the official Position Description, which

contains policymaking, policy-implementing, spokesperson and confidential duties.

    <u>Fourth</u>, plaintiff's argument (at 22) that "the Illinois General Assembly has declared that

political affiliation is never an appropriate consideration in either the selection or removal of the

Executive Secretary" is incorrect and is irrelevant to the plaintiff's First Amendment claim.  In

support of this claim, plaintiff relies on 20 ILCS 415/10 of the Illinois Personnel Code, which

states that the Commission shall "appoint a full-time executive secretary . . . [who] shall be

subject to the provisions of jurisdictions A, B and C of this Act."  However, the fact that the

Executive Secretary is covered by the Personnel Code does not support plaintiff's claim that the

---

[4]  In our opening brief (at 11) we noted that the validity of this approach was reaffirmed by both
the Seventh Circuit and other district court judges in this Circuit.  This approach was again
followed by District Court Judge Kendall in granting the State Officials' motion for judgment on
the pleadings in <u>Buchheit v. Blagojevich</u>, Case No. 04 C 2070, a case involving a substantially
similar patronage claim against the State Officials.  Judge Kendall stated "the Seventh Circuit's
holding in <i>Pierson</i> clarified that the official job description alone can be sufficient evidence of
reliability."  (4/6/06 Order attached as Ex. A, at 4.)

Illinois General Assembly "has declared political affiliation is never an appropriate consideration" for the position. To the contrary, the Commission is empowered to "appoint" an Executive Secretary of its choosing and, pursuant to Section 4(d)(3) of the Personnel Code, the appointment of the Executive Secretary, as one of the "[l]icensed attorneys in positions as legal and technical advisors," is exempt from the use of eligibility lists and other competitive selection procedures.

Moreover, the fact that the Executive Secretary has certain civil service protections under the Illinois Personnel Code, is irrelevant to plaintiff's First Amendment claim. The Seventh Circuit has repeatedly held that a state's statutory method for removing an employee and the civil service protections provided to an employee is irrelevant to the <u>Branti</u> analysis. In <u>Flenner v. Glover</u>, 107 F.3d 459, 464 (7th Cir. 1997), the Seventh Circuit stated that the fact that deputy sheriffs and correctional officers can only be removed from office "for cause" under Illinois law is not relevant or determinative under <u>Branti</u>. The Court also noted that there is no case law holding that the statutory method of removal of an employee is instructive in the analysis of patronage dismissal. In <u>Park Superintendents' Prof'l Ass'n v. Jim Edgar, et al.</u>, No. 97-C-6412, 1998 WL 525810, at *6 (N.D. Ill. Aug. 18, 1998) (attached as Ex. B), the court rejected the same argument that plaintiff asserts here and stated that it is irrelevant that "the employees do not qualify for the Jurisdiction B exemption" because the standards for exemption under the Illinois Personnel Code "are far more stringent than the liberal standards used for *Rutan* exemption." <u>See</u> <u>also</u> <u>Meeks v. Grimes</u>, 779 F.2d 417, 421 (7th Cir. 1985) (stating that "provisions of the Indiana Code making the plaintiffs at will employees are irrelevant.")

<u>Fifth</u>, plaintiff's argument (at 23-24) that positions containing some "politically neutral" duties can never fall within the <u>Branti</u> exception is meritless and has been rejected by Seventh

27

Circuit.  In Thompson v. Illinois Dept. of Prof'l Reg., 300 F.3d 750 (7th Cir. 2002), the plaintiff

was a Chief Administrative Law Judge ("Chief ALJ") and he made the same argument the

plaintiff makes here – that "as Chief ALJ he, in fact, has very limited powers and is an impartial,

quasi-judicial official."  Id. at 757.  The Seventh Circuit rejected this argument and found that

although the Chief ALJ had *some* duties in which he made "independent decisions" and

exercised "judicial impartiality," he was Elrod-exempt because after considering all the duties in

the Position Description, it was clear that the Chief ALJ "spends a considerable amount of time

formulating policy and implementing broad goals."  Id.  Here, plaintiff attempts to focus on what

he perceives are politically neutral tasks regarding the "administration of the 'Personnel Code,'"

but, based on a review of his Position Description, it is clear that plaintiff, like the Chief ALJ,

