## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ROBERT POWERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case:  04-3024 |
| | ) | |
| GEORGE E. RICHARDS, ET AL. | ) | Honorable Jeanne E. Scott |
| | ) | |
| Defendants. | ) | |

### EXHIBIT INDEX

The State Officials submit this Exhibit Index and the following exhibits as attachments to their Memorandum of Law in Support of the State Officials' Reply Brief In Support of Their Motion for Summary Judgment in the above-captioned case:

Exhibit A:     Buchheit v. Blagojevich, Case No. 04 C 2070, (N.D. Ill. Kendall, J. Apr. 6, 2006.)

Exhibit B:     Park Superintendents' Prof'l Ass'n v. Jim Edgar, et al., No. 97-C-6412, 1998 WL 525810, (N.D. Ill. Aug. 18, 1998.)

Exhibit C:     A.C. v. Bd. of Educ., No. 05-4092, 2005 WL 3560658, (C.D. Ill. Dec. 28, 2005)

Respectfully submitted:

GEORGE E. RICHARDS, ET. AL.

Dated:  April 10, 2006

By:     s/ Jeffrey D. Colman
One of Their Attorneys

Jeffrey D. Colman
David Jiménez-Ekman
John R. Storino
Christopher V. Parente
Acting as Special Assistant Attorneys General
JENNER & BLOCK LLP
One IBM Plaza
Chicago, IL 60611
Telephone: (312) 222-9350
Facsimile: (312) 527-0484

# EXHIBIT

# A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STANLEY BUCHHEIT, | ) | |
| | ) | Case No. 04 C 2070 |
| Plaintiff, | ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| ROD BLAGOJEVICH, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stanley Buchheit ("Plaintiff") filed a complaint against Governor Rod Blagojevich ("Defendant"), alleging that Defendant improperly terminated Plaintiff from his position as Assistant Warden at the Menard Correctional Center on the basis of Plaintiff's political affiliation. After the Seventh Circuit awarded summary judgment in favor of Defendant on a substantially similar case involving two plaintiff assistant wardens, Defendant moved for summary judgment in the instant case. Rather than respond to that motion, Plaintiff filed a motion to continue discovery pursuant to Federal Rule of Civil Procedure 56(f). In light of controlling Seventh Circuit precedent directly related to the instant matter, the Court denies Plaintiff's motion to continue discovery and enters judgment in favor of Defendant.

### Facts

The following facts are taken from Plaintiff's complaint. Plaintiff was employed by the Illinois Department of Corrections for 19 years, until he was terminated in early 2003. Complaint at ¶ 4. During those 19 years, Plaintiff held numerous positions with the Illinois Department of Corrections, the final position being that of Assistant Warden of Operations at the Menard

Correctional Center.  *Id.*  Plaintiff was appointed to the position of Assistant Warden during a Republican administration in Illinois.  *Id.*   By early 2003, Governor Blagojevich had assumed office as the Governor of Illinois.  Plaintiff alleges that because he did not have policy-making authority in his position, he was wrongly terminated on the basis of his political affiliation, in violation of his First Amendment rights.

<u>Procedural History</u>

On March 19, 2004, Plaintiff filed his complaint against Defendant.  On June 16, 2004, while still in the pleadings phase of the case, Plaintiff signed a stipulation that the attached job description was a "true and correct copy of a Position Description contained in the files of the Illinois Department of Central Management Services" for his former position.  On July 30, 2004, with its motion for judgment on the pleadings still pending, Defendant filed an unopposed motion to stay the action pending the resolution of a potentially dispositive appeal, *Riley v. Blagojevich*, 425 F. 3d 357 (7th Cir. 2005).  The Court granted the motion to stay discovery pending resolution of the *Riley* appeal.

On September 23, 2005, the Seventh Circuit decided *Riley* in favor of Defendant and against two assistant wardens holding positions substantially similar to that held by Plaintiff.  The appellate court in *Riley* based its decision in part on the fact that the *Riley* plaintiffs had agreed that the job descriptions were the official descriptions of their respective positions.  *Id.* at 364.  Plaintiff promptly moved to withdraw his own stipulation regarding his own former job description, which motion the Court denied.

On January 6, 2006, Defendant filed a motion for summary judgment, based primarily upon the holding in *Riley*.  On January 13, 2006, Plaintiff filed a motion to compel the continuation of

discovery pursuant to Federal Rule of Civil Procedure 56(f).   On March 15, 2006, after briefing on

the 56(f) motion had concluded, the parties briefed additional authority in support of Defendant's

opposition to continued discovery, including a newly decided Seventh Circuit case clarifying *Riley*,

*Pierson v. Blagojevich*, 437 F.3d 587 (7th Cir. 2005) (published Feb. 2006).

## The Impact of *Riley* and *Pierson*

Defendant argues that *Riley* and *Pierson* obviate the need for any further discovery in this

matter, because the only two facts required to decide this case have already been discovered: (1)

Plaintiff has stipulated that the job description is a "true and correct copy of a Position Description

contained in the files of the Illinois Department of Central Management Services" for Plaintiff's

former position, and (2) the job description has not altered since 1980, long prior to the election of

Defendant.

Plaintiff argues that he cannot answer the motion for summary judgment without further

discovery into the objectivity and reliability of the official description of his position.   Plaintiff

believes that *Riley* supports his argument, relying primarily upon the portion of the holding in *Riley*

that a court's inquiry into a job description should focus on whether the job description was

"reliable," through a focus on the creation and maintenance of the position description. *Riley* at 361.

Plaintiff argues that this portion of *Riley* allows discovery into the procedure for "vetting and

updating" his job description.

Plaintiff's argument has been addressed and refuted by both *Riley* and *Pierson*. The *Riley*

court reiterated the holding of *Meeks v. Grimes* that the court's focus is "on the inherent power of

the office, not what any individual officeholder actually does."   *Id.* at 360-61, *quoting Meeks v.*

3

*Grimes*, 779 F.2d 417, 419 n.1 (7th Cir. 1985). The *Riley* court then turned to the importance of the job description, stating:

> For the job description to be the pivot on which the case turns, the inquiry must focus on how the description was created; how it is updated and thus kept realistic rather than being allowed to drift far from the actual duties of the position; in short, on how reliable, how authoritative, the description is.