"spends a considerable amount of time formulating policy and implementing broad goals."  Id.[5]

Sixth, plaintiff's argument (at 24) that the bi-partisan nature of the Commission entirely

removes his position from the Branti exception because it somehow renders all his policymaking,

policy-implementing, and confidential duties innocuous is meritless both factually and legally.

Although the Commission performs its duties in a bi-partisan manner, the members of the

Commission are not bi-partisan, but rather they are appointed by the Governor and there cannot

be more than three members of one political party.  Clearly, members of the Commission are in

---

[5] Plaintiff attempts to distinguish Thompson (at 29) by mistakenly arguing that the Chief ALJ "still held the formal appointment as deputy chief counsel and as such was "partially exempt from the provisions of the 'Personnel Code' by virtue of §4(d)(5) of that law."  This argument fails for several reasons.  The Seventh Circuit clearly decided the plaintiff's patronage claim in light of his duties as Chief ALJ, not as deputy chief counsel.  Moreover, the plaintiff's perceived partial exemption from the Personnel Code is irrelevant because, as outlined above, the provision of civil service protections to an employee is irrelevant to a Branti inquiry, and the Seventh Circuit relied on the CMS Position Description, not any provisions of the Personnel Code. Additionally, the plaintiff's Executive Secretary position is exempt under Section 4(d)(5).

Branti-exempt positions in light of their policymaking responsibilities.[6]  Accordingly, plaintiff's

admitted "confidential relationship" with the members of the Commission is fatal to his claim

because it "authorizes, either directly or indirectly, meaningful input into government decision-

making on issues where there is room for principled disagreement on goals or their

implementation" and thus makes political affiliation an appropriate requirement for his

Executive Secretary position.  Nekolny, 653 F.2d at 1170. See also, Americanos v. Carter, 74

F.3d 138, 142 (7th Cir. 1996).

        In Collins v. Voinovich, 150 F.3d 575 (6th Cir. 1998), the plaintiff was the assistant legal

counsel of the Ohio Lottery Commission who claimed "he performed politically neutral legal

tasks, had no discretionary authority, [and] did not handle matters of partisan political interest . .

. ."  In granting summary judgment, the Sixth Circuit found political affiliation was an

appropriate requirement for the position noting "the inherently political nature of the OLC is

reflected in the governing statute's requirement that the nine commissioner positions on the OLC

must be balanced such that no party has more than a bare majority on the board."  Id. at 578.

        Seventh, plaintiff fails in his attempt (at 25-28) to distinguish some of the controlling

cases of this Circuit which hold that as long as the official Position Description is accurate –

which plaintiff does not dispute – "the state is entitled to rely on it to reveal the scope of the

jobholder's duties and enable the court to determine whether the duties bring the job into the

circle within which elected officials are entitled to demand political loyalty."  Riley, 425 F.3d at

362.  Plaintiff's primary argument in an effort to distinguish Riley, Utley and Steigmann is that

the positions at issue in those cases were not covered by the Illinois Personnel Code and,

---

[6] However, according to the plaintiff's argument, the Commission members would have to be
protected from political termination because they are required to function in a bi-partisan
manner.

therefore, the courts in those three cases properly relied on the official Position Descriptions to determine the duties inherent in the positions. However, plaintiff's argument, once again, misses the mark because it is well-established that the civil service protections an employee may have under the Personnel Code does not affect the <u>Branti</u> inquiry.[7] Likewise, any advice the Commission may have received regarding what standards must be met under the Personnel Code prior to terminating the plaintiff has no bearing on his First Amendment claim. Indeed, each of three cases relied exclusively on the official Position Description in evaluating the <u>Branti</u> defense – just as this Court should – because that is the controlling law in the Circuit.