*Id* at 361. The court examined the official job descriptions of two assistant wardens in Illinois, whose official job descriptions were substantially similar to that of Plaintiff, and found them to be reliable. *Id.* at 362-63. The *Riley* court specifically noted that while each job description might not exactly reflect what each assistant warden did, due to the different conditions and different personnel at each prison, the central focus of the inquiry was that each of the positions was "a *reliable* description rather than something that had been manipulated by officials seeking to expand their power to appoint loyalists beyond the lawful bounds." *Id.* at 361 (emphasis in original).

While *Riley* appeared to leave open the possibility that a plaintiff might in some circumstances conduct discovery into the reliability of a job description, the Seventh Circuit's holding in *Pierson* clarified that the official job description alone can be sufficient evidence of reliability. In *Pierson*, the appellate court summarily reversed the district court and directed judgment in favor of Defendant on the pleadings alone. The *Pierson* court stated that "an official job description, if reliable, is the correct basis for determining whether political affiliation is a legitimate requirement of the job." *Pierson*, 437 F.3d at 588, *citing Riley*, 425 F.3d at 364. To determine "reliability," the *Pierson* court looked to the facts that (i) plaintiff Pierson stipulated that the job description attached to the answer was a "true and correct copy of a Position Description contained in the files of the Illinois Department of Central Management Services" for the position held by Pierson, and (ii) the job description had been in effect from May 1999 to the present, prior

4

to the election of Governor Blagojevich. *Id.* at 588. On the basis of these two facts, the *Pierson*

court directed the district court to enter judgment in favor of Defendant. *Id.*

In the matter before the court, Plaintiff signed a stipulation identical to that at issue in

*Pierson*, and has not opposed Defendant's assertion that the job description has remained

substantially the same since 1980. Plaintiff's job description is as follows:

> Under administrative direction of the Sr. Public Service Adm., Warden, plans,
> organizes and directs the entire program of Operations at the Menard Correctional
> Center; supervises staff, administratively responsible and accountable for the
> execution of policies and procedures in the management of the institution while serve
> as Duty Warden, develops and implements policies and procedures; gathers data
> regarding budgetary matters of program area.
>
> 1. Plans, organize and directs security, maintenance, Training Office, Dietary,
> Laundry and shift commanders; directs various department heads and their staff in
> order to ensure an efficient and orderly and equitable operation for both the
> employees and residents; confers with the Warden on any problems and decisions
> concerning these functions; communicates information to the Warden regarding
> maintenance projects; develops and implements policies and procedures. (30%)
>
> 2.    Supervises staff; assigns work; approves time off; provides guidance and
> training; gives oral reprimands and effectively recommends grievance resolutions;
> completes and signs performance evaluations; establishes annual goals and objective;
> counsels employees on problems with productivity and quality of work; determines
> staffing needs to achieve program goals and objectives; reviews activity reports.
> (25%)
>
> 3. Participates in carrying out the policies rules and regulations of the institution in
> order to ensure proper operations of the daily functions of the institution;
> administratively responsible and accountable for the execution of policies and
> procedures in the management of the institution while serving as Duty Warden;
> gathers data for the Operations program budget. (20%)
>
> 4. Issues decisions on disciplinary actions involving the infractions of the institution
> rules by the residents; holds regular interviews with residents by request in order to
> assist them with problems; interviews and assists employees with personal and work
> related problems. (10%)
> 5. Coordinates department heads of the Operation program to ensure that all
> institutional audits are conducted in the time specified; reviews prepared

5

documentation; coordinates corrective action based on recommendations from audit findings. (5%)

6. Conducts daily routine inspection tours of the institution for sanitation, safety and security measures; reports findings to the Chief Adm. Officer and makes recommendations for any changes, problems, or improvements. (5%)

7. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. (5%)

Stipulation, attached as Exhibit A to Defendant's Resp. to Plaintiff's Mot. to Withdraw Stipualation,

Docket No. 24, filed Oct. 12, 2005. The Court, having reviewed Plaintiff's job description, finds

it to be substantially similar to the descriptions for assistant wardens published in the *Riley* opinion.

The *Riley* court reviewed two job descriptions, each of which varied slightly from the job description

for the job held by Plaintiff. To illustrate, the Court reprints plaintiff Riley's job description in its

entirety:

Subject to administrative approval of the Warden, ... serves as Assistant Warden of Operations: formulates, organizes, and directs the overall Operations Program for Tamms Correctional Center; supervises staff; maintains and enforces disciplinary, safety, security and custodial measures; administratively responsible and accountable for execution of policies and procedures in management of the institution while serving as Duty Warden.

1. As Assistant Warden, assists in the development, establishment and implementation of rules, regulations, directives, policies and procedures of the institution to ensure proper operation of the daily functions; administratively responsible and accountable for execution of policies and procedures in management of the institution while serving as Duty Warden. (35%)

2. Plans, organizes and directs the overall Operations function and their managers, including security, physical plant operations, dietary services, inmate discipline, work camp and other miscellaneous logistical support services; coordinate[s] all inmate programs related to these functions; participates in the budget process by gathering data from department heads regarding current and anticipated programs and projects; makes recommendations to management outlining budgetary needs. (25%)

6

3. Supervises staff; assigns work; approves time off; provides guidance and training; gives oral reprimands and effectively recommends grievance resolutions; completes and signs performance evaluations; establishes annual goals and objectives; counsels employees on problems with productivity and quality of work; determines staffing needs to achieve program goals and objectives; reviews activity reports. (15%)

4. Serves as Chairman of the Safety and Sanitation Committee; conducts routine and unscheduled safety, health, sanitation and security inspection tours throughout the institution; makes recommendations to the Warden as to any changes, problems or improvements. (10%).

5. Serves as Chairman of the Adjustment Committee; makes decisions on disciplinary problems involving infractions of the institution rules by residents; hears and resolves problems; enforces discipline. (10%).

6. Performs other duties as required or assigned which are reasonably within the scope of the duties enumerated above. (5 %).