Plaintiff's attempt (at 26) to limit the holding in <u>Riley</u> fails because although he correctly noted that <u>Riley</u> recognized that not "every *Elrod/Branti* case can be resolved by reading the job description," the plaintiff failed to mention the two limitations <u>Riley</u> placed on the use of Position Descriptions. <u>Riley</u> stated that in some cases "[t]he description might leave the reader unclear whether the job confers any policy-making or confidential discretion, and then additional evidence would be necessary" or "[s]ome job descriptions, perhaps, will have been altered by the elected officials not to reflect actual changes in the duties of a position but rather to enable them to fill jobs that do not involve such duties with their political favorites." <u>Riley</u>, 425 F.3d at 365. However, neither of these exceptions is applicable here because the plaintiff's official Position Description – which the plaintiff does not dispute – details significant policymaking, policy implementing and confidential duties. (S.O. Mem. 12-15).

---

[7] Apart from being irrelevant, the plaintiff's argument is incorrect. The Chief Records Officer position in <u>Utley</u> is covered by the Personnel Code and can typically only be terminated for cause. Moreover, contrary to plaintiff's claim that the assistant warden in <u>Riley</u> "was exempt from the protections of the 'Personnel Code' by virtue of §4d(3) of that law," the assistant warden was, in fact, covered by Jurisdictions A and C of the Personnel Code.

Eighth, plaintiff's failure to address (much less distinguish) the significant spokesperson and liaison duties of his former position and the Seventh Circuit caselaw holding that those duties alone make his position exempt under Branti is fatal to his claim.  (S.O. Mem. 14-15.)

## III.  The State Officials Are Entitled To Summary Judgment On Plaintiff's Due Process Claim Because Plaintiff Received All The Process He Was Entitled Under The Law.

A procedural due process claim against government officials requires proof of inadequate procedures and interference with a liberty or property interest. A.C. v. Bd. of Educ., No. 05-4092, 2005 WL 3560658, at *1 (C.D. Ill. Dec. 28, 2005) (attached as Ex. C.)  Plaintiff argues (at 37) that his due process rights were violated because "[a]lthough the Defendants claim that the Plaintiff 'did not present any new evidence refuting the charges,' a reasonable trier of fact could disagree."  Plaintiff's focus on what he told Commissioner Richards at his pre-deprivation hearing is misplaced and irrelevant to his due process claim.  To maintain his due process claim, plaintiff must prove that he did not receive notice of and did not have an opportunity to refute the charges.  Not only does plaintiff fail to prove (or even allege) these essential allegations, he concedes that he received notice of the charges and had an opportunity to refute them.  (Pl. Resp., Ex. 1 ¶¶ 9, 12, & 13.)  Rather, plaintiff's argument is that a "reasonable trier of fact" might disagree with Commissioner Richards' decision.  Even if – contrary to fact – Commissioner Richards made an ill-advised decision,"[t]he Due Process Clause 'is not a guarantee against incorrect or ill-advised personnel decisions.'  For this reason we focus our inquiry on whether [plaintiff] received adequate *due process*."  Wallace v. Tilley, 41 F.3d 296, 299-300 (7th Cir. 1994) (citations omitted; emphasis supplied.)  Here, there can be no argument that plaintiff did not receive "adequate due process."

As outlined in our opening brief (which is not disputed by plaintiff), plaintiff received notice of the allegations against him a month before his pre-deprivation hearing.  He also

received a copy of the written charges against him, a list of witnesses, and copies of the evidence against him more than a week prior to his pre-deprivation hearing. At the pre-deprivation hearing, he was again presented with the charges and evidence against him, and he had an opportunity to present his side of the story. (S.O. Mem 17-19.) Plaintiff also received a two-day, post-deprivation "trial-type" hearing in front of a neutral Administrative Law Judge ("ALJ"), in which he was able to conduct discovery, present evidence and cross-examine the witnesses against him. In his response, plaintiff fails to create any dispute of fact as to any inadequacies in these proceedings that could support his claim and, consequently, summary judgment is required.