*Riley*, 425 F.3d at 362. The *Riley* court determined that Riley's position, along with that of the other

named plaintiff in that case, was a policy-making positions sufficient to permit Defendant to replace

the job holder with a political appointee. Specifically, the *Riley* court drew attention to the portion

of each of the assistant warden position descriptions requiring the assistant wardens to spend time

as "Duty Warden." *Id.* at 363-64. Plaintiff's job description likewise required Plaintiff to be the

Duty Warden approximately 20% of the time. The *Riley* court also looked to the budgetary, rule-

making, and disciplinary job requirements of the two assistant warden plaintiffs before the court;

Plaintiff in the instant case had the same responsibilities. *Id.* The factual similarity of Plaintiff's

job description to that of Riley's place the case before the Court squarely under *Pierson* and *Riley.*

7

WHEREFORE, the Court denies Plaintiff's motion to continue discovery pursuant to Federal

Rule of Civil Procedure 56(f), and enters judgment on the pleadings in favor of Defendant.

VIRGINIA M. KENDALL
United States District Judge

Dated: April 5, 2006

8

# United States District Court
## Northern District of Illinois
### Eastern Division

Stanley Buchheit

**JUDGMENT IN A CIVIL CASE**

v.

Case Number: 04 C 2070

Rod Blagojevich

☐    Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

☐    Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that the court enters judgment on the pleadings in favor of defendant, Rod Blagojevich.

Michael W. Dobbins, Clerk of Court

Date: 4/6/2006

/s/ Sandra L. Brooks, Deputy Clerk

# EXHIBIT

# B

Westlaw.

Not Reported in F.Supp.2d                                                                  Page 1

Not Reported in F.Supp.2d, 1998 WL 525810 (N.D.Ill.)

**(Cite as: 1998 WL 525810 (N.D.Ill.))**

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois.
PARK SUPERINTENDENTS' PROFESSIONAL
ASSOCIATION and John Blume, Plaintiffs,
v.
STATE OF ILLINOIS, Jim Edgar, Governor of the
State of Illinois, Michael S.
Schwartz, Director of Central Management Services
of the State of Illinois, G.
Brent Manning, Director of Department of Natural
Resources of the State of
Illinois, and Susan Mogerman, Acting Director of
Illinois Historic Preservation
Agency, Defendants.
**No. 97 C 6412.**

Aug. 18, 1998.

**MEMORANDUM OPINION AND ORDER**

ZAGEL, J.

*\*1* Plaintiffs, Park Superintendents Professional
Association and Jon Blume ("Blume") (collectively
"Association"), filed a three-count complaint
against defendants State of Illinois; Jim Edgar,
Governor of the State of Illinois; Michael Schwartz,
Director of Department of Central Management
Services of the State of Illinois; G. Brent Manning,
Director of Department of Natural Resources of the
State of Illinois, and Susan Mogerman, Acting
Director of Illinois Historic Preservation Agency
(collectively "State Officials"). Count I asserts two
claims. First, State Officials unlawfully retaliated
against Blume. Second, State Officials engaged in
the political patronage hiring of Site
Superintendents. The Association bases both claims

on the First Amendment (freedom of speech, free
association, and the right to seek redress for
grievances), pursuant to 42 U.S.C. § 1983. Under
12(b)(6) of the Federal Rules of Civil Procedure,
the State Officials move to dismiss the complaint
for failure to state a claim. In their response
memorandum, the Association moves to voluntarily
dismiss Counts II and III and moves to voluntarily
dismiss the State of Illinois as a defendant. I deny
the State Officials' motion to dismiss Count I's first
claim and grant their motion to dismiss Count I's
second claim. Furthermore, I grant the Association's
motion to dismiss Counts II and III without
prejudice and dismiss the State of Illinois as a
defendant.

BACKGROUND
John Blume is a Site Superintendent with
responsibility for the day-to-day land management
and maintenance of the Starved Rock State Park
within the Illinois Department of Natural
Resources. Blume is also the President of the Park
Superintendents' Professional Association. The
Association comprises a majority of the Site
Superintendents the State employs within the
Department of Natural Resources and the Illinois
Historic Preservation Agency. The Association
represents its members with respect to matters
affecting their hours, wages, and working
conditions. The Association's members are
employed within the civil service of the State of
Illinois pursuant to the Personnel Code of the State
of Illinois, 20 ILCS 415/1.

Count I asserts two separate claims. First, the
Association maintains that the State Officials and
their agents retaliated against Blume based on his
First Amendment protected activities. The
Department of Central Management Services
devised personnel rules applicable to Association
members, including a grievance procedure by which
employees may seek review of disciplinary actions
and any matter affecting their conditions of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 2

Not Reported in F.Supp.2d, 1998 WL 525810 (N.D.Ill.)

(Cite as: 1998 WL 525810 (N.D.Ill.))

employment. Blume allegedly suffered retaliation following his utilization of the grievance procedure to express his discontent over employment issues. The Association attached copies of these grievances to the complaint. [FN1] The Association's complaint cites one grievance to show Blume's speech on the State Official's alleged political patronage-based hiring of inexperienced or unqualified persons to fill Site Superintendent positions at public lands and historic sites. The grievance stated:

> FN1. I consider the attached exhibits as being a part of the complaint. *See* Fed.R.Civ.Pro. 10(c).

**\*2** I grieve that I was not allowed to interview for the Public Service Administrator (formerly Site Superintendent) position at Morrison-Rockwood State Park, Whiteside County. The vacant position was not posted or open for interview; IDNR appointed a PSA without posting competitive interview.
Relief Sought: IDNR post all PSA/Site vacancies and follow Personnel Rules in filling vacancies, whether new or existing positions. Further, IDNR follow its Division of Lands and Education Hiring Policies by selecting and promoting qualified candidates with college and/or valid comparable experience, without preference based on political affiliation.
Blume also attached a February 24, 1997 letter the Association's attorney wrote on Blume's behalf as the Association's President and a grievance he filed on May 6, 1997, both addressed to a party at Central Management Services. Both exhibits concerned the Association's efforts to negotiate with the State over matters affecting pay, hours of work, and working conditions for the Association's members. The Association also claims that Blume's position as President of the Association and Blume and the Association's speech concerning the allocation of funds for maintenance of State parks caused the officials to take adverse actions against him. It cites as evidence of retaliation for the speech the downgrading of Blume's 1994, 1995, and 1996 employment evaluations and the imposition of unwarranted disciplinary suspensions upon Blume

in 1994 and 1997.