**A.     Due to the sensitive nature of his position and the seriousness of the charges against him, plaintiff was not entitled to a pre-deprivation hearing.**

Although plaintiff claims (at 32) that the State Officials' argument that we could properly remove plaintiff from his position *before* his pre-deprivation hearing as long as he was given a full post-termination hearing "is wrong on both the facts and the law," plaintiff fails to cite any contrary authority. Moreover, plaintiff's fails to distinguish the majority of the cases which hold that where an important governmental interest requires summary action, immediate and full *post*-deprivation hearings (without any pre-deprivation hearing at all) satisfy due process. (S.O. Mem. 15-17.) Plaintiff's attempt to distinguish <u>Gilbert v. Homar</u>, 520 U.S. 924 (1997) fails because the United States Supreme Court found that post-deprivation proceedings may satisfy the requirements of the Due Process Clause when a state must act quickly.

While plaintiff is correct that the plaintiff in <u>Gilbert</u> was suspended and not terminated, the basic tenets of <u>Gilbert</u> still apply in this case. In <u>Gilbert</u>, the Supreme Court stated that "[t]his Court has recognized on many occasions, that where a State must act quickly, or where it would be impractical to provide pre-deprivation process, post deprivation process satisfies the requirements of the Due Process Clause." <u>Id</u>. at 930. Just because the plaintiff in this case was

32

terminated it does not eviscerate the entire doctrine, but rather is merely one factor taken into account under the private interest prong of the <u>Matthews</u> test.  Despite plaintiff's efforts, the three prongs of the <u>Matthews</u> test weigh heavily in favor of the State Officials.

<u>First</u>, plaintiff's argument (at 32) that he could not have caused any possible damage in his Executive Secretary position because "[a]ny misconduct committed by the Plaintiff occurred before, not while, he was the Commission's Executive Secretary" is meritless and defies logic. The issue of *when* the plaintiff fraudulently executed personnel documents and manipulated the Personnel Code is irrelevant to the State Officials' concern that he was now the chief administrative officer of the Commission and was responsible for running the day-to-day operations of the Commission, which is in charge of upholding the Personnel Code.  Moreover, plaintiff fails to confront the fact that if the State Officials had not timely removed him from his position, he would have been presiding over the propriety of his own dismissal and the dismissal of the State employees that he fraudulently placed into their positions.  (S.O. Mem. 17.)

<u>Second</u>, any burden on plaintiff's private interests was mitigated because he was suspended *with pay* until after his pre-deprivation hearing and the Director of CMS approved his discharge. (Richards Aff. ¶ 6.)  After he was discharged, plaintiff was entitled to a full post-deprivation hearing within thirty days.  Thus, even assuming (contrary to fact and for purposes of argument only) that a pre-deprivation hearing was required, the only potential loss to the plaintiff was the thirty days without pay between the approval of his discharge and the post-deprivation hearing.  Moreover, it was *plaintiff* who requested to postpone the post-deprivation hearing. (6/27/03 Tr. 108:7-12.)  However, plaintiff's thirty days without pay prior to his post-deprivation hearing cannot compare to the Commission's strong and legitimate concern that their Executive Secretary had intentionally and repeatedly violated the Personnel Code.

Third, plaintiff misconstrues (at 33) the nature of the charges against him in an effort to demonstrate that there was a risk of erroneous deprivation prior to his post-deprivation hearing. Plaintiff was charged with making a false statement or mark on an official CMS form in violation of 20 ILCS 415/13 when he signed his name as the Director of CMS when he was not the Director of CMS. (6/27/03 Tr. 34:16-18 & 41:8-11). Because the plaintiff admitted at the pre-deprivation hearing (which occurred while plaintiff was still being paid) that he *voluntarily* signed his name in a box labeled "Director of Central Management Services," there was virtually no risk of erroneous deprivation with respect to his being terminated for making a false mark. Plaintiff's assertion that he presented Chairman Richards at the pre-deprivation hearing with facts that he hoped would establish a defense are exactly the types of issues that are resolved (and were resolved in favor of the State Officials) at the complete post-deprivation hearing.