The Association's second claim in Count I alleges that the State Officials unconstitutionally filled approximately fifteen vacant Site Superintendent positions based on "partisan political reasons." Relevant to this claim is a January 19, 1994 Illinois State Labor Relation's Board (ISLRB) Decision and Order. [FN2] The ISLRB agreed with an administrative law judge's recommendation finding the Site Superintendents to be managers under the Illinois Public Labor Relations Act and therefore exempt from collective bargaining. *See Illinois Federation of Public Employees, Local 4408, IFT-AFT and State of Illinois, Dept. of Central Management Services (Historic Preservation Agency),* Ill. S.L.R.B. S-UC-93-60, *decision and order,* 1.

> FN2. I may take judicial notice of administrative decisions. *See, e.g., Doherty v. City of Chicago,* 75 F.3d 318, 324 n. 4 (7th Cir.1996).

DISCUSSION
A motion to dismiss's purpose is to test the sufficiency of the complaint, not to decide the merits of the case. *See Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.,* 805 F.2d 732, 733 (7th Cir.1986). The court accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiff. *See Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir.1991). The court will only dismiss for failure to state a claim if it appears beyond doubt "that the plaintiff cannot establish any set of facts that would entitle him the relief requested." *Mosley v. Klincar,* 947 F.2d 1338, 1339 (7th Cir.1991). However, the court is not required to accept legal conclusions either alleged or inferred from pleaded facts. *See Nelson v. Monroe Regional Medical Ctr.,* 925 F.2d 1555, 1559 (7th Cir.1991).

1. Retaliation Claim
**\*3** To state a retaliation claim under 42 U.S.C. § 1983, the Association must show that: (1) Blume engaged in what was constitutionally protected speech under the circumstances, and (2) the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 525810 (N.D.Ill.)

**(Cite as: 1998 WL 525810 (N.D.Ill.))**

Page 3

defendants retaliated against them because of that speech. *See Barkoo v. Melby,* 901 F.2d 613, 617 (7th Cir.1990). To consider the Association's speech constitutionally protected, it must address matters of public concern. *See Hulbert v. Wilhelm,* 120 F.3d 648, 653 (7th Cir.1997). Matters of public concern include political, social, or other community concerns. *See Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Whether speech pertains to matters of public concern "depends upon the content, form and context of the statements." *Landstrom v. Illinois Department of Children and Family Services,* 892 F.2d 670, 679 (7th Cir.1990). Therefore, even though speech may appear to deal with a matter of public concern, I must consider Blume's speech in the appropriate context and determine if he intended to raise an issue of public concern or further a private interest. *See Barkoo,* 901 F.2d at 618. The Seventh Circuit describes the distinction between a public concern and a private interest "as being the difference between an employee complaining about matters private to himself, such as whether he was being paid enough or was given deserved promotions, as compared to an employee who is engaged in whistle blowing or otherwise going public with matters in which the public might be expected to take an interest." *Lashbrook v. Oerkfitz,* 65 F.3d 1339, 1350 (7th Cir.1995).

The State Officials contend that the Association's complaint and attached grievances fail to allege sufficient factual material to establish that Blume's grievances or other speech were matters of public concern. To determine whether the different speech events at issue pertain to matters of public concern, I must analyze each event's "content, form and context." *Landstrom,* 892 F.2d at 679.

A survey of the April 16, 1997 grievance reveals that Blume expressed a matter of private, rather than public, concern. Blume's speech was in the form of a personal grievance and in the context of a personal employment dispute The content of Blume's grievance focused on Central Management Services not allowing him to interview for the Site Superintendent position at Morrison-Rockwood State Park. The grievance's purpose was not to gain

public attention over political patronage. Blume's requested relief that the State no longer hire based on an applicant's political affiliation does not recast Blume's personal employment grievance into a public concern matter because of the form and context in which Blume requested this relief. Although Blume's use of the internal grievance procedure does not remove his First Amendment protections, *see Givhan v. Western Line Consol. Sch. Dist.,* 439, U.S. 410, 413 (1979), his addressing the matter of political-based hiring in the form and context of his grievance over not being allowed to interview for a position does render the speech unprotected. While political patronage may very well be in other forms and contexts a public concern matter, "it is plaintiff's speech, not defendants' behavior, which must concern the public if it is to warrant First Amendment protection." *Hayes v. City of Chicago,* 710 F.Supp. 239, 242 (N.D.Ill.1989). Blume spoke not as a concerned citizen seeking to spark debate over the State Official's hiring practices but as an employee requesting a change in his employer's hiring practices.

**\*4** The State Officials also contend that the Association's complaint fails to provide any specificity regarding the Association and Blume's speech concerning the allocation of funds for the maintenance of State parks, thus rendering it impossible for me to determine whether Blume's speech touched on matters of public concern. [FN3] While I agree that the Association's complaint offers no details about the form and context of their and Blume's speech concerning the allocation of funds, to dismiss a complaint for failure to state a claim it must appear beyond doubt that the Association cannot establish any of the facts that would entitle him to the relief requested. At this early procedural stage, taking as true the Association's claim that it and Blume spoke about the proper allocation of funds "in accordance with the policy determinations of the General Assembly of the State of Illinois," I cannot conclude that the Association and Blume's speech on the allocation did not address a public concern matter. Clearly, the allocation of State funds may be a matter of public concern, but it depends upon the speech's form and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 4

Not Reported in F.Supp.2d, 1998 WL 525810 (N.D.Ill.)

**(Cite as: 1998 WL 525810 (N.D.Ill.))**

context. In refusing to dismiss this claim, I am not giving an opinion on the merits of this portion of the complaint. The State Officials may ultimately prove that the speech did not touch upon matters of public concern, but its argument regarding the lack of detail supporting this claim cannot prevail at the pleading stage.

> FN3. In the complaint the Association simply states that it and Blume spoke and took action with respect to the "proper allocation of funds for the maintenance of State parks in accordance with the policy determinations of the General Assembly of the State of Illinois."