> **B.     Alternatively, even if he was entitled to a pre-termination hearing, plaintiff received everything to which he was entitled.**

Plaintiff concedes (at 31) that the Supreme Court has held that the "pre-termination hearing need not be elaborate and due process is satisfied if the employee receives oral or written notice of the charges against him, an explanation of the employer's evidence and an opportunity to present his side of the story." Cleveland Board of Ed. v. Loudermill, 470 U.S. 532 (1982.) Plaintiff admits that: he received written notice of the charges against him prior to the hearing (Pl. Resp., Ex. 1 ¶¶ 9, 12); at the pre-termination hearing, Commissioner Richards again informed him of the charges and presented plaintiff with the evidence against him (Richards Aff. ¶ 10; 6/27/03 Tr. at 29:15-20); and plaintiff was given the opportunity to respond to the charges to Commissioner Richards and present his side of the story. (Pl. Resp., Ex. 1 ¶ 13). These admissions, by themselves, establish that plaintiff received a proper pre-deprivation hearing. Plaintiff does not – because he cannot – challenge the adequacy of the pre-deprivation

procedures he received.  Rather, plaintiff essentially makes one assertion regarding the *timing* of his pre-termination hearing.  However, plaintiff's assertion (at 35) that a "reasonable jury could conclude that by the time of the Plaintiff's pre-deprivation hearing on May 29, 2003, the Commission Officials had already decided to terminate his employment" fails for three reasons.

First, plaintiff presents no evidence (apart from his self-serving assertion) that the Commission decided to terminate him prior to the pre-termination hearing, and this assertion is foreclosed by Commissioner Richards' affidavit.  See Curry v. Pulliam, 234 F. Supp. 2d 921, 928-29 (S.D. Ind. 2002) (finding that a plaintiff "must do more than merely assert that the decision to terminate him was made before the hearing. He must offer evidence from which a reasonable trier of fact could infer such a conclusion.")  According to Commissioner Richards' unrefuted affidavit, on May 13, 2003, the Commission agreed to suspend plaintiff with pay and authorized Commissioner Richards to conduct a pre-deprivation hearing, and to impose the appropriate amount of discipline, up to and including discharge, depending on whether the plaintiff presented some new exculpatory evidence.  (Richards Aff. ¶¶ 10-12; 11/7/03 Order at 4.)  No decision to fire the plaintiff was made prior to the pre-deprivation hearing because the plaintiff still had the opportunity to present exculpatory evidence at the pre-deprivation hearing. The Commission had expressly reserved its judgment on whether to terminate the plaintiff until after Commissioner Richards heard plaintiff's side of the story, and determined if there were grounds for discharge.  As the Seventh Circuit noted in Ryan v. Illinois Dep't of Children and Family Svcs., 185 F.3d 751, 762 (7th Cir. 1999), "[t]hat at the start of the hearing the agency decisionmakers tentatively believe the employee should be removed does not raise a constitutional problem–indeed, it would be surprising if the employee were brought up on

charges warranting termination absent such a belief–so long as the decisionmakers are open to other views."

Here, it is undisputed that Commissioner Richards was "open to other views," as demonstrated in his affidavit and by his decision to only suspend Ms. Sarajane Wright after her pre-deprivation hearing.  For example, if the plaintiff had informed Commissioner Richards that he did not sign the CMS forms, he may not have been terminated.  However, at the pre-deprivation hearing, plaintiff admitted that he signed his name on an official CMS form in a box clearly labeled Director of CMS.  (6/27/03 Tr. 34:16-18 & 41:8-11.)  Plaintiff also admitted that he did not  have the signature authority for the Director of CMS (6/27/03 Tr. at 55:3-19), but he still signed the CMS forms at issue in the box marked Director of CMS and did not indicate that he was not signing as the Director of CMS.  (6/27/03 Tr. 34:16-18 & 41:8-11).  After hearing plaintiff's explanation and admissions, Commissioner Richards exercised the Commission's authority and recommended that plaintiff be terminated.  Furthermore, it is undisputed that plaintiff was not terminated (and continued to be paid) until after his pre-deprivation hearing.