The State Officials also argue that the Association's complaint fails to provide any details concerning Blume's activity in the Association, thus rendering it impossible for me to determine whether this activity touched on matters of public concern. [FN4] Just like the allegation concerning speech over the fund allocation, the Association's complaint offers no additional facts detailing Blume's Association activities. However, public employee union activity often touches upon matters of public concern. *See Gregorich v. Lund,* 54 F.3d 410, 415-416 (7th Cir.1995). That is not to say that Blume's union activities necessarily did touch upon matters of public concern, but I must draw all inferences in favor of the Association at this stage. Therefore, I hold that the State Officials' argument concerning the lack of detail supporting this claim cannot prevail at this stage.

> FN4. In the complaint the Association simply states that the State Officials and their agents have taken adverse actions against him in part because of his position as President of the Association.

The State Officials also contend that I must dismiss the Association's claim based on Blume's speech concerning the Association's efforts to negotiate with the State because this claim lacks sufficient detail for me to determine whether this speech touched on matters of public concern. The State Officials' contention neglects the February 24, 1997

letter and May 6, 1997 grievance. After reviewing the exhibits' content, form, and context, I conclude that the letter and grievance touched matters of public concern. Both exhibits demonstrate that Blume's objective in sending the letter and filing the grievance was not to further just his own interests. Blume sought to benefit others through the Association's attempts to negotiate with the State in regards to pay, hours of work and working conditions. Nothing in either exhibit touches upon Blume's personal employment disputes with the State Officials. Instead, on behalf of the Association's members, Blume challenged the State's negotiation practices. *See, e.g., Hayes,* 710 F.Supp. at 242 (asserting if plaintiff's grievance sought to specifically challenge City of Chicago's general employment practices, it could then be considered a matter of public concern).

*\*5* The State Officials contend that even if the Association spoke on matters of public concern, the Association's complaint does not state a First Amendment retaliation claim because it fails to sufficiently allege that the State Officials retaliated against Blume because of his speech. They argue that the Association's complaint contains nothing more than a conclusory assertion that the State Officials and their agents retaliated against Blume for his speech. In addition, they argue that the Association cannot establish retaliatory motive because the attached exhibits indicate that the State Officials based Blume's evaluations and suspensions on his job performance, not on his alleged conduct.

At the pleading stage, I cannot accept the State Officials' assertion that the exhibits clearly demonstrate that the employment decisions were unrelated to the protected conduct. [FN5] At this stage, I must take the Association's reasons for the State Officials' actions as true, and as the case proceeds, the State Officials will have the opportunity to challenge the Association on the motivations behind the employment decisions. Accordingly, I deny the State Officials' motion to dismiss the retaliation claim.

> FN5. The State Officials' attempt to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5

Not Reported in F.Supp.2d, 1998 WL 525810 (N.D.Ill.)

**(Cite as: 1998 WL 525810 (N.D.Ill.))**

analogize this case to *Caldwell v. City of Elwood, Indiana,* 959 F.2d 670 (7th Cir.1992) fails. There, the Seventh Circuit affirmed the 12(b)(6) dismissal of a retaliation claim, holding that a complaint that fails to show that the defendants knew of the plaintiff's speech is insufficient to state a retaliation claim. *See Caldwell,* 959 F.2d at 672. Here, the State Officials make no attempt to argue that they were unaware of Blume's speech, and rightfully so, because the grievances and responses to the grievances illustrate that they were aware of the Blume and the Association's speech.

2. Political Patronage Claim

Resolving a plaintiff's political patronage claim in the context of a motion to dismiss may be difficult. Here, the record is sufficient to resolve this claim. While the complaint itself contains no description of the Site Superintendent position and its responsibilities, the complaint references and incorporates numerous exhibits I may properly consider. [FN6] I may also take notice of the ISLRB's decision and order. [FN7]

FN6. *See* Fed.R.Civ.Pro. 10(c).

FN7. *See, e.g., Doherty,* 75 F.3d at 324 n. 4 .

The Association's second claim in Count I is that the State Officials filled fifteen vacant Site Superintendent positions based on the applicant's political affiliation violating the Association's First Amendment rights. Government officials ordinarily cannot base hiring decisions of employees on political affiliation. *See Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). However, certain positions are *Rutan* exempt. The State Officials, conceding the hiring on the basis of political affiliation to be true for the purposes of a 12(b)(6) motion, argue that the Site Superintendent position is *Rutan* exempt. Therefore, the Site Superintendents argue, the Association does not have a First Amendment claim.

To determine whether a position is *Rutan* exempt, I must inquire into whether the State Officials can demonstrate that party affiliation is an appropriate requirement for the effective performance of the Site Superintendent position. *See Americanos v. Carter,* 74 F.3d 138, 140 (7th Cir.1996). Specifically, the inquiry must focus on whether the Site Superintendent position has "meaningful input into governmental decision making on issues where there is room for principled disagreement on goals or their implementation." *Americanos,* 74 F.3d at 141.

*6 The Site Superintendent position is *Rutan* exempt because an examination of the exhibits and the ISLRB decision and order reveals that the Site Superintendents hold positions that involve them giving substantial input into the handling of their respective sites. By themselves the grievances and memorandums do not definitively show the Site Superintendents are *Rutan* exempt, but they support the ISLRB's findings that the Site Superintendents deal with budgetary issues, supervise employees, and organize and implement various programs. The ISLRB's decision and order supported the administrative law judge's finding that Site Superintendents make "numerous discretionary decisions which broadly affect not only the fundamental purposes and goals of their agency, but the methods of achieving those goals." *Illinois Federation of Public Employees, Local 4408,* Ill. S.L.R.B. S-UC-93-60 at 3. Moreover, the Site Superintendents are responsible effectuating management policies and functions because they determine how to allocate site resources and personnel to best fulfill their agency's prerogative. *Id.* at 4. The *Rutan* exception was envisioned to cover just this type of employee, one who can affect the "fundamental purposes and goals of their agency." [FN8] *Id.* at 3.

FN8. The Association claims that because the Site Superintendents do not individually formulate policy for the entire state and are subordinate to regional land managers, they are *not Rutan* exempt. To be considered *Rutan* exempt, the Site Superintendents do not have to formulate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6

Not Reported in F.Supp.2d, 1998 WL 525810 (N.D.Ill.)