Second, in his response, plaintiff notes (at 10) that Sarajane Wright – another employee of the Commission that was charged with assisting the plaintiff in fraudulently executing personnel transactions – was placed on administrative leave along with the plaintiff.  As with the plaintiff, the Commission authorized Commissioner Richards with the same authority to conduct a pre-deprivation hearing and to impose discipline, up to and including discharge, on Ms. Wright based on her pre-deprivation hearing.  (6/27/03 Tr. 60:15-23).  However, Ms. Wright was not terminated, but rather was merely suspended because "after the pre-disciplinary hearing [Commissioner Richards] determined that [he] didn't think there were grounds for discharge." (6/27/03 Tr. 61:3-18).  This clearly demonstrates that no decision was made by the Commission

36

to terminate either Ms. Wright or the plaintiff prior to their pre-deprivation hearings, but rather Commissioner Richards was "open to other views." Ryan, 185 F.3d 751.

Third, plaintiff's claim (at 37) that Commissioner Richards was obligated to "report back" to the other Commission members after the plaintiff's pre-deprivation hearing is wrong both factually[8] and legally. Plaintiff presents no support for this claim because he fails to point to any provision of the Personnel Code which entitles an employee to a pre-deprivation hearing in front of the entire Commission or any authority that the Commission could not delegate its authority to conduct the pre-deprivation hearing. Plaintiff argues (at 37) that because he presented several facts at the pre-deprivation hearing (that plaintiff subjectively believes constitute a defense to the charges), Commissioner Richards should have shared all this evidence with the other Commission members. However, this is not required under the law, and the plaintiff is essentially challenging the *merits* of the termination decision – something he clearly cannot do as part of a federal due process claim. As the Supreme Court stated in Loudermill, "the pre-termination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions–essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." 470 U.S. at 546. Here, Commissioner Richards made the determination that there were "reasonable grounds" to believe that the charges of making a false mark against the plaintiff were true because plaintiff *admitted* to signing the CMS forms in a place he knew he was not authorized to sign. (6/27/03 Tr. 34:16-18 & 41:8-11.)[9]

---

[8] Even though he was not obligated to "report back" to the other Commissioners, Commissioner Richards did contact all the other members of the Commission after the pre-deprivations meeting and indicated that he would continue with the discharge of the plaintiff. (6/27/03 Tr. 59:19-23).

[9] Plaintiff also argues (at 38) that his pre-deprivation hearing was deficient because he received "some, but not all, of the evidence" against him at his hearing. Once again, plaintiff fails to cite

**C.      Plaintiff received a full post-deprivation hearing.**

Although plaintiff concedes (at 39) that he was given a complete post-deprivation

hearing, plaintiff fails to confront the fact that such expansive post-deprivation procedures can

remedy perceived deficiencies in a pre-deprivation hearing and satisfy due process.

Plaintiff attempts to challenge the post-deprivation hearing (at 39) on the grounds that the

hearing did not "have a decision maker who did not participate in the determination under

review."  That is simply not true.  It cannot be disputed that his post-deprivation hearing was

conducted by a neutral Administrative Law Judge who did not participate in the original

determination to dismiss the plaintiff.  Moreover, plaintiff's strained attempt to show that Judge

Trapp was bias because he was "appointed by the Commission" is baseless.  The Commission

regularly appoints Administrative Law Judges to conduct review hearings for employees, and the

judges owes no allegiance to the Commission.  Plaintiff even admits that to the best of his

knowledge "Mr. Trapp had never worked for the Commission or previously served it as an

administrative law judge." (Pl. Resp., Ex. 1 ¶ 16).