**(Cite as: 1998 WL 525810 (N.D.Ill.))**

policy for the entire state and higher ranking officials can supervise them. *See Selch v. Letts,* 5 F.3d 1040 (7th Cir.1993) (holding that a subdistrict superintendent of highways position that fell at the lower end of the management hierarchy was *Rutan* exempt).

The Association argues that the Site Superintendents are not exempt from *Rutan* because the Site Superintendents are not exempt under the ADEA and Title VII. [FN9] Therefore, the Association claims, it is inconsistent for the ADEA and Title VII to cover the Site Superintendents, but not for *Rutan* to cover them. The Association argues it is inconsistent because the standard for determining whether a public employee is exempt under the ADEA and Title VII is essentially indistinguishable from determining whether a public employee is exempt under *Rutan.*

> FN9. The ADEA and Title VII exempt policymakers from their protection.

I disagree. The standard used for the *Rutan* exemption is definitely distinguishable from the standard used for the ADEA and Title VII exemption. It is true that if a position falls within ADEA's and Title VII's policymaking exemptions, it is likely *Rutan* exempt. *See Heck v. Freeport,* 985 F.2d 305, 310 (7th Cir.1993). However, it does not necessarily follow that if a position is not exempt from the ADEA and Title VII's protections, it is not exempt from *Rutan's* protections. *Rutan* has more liberal standards for exemption than the ADEA and Title VII. *See Tranello v. Frey,* 758 F.Supp. 841, 849-850 (W.D.N.Y.1991) (holding that courts must construe the policymaking exemption in the ADEA more narrowly than the *Rutan* exemption in keeping with the ADEA's broad scope and purpose of eliminating age discrimination).

The Association also asserts that the Site Superintendents' civil service status, which is subject to Jurisdiction B of the Illinois Personnel Code, is relevant, although not determinative, in showing that they are not exempt from *Rutan.* [FN10] The Association claims that since they do

not meet the standards for Jurisdiction B exemption, they should not be *Rutan* exempt. [FN11] I disagree. I do not find it relevant that the employees do not qualify for the Jurisdiction B exemption. Just like with the ADEA and Title VII, the standards for Jurisdiction B exemption are far more stringent than the liberal standards used for *Rutan* exemption. For example, nothing in *Rutan*-exemption analysis mandates that the Site Superintendents be directly responsible to a high-level government official and formulate policy. *Rutan* exemption only requires that the Site Superintendents have "meaningful input into government decision making." *Americanos,* 74 F.3d at 141. Since the record demonstrates political affiliation is an appropriate requirement for the Site Superintendent position, I dismiss the Association's second claim in Count I.

> FN10. The civil service of the State of Illinois employs the Association's members pursuant to the Personnel Code of the State of Illinois, 20 ILCS 415/1. Among the provisions requirements is that the "selection and tenure" of employees must be "... on the basis of merit and fitness" pursuant to objective standards commensurate with the positions to be filled. These positions fall within Jurisdiction B of the personnel code.

> FN11. The Illinois Personnel Code, 20 ILCS 415/4d(3) exempts certain employees from Jurisdiction B. Ill.Admin.Code, tit. 80, § 1.142, lists the prerequisites necessary for Jurisdiction B exemption: The employee (a) must be directly responsible to the Governor, a departmental director or assistant director appointed by the governor, a board or commission established by the Governor, or other positions specified in provisions (4) through (7) of § 1.1.42; and (b) either does one or more of the following: (1) "directs programs defined by statute and/or departmental, board, or commission or possess significant authority when acting in the capacity of a director of programs to bind the agency;" and/or (2) "makes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 525810 (N.D.Ill.)

**(Cite as: 1998 WL 525810 (N.D.Ill.))**

Page 7

decisions in exercising principal responsibility for the determination or execution of policy which fix objectives or state the principles to control action toward operating objectives of one or more division, such decisions being subject to review or reversal only by the director, assistant director, board, or commission;" and/or (3) "participates in the planning and programming of departmental, board, or commission activities, integrating the plans and projections of related divisions, and the scheduling of projected work programs of those agencies."

## CONCLUSION

*7 I deny the State Officials' motion to dismiss Count I's first claim. I agree with the State Officials that the First Amendment does not protect the grievance concerning political patronage hiring. However, other speech is constitutionally protected or its right to constitutional protection is yet to be determined. I dismiss Count I's second claim. The record demonstrates that the State Officials engaged in constitutional political patronage hiring. Additionally, I dismiss Counts II and III without prejudice and dismiss the State of Illinois as a defendant.

Not Reported in F.Supp.2d, 1998 WL 525810 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 1:97cv06412 (Docket) (Sep. 11, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT

C

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3560658 (C.D.Ill.)

(Cite as: 2005 WL 3560658 (C.D.Ill.))

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
C.D. Illinois.
A.C., a minor, by Mark Carlson and Julie Carlson,
his parents, Plaintiffs,
v.
BOARD OF EDUCATION FOR CAMBRIDGE
COMMUNITY UNIT SCHOOL DISTRICT # 227,
Defendant.
No. 05-4092.

Dec. 28, 2005.

Shari R. Rhode, Rhode & Jackson PC, Carbondale,
IL, James W. Springer, Kavanagh Scully Sudow
White & Frederick PC, Peoria, IL, for Plaintiff.

Colette L. McCarty, Robbins Schwartz Nicholas
Lifton & Taylor, Decatur, IL, for Defendant.

*ORDER*

MIHM, J.

**\*1** This matter is now before the Court on
Plaintiffs' Motion for Preliminary Injunctive Relief.
For the reasons set forth below, the Motion [# 4] is
DENIED.

BACKGROUND

According to the Complaint in this matter, in April
2005, Plaintiff A.C. was a junior at Cambridge High
School and was involved in three different
school-sponsored athletic teams. On April 5, 2005,
he discharged what he contends was a toy gun at
one or more students in the parking lot of the High
School after school had been dismissed for the day.
Following an investigation, Principal Monte
Munsinger ("Munsinger") determined that the gun

was not a toy, but rather a look-alike weapon, which
fired small plastic BBs, and gave A.C. a ten-day
academic suspension. The Athletic Council
subsequently made a similar finding and imposed a
365-day suspension from all extracurricular athletic
activities. Both Munsinger and the Athletic Council
found that A.C.'s possession and use of the
look-alike weapon constituted Gross Misconduct
under the Student Handbook.