The cases cited by plaintiff (at 39) to support his claim that his post-termination hearing

did not have "a decision maker who did not participate in the determination under review" are

readily distinguishable.  In Goldberg v. Kelly, 397 U.S. 254, 271 (1970), the Court noted that the

case worker who first recommended that the plaintiff's welfare benefits be terminated "should

not have participated in making the determination under review."  In Gibson v. Berry Hill, 411

U.S. 564, 571 (1973), the Court found the Alabama Board of Optometry could not preside over

the hearing to revoke the licenses of certain optometrist since the Board "which acts as both

---

any authority in support of this proposition and this is not the law.  The pre-deprivation hearing
satisfied due process because plaintiff received "notice of the charges against him, an
explanation of the employer's evidence and an opportunity to present his side of the story."
Loudermill, 470 U.S. 532.

prosecutor and judge in delicensing proceedings, had previously brought suit against the plaintiffs on virtually identical charges in the state courts." These are exactly the types of situations that the Commission avoided in this case by arranging for an independent ALJ to conduct plaintiff's post-deprivation hearing.[10]

### IV. The State Officials Are Entitled To Qualified Immunity From Damages Because Plaintiff Cannot Point To Closely Analogous Cases Supporting His Claims.

In his response, plaintiff failed to cite any case, much less a "nearly identical" case, establishing that the State Officials could not consider political affiliation when making personnel decisions involving the Executive Secretary position. See Pounds v. Griepenstroh, 970 F.2d 338, 341 (7th Cir. 1992). Instead, plaintiff merely reargues that "[a]n Act of the Illinois General Assembly informed them that the Executive Secretary could be terminated only for cause." However, as demonstrated above, the civil service protections to an employee are irrelevant to a Branti analysis. Because the plaintiff has not offered any relevant precedent to demonstrate that, at the time of his termination, it was clearly established that the Executive Secretary position could not be fired for political reasons, the State Officials are entitled to qualified immunity of plaintiff's patronage claim.

Similarly, with respect to his due process claim, plaintiff merely reargues the merits of his claim which have been disputed above. The State Officials are entitled to qualified immunity on the due process claim because there are simply no cases finding a due process violation in closely analogous circumstances.

---

[10] Plaintiff's claim (at 40) that the post-termination hearing was flawed because the Commission members were "prepared to testify against him" is absurd. Commissioner Richards testified at the hearing because plaintiff challenged the adequacy of his pre-deprivation hearing. Plaintiff's counsel cross-examined Commissioner Richards and it was Judge Trapp, not the Commission, who presided over and adjudicated plaintiff's post-deprivation hearing.

## **Conclusion**

For the foregoing reasons, this Court should grant summary judgment in favor of the

State Officials on Plaintiff's complaint, or, alternatively, bar all claims for damages against the

State Officials under the doctrine of qualified immunity.

Respectfully submitted:

GEORGE E. RICHARDS, RAYMOND W.
EWELL, JOHN M. DORGAN, BARABARA
J. PETERSON, DAN P. FABRIZO, ROD
BLAGOJEVICH, THOMAS LONDRIGAN
and ALONZO MONK

Dated:  April 10, 2006                          By:    s/ Jeffrey D. Colman
                                                       One of Their Attorneys

Jeffrey D. Colman
David Jiménez-Ekman
John R. Storino
Christopher V. Parente
Acting as Special Assistant Attorneys General
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

## CERTIFICATION OF SERVICE

I, Jeffrey D. Colman , hereby certify that on Monday, April 10, 2006, I electronically filed the foregoing State Officials' Reply Brief in Support of their Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James P. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, IL 62701

s/ Jeffrey D. Colman
Jeffrey D. Colman
Bar Number: 0491160
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone:  (312) 222-9350
Facsimile:  (312) 527-0484

41