Plaintiffs bring this litigation claiming that A.C.'s
due process rights were violated by the actions of
the Defendant. Plaintiffs have now filed a Motion
for Preliminary Injunctive Relief, asking the Court
to enjoin Defendant from enforcing A.C.'s 365-day
athletic suspension withholding his right to
participate in school athletics. On Monday,
December 19, 2005, the Court held an evidentiary
hearing on the Motion during which several
witnesses testified and numerous exhibits were
introduced. This Order follows.

DISCUSSION

In this circuit, injunctive relief is warranted if the
movant can make a threshold showing: (1) that the
movant has some likelihood of success on the
merits of the underlying litigation; (2) that no
adequate remedy at law exists; and (3) that the
movant will suffer irreparable harm if the injunction
is not granted. *Ty. Inc. v. Jones Group,* 237 F.3d
891, 895 (7th Cir.2001). If these three conditions
are met, then the Court must balance the harm to the
movant if the injunction is not issued against the
harm to the defendant if it is issued improvidently
and consider the interest of the public in whether
the injunction is to be granted or denied. *Id.; see
also, Duct-O-Wire Co. v. U.S. Crane, Inc.,* 31 F.3d
506, 509 (7th Cir.1994); *Storck USA, L.P. v. Farley
Candy Co.,* 14 F.3d 311, 314-15 (7th Cir.1994);
*Abbott Laboratories v. Mead Johnson & Co.,* 971
F.2d 6, 11-12 (7th Cir.1992). The Court then sits as
a court of equity, weighing all these factors and
employing a sliding-scale approach. *Id.* That is, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 2

Not Reported in F.Supp.2d, 2005 WL 3560658 (C.D.Ill.)

(Cite as: 2005 WL 3560658 (C.D.Ill.))

more likely the plaintiff's chance of success on the merits, the less the balance of harms need weigh in its favor." *Id.*

Here, the Court need look no further than the first element of the test, as the Court finds that the record presented in this case does not establish that Plaintiffs have some likelihood of success on the merits of the underlying litigation. The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV § 1. A procedural due process claim against government officials requires proof of inadequate procedures and interference with a liberty or property interest. *Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 82, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). Thus, in order to have any likelihood of success on a procedural due process claim, Plaintiffs must demonstrate that they have a protectable property or liberty interest at stake. Such interests are "are not created by the Constitution. Rather, they are created and their dimensions defined by an independent source such as state statutes or rules entitling the citizen to certain benefits." *Goss v. Lopez,* 419 U.S. 565, 572-73, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), *citing Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**\*2** Plaintiffs contend that A.C. has a protectable property interest in continued participation in the athletic program and prospects for college scholarships attendant to such participation. In *Roth,* the Supreme Court clarified the parameters of a protectable property interest in the educational setting:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

408 U.S. at 577. Given this definition, courts in other jurisdictions have repeatedly held that there is no protectable property or liberty interest in participating in interscholastic athletics. *Hamilton v. Tennessee Secondary School Athletic Association,* 552 F.2d 681, 682 (6th Cir.1976), *citing Mitchell v.*

*Louisiana High School Athletic Association,* 430 F.2d 1155, 1157- 58 (5th Cir.1970) (finding that the privilege of participating in interscholastic athletics falls outside the protection of due process); *Hebert v. Ventetuolo,* 638 F.2d 5, 6 (1st Cir.1981) (finding that since there is no property right to play interscholastic sports, there is no constitutional entitlement to any process whatsoever); *Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, (9th Cir.1981); *Poling v. Murphy,* 872 F.2d 757, 764 (6th Cir.1989); *U.S. ex rel. Missouri State High School Activities Assn.,* 682 F.2d 147, 153 (8th Cir.1982); *Burrows v. Ohio High School Athletic Assn.,* 891 F.2d 122 (6th Cir.1989); *Smith v. Chippewa Falls Area Unified School District,* 302 F.Supp.2d 953, 957 (W.D.Wis.2002) (noting that the preponderance of federal district courts considering the question have held that the opportunity to participate in extracurricular activities is not a protected property interest). Similarly, the Illinois courts have noted that "[s]tudents can need, want, and expect to participate in interscholastic athletics, but students are not entitled to participate in them" in holding that participation in athletics does not rise to the level of a protected interest. *Jordan v. O'Fallon Township High School Dist. No. 203 Board of Education,* 302 Ill.App.3d 1070, 235 Ill.Dec. 877, 706 N.E.2d 137, 140 (1999); *Clements v. Board of Education of Decatur Public School Dist. No. 61,* 133 Ill.App.3d 531, 88 Ill.Dec. 601, 478 N.E.2d 1209, 1210 (1985).

In support of their argument that they have a protectable property interest, Plaintiffs primarily rely on two related decisions in *Butler v. Oak Creek-Franklin School District,* 116 F .Supp.2d 1038 (E.D.Wis.2000), and 172 F.Supp.2d 1102 (E.D.Wis.2001). With all due respect, these decisions are non-binding precedent that the Court finds to be readily distinguishable. As previously noted, a property interest is derived from an independent source such as state statutes or rules granting an entitlement to benefits. *Goss,* 419 U.S. at 572-73. Such was the case in *Butler,* where the district court found that the school's student handbook, the school's Athletic Code, the rules of the Wisconsin Interscholastic Athletic Association, a state attorney general's opinion, and two state laws

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 3560658 (C.D.Ill.)

(Cite as: 2005 WL 3560658 (C.D.Ill.))

combined to provide the student's entitlement to continued athletic participation. 172 F.Supp.2d at 1110. Plaintiffs have not cited, and the Court is otherwise unaware of, any analogous laws, opinions, or rules existing in the state of Illinois that could serve as the source of an entitlement. To the contrary, it would appear that Illinois courts have taken the position that there is no such rule or regulation. *See Jordan,* 302 Ill.App.3d at 1076, 235 Ill.Dec. 877, 706 N.E.2d 137 (finding that "[f]ootball is neither an integral part of a quality education nor a requirement under any rule or regulation governing education in this State.... Simply put, playing high school football is a privilege rather than a right." Thus, the Court must reject the suggestion that the decision in *Butler* properly supports Plaintiffs' position in this case.

*3 While the Seventh Circuit has not expressly addressed this issue, two opinions involving related issues provide some indication of how the Court of Appeals might rule if it were to consider this question directly. In *Schaill v. Tippecanoe County School Corp.,* 864 F.2d 1309, 1323 (7th Cir.1988), the Seventh Circuit relied on the First Circuit's decision in *Hebert* in noting "that there is room for doubt whether a student has a constitutionally protected liberty interest in being free of the potential stigma associated with removal from an athletic team." In *Todd v. Rush County Schools,* 133 F.3d 984, 986 (7th Cir.1998), the Court of Appeals also suggested that extracurricular activities, such as athletics, are only a privilege rather than a right. Accordingly, the Court finds that the Court of Appeals would likely follow the existing persuasive precedent cited above and hold that participation in interscholastic sports does not implicate any protectable liberty or property interest.

The Court therefore concludes that Plaintiffs have failed to demonstrate that they have any protectable liberty or property interest in continued participation in school athletics. Having so found, the Court need not go on to consider to what process Plaintiffs would have been entitled or whether the process that was provided was sufficient.

Even assuming *arguendo* that continued participation in interscholastic sports could rise to the level of a protectable property interest in Illinois, on the record before the Court, it would appear that Plaintiffs received constitutionally adequate process with respect to the 365-day athletic suspension that was imposed. In *Goss,* the Supreme Court clarified that a student given a suspension for disciplinary infractions was entitled to "oral or written notice of the charges against him, and if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581. These procedures need only be "rudimentary", amounting to "an informal give-and-take between student and disciplinarian." *Id.* at 584. A hearing is adequate even if it is conducted before a disciplinarian who "himself has witnessed the conduct forming the basis for the charge." *Id.*

While the version of the April 5, 2005, incident testified to by A.C. during the hearing is somewhat inconsistent with the statement that he gave to Munsinger, as reflected in Munsinger's investigation summary, the material procedural details are essentially undisputed. The evidence produced during the evidentiary hearing indicated that A.C. and/or his mother had multiple oral conversations with school officials regarding the nature of the charges against him, as well as the possible penalties at stake. [FN1] In a letter dated April 25, 2005, Plaintiffs received written notice that the Athletic Council would convene a meeting on April 29, 2005, to consider possible disciplinary action against A.C. During this meeting, the Plaintiffs requested a postponement of the hearing to allow the coach of A.C.'s current sport to be present, and the request was granted. On May 3, 2005, the Athletic Council convened. Munsinger made a presentation regarding the results of his investigation into the facts of the April 5, 2005, incident, including the basis for his conclusion that the gun was a look-alike weapon. Based on the information presented both to the Athletic Council and during the evidentiary hearing before this Court, it is clear that the gun possessed by A.C. was fairly characterized as a look-alike weapon. Plaintiffs were given the opportunity at the Athletic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3560658 (C.D.Ill.)

**(Cite as: 2005 WL 3560658 (C.D.Ill.))**

Council hearing to ask questions and present evidence on their own behalf and did in fact argue that the weapon was not a look-alike and that A.C.'s actions did not rise to the level of gross misconduct. The Athletic Council then deliberated and issued its decision to impose the 365-day athletic suspension. Such process clearly satisfies the requirements of *Goss.*

> FN1. The Court notes that there was evidence presented with respect to oral and written communications between A.C.'s attorney and the School District regarding an agreed settlement of the disciplinary action. Although A.C. and his parents believed that this was a global settlement, the School District viewed the settlement as resolving only the question of academic discipline, not the issue of suspension from extracurricular activities. This appears to have been a good faith misunderstanding that has no bearing on the outcome of the present Motion.

*\*4* It is interesting to note that, while Plaintiffs have consistently challenged the finding by the Athletic Council that the item discharged in the parking lot was a look-alike weapon rather than simply a toy gun, at no time have they offered pictures showing an item different from the pictures of the obvious look-alike weapon which Munsinger obtained from advertisements on the Airsoft website. Said pictures were identified by students who were witnesses to the incident. The gun itself was not available because A.C.'s father, upon learning of the incident, burned it in the firepit.

Parenthetically, the Court would note that the process, while constitutionally adequate, was not perfect. There is evidence in the record that on April 21, 2005, the Board of Education announced that A.C. would receive a 365-day athletic suspension after hearing testimony in executive session from only one side of the incident and without any opportunity to participate by Plaintiffs, who had been told that A.C.'s situation was not on the agenda for that meeting. Even though it is not outcome determinative, if true, this would seem to

be a fundamental breach of fairness by the Board of Education. There was also evidence indicating that this was the first and only time that the Board of Education had ever made a recommendation to the Athletic Council as to what its decision should be and that Munsinger, who investigated and imposed the academic suspension, served as the "prosecutor" before the Academic Council and asked whether any Council member disagreed with the recommendation of the Board. While this may in part be explained by the fact that this was also the first time that the Board had encountered a perceived weapons violation and the coach who testified during our court hearing stated that he would have reached the same conclusion even without the recommendation from the Board, these facts are nevertheless suggestive of an unnecessarily aggressive involvement by the Board. That is especially true in view of the fact that the School District's Student Handbook appears to contemplate that the Athletic Council will act independently of any academic discipline imposed by the principal and the School Board.

Thus, the Court must conclude that Plaintiffs have not demonstrated a likelihood of success on the merits of their due process claim with respect to the 365-day athletic suspension. Accordingly, their request for preliminary injunctive relief must be denied.

*CONCLUSION*

For the reasons set forth above, Plaintiffs' Motion for Preliminary Injunctive Relief [# 4] is DENIED, first because Plaintiffs have not established a protectable liberty or property interest giving rise to a cognizable Due Process Claim, and second because this record does not support a finding of a reasonable likelihood of success on the merits of a Due Process Claim. This matter is REFERRED to Magistrate Judge Gorman for further proceedings.

Not Reported in F.Supp.2d, 2005 WL 3560658 (C.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 4:05cv04092 (Docket) (Nov. 21, 2005)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